FILED
August 29, 2008
CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
0001386643

[51]

1   Dean M. Gloster (SBN 109313)
        (dgloster@fbm.com)
2   Kelly A. Woodruff (SBN 160235)
        (kwoodruff@fbm.com)
3   Monica M. Swanson (SBN 233265)
        (mswanson@fbm.com)
4   FARELLA BRAUN & MARTEL LLP
    235 Montgomery Street, 17th Floor
5   San Francisco, CA  94104
    Telephone:  (415) 954-4400
6   Facsimile:  (415) 954-4480

7   Attorneys for Creditors
    International Association of Firefighters, Local 1186
8   ("IAFF"); Vallejo Police Officers' Association
    ("VPOA"); and International Brotherhood of
9   Electrical Workers, Local 2376 ("IBEW")

10              UNITED STATES BANKRUPTCY COURT

11              EASTERN DISTRICT OF CALIFORNIA

12                   SACRAMENTO DIVISION

13   In re:                          | Case No. 2008-26813 (MSM)

14   CITY OF VALLEJO, CALIFORNIA,    | OHS-1

15              Debtor.              | Chapter 9

16                                   | **INTERNATIONAL ASSOCIATION OF**
                                     | **FIREFIGHTERS', LOCAL 1186, VALLEJO**
17                                   | **POLICE OFFICERS' ASSOCIATION'S,**
                                     | **AND INTERNATIONAL BROTHERHOOD**
18                                   | **OF ELECTRICAL WORKERS', LOCAL**
                                     | **2376 (COLLECTIVELY "UNIONS")**
19                                   | **[PROPOSED] FINDINGS OF FACT AND**
                                     | **CONCLUSIONS OF LAW REGARDING**
20                                   | **OBJECTION TO DEBTOR'S**
                                     | **BANKRUPTCY PETITION AND**
21                                   | **STATEMENT OF QUALIFICATIONS**
                                     | **UNDER SECTION 109(c)**
22
23
                                     | **Date:    July 23, 2008**
24                                   | **Time:    1:30 p.m.**
                                     | **Dept:    A**
25                                   | **Judge:   Hon. Michael McManus**
26
27
28

Farella Braun & Martel LLP
235 Montgomery Street
San Francisco, CA 94104
(415) 954-4400

UNIONS' PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW - Case No. 08-26813 MSM

- 1 -

23085\1692801.3

1    The International Association of Firefighters, Local 1186 ("IAFF"), Vallejo Police

2    Officers' Association ("VPOA"), and International Brotherhood of Electrical Workers, Local

3    2376 ("IBEW") (collectively, the "Unions") hereby submit their Proposed Findings of Fact and

4    Conclusions of Law regarding their objection to the City of Vallejo's ("City" or "Vallejo") claim

5    that it is eligible for bankruptcy under Bankruptcy Code, 11 U.S.C. § 109(c),[1] and that it filed its

6    bankruptcy petition in good faith as required by Section 921(c).

7    **I.**    **INTRODUCTION**

8        On May 23, 2008, Vallejo filed a petition for bankruptcy under Chapter 9 of the Code.

9    [Docket No. 1.]  It contemporaneously filed a Statement of Qualifications under Section 109(c)

10    and a Memorandum of Law in support of its Statement of Qualifications ("Memorandum").

11    [Docket No. 4.]  This Court set a June 27 deadline for interested parties to file objections to the

12    petition and to Vallejo's Memorandum.  On June 27, the Unions' filed their Objection To

13    Debtor's Bankruptcy Petition And Statement Of Qualifications Under Section 109(c) (the

14    "Objection").  [Docket No. 36.]  The City filed its Reply memorandum ("Reply") on July 18.

15        The Court set an expedited discovery schedule, allowing the parties to request documents

16    and take depositions between June 30 and July 22.  The Court also set an evidentiary hearing

17    commencing on July 23 and following the Court's Alternative Direct Testimony rules, which

18    require the parties to submit their direct testimony in the form of declarations and to make

19    available for cross-examination each witness whose declaration is being offered.  The City

20    presented its evidence through Susan Mayer, Vallejo's Assistant Finance Director; Craig

21    Whittom, Vallejo's Assistant City Manager/Community Development Director; Jon Oiler,

22    Vallejo's Auditor/Controller; and Cecilia Valente, an officer of Union Bank.  The Unions

23    presented additional evidence through Roger Mialocq, a principal with consulting firm Harvey M.

24    Rose Associates, LLC.  Hearings were held on July 23, 24 and 25, and August 5, 7, 8, 19, 21 and

25    22.

26

27    _____

28    [1] All further references to "Section" or "Code" are references to the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*

Farella Braun & Martel LLP
235 Montgomery Street
San Francisco, CA 94104
(415) 954-4400

UNIONS' PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW - Case No. 08-26813 MSM                - 2 -                23085\1692801.3

1    Based on the Court's evaluation of the evidence at trial and the parties' submissions, the

2    Court now enters the following Findings of Fact and Conclusions of Law.

3    ## II.    FINDINGS OF FACT

4    ### A.    The Parties

5    1.    Vallejo is a political subdivision of the State of California and is a

6    municipality within the meaning of Section 101(40).

7    2.    IAFF is a labor association representing Vallejo firefighters and is a party

8    to a collective bargaining agreement with the City that expires June 30, 2010.

9    3.    VPOA is a labor association representing Vallejo police officers and is a

10    party to a collective bargaining agreement with the City that expires June 30, 2010.

11    4.    IBEW is a labor association representing miscellaneous non-management

12    employees of Vallejo and is a party to a collective bargaining agreement with the City that

13    expires June 30, 2010.

14    ### B.    The City's Financial Situation

15    5.    The City's fiscal year runs from July 1 through June 30 of each year.

16    6.    The City's audited financial statements are reported annually in a

17    Comprehensive Annual Financial Report ("CAFR").  (7/23/08 Tr. at 23:7-12.)

18    #### Fiscal Year 2006

19    7.    The City's 2006 CAFR (for fiscal year ended June 30, 2006) reported

20    $1,013.4 million in total assets and $637.9 million in net assets in excess of liabilities.  (Trial Ex.

21    EE at 15.)

22    8.    The City's 2006 CAFR reported a total governmental fund balance of

23    $147.31 million and a General Fund balance of $10.86 million at the end of the fiscal year.  (Trial

24    Ex. EE at 18.)

25    9.    At the end of fiscal year 2006, the City reported $2.6 million in advances

26    from the General Fund to the Transportation Fund and $8.8 million in advances from the General

27    Fund to the Redevelopment Agency ("RDA") that were booked as transfers due to uncertainties

28    in the timing of repayment.  (Trial Ex. EE at 53.)

Farella Braun & Martel LLP
235 Montgomery Street
San Francisco, CA 94104
(415) 954-4400

UNIONS' PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW - Case No. 08-26813 MSM

- 3 -

23085\1692801.3

**Fiscal Year 2007**

10.     The City's 2007 CAFR (for fiscal year ended June 30, 2007) reported $983.0 million in total assets and $624.5 million in net assets in excess of liabilities at the end of the fiscal year. (Trial Ex. J at 13.)

11.     The City's 2007 CAFR reported a total governmental fund balance of $123.59 million and a General Fund balance of $7.02 million. (Trial Ex. J at 17.)

12.     At the end of fiscal year 2007, the City reported $3.1 million in advances from the General Fund to the Transportation Fund and $9.2 million in advances from the General Fund to the RDA that were booked as transfers due to uncertainties in the timing of repayment. (Trial Ex. J at 52-53.)

**Fiscal Year 2008**

13.     The City's fiscal year 2008 budget was premised on the City winning a staffing arbitration with the IAFF. (Trial Ex. J at vii; Ex. 1-H at 2-3.)

14.     The City lost the staffing arbitration, requiring the City to maintain a firefighter shift staffing level of 28. (Trial Ex. O.) The arbitrator found that the lower staffing levels being proposed by the City would adversely affect safety and workload of firefighters. (*Id.* at 46.)

15.     The fiscal year 2008 budget reflected financial difficulties, including overly optimistic budgeting savings in the prior year; a slowing of the housing market; and worse than expected Transportation Fund deficits. (Trial Ex. Y at ii-vii.)

16.     A midyear evaluation showed a "worsening" situation and reported that fiscal year 2007-08 revenues were projected at almost $5 million less than assumed when the budget was adopted. (Trial Ex. 1-E at 2-3.)

17.     The City has not yet issued its 2008 CAFR. (7/23/08 Tr. at 23:7-12; 8/5/08 Tr. at 213:2-214:6.) Its March 11, 2008 amended budget, however, projected a $4.2 million operating deficit for an ending available balance of $0. (Trial Ex. K at D-2.) Ms. Mayer testified that the Finance Department was projecting fiscal year 2008 to come in at budget. (8/5/08 Tr. at 214:7-14.)

Farella Braun & Martel LLP
235 Montgomery Street
San Francisco, CA 94104
(415) 954-4400

Unions' Proposed Findings of Fact and
Conclusions of Law - Case No. 08-26813 MSM

- 4 -

23085\1692801.3

1

**C.     Fiscal Year 2009 And Budget Projections**

2

18.     Other than its debts to the Unions and some penalty invoices from Union

3

Bank, the City is current on its contractual obligations. (Trial Ex. 5-B; 7/23/08 Tr. at 131:13-

4

132:2.)

5

19.     Vallejo submitted a General Fund Balance Projection with its petition,

6

showing two different scenarios as the basis for its bankruptcy: one projecting a $16,989,015

7

deficit for fiscal year 2008/09 and the other projecting a $10,701,380 deficit for fiscal year

8

2008/09. (Trial Ex. 1-C; 7/23/08 Tr. at 96:4-16.)  The first scenario was shown in Column A of

9

Trial Ex. 1-C, and the second scenario was shown in Column B of Trial Ex. 1-C.

10

**Fiscal Year 2009 Revenues**

11

20.     The second scenario, Column B, accounted for a $1 million one-time

12

transfer from the Insurance Fund to the General Fund and an additional $400,000 repayment from

13

the RDA to the General Fund. (7/23/08 Tr. at 99:5-16.)  The City Council has authorized this

14

additional $1.4 million in revenue in the 2008/09 adopted budget. (*Id.* at 105:6-9; Trial Ex. K at

15

iv & viii.)[2]

16

21.     Neither projection includes payments for state-mandated SB 90 claims that

17

Ms. Mayer testified were being filed for fiscal years 2006/07 and 2007/08. (8/5/08 Tr. at 136:8-

18

16.)[3]  The City estimates annual SB 90 reimbursements at $200,000, (Trial Ex. 15 at 3), however,

19

a 10% late penalty will apply to the 2006/07 claim. (8/21/08 ROUGH Tr. at 91:20-24.)  Mr.

20

Mialocq testified that after 2004, there was a change in the law on the reimbursement of SB 90

21

claims, and the State is now required (1) to pay claims for 2005 and later years promptly and (2)

22

to pay claims for years before 2005 over fifteen years with interest. (8/22/08 ROUGH Tr. at

23

12:3-24.)  An additional $507,891 is still due and owing from the State and is collecting interest.

24

(Trial Ex. FF; 8/5/08 Tr. at 137:18-21.)

25

26

[2] While Trial Ex. K is the 2008/09 proposed budget, Ms. Mayer testified that the proposed budget was adopted without changes.  (7/24/08 Tr. at 112:16-113:15.)

27

[3] California state law requires the state to reimburse local governments for the costs of complying

28

with state-mandated services and has authorized cities to file claims for reimbursement of certain of these services, pursuant to California Constitution, Article XIIIB.

Farella Braun & Martel LLP
235 Montgomery Street
San Francisco, CA 94104
(415) 954-4400

UNIONS' PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW - Case No. 08-26813 MSM          - 5 -          23085\1692801.3

22.     Neither projection includes the additional $518,301 of program revenues that was included in the 2008/09 adopted budget. (Comparing Ex. 1-C to Ex. K at D-2.)

23.     Vallejo's revenue projections assume $1.0 million of unidentified revenue losses from the State, and include no new revenues sources other than the one-time $1.4 million transfer and repayment included in Column B. (Trial Ex. 1-C.)

**Fiscal Year 2009 Non-Labor Expenditures**

24.     The second scenario, Column B, accounted for various program reductions that the City could implement. (Trial Ex. 1-C; 7/23/08 Tr. at 96:4-15.)

25.     While the first scenario, Column A, presented full funding of vehicle maintenance and replacement operations at $4,729,896, the second scenario, Column B, showed reduced contributions of $3,104,896. (7/23/08 Tr. at 106:23-109:21.) City Council has authority to reduce funding for vehicles, (*id.* at 111:17-20), and ultimately budgeted $2,366,871 to vehicle maintenance and replacements in 2008/09. (Trial Ex. K at D-2.)

26.     Column A also projected $1.6 million in contributions to other agencies, which is a discretionary expense. (7/23/08 Tr. at 113:10-21.) In its adopted budget, the City reduced the amount to $750,000. (*Id.* at 113:22-114:1.)

27.     Both scenarios also project $3.03 million in debt service obligations, based on a 9% interest rate. (*Id.* at 114:18-22; 117:6-9.) Ms. Mayer testified that the City projected 9% interest based on the advice of bond counsel and legal and financial experts. (*Id.* at 129:18-25; 7/24/08 Tr. at 7:11-25, 9:19-10:9.) She did not review the bond indenture documents. (7/23/08 Tr. at 119:2-5). Ms. Mayer testified that the 9% was also based in part on the City's potential default given its deteriorated credit. (*Id.* at 120:12-23; Trial Ex. 5 at ¶ 28.) As noted above, however, the City has not defaulted. (Trial Ex. 5-B; 7/23/08 Tr. at 131:13-132:2.)

28.     In the two years prior to the bankruptcy filing , the average interest rate on General Fund secured bonds ranged from approximately 3% to approximately 4.2%. (Trial. Ex. F; 7/24/08 Tr. at 17:16-18:6.) The interest rates the City experienced in May and June 2008 were between 5% and 6%. (*Id.* at 18:7-19:8; Trial Ex. 5 at ¶ 28.) In its pendency plan, effective July 1, 2008, the City capped its debt service at 6%. (*Id.*; Trial Ex. 5-B.) Accordingly, the City has

Parella Braun & Martel LLP
235 Montgomery Street
San Francisco, CA  94104
(415) 954-4400

UNIONS' PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW - Case No. 08-26813 MSM

- 6 -

23085\1692801.3

1  not had to pay interest at over 6%. And the City presented no evidence to show that it will have

2  to pay interest at over 6%.

3         29.    Use of a 6% as opposed to a 9% interest rate in the fund balance

4  projections results in an $812,000 savings. (7/24/08 Tr. at 19:14-18; Trial Ex. 1-B at 29.)

5         30.    The City's General Fund currently secures approximately $50 million of

6  variable rate bonds. (Trial Ex. 5-B at 4.) Much of this amount is the obligation of other funds of

7  the City, but the General Fund is responsible if the other funds do not repay the obligations.

8  (7/23/08 Tr. at 115:3-12; 7/24/08 Tr. at 24:24-25:2.) As of July 2008, Union Bank, the City's

9  Letter of Credit provider for approximately $47 million of those variable rate bonds invoked a

10  mandatory tender of all its bonds, by tender advance, paying those bonds. (Trial Ex. 5 at ¶ 28;

11  7/24/08 Tr. at 15:17-22.) The bond document in evidence, the Reimbursement Agreement

12  between the City and Union Bank, provides that in the event of such a tender, interest is then due

13  and to be paid at the "Draw Rate" (Trial Ex. G at 14, § 2.06), which is defined as the "Reference

14  Rate" declared by Union Bank from time to time plus 1%. (Trial Ex G at 5.) "Reference Rate" is

15  Union Bank's reference rate declared from time to time (Trial Ex. G at 9), and is currently 5%.

16  (Trial Ex. H; 7/23/08 Tr. at 126:2-20.) Only in the event interest "is not paid on Tender Advances

17  when due and payable" at the Draw Rate of 6%, is the City obligated instead to pay interest

18  instead at the "Default Rate." (Trial Ex. G. at 14, § 2.06.) The "Default Rate" is defined as the

19  Reference Rate plus 3%. (Trial Ex. G at 5.)

20         31.    The Reimbursement Agreement provides that the City is obligated to pay

21  the attorneys' fees of Union Bank in connection with this matter. (Trial Ex. G at 45-46.)

22                        **Fiscal Year 2009 Labor Expenditures**

23         32.    Both of the City's General Fund projection scenarios assumed full

24  obligations under the City's union contracts. (Trial Ex. 1-C.) While Column A assumes salaries

25  and benefits for 134 police officers, Column B assumes salaries and benefits for 124 officers to

26  reflect attrition in the police department, thereby dropping projected police expenditures from

27  $30.5 million to $28.5 million. (*Id.;* 7/24/08 Tr. at 32:14-19.) Column B also drops expenditures

28  by $500,000 based on vacancies. (Trial Ex. 1-C; 8/5/08 Tr. at 54:25-55:13.)

Farella Braun & Martel LLP
235 Montgomery Street
San Francisco, CA 94104
(415) 954-4400

UNIONS' PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW - Case No. 08-26813 MSM

- 7 -

23085\1692801.3

33.     As will be discussed more below, the Unions offered salary cuts and other contract modifications in the months leading up to the bankruptcy.  A General Fund balance projection prepared on June 6, 2008, which was based on the concessions offered by the public safety workers, showed a salary expenditure savings of over $12 million and a General Fund positive balance of $1 million.  (Trial Ex. K at D-2, Column C.)  The positive General Fund balance would have been even higher had the projection accounted for a three percent salary reduction in the form of a work furlough offered by IBEW workers.  (7/24/08 Tr. at 55:6-19; 8/5/08 Tr. at 59:4-11.)

34.     Ms. Mayer testified that Trial Ex. K at D-2, which was excerpted and shown to her as Trial Ex. E, did not project cost savings under the Unions' offer if a 6.5% salary cut was restored on March 1, 2009 as opposed to July 1, 2009.  A separate projection prepared by Ms. Mayer, (Trial Ex. X), showed that a March 1, 2009 restoration would result in an additional $400,000 for police and an additional $400,000 for fire, still allowing the City to stay within budget.  (8/5/08 Tr. at 58:15-59:3.)  Both Ms. Mayer and Mr. Whittom testified that the Unions offered to extend the 6.5% restoration to July 1, 2009 if the City could not afford the restoration on March 1.  (7/24/08 Tr. at 65:20-25; 7/25/08 Tr. at 24:11-15.)  Exhibit X also showed that the 3% work furlough offered by IBEW workers resulted in slightly over $200,000 in cost savings. (comparing Trial Ex. X to Trial Ex. K at D-2.)

35.     Finally, the City's projected 2008/09 contract rates for VPOA and IAFF salaries assume a 5.5% cost of living adjustment ("COLA").  (Trial Ex. 2-A; 7/23/08 Tr. at 97:1-5; 7/25/08 Tr. at 17:2-3.)  The actual COLA will not be known until the late spring of 2009 when all of Vallejo's 14 comparison agencies complete their collective bargaining negotiations.  (Trial Ex. 2 at ¶ 9.)  At the time of Vallejo's bankruptcy filing, however, eleven of the 14 agencies had determined their 2008-09 salary increases (*id.*), and Vallejo calculated a 4% COLA based on the 11 agencies that had acted.  (*Id.* at fn. 2.)  The City presented no evidence that the 2008/09 COLA will be 5.5%.  The City presented no evidence that the cumulative impact of the 3 comparison agencies that had not yet reported would or even could increase the actual 2008/09 COLA to a rate significantly higher than 4%.

Farella Braun & Martel LLP
235 Montgomery Street
San Francisco, CA 94104
(415) 954-4400

UNIONS' PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW - Case No. 08-26813 MSM

- 8 -

23085\1692801.3

36.    A sensitivity analysis performed by City staff showed that in the 2008/09

fiscal year, a 1% salary increase for police and fire, would result in $383,000 of additional costs

to the City. (*Id.* at ¶10.) This analysis was done using reduced interim agreement salaries as

opposed to the higher 2008/09 contract salaries. (*Id.*) A 1% salary increase under the contract

rates would be even higher than $383,000, meaning a 1% decrease under the contract rates would

save the City more than $383,000. (Tr. 7/25/08 at 19:11-20:9.) Accordingly, if the actual

2008/09 COLA is closer to 4% as opposed to 5.5%, the City's labor costs for 2008/09 will be

over half a million dollars lower than projected.

### D.    Available Fund Transfers, Loan Repayments, and Reimbursements

37.    There are also some opportunities for the City to repay loans from the

General Fund to other funds or agencies or to transfer to or reimburse the General Fund for prior

advances or transfers. The 2007 CAFR notes that the Redevelopment Agency owes the General

Fund almost $9.2 million. (Trial Ex. J at 53.)

38.    The 2008-09 adopted budget also discloses almost $2.3 million in prior

"General Fund transfers" to the Insurance Fund, recorded as revenue of the Insurance Fund in

fiscal years 2005 and 2006. (Trial Ex. K at H-3.) Ms. Mayer testified that these were "equity

transfers." (8/5/08 Tr. at 153:18-154:5.)

39.    The adopted 2008-09 budget notes that the General Fund has made almost

$3.2 million in contributions in fiscal years 2006-2008 to the Local Transportation Fund. (Trial

Ex K at E-5.) The CAFR for 2007 notes that the "contributions" for 2006 and 2007—almost $3.1

million of the total—were advances booked as transfers because "the ultimate repayment date of

the advances [was] uncertain." (Trial Ex. J at 52.)

40.    In addition to the almost $9.2 million still owed by the Redevelopment

Agency as disclosed in the 2007 CAFR, in fiscal year 1994 the City wrote off substantial amounts

owed by the Redevelopment Agency to the City. (Trial Exs. U-F, GG at 27, HH at 2.) There is

conflicting evidence on whether a portion of the written off debt was simply "forgiven" as

described in the 1994 CAFR (Trial Exs. U-F, GG at 27) or was in connection with a transfer of a

capital asset to the City as "eliminating amounts related [sic] infrastructure improvements."

Farella Braun & Martel LLP
235 Montgomery Street
San Francisco, CA 94104
(415) 954-4400

Unions' Proposed Findings of Fact and
Conclusions of Law - Case No. 08-26813 MSM

- 9 -

23085\1692801.3

1   (Trial Ex. HH at 2.)  In any event, a large portion of the write off was a retroactive change of the

2   interest rate on the outstanding debt from 10% to 4%, and that this was done "as a result of

3   Council concerns regarding the ability of the project areas to repay the advances." (Trial Exs. U-

4   F, GG at 27.)  The amount of debt forgiven through the retroactive reduction to the interest rate

5   alone was over $2.2 million. (*Id.*)  The amount of interest forgiven for the Flosden

6   redevelopment area alone was over $196,000 (Trial Ex. HH at 2), a number which would have

7   grown substantially if it had continued to bear interest for the last 14 years.

8           41.    The Redevelopment Agency has substantial ability to pay back a portion of

9   the almost $9.2 million it owes to the General Fund: out of the almost $12.2 million in funds it

10  had in May 2008 (Trial Ex. 1-A at 3) or out of a portion of the $15.2 million in notes and loans

11  receivable it holds. (Trial Ex. J at 55.)  Ms. Mayer testified, in connection with a discussion of

12  the debt forgiveness in 1994, that the City Council can transfer assets to the general fund in

13  satisfaction of debt. (8/5/08 ROUGH Tr. at 170:7-11, 172:11-13; see also 8/19/08 Tr. at 50:20-

14  23, Mr. Whittom testifying that City Council runs the RDA.)

15          42.    The Insurance Fund has substantial current assets, in the form of cash,

16  investments, and short term advances receivable from other funds.  (Trial Ex. J at 113, listing $9.5

17  million in current assets.)  Against the $9.5 million in current Insurance Fund assets disclosed in

18  the latest CAFR, the Insurance Fund has substantial long-term liabilities, for future claims, but

19  only $3.3 million in current liabilities. (*Id.*)  Mr. Mialocq testified that the City could terminate

20  the Insurance Fund, like other cities do, in favor of a "pay as you go" system of paying only the

21  current liabilities instead of setting aside funds for future liabilities not yet due, and could

22  distribute out the bulk of the funds freed up to the General Fund. (8/21/08 ROUGH Tr. at 105:9-

23  106:10.)  Even apart from dissolving the Insurance Fund or repaying from it the prior $2.3 million

24  in transfers from the General Fund, Mr. Mialocq testified that the Insurance Fund could also make

25  a three year loan to the General Fund. (*Id.* at 101:4-25.)  The City already uses the Insurance

26  Fund to make loans to numerous other funds "with short-term cash deficits." (Trial Ex. 1-B at 12;

27  *see also* Trial Ex. J at 52, showing $3.5 million in short-term lending from the Insurance Fund to

28  other funds at the end of fiscal year 2006/07.)

Farella Braun & Martel LLP
235 Montgomery Street
San Francisco, CA  94104
(415) 954-4400

UNIONS' PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW - Case No. 08-26813 MSM

- 10 -

23085\1692801.3

43. The Local Transportation Fund could also repay a portion of the $3.2 million it owes to the General Fund. (Trial Ex. K at E-5.) According to the adopted 2008-9 Budget, the Local Transportation Fund has bought over $18 million in capital assets in the last 4 years alone (*id.*), and actually spent over $13 million in fiscal year 2008 on capital improvements, twenty times what it spent the year before and five times what it spent in 2006, a year with large deficits. (*Id.*) Ms. Mayer testified that the Local Transportation Fund "cannot run at a profit" and continues to receive grants (8/5/08 Tr. at 150:11-25), but that objection does not prevent the fund from repaying debts to the General Fund. First, according to the latest published CAFRs, the Local Transportation Fund routinely pays back borrowings from the Insurance Fund (Trial Ex. EE at 52, $1.6 M interfund loan balance; Trial Ex. J at 52, $298k interfund loan balance; *see also* fund balances as of May 2008, Trial Ex. 1-K, fund 420 at p. 3 and fund 505 at p. 3.) Second, the Local Transportation Fund already repaid $300,000 to the General Fund in the 2007-08 fiscal year. (*See* Trial Exs. 1-B at 11 of 17 and 1-I at 6 of 9 "Transfer of eligible one-time funds to the General Fund" Transportation -- $300,000.) Finally, Vallejo's own Draft Fiscal Emergency Plan shows that the Local Transportation Fund is still pursuing grants from the Water Emergency Transportation Agency to pay back its loans (Trial Exs. 1-I at 30, 1-J at 9), and is considering a ferry parking fee to pay back its loans. (Trial Ex. 1-I at 30.)

44. The City could also reinstate a portion of the loans forgiven in 1994, and repay at least the forgiven interest with respect to the Flosden redevelopment area immediately, which with 14 years of accrued interest at the original 10% rate, might be approximately $700,000. The Harvey Rose Report recommended that Vallejo reinstate the forgiven debt to the extent that the redevelopment areas now have the ability to repay. (Trial Ex. U-B at 13.) The Flosden redevelopment area now does have an ability to repay its share of the forgiven interest. The City's latest fund balance figures showed that in May 2008, the Flosden Area Capital Fund had $6.1 million in cash, all held by the fund, and none by trustees. (Trial Ex. 1-K at 3.) The Flosden area generates $1.8 million in tax revenue annually, with no debt service obligations. (Trial Ex. K at F-8 and F-9.) The Flosden capital fund has $1.7 million in cash simply sitting appropriated for future expenditures on the North Community Center. (Ex. K at F-9.) Regarding

Farella Braun & Martel LLP
235 Montgomery Street
San Francisco, CA 94104
(415) 954-4400

UNIONS' PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW - Case No. 08-26813 MSM

- 11 -

23085\1692801.3

1   the amount of the reinstated interest, Ms. Mayer testified that she did not see "a basis" for

2   reinstating the 10% interest rate, because that figure was higher than Vallejo's cost of funds,

3   (8/22/08 ROUGH Tr. at 27:6-25), but that testimony is not credible.  First, Mr. Mialocq testified

4   that many other cities charge their redevelopment agencies 10% interest on loans from the general

5   fund.  (8/22/08 ROUGH Tr. at 120:6-13.)  Second, the interest rate was 10% prior to the

6   Council's action in 1994, and the Council's retroactive change to the interest rate at the time was

7   not described as having anything to do with the cost of funds or expected return on investment,

8   but rather was made "as a result of Council concerns regarding the ability of the project areas to

9   repay the advances" at the 10% interest rate.  (Trial Exs. U-F, GG at 27.)

10          **E.     Availability of Other Expense Reductions.**

11          45.     The City has other opportunities to reduce expenses apart from

12   modifications to its collective bargaining agreements.  The 2008-09 adopted budget, compared to

13   the actual numbers for fiscal year 2006-07 includes steep cuts for the expenditures related to

14   police services (Trial Ex. K at D-19, an expenditure reduction of approximately 15%, from $34.4

15   million to $29.2 million) and the fire department (Trial Ex. K at D-21, an expenditure reduction

16   of approximately 16%, from $25.2 million to $21.1 million.)  That same budget, however,

17   includes substantial increases, compared with fiscal year 2006-07 in the costs of community

18   **redevelopment** (Ex. K at D-18, an approximately 20% increase from $3.3 million to $3.9

19   million) and in the cost of non-departmental expenses (Trial Ex. K at D-9, an approximately 27%

20   increase, from $9.2 million to $11.8 million.)

21          46.     The City's own analysis shows that the bulk of the City's General Fund

22   expenses are discretionary, rather than fixed, and many of them could be cut, although some

23   specific expense reductions would create difficulties.  (Trial Ex. 1-B at 14.)

24          47.     In addition, there are further opportunities for saving labor costs without

25   modifying the collective bargaining agreements in bankruptcy, because the number of employee

26   positions could be reduced.  (Trial Ex. D, no minimum police staffing requirements until May

27   2010; *see also* 8/7/08 Tr. at 35:15-19, Ms. Mayer testified that police were less concerned about

28   minimum staffing than about maintaining salary levels.)  Even changes to minimum shift staffing

Farella Braun & Martel LLP
235 Montgomery Street
San Francisco, CA  94104
(415) 954-4400

UNIONS' PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW - Case No. 08-26813 MSM                - 12 -                23085\1692801.3

1  in the fire department might be possible without modification in bankruptcy of the collective

2  bargaining agreement, if the firefighter union does not bring a grievance over the staffing change.

3  (*See* Trial Ex. 1-B at 14, noting that changing minimum per shift staffing in the fire department

4  would create difficulties "if challenged" which might, after an arbitration, require the city to

5  reopen one or both closed fire stations.)

6         **F.**    **Availability of New And Increased Revenues**

7                 **City Manager's March 23, 2007 Memo**

8          48.    In March 2007, City Manager Joseph Tanner sent a memorandum to the

9  mayor, the city council, and all city employees stating that "[t]he City's General fund is in serious

10  financial trouble." (Trial Ex. L; 7/25/08 Tr. at 35:16-18; 8/5/08 Tr. at 75:4-11.) In that memo,

11  Mr. Tanner stated that he had requested budget cuts from "all" City Departments, "especially"

12  those funded by the General Fund. (Trial Ex. L.) This included a requested $3 million in cuts

13  from the police department, and an additional $2.5 million in cuts from the Fire Department. (*Id.*)

14          49.    In addition, Mr. Tanner stated that City staff was "looking at various

15  avenues to increase funding," and he listed 16 potential sources for increased revenues. (*Id.*)

16  Some of the 16 were increases in existing sources of revenue, and the rest identified new sources

17  of revenue. (8/5/08 Tr. at 86:12-25.)

18          50.    The proposed increases in existing sources of revenue listed in Mr.

19  Tanner's March 2007 memorandum were: (1) planning and building fee increases; (2) ferry

20  service increases; (3) bus service increases; (4) garbage franchise fee increase; (5) inter-fund

21  transfer cost allocation expense; (6) water fund increases; (7) police services fees; and (8) fire

22  inspection fees. (8/5/08 Tr. at 86:12-25.) Of these, the following were implemented: planning

23  and building fee increases, ferry and bus service increases, garbage franchise fee increases, and

24  water fund increases. (*Id.* at 76:2-5; 77:13-16; 78:8-23; 81:20-82:13.) Ms. Mayer testified that

25  she did not believe that police service fees had been implemented. (*Id.* at 83:17-84:10.) As to

26  fire inspection fees, she testified that apart from an automatic annual increase, no further analysis

27  had been done. (*Id.*) Number 5 – cost allocation – has not been implemented, but is expected to

28  be implemented. (*Id.* at 80:23-81:12.)

Farella Braun & Martel LLP
235 Montgomery Street
San Francisco, CA 94104
(415) 954-4400

Unions' Proposed Findings of Fact and
Conclusions of Law - Case No. 08-26813 MSM

- 13 -

23085\1692801.3

51.    The proposed new sources of revenue listed in Mr. Tanner's March 2007 memorandum were: (1) false alarm fees; (2) street sweeping fees charged to other agencies; (3) litter tax on fast food restaurants; (4) seeking voter approval of fire assessment; (5) seeking voter approval of sales tax; (6) seeking voter approval of parcel tax; (7) seeking voter approval of city-wide maintenance district; and (8) seeking voter approval of property tax. (8/5/08 Tr. at 86:12-25.) Of these, only the false alarm fees have been implemented. (*Id.* at 20-23.) As to number 7, maintenance district taxes were approved by default in 2 of 8 districts. (*Id.* at 84:22-85:25.)

### June 2007 Voter Poll

52.    Also in 2007, the City hired Evans McDonough Company ("EMC") to conduct a poll of Vallejo voters. (Trial Ex. R.) The purpose of the poll was to determine voter attitudes toward tax measures, specifically a fire and police assessment measure and a utility user's tax. (Trial Ex. QQ.)

53.    EMC presented the raw results in a report in June 2007. (Tr. Ex. R.) All numbers in the EMC report represent percentages. (*Id.* at 039759.)

54.    The raw results showed that Vallejo voters were concerned about City management. (*Id.* at 039774.) For example, 77% of voters polled rated economic development in Vallejo to be "poor" or "only fair." (*Id.*) 75% rated the City Government as doing a "poor" or "only fair" job. (*Id.*) 71% considered City Council's performance to be "poor" or "only fair." And 74% rated the management of the City's budget as "poor" or "only fair." (*Id.*)

55.    In contrast, the raw results showed that Vallejo voters rated the quality of police and fire services favorably. (*Id.* at 039772.) 72% rated the job of the Vallejo Fire Department as "excellent" or "good." (*Id.*) 68% rated the job of the Vallejo Police Department as "excellent" or "good." (*Id.*)

56.    Over three-quarters of voters surveyed stated that they did not mind continuing an existing utility tax at the same rate. (*Id.* at 039783.) EMC concluded that support for the utility tax renewal was "right at the threshold needed for approval." (*Id.* at 039787.) While EMC concluded that passage of the tax would "be a challenge," they also described it as "definitely possible." (*Id.*)

Parella Braun & Martel LLP
235 Montgomery Street
San Francisco, CA 94104
(415) 954-4400

UNIONS' PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW - Case No. 08-26813 MSM

- 14 -

23085\1692801.3

57.     While the EMC report did not contain a separate conclusion as to whether a police or fire assessment tax would pass, 70% of voters "strongly agreed" or "somewhat agreed" with the following statement: ""Maintaining fire, paramedic, and police, services in Vallejo should be a top priority, even if it means raising taxes." (*Id.* at 039763.)

58.     City Council did not place any taxes on the subsequent two ballots – in November 2007 and June 2008. (7/25/08 Tr. at 77:9-16.)

59.     City Councilmember Gomes asked City Manager Joseph Tanner about the poll results at a public City Council meeting on March 3, 2008. (7/25/08 Tr. at 77:24-78:16). In response to her question, Mr. Tanner stated that "the results were dismal at best. The voters at the time wanted absolutely no part in raising any fees or any revenues. And as a matter of fact, the voters didn't even want to support the fees that they already had." (*Id.*)

### November 13, 2007 "Budget Team"

60.     In November 2007, City staff announced that it was appointing a "budget team" to "pursue a strategy with three main components." (Trial Ex. 1-E at 6-7.) These were: (1) opening a dialogue with employee groups to pursue contract changes; (2) evaluate options associated with insolvency; and (3) prepare a set of budget changes. (*Id.*) Raising revenue was not specifically identified as an objective of the "budget team." (*Id.*) Mr. Whittom testified that a "formal team was never actually created." (7/25/08 Tr. at 39:23-25.) Mr. Whittom was designated as the "point person" in working with the labor groups. (*Id.* at 36:24-37:3.)

### Assistant City Manager's December 2007 Memo

61.     On December 21, 2007, Assistant City Manager Craig Whittom sent a memo to various department heads outlining "three parallel approaches" to resolving the "General Fund imbalance." (Trial Ex. M.) The first was "discussions with labor groups." (*Id.*) The second was "recommendations regarding expenditure reductions and revenue enhancements *in the event labor negotiations [were] unsuccessful.*" (*Id.*) (emphasis added). The third was to assess "the ramifications of insolvency." (*Id.*)

**Management Partners Revenue Enhancement Memoranda**

62.    Mr. Whittom could not identify a main point person at the City whose task it was to research revenues. (7/25/08 Tr. at 36:7-17.)

63.    In January or February of 2008, however, the City hired consultants at Management Partners Associates to assist the City in finding new revenues. (7/25/08 Tr. at 63:11-24.) Management Partners provided the City with a draft revenue enhancement memo in March 2008, identifying 21 potential options for raising revenues. (*Id.* at 64:9-65:7; Trial Ex. DD.) Mr. Whittom was the principal person at the City responsible for the Management Partners report. (7/25/08 Tr. at 64:24-65:2.)

64.    By June 20, 2008, the Management Partners report had grown to include 24 revenue options, including the following "potential revenue impact" for the following 10 potential revenues:

Extension of Utility Users Taxes ................................... $4 million annually

Admissions Tax......................................................... $2.8 million annually

Increased Sales and Use tax .............................. $2.8 to 5.6 million annually

Business Tax Restructure.................................................up to $1.4 million

Increased Transient Occupancy Tax ................................. $73,000 annually

EMS Fee................................................................. $400,000 -- $700,000

Business Tax Administration Fee ................................... $171,000 annually

Freeway Billboard Signs ............................................... $170,000 annually

911 Emergency Communication System Access Fee. $2-5 million annually

Corporate Sponsorships .................................................. $50,000 annually

(*Id.*) The report also noted $9.2 million owing from the RDA fund and $3.1 million owing from the Transportation Fund. (*Id.* at 035399.) Financial projections for the remaining 12 revenue options identified were left blank or listed as "unknown" or "pending further analysis." These included 100% cost recovery for city user fees, cost allocation plan annual update, SB 90 reimbursements, unclaimed property, community facilities districts, parcel tax, citywide assessment district for lighting and landscape maintenance, ferry parking lot user fees, street

Farella Braun & Martel LLP
235 Montgomery Street
San Francisco, CA 94104
(415) 954-4400

UNIONS' PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW - Case No. 08-26813 MSM

- 16 -

23085\1692801.3

1  pavement impact fees, construction and refuse vehicle impact fee, sale of surplus properties, and

2  public safety development impact fees.  (Trial Ex. Q.)

3          65.    Mr. Whittom confirmed that the City plans to continue exploring these

4  revenue options. (7/25/08 Tr. at 69:14-17.) Ms. Mayer similarly testified that the City is taking

5  steps to move these revenues forward and to present City Council with a "menu of options."

6  (8/05/08 Tr. at 123:19-24.)

7          66.    Mr. Whittom also testified that the City has begun to implement some of

8  the revenue options listed in the Management Partners report, such as "cost allocation plan

9  update, 100 percent cost recovery for city user fees and charges, SB-90 reimbursements and

10  unclaimed property." (7/25/08 Tr. at 69:18-70:1.)

11          67.    Ms. Mayer testified that the City plans to place a 911 emergency

12  communications access fee on the ballot in November 2009.  (8/5/08 Tr. at 103:21-105:23.)  As

13  noted above, Management Partners estimates that the City could earn $2 to 5 million annually

14  from this revenue.  (Trial Ex. Q at 035394; Trial Ex. DD at 5.)

15          68.    Ms. Mayer testified that the City is also working to place an increased sales

16  and use tax on the November 2009 ballot.  (8/5/08 Tr. at 121:20-122:24.)  As noted above,

17  Management Partners projects $2.8 to $5.6 million in additional annual revenues from such a tax.

18  (*Id.*)

19          69.    Ms. Mayer testified that the City is considering placing a Utility Users Tax

20  on the November 2009 ballot.  (8/5/08 Tr. at 126:3-10.)  As noted above, Management Partners

21  projects $4 million in additional annual revenues from such a tax.  (Trial Ex. Q at 035384; Trial

22  Ex. DD at 18.)

23          70.    Ms. Mayer further testified that the City is actively considering the EMS

24  fee, estimated to generate $400,000 to $700,000.  (8/5/08 Tr. at 110:19-111:24; Trial Ex. 5 at ¶

25  19.)

26          71.    The City has not implemented parking fees for the ferry; or business tax

27  administration fees; or new park admissions fees.  (8/5/08 Tr. at 108:4-10, 127:2-15.)

28

Farella Braun & Martel LLP
235 Montgomery Street
San Francisco, CA 94104
(415) 954-4400

UNIONS' PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW - Case No. 08-26813 MSM

- 17 -

23085\1692801.3

72.     No new revenues were included in the General Fund cash flow projection submitted to the court. (Trial Ex. 1-L.) While the City acknowledges $1.45 million in council approved new revenues, they were not included in the 2008/09 revenue projections but were instead placed below the line. (Trial Ex. 1-C.)

73.     The City projected decreased revenues in fiscal year 2009/10, followed by increases of only $200,000 in both fiscal years 2010/11 and 2011/12. (Trial Ex. 1-C at 2.)

74.     Mr. Whittom initially intended to present the Management Partners report to City Council in March 2008. (7/25/08 Tr. at 64:2-6). Mr. Whittom testified, however, that the report has still not gone to Council. (*Id.* at 68:18-20.) As of June 20, 2008, the report was still in draft form. (Trial. Ex. Q.)

75.     Both Mr. Whittom and Ms. Mayer testified that the bankruptcy proceedings have delayed them in presenting revenue options to City Council. (7/25/08 Tr. at 69:8-13; 8/5/08 Tr. at 124:25-125:3; 8/19/08 Tr. at 35:3-8.)

## November 2008 Ballot

76.     No new taxes will be placed on the ballot in November 2008. (8/19/08 Tr. at 28:7-9.) At the June 10, 2008 City Council meeting, the City's mayor reminded City Council that a tax initiative could be placed on the November 2008 ballot with unanimous City Council approval and raised the idea of placing a sales tax initiative on the ballot, noting the Vallejo has the lowest sales tax rate of any Bay Area city. (*Id.* at 27:12-28:3, 29:20-23, 32:9-15.) Mr. Whittom confirmed that both the City's sales tax rate charged and its sales tax rate collections are lower than other cities. (*Id.* at 32:9-33:2.) Nonetheless, City Council declined to place any new tax measures on the November 2008 ballot. (*Id.* at 28:7-13.)

## Asset Management Policy and Surplus Properties

77.     The City adopted an asset management policy in February 2007. (Trial Ex. KK.) The policy estimates the value of City-owned real estate at $300-400,000,000. (*Id.* at 3.) The policy sets forth guidelines for the purchase and sale of real estate by the City. (*Id.* at 7-8.)

78.     In addition to the policy, the City's Municipal Code sets out procedures by which the City Manager can sell City-owned property by auction. (Trial Ex. AA; 8/19/08 Tr. at

Farella Braun & Martel LLP
235 Montgomery Street
San Francisco, CA 94104
(415) 954-4400

UNIONS' PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW - Case No. 08-26813 MSM

- 18 -

23085\1692801.3

143:8-11.) Mr. Whittom testified that at least in the last four years, the City Manager never utilized these procedures to sell City-owned property. (*Id.* at 37:1-11.) He further testified that the procedures may have been utilized prior to that, but that he was not aware of any such instances. (*Id.*)

79.    In October 2007, the City Council authorized the sale of four surplus properties. (Trial Ex. Z.) Mr. England, the City's real property asset manager, estimated net proceeds from these four properties at $1,415,460. (Trial Ex. RR; 8/19/08 Tr. at 39:9-15.) The City has still not listed these properties for sale. (8/19/08 Tr. at 46:16-19.) Mr. Whittom hired Mr. England, and Mr. England works within the City's Community Development Department, of which Mr. Whittom is the department head. (8/19/08 Tr. at 37:12-22.) Mr. Whittom has never instructed Mr. England to dispense with appraisals and proceed to sale. (*Id.* at 46:20-22). These sites could generate regular income for the City, such as through property taxes, sales taxes, and lease payments. (*Id.* at 42:14-43:11.)

80.    City staff has identified an additional 8 surplus properties estimated to generate $1,536,360 in revenue in FY 2010/11. (Trial Ex. RR.) Staff intended to bring these additional 8 properties to City Council for approval in March 2008. (8/19/08 Tr. at 47:19-48:15.) That was not done. (*Id.*) Staff then intended to bring these 8 properties to City Council in May 2008. (*Id.* at 48:20-49:14.) That was not done. (*Id.*) Staff then intended to bring these 8 properties to City Council in August 2008. (*Id.* at 46:23-47:4.) That was not done. (*Id.*) Staff currently plans to bring these properties to City Council in September 2008. (*Id.*)

81.    The City's Asset Management Plan allows the City Manager or his designee to dispose of surplus properties valued at $500,000 or less. (Trial Ex. KK at 7-8.) Neither Mr. Whittom nor the City Manager has invoked this policy to dispose of properties designated surplus. (8/19/08 Tr. at 45:4-46:6.)

Farella Braun & Martel LLP
235 Montgomery Street
San Francisco, CA  94104
(415) 954-4400

UNIONS' PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW - Case No. 08-26813 MSM

- 19 -

23085\1692801.3

**City Council**

82.    Mr. Whittom testified that the City still did not have a date planned for the presentation of the Management Partners results to City Council. (7/25/08 Tr. at 69:8-13.)

83.    At least two City Council members made statements to the effect that the City should not consider raising revenues because the budget problem was one of expenses. At the June 5, 2007 Council Meeting, Councilmember Gomes stated "Since I've been up here for almost a year and a half now, this oppressive, all-consuming issue of this battle with the fire union has been the main thing that we talk about that we deal with – month after month after month. So you're right. We can't talk about bringing in revenues. We can't talk about moving this City forward until we deal with this issue." (7/25/08 Tr. at 46:16-23.) Councilmember Shively stated at a February 26, 2008 meeting that "For everyone who thinks that the absolute answer is more revenue, I'm just going to echo J.D. Miller once again – yes we need more revenue, but that's not the cause of the problem. It's not a lack of revenue. It's an excess of expenses. And until we get those expenses under control, it isn't going to matter how much money comes into the City because it's just going to keep right on passing through to the people who hold the contracts that we can't afford." (*Id.* at 44:23-45:10.)

84.    Mr. Whittom testified that during negotiations with the labor unions, the City chose not bring the Management Partners revenue enhancement reports to City Council because "it made more sense to bring the revenue report at a time that we were bringing the modifications to the labor groups." (7/25/08 Tr. at 67:3-16.) A June 4, 2008 email from Mr. Whittom to Management Partners states that the City "postponed" bringing the revenue report to City Council "until we had a labor deal to bring at the same time, making it more *palatable* for the [City Council] to make the hard revenue decisions." (Trial Ex. P)(emphasis added).

85.    Similarly, as described above, the City Council has declined to place new taxes on the November 2008 ballot. When the mayor raised the idea of including a sales tax initiative on the ballot at the June 10, 2008 City Council meeting, Councilmember Gomes, responded: "I agree with Councilmember Shively – until we can show that we've cleaned up our house and fixed our fiscal problem, not just deciding to go bankrupt – that doesn't show that we

Farella Braun & Martel LLP
235 Montgomery Street
San Francisco, CA 94104
(415) 954-4400

UNIONS' PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW - Case No. 08-26813 MSM

- 20 -

23085\1692801.3

1   have changed our fiscal ways – but actually come up with a plan and a long-term plan and

2   actually looked at what those salaries should be and setting those salaries at a fair level to

3   everybody, then we could consider - in my mind - a sales tax. . . . Again, I think we have to clean

4   our house first, and we have not cleaned house yet. We are just getting the broom out." (8/19/08

5   Tr. at 30:2-31:15.)

6       **G.    Union Contracts**

7           86.    The current labor agreements are in place through June 30, 2010. (Trial

8   Ex. 2 at ¶ 4.)

9           87.    The public safety workers received a salary increase on July 1, 2007 that

10  was higher than prior year increases because it included a restoration of 4.5% that the Unions

11  deferred on July 1, 2004. (Trial Ex. 1-G at 24-25; 8/5/08 Tr. at 175:22-176:2.)

12          88.    An April 8, 2008 report prepared by Police Chief Nichelini for City

13  Manager Joe Tanner concluded that Vallejo ranked 12 out of 19 in police costs per resident

14  among Northern California cities over 100,000 in population. (Trial Ex. OO). Chief Nichelini

15  also reported that Vallejo had the fifth highest violent crime rate of all Northern California cities

16  over 100,000 in population. (*Id.*)

17          89.    A December 10, 2007 report prepared by Chief Nichelini for City Manager

18  Tanner concluded that Vallejo's police costs, when viewed as a percent of total city expenditures,

19  were on average with other California cities. (Trial Ex. PP.)

20          90.    Vallejo does not refute Chief Nichelini's findings and has not shown that

21  its labor salaries are disproportionate with other cities. While the City submitted a declaration

22  from Jon Oiler purporting to show that its general fund expenditures on police and fire are among

23  the highest among comparison cities, (Trial Ex. 3), the court finds that Mr. Oiler's declaration

24  lacks credibility.

25          91.    Mr. Oiler did not prepare the report of comparative public safety

26  expenditures attached to his declaration, Trial Ex. 3-A. (8/7/08 Tr. at 76:6-8.)

27          92.    Mr. Oiler has no personal knowledge of the methodology used to generate

28  the comparative report attached to his declaration. Specifically, Mr. Oiler has no knowledge of

Farella Braun & Martel LLP
235 Montgomery Street
San Francisco, CA  94104
(415) 954-4400

UNIONS' PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW - Case No. 08-26813 MSM

- 21 -

23085\1692801.3

1  why the comparison cities were chosen, (8/7/08 Tr. at 92:20 – 93:1), no knowledge whether

2  geographic proximity was a factor in selecting the cities compared, (*id.* at 95:8-11), no knowledge

3  of why only 13 cities were compared, (*id.* at 96:12-14), no knowledge whether 13 cities is enough

4  to generate a statistically meaningful analysis, (*id.* at 96:15-17), no knowledge whether

5  population size was a criteria for selecting the cities compared, (*id.* at 97:5-7; 102:2-5), and no

6  knowledge whether public safety is correlated to population size. (*Id.* at 98:24 – 99:1.)

7         93.  According to the California Department of Finance, Vallejo's population as

8  of June 30, 2007 was 121,425, not 100,889 as stated in Exhibit A to the Oiler Declaration.

9  (8/7/08 Tr. at 87:4-16; Trial Ex. MM.)

10         94.  Exhibit A to the Oiler Declaration did not take into consideration the

11  median household income of the cities studied, (8/7/08 Tr. at 102:13-15), nor did it consider

12  average salaries in those cities, (*id.* at 102:16-18), or any cost of living indices, (*id.* at 102:19-21),

13  in assessing whether the cities are in fact comparable.

14         95.  Further, in comparing police and fire department expenditures contained in

15  his Exhibit A, Mr. Oiler failed to take into account the cities' crime rates, (8/7/08 Tr. at 102:22-

16  24), geographic sizes, (*id.* at 102:25-103:2), the number of public safety employees per capita,

17  (*id.* at 103:3-5), or whether each of the cities he compared even maintains a fire department, (*id.*

18  at 103:14-17.)

19         96.  No analysis was done to ensure that each of the comparison cities' general

20  fund line item expenditures were the same as Vallejo's general fund line item expenditures or to

21  otherwise ensure that the general funds being compared had the same composition. (8/7/08 Tr. at

22  104:17-22; 105:6-106:5.) Mr. Oiler had no knowledge whether any of the cities compared in

23  Exhibit A to his declaration pay for some of their police and fire expenses out of special funds

24  other than their general funds. (8/7/08 Tr. at 106:6-10.)

25         97.  Similarly, Mr. Oiler did not know whether the line item entitled "Police

26  and Fire Department Expenditures" in Exhibit A to his Declaration encompassed the same

27  expenses for each of the cities compared. (8/7/08 Tr. at 113:9 – 115:1.)

28

Farella Braun & Martel LLP
235 Montgomery Street
San Francisco, CA  94104
(415) 954-4400

UNIONS' PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW - Case No. 08-26813 MSM

- 22 -

23085\1692801.3

98.     Mr. Oiler's Exhibit A did not provide a true average per capita expenditure for public safety expenditures of the 13 cities compared.  Rather than adding the per capita public safety figure for each of the 13 cities and dividing that number by 13, the figure in Exhibit A instead reflects the average of the 13 cities public safety expenditures divided by the average population of the 13 cities.  (8/7/08 Tr. at 107:17 – 108:15.)  When the total of the 13 cities per capita public safety expenditures is divided by 13, the per capita average for public safety expenditures is $507, not $489, as reported in Exhibit A.

99.     The Vallejo public safety expenditure amount used in Exhibit A to Mr. Oiler's Declaration reflects only gross expenditures and was not offset by the more than $8 million in program revenues generated by the Vallejo Police and Fire Departments in fiscal year 2007.  (8/7/08 Tr. at 110:2-15.)  When the Vallejo Police and Fire Departments' program revenues are deducted from the gross Police and Fire Department expenditures, the City of Vallejo's net public safety expenditures for Fiscal Year 2007 are approximately $55 million, not $63.289 million as reported in Exhibit A to Mr. Oiler's Declaration.  (*Id.* at 111:12 – 112:19.)

100.     Exhibit A to Mr. Oiler's Declaration was prepared solely for purposes of the bankruptcy proceeding.  (8/7/08 Tr. at 77:18-78:1.)  It makes no conclusions about the City's solvency or the impact of employee salaries on the City's solvency.  (*Id.* at 78:17-19.)

**H.     Negotiations**

101.     In addition to the staffing arbitration with IAFF, the City and the Unions were involved in other litigation, arbitrations, and grievances on a variety of issues in 2007. (Trial Ex. 1-I at 5.)

102.     This included an arbitration related to minimum staffing between the City and VPOA.  (*Id.*)  On January 18, 2008, the parties entered a tentative agreement settling the arbitration and setting the minimum number of sworn officers at 145.  (Trial Ex. N.)  The parties later agreed, effective January 18, 2008 that the VPOA would waive this minimum staffing requirement until May 30, 2010.  (Trial Ex. D at 1.)

103.     In February 2008, City staff presented a draft fiscal emergency plan.  (Trial Ex. 1-I.)  The plan proposed funding an $11.2 million General Fund reserve in FY 08/09 to be

Farella Braun & Martel LLP
235 Montgomery Street
San Francisco, CA 94104
(415) 954-4400

UNIONS' PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW - Case No. 08-26813 MSM

- 23 -

23085\1692801.3

1    achieved in large part through "deep rollbacks" in city salaries, including a 15% rollback in

2    public safety worker salaries and an 8% rollback in IBEW salaries. (*Id.* at 5-6.)

3         104.   In conjunction with the Fiscal Emergency Plan, the City met with its labor

4    groups to negotiate economic concessions to the existing union contracts. (Trial Ex. 1-I at 5.)

5         105.   VPOA and IAFF requested that the pending litigation, arbitrations, and

6    grievances between them and the City be resolved prior to negotiating economic concessions.

7    (*Id.*) This was discussed at the May 3, 2008 City Council meeting. At that meeting,

8    Councilmember Shively asked Mr. Whittom: "What tools will you have to negotiate with if we

9    dismiss all these arbitrations, lawsuits, and resolve the grievances?" Mr. Whittom responded:

10   "The tool would be the threat of bankruptcy . . . We have binding agreement with our labor

11   groups. They don't want to risk those binding agreements when we have Marc as he said fighting

12   early and often in a bankruptcy context." (7/25/08 Tr. at 102:18; 8/19/08 Tr. at 23:10-21.) Mr.

13   Whittom was referring to Marc Levinson, the City's bankruptcy counsel. (8/19/08 Tr. at 23:22-

14   24:4.)

15        106.   On March 3, 2008, the City Council approved Interim Agreements between

16   the City and VPOA and the City and IAFF. (Trial Exs. B, C, D, and 13.) Among other things,

17   police and firefighters agreed to rollback 6.5% of their 2007/08 salary increases from March 1,

18   2008 through the remainder of the fiscal year. (*Id.*) The Unions also agreed to waive an

19   additional 1.7% of their 2007/08 salary increase retroactive to July 1, 2007. (*Id.*)

20        107.   An outside consultant retained by the City reported that, while Vallejo's

21   interim agreement salary levels were competitive, the City's competitive position "would erode

22   over time as other agencies have typically been increasing compensation on an annual basis."

23   (7/25/08 Tr. at 26:5-27:1.) The City is already experiencing retention problems. (*Id.* at 28:11-

24   29:1.)

25        108.   One of the VPOA interim agreements formalized the tentative agreement

26   setting a 145 minimum staffing requirement. (Trial Ex. D.) In that same agreement, the VPOA

27   agreed to waive this staffing requirement until May 30, 2010. (*Id.*) Accordingly, the City

28   currently has no minimum police staffing requirement.

Farella Braun & Martel LLP
235 Montgomery Street
San Francisco, CA 94104
(415) 954-4400

UNIONS' PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW - Case No. 08-26813 MSM

- 24 -

23085\1692801.3

109.  One of the IAFF interim agreements reduced minimum daily staffing from 28 to 22 (Trial Ex. C), despite the arbitrator's earlier finding that safety considerations for firefighters required 28.  (Trial Ex. O.)

110.  The Union representing City management, CAMP, did not make any economic concessions. (7/25/08 Tr. at 33:24-34:12.)

111.  Following the Interim Agreements, the City, VPOA, IAFF, and IBEW agreed to engage in mediation with the objective to identify expenditure reductions, revenue enhancements and collective bargaining agreement modifications in an attempt to develop a General Fund balance plan that ensured funding for a range of city services and provided for a positive General Fund reserve through fiscal year 2012. (Trial Ex. 2 at ¶ 24.)

112.  The parties retained John Kagel as their mediator. (7/25/08 Tr. at 99:24-25.) They met with him on several occasions in March, April, and May of 2008. (Trial Ex. 2 at ¶ fn. 7.)

113.  The Unions retained Mr. Roger Mialocq, from Harvey Rose Associates, LLC – a public management consulting firm – to participate in part of the mediation and to analyze the City's financial situation. (Trial Ex. U.) Mr. Mialocq prepared reports on the City's financial situation and proposed suggestions for cutting expenses and raising revenues. (Trial Ex. U-B; 7/25/08 Tr. at 81:2-83:8.) The City agreed with many of his recommendations. (7/25/08 Tr. at 83:13-24; 8/19/08 Tr. at 117:23-119:5; Trial Ex. U at ¶ 13.)

114.  Several offers were exchanged during the course of the mediation. (Trial Exs. W, LL, 15, 17, 18.)

115.  The City's initial offer would have required the Unions to rollback salaries to fiscal year 2005/06 rates.  Further, it provided for no salary increase in 2009/10 and capped salary increases at 2% for the subsequent two fiscal years, subject to "the economic condition of the General Fund."  The offer also required the VPOA to forego its minimum staffing requirements until 2012 and for the IAFF to maintain its shift staffing level of 22 for that same period. (Trial Ex. LL; 8/19/08 Tr. at 178:8-180:8.)

Farella Braun & Martel LLP
235 Montgomery Street
San Francisco, CA 94104
(415) 954-4400

UNIONS' PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW - Case No. 08-26813 MSM

- 25 -

23085\1692801.3

116.   The City's final offer was presented in mediation on May 14, 2008 in writing with some later modifications communicated verbally. (Trial Ex. 18; 7/25/08 Tr. at 96:12-17.)  The key terms included the following:

- Public safety employees would continue their 6.5% pay cut until June 30, 2011.
- Public safety employees would give up, forever, a 1.7% raise owed retroactive to July 1, 2007.  After July 1, 2010, the raise was to be applied to future retiree medical costs.
- Public safety employees would give up, forever, two raises Vallejo estimated at 5.5% each for public safety employees in each of the next two fiscal years; and IBEW would match the offer to give up, forever, pay raises due in each of the next two fiscal years.
- The terms of the collective bargaining agreements would be extended to June 30, 2012.  On July 1, 2010 and again on July 1, 2011, if median salaries of representative positions were less than median salaries in a list of comparable cities, a salary re-opener would apply.  Any salary increase would be subject to the City's economic condition (including breadth of services and increasing reserves to 5% as soon as possible).
- In addition, Vallejo could continue the reduced staffing of only 6 fire stations.
- The City proposed various other changes to work rules and benefits. (*Id.*; 7/25/08 Tr. at 97:20-98:19.)

117.   The Unions' final offer was presented in and outside of mediation, including by letter dated May 15, 2008. (Trial Ex. W.)  The key terms included the following:

- Public safety employees would continue their 6.5% pay cut until March 1, 2009 or through June 30, 2009 if Vallejo was still in financial difficulty on March 1, 2009.
- Other employees represented by the IBEW would take a 3% pay cut in the form of a reduced hours work furlough.

Farella Braun & Martel LLP
235 Montgomery Street
San Francisco, CA  94104
(415) 954-4400

UNIONS' PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW - Case No. 08-26813 MSM

23085\1692801.3

- Public safety employees would give up, forever, a 1.7% raise owed retroactive to July 1, 2007. After July 1, 2009, the raise was to be applied to future retiree medical costs.

- Public safety employees would give up, forever, two raises Vallejo estimated at 5.5% each for public safety employees in each of the next two fiscal years; and IBEW would match the offer to give up, forever, pay raises due in each of the next two fiscal years.

- In future years, starting in 2009 and 2010, a portion of the cost savings from the raises given up was to be earmarked to fund retiree medical costs and current employee medical costs.

- The terms of the collective bargaining agreements would be extended to June 30, 2014 because the Unions requested several years left on the contracts, giving rise to a bankruptcy claim, if Vallejo took the deal but filed for bankruptcy anyway. But raises in future years would be capped at 3 to 5% based on average increases in comparable cities, and would be contingent on Vallejo's achieving a reserve after reasonable efforts and Vallejo's ability to have quality of life expenditures in the general fund budget. As a safety-valve, if the parties disputed the City's ability to pay, they could take the issue to arbitration.

- In addition, Vallejo could continue the reduced staffing of only 6 fire stations for the next two fiscal years, saving the City approximately $2 million per fire station.[4]

- The Unions proposed various other changes to work rules and benefits. (Trial Ex. W.)

118.    Other than the contract extension, with a cap and floor on future raises that were subject to the City's ability to pay, the Unions did not request anything in return for what they were giving up. (8/19/08 Tr. at 144:21-145:10; Trial Ex. W.)[5]

---

[4] 7/24/08 Tr. at 67:21-25.

[5] The City offered a two year contract extension, to 2012. (Trial Ex. 18.)

Farella Braun & Martel LLP
235 Montgomery Street
San Francisco, CA 94104
(415) 954-4400

UNIONS' PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW - Case No. 08-26813 MSM

- 27 -

23085\1692801.3

119.    While Mr. Whittom testified that the City was "concerned" with the Unions' proposal to arbitrate disputes over whether the City could afford salary increases in the out-years, the City did not propose any alternative mechanism for resolving such disputes. (8/19/08 Tr. at 145:19-146:3.)

120.    The Unions' have kept their offer open, even after the bankruptcy filing. (8/19/08 Tr. at 129:1-7.)

121.    The City admits that the Unions negotiated in good faith. (Trial Ex. 2 at ¶ 25; 8/19/08 Tr. at 66:25-67:3.)

122.    The City admits that the Unions' offer would have allowed it to remain solvent this fiscal year. (7/25/08 Tr. at 87:8-18.) The final offer was projected by the City to save $12.3 million in labor costs in FY 2008/09. (Trial Ex. K at D-2, Column C; 8/5/08 Tr. at 40:20-25, 62:18-23.) Accordingly, had the City accepted the Unions' offer, it could have reduced its obligations this year by $12.3 million.

123.    The Unions' offer could also have allowed the City to stay solvent in future years because, under the offer, salary increases would be made subject to the City's ability to pay, including consideration of the need for a reasonable reserve, available revenue sources, and reasonable breadth of services. (Trial Ex. W at 2.) Moreover, as discussed above, the City's witnesses have confirmed that they are taking steps to implement new revenues, which would increase revenues above what the City projected for fiscal year 2008/09 and thereafter. The City recognizes that revenue enhancements are "critical." (Trial Ex. 14 at 7.)

124.    While the July 1, 2009 restoration of the 6.5% pay cut was not made subject to the City's ability to pay, the Court does not find that the restoration would have made the City insolvent by fiscal year 2009/10 as argued by the City. The restoration would make for slightly over $2.2 million in additional annual expenditures. (Trial Ex. 24.) The City likely could meet this obligation given its efforts and "objectives" to raise new revenues or cut staffing and other costs. (Trial Exs. M, LL.) Indeed, the City acknowledged $2.7 million in council-approved new revenues in fiscal year 2009/10 as well as $500,000 in surplus property sales. (Trial Ex. 1-C at 2, below the line.) This is a conservative estimate considering the millions of dollars in

Farella Braun & Martel LLP
235 Montgomery Street
San Francisco, CA  94104
(415) 954-4400

UNIONS' PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW - Case No. 08-26813 MSM

- 28 -

23085\1692801.3

1   increased revenues and surplus property proceeds that the City and its consultant have been

2   working to generate.  Moreover, on May 4, 2008 the City itself offered a salary increase on July

3   1, 2009.  (Trial Ex. 17.)[6]

4          125.    Despite the Unions' offer, the City's General Fund projections submitted to

5   the Court for the fiscal years following fiscal year 2009, assume contractual salary raises.  (Trial

6   Ex. 1-C.)  Also, despite the City's commitment to "actively pursue revenues" (Trial Ex. 18 at 8),

7   despite the City's objective to enhance revenues, and despite the City's plans to place new taxes

8   on the November 2009 ballot, the City's General Fund projections for the fiscal years following

9   fiscal year 2009 assume decreased revenues, followed by annual increases of only $200,000.

10  (Trial Ex. 1-C.)

11         126.    During the ongoing mediation, the City retained an outside consultant,

12  Management Partners Associates to conduct a salary survey, comparing Vallejo's public safety

13  worker salaries with those of other Bay Area cities.  (7/25/08 Tr. at 24:19-27:16).  Mr. Whittom

14  testified that the study was done as a "tool for management" in its discussions and was "intended

15  to inform the ongoing negotiations between City administration and public safety unions with the

16  goal of reaching an agreement." (*Id.*)  The study was not completed, however, until May 20,

17  2008, after the negotiations had ended on May 16, after the City Council voted to authorize

18  bankruptcy on May 6, and three days before the filing of the bankruptcy petition.  (*Id.* at 27:18-

19  28:7.)

20         127.    Despite having commissioned a comparability analysis, the City offered no

21  evidence that its final offer or any of its prior offers included salaries that would allow the City to

22  remain competitive with other police and fire agencies nor whether the final offer addressed

23  recruitment and retention issues.

24         128.    During the mediations, the Unions asked Mr. Whittom if the City was

25  conducting a comparability study.  (8/19/08 Tr. at 58:23-60:11.)  Mr. Whittom told them that it

26  

27  [6] While the City offered a projection showing a $3.2 million General Fund deficit in fiscal year
    2009/10 based on the 6.5% restoration (Trial Ex. 25 at 3), this projection predicted lower

28  revenues in 2009/10 than in 2008/09, assumed 129 officers rather than 124, and continued to
    place $3.2 million in new revenues below the line.  The City did not explain these assumptions.

Farella Braun & Martel LLP
235 Montgomery Street
San Francisco, CA 94104
(415) 954-4400

UNIONS' PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW - Case No. 08-26813 MSM

- 29 -

23085\1692801.3

1    was not. (*Id.*) This was not true. (*Id.*)

2    129.    Also, during the mediations, the City projected a 12% interest rate on its

3    General Fund secured bonds. When the Unions asked for the basis for this assumption, the City

4    claimed attorney-client privilege and declined to provide any materials. (Trial Ex. U-B at 7.)

5    130.    After City Council authorized the filing of the bankruptcy petition on May

6    6, the parties continued to meet. (8/19/08 Tr. at 132:21-133:11.) At that time, the Unions offered

7    to extend the Interim Agreements beyond June 30, 2008 so that the parties could keep meeting

8    and resolve the City's financial problems without a bankruptcy filing. (*Id.* at 148:10-18.) The

9    parties also discussed the possibility of accepting an offer from the California State Controller to

10   assist the City. (*Id.* at 149:5-9.) Specifically, the State Controller had offered to provide

11   accounting and legal assistance to the City without cost, to facilitate preparation of SB 90 claims,

12   to obtain any monies owed to the City by the State on an expedited basis, and to review and

13   proscribe legal options for the City to make inter-fund loans to its General Fund from enterprise,

14   internal service, and other funds. (Trial Ex. U at ¶ 13.)

15   131.    The City did not accept the State Controller's offer to help. (8/5/08 Tr. at

16   135:16-136:16). In fact, though the State Controller offered to help the City identify SB 90

17   reimbursement claims free of charge, the City declined and opted to pay consultants to file its SB

18   90 claims. (*Id.*)

19   132.    The City also declined the Unions' May 16 offer to extend the Interim

20   Agreements so as to allow the parties time to continue meeting and to address the City's financial

21   problems without a bankruptcy filing. (8/19/08 Tr. at 148:10-21.) The City proceeded to file its

22   bankruptcy petition on May 23, 2008.

23   **Post-Bankruptcy Filing**

24   133.    Less than a month after filing its petition, the City moved in these

25   proceedings for court approval to reject its collective bargaining agreements. [Docket No. 69.]

26   The City has not moved to reject or modify any of its other obligations.

27   134.    Following its filing, Vallejo adopted a "pendency plan," effective July 1,

28   2008, under which it honors some, but not all, of its obligations during the case. (Trial Ex. 5-B.)

Farella Braun & Martel LLP
235 Montgomery Street
San Francisco, CA 94104
(415) 954-4400

Unions' Proposed Findings of Fact and
Conclusions of Law - Case No. 08-26813 MSM

- 30 -

23085\1692801.3

Under the pendency plan and related budget, the City "anticipates paying its service and supply vendors in full" (Trial Ex. 5-B, at 5), and contemplates continuing to voluntarily pay holders of bonds and Certificates of Participation, but unilaterally cuts pay and eliminates contractually required pay raises for its Union-represented workers. Additionally, workers who retire or lose their jobs lose their vested rights to be paid their accrued vacation, sick time and compensated absences on the day of termination. (*Id.* p. 3, Section V.) Instead, departing employees with large balances have to wait until 2010 for half of what they are owed. (*Id.*)

## I.    Negotiations With Other Creditors

135.    The City presented no evidence that it negotiated with any of its creditors over their proposed treatment in the bankruptcy as impaired creditors. Nor did the City present evidence it had negotiated with its fourth union, CAMP, over how it would be treated in the bankruptcy.

136.    Mr. Whittom made the following statement in his declaration: "Reaching an agreement with the labor associations that would permit the City to avoid insolvency in the coming fiscal year, eliminate General Fund projected deficits for the next few years, and provide an opportunity for the City to gradually reestablish General Fund reserved was a necessary predicate to the utility of negotiations with any creditors other than the labor associations." (Trial Ex. 2 at ¶ 27.) When asked about this statement at trial, however, Mr. Whittom admitted that no creditor ever told him this. (7/25/08 Tr. at 93:3-18.)

137.    While the City did have some meetings with representatives of Union Bank, Ms. Valente testified that the discussion concerning the "restructuring of the City's obligations" was "a very general discussion." (7/24/08 Tr. at 85:19-86:1.) She further testified that it was a general discussion of "things" Union Bank "might want to consider" from the City's "standpoint" but "it wasn't specific as to individual terms." (*Id.* at 86:13-87:2.) Ms. Valente recalled four discussions in total – the first one being an in-person meeting and the others being conference calls. (*Id.* at 81:15-24.) Ms. Valente testified that the prospect of a bankruptcy filing "was not really a major subject of our meeting." (*Id.* at 84:4-13.) Ms. Valente was unable to recall any discussion "about what would happen to the City's obligations to the bank in the event

Farella Braun & Martel LLP
235 Montgomery Street
San Francisco, CA 94104
(415) 954-4400

UNIONS' PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW - Case No. 08-26813 MSM

- 31 -

23085\1692801.3

1   of a bankruptcy." (*Id.* at 99:13-16.)

2           138.   The City never shared with Union Bank what the labor unions had offered.

3   (*Id.* at 100:13-15.)  The City never invited anyone from Union Bank to talk jointly with the City

4   and the labor unions.  (*Id.* at 100:16-22.)

5           139.   As noted above, the City is paying higher interest on its variable rate bond

6   debt now than it was prior to the bankruptcy.  (Trial Ex. F; Trial Ex. 5 at ¶ 28.)

7           140.   There is no evidence that the City negotiated with Union Bank or any other

8   creditor over how the City would seek to impair their debts in the bankruptcy or treat impaired

9   debts under a plan of arrangement.

10          141.   The City offered no evidence that it negotiated with the Unions over how it

11   would seek to impair their contractual rights under Chapter 9, or treat those impaired obligations

12   under a plan of arrangement.  Mr. Whittom admitted that the City never discussed with the

13   Unions possible components of a plan of arrangement in the bankruptcy.  (7/25/08 Tr. at 91:25-

14   92:6.)

15          142.   Apart from Union Bank and the Unions, there is no evidence that the City

16   met with any other creditors at all.

17     **J.**    **Proposed Plan of Arrangement**

18          143.   The City offered no evidence of a proposed plan of arrangement or any

19   components of a proposed plan of arrangement.

20

21          144.   To the extent that any of these findings of fact should more properly be

22   characterized as conclusions of law, they shall be deemed as such.

23

24

25

26

27

28

Farella Braun & Martel LLP
235 Montgomery Street
San Francisco, CA  94104
(415) 954-4400

UNIONS' PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW - Case No. 08-26813 MSM

- 32 -

23085\1692801.3

III.    **CONCLUSIONS OF LAW**

145.    Under Section 921(c) of the Bankruptcy Code, a municipality's bankruptcy petition ***must*** be dismissed if either the debtor did not file the petition in good faith or the debtor does not meet the requirements of Chapter 9.  11 U.S.C. § 921(c); *In re Valley Health Sys.*, 383 B.R. 156, 160 (Bankr. C.D. Cal. 2008) (despite permissive language of the statute, section 921(c) ***requires*** dismissal if debtor is not eligible for relief under Chapter 9).  Thus, to be eligible for relief under Chapter 9, in addition to filing the petition in good faith, an entity must:

   a.    Be a municipality;

   b.    Be specifically authorized to be a bankruptcy debtor;

   c.    Be insolvent as specifically defined by 11 U.S.C. § 101(32)(C);

   d.    Genuinely desire to effect a plan to adjust its debts that exist as of the commencement of the case; and

   e.    Satisfy one of the four alternative statutory requirements for negotiating with its creditors before filing its petition.[7]

11 U.S.C. § 109(c).

146.    The debtor bears the burden of establishing that it meets each of those five statutory requirements of Section 109(c).  *In re Valley Health*, 383 B.R. at 161; *In re County of Orange*, 183 B.R. 594, 599 (Bankr. C.D. Cal. 1995).  This burden is a substantial one.  As one court explained "[t]he bankruptcy court's jurisdiction should not be exercised lightly in Chapter 9 cases . . . .  Considering the bankruptcy court's severely limited control over the debtor, once the petition is approved, access to Chapter 9 relief has been designed to be an intentionally difficult task." *In re Sullivan County Reg'l Refuse Disposal Dist.*, 165 B.R. 60, 82 (Bankr. D.N.H. 1994).

A.    **Municipality Requirement**

147.    Vallejo is a municipality within the meaning of Section 109(c)(1).  *See* 11 U.S.C. § 101(40) (defining "municipality" as "political subdivision or public agency or instrumentality of a State.")

---

[7] That is, that (A) it obtained consent of each class of creditors, (B) it negotiated in good faith but failed to reach agreement with its creditors, (C) negotiations are impracticable, or (D) it believes creditors may attempt to obtain avoidable preferential transfers.  11 U.S.C. § 109(c)(5).

Farella Braun & Martel LLP
235 Montgomery Street
San Francisco, CA 94104
(415) 954-4400

UNIONS' PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW - Case No. 08-26813 MSM

- 33 -

23085\1692801.3

**B.     State Law Authorization**

148.    California law authorizes Vallejo to bring a petition under Chapter 9. *See* Cal. Gov't. Code § 53760(a) ("Except as otherwise provided by statute, a local public entity in this state may file a petition and exercise powers pursuant to applicable federal bankruptcy law.")

**C.     Insolvency Requirement**

149.    Section 109(c)(3) of the Bankruptcy Code requires that Vallejo be insolvent. A city is "insolvent" if it is: "(i) generally not paying its debts as they become due unless such debts are the subject of a bona fide dispute; or (ii) unable to pay its debts as they become due." 11 U.S.C. § 101(32)(C). The test under the first prong requires current non-payment of obligations, but the test under the second prong is prospective, looking to the debtor's future inability to pay. *In re Bridgeport*, 129 B.R. 322 at 336-37. The reference point for determining insolvency is the date of the petition. *In re Town of Westlake, Texas*, 211 B.R. 860, 866 (Bankr. N.D. Tex. 1997). In other words, "it must be determined as of that date whether [the city] *will be* unable to pay its debts as they become due." *In re Bridgeport*, 129 B.R. at 337 (emphasis added). Vallejo has paid all its debts as they come due.

## First Prong -- Non-Payment Of Obligations

150.    As discussed above, at the filing of its petition, Vallejo was meeting its obligations. (Trial Ex. 5-B at 5; 7/23/08 Tr. at 131:13-132:2). Accordingly, Vallejo is not insolvent under 11 U.S.C. § 101(32)(C)(i). *See In re Westlake*, 211 B.R. 860, 864 (Bankr. N.D. Tex. 1997) (municipality not insolvent under Section 101(32)(C)(i) where it was "generally paying its debts" and "substantially current to creditors" on petition date.)

## Second Prong -- Inability To Pay Debts As They Become Due

151.    To be insolvent under the inability to pay test, the debtor must prove that it has debts that will mature imminently (in the current or next fiscal year) *and* that its inability to meet the debts is certain. *In re Westlake*, 211 B.R. at 865-66. *See also In re Bridgeport*, 129 B.R. at 338 ("[T]o be found insolvent a city must prove that it will be unable to pay its debts as they become due in its current fiscal year or, based on an adopted budget, in its next fiscal year.")

Farella Braun & Martel LLP
235 Montgomery Street
San Francisco, CA 94104
(415) 954-4400

UNIONS' PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW - Case No. 08-26813 MSM

- 34 -

23085\1692801.3

1          a.    *The Unions' Offer Allows The City To Remain Solvent*

2          152.    Vallejo filed its petition on May 23, 2008. The new fiscal year began July

3    1, 2008. Vallejo admits that the Unions have offered contract modifications that, if accepted,

4    would allow the City to remain solvent through the new fiscal year. (7/25/08 Tr. at 87:8-18; Trial

5    Ex. K at D-2; Trial Ex. X.) This alone establishes that Vallejo is not insolvent under the second

6    prong, requiring proof of inability to pay debts as they become due in the fiscal year of the

7    bankruptcy filing or the next fiscal year. "[I]nability to pay under § 101(32)(C)(ii) depends upon

8    the *inescapable* quality of the obligation and the certainty that it cannot be met." *In re Hamilton*

9    *Creek Metro. Dist.,* 143 F.3d 1381, 1386 (10th Cir. 1998) (emphasis added) (citations and internal

10   quotes omitted). The City's salary obligations under the current collective bargaining agreements

11   are not **"inescapable."** The Unions' offer to retire $12.3 million in salary obligations in 2008/09

12   is still on the table. (08/19/08 Tr. at 129:1-7.)

13         153.    The definition of insolvency "does not appear to encompass a situation

14   where a municipality deliberately budgets or spends itself into insolvency (so as to qualify under

15   § 101(32)(C)(ii), *when other realistic avenues and scenarios are possible.*" *In re Westlake*, 211

16   B.R. at 867 (emphasis added). While the Court cannot force a party to accept a settlement offer,

17   Vallejo cannot force the Court to grant it the protections of the bankruptcy laws where it passed

18   up and continues to pass up ***realistic*** alternatives to bankruptcy.

19         154.    While Vallejo argues that it would have eventually become insolvent in

20   any event as soon as salary increases became due in 2009/2010 and later years, this is largely

21   belied by the evidence. Specifically, the Unions' made salary raises contingent on the City's

22   ability to pay, including consideration of the need for a reasonable reserve, available revenue

23   sources, and reasonable breadth of services. Accordingly, salary obligations in the out-years were

24   contingent obligations and could not make the City bankrupt. *See In re Hamilton Creek Metro.*

25   *Dist.,* 143 F.3d 1381, 1386 (10th Cir. 1998). In *Hamilton*, which arose under Chapter 9, the debt

26   at issue was interest on certain exchange bonds. Interest on the original bonds was due on semi-

27   annual installment dates. Under a plan reached through prior negotiations with bondholders,

28   however, actual interest payments were only required on those dates to the extent the debtor had

Farella Braun & Martel LLP
235 Montgomery Street
San Francisco, CA 94104
(415) 954-4400

UNIONS' PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW - Case No. 08-26813 MSM

- 35 -

23085\1692801.3

1  funds available.  The debtor argued that it was insolvent because it could not make its interest

2  payments on the due dates.  The court disagreed because of the contingent nature of the

3  bondholders' right to payment finding that the "interest payments [were] neither presently,

4  unconditionally owing nor presently enforceable because they [were] indefinitely contingent on

5  the availability of certain Plan-defined funds.")  Similarly here, had Vallejo accepted the Unions'

6  offer, salary raises in the out-years would have been contingent on the availability of City funds

7  and would not constitute unconditionally due and owing debts sufficient to qualify for

8  bankruptcy.[8]

9          155.    While the Unions did not make the July 1, 2009 restoration of the prior

10  6.5% salary cut contingent on ability to pay, this does not affect the solvency analysis as to the

11  2008/09 fiscal year.  Nor is it clear that the 6.5% restoration would have bankrupted the City in

12  the out-years.  While the City offered a projection showing a $3.2 million general find deficit in

13  fiscal year 2009/10 based on the 6.5% restoration (Trial Ex. 25 at 3), this same projection placed

14  $3.2 million in new revenues below the line.  This projection also predicted lower revenues in

15  2009/10 than in 2008/09 and assumed 129 officers rather than 124.  The City did not explain the

16  basis for these assumptions.  Moreover, the City itself eventually agreed to restore the 6.5% in

17  2011.  (7/25/08 Tr. at 97:22-98:19.)  More notably, an earlier offer from the City would have

18  given the Unions a salary re-opener on July 1, 2009.  (Trial Ex. 17.)

19          156.    Moreover, the Court is reluctant to find Vallejo eligible for bankruptcy

20  based on what might or might not happen in 2009/10.  Ms. Mayer admitted that budgeting is a

21  science of estimation and that the further one goes out, the more speculative the projections

22  become.  (8/7/08 Tr. at 27:6-12.)  There are many variables that could affect Vallejo's financial

23  condition in the 2009/10 fiscal year.  These include voter approval of tax initiatives in November

24  2009, increased tax collection rates, additional identification and sale of surplus properties,

25  implementation of other revenue enhancements that have been identified, changes in property and

---

26  [8] See also In re Westlake, 211 B.R. 860, 866 (Bankr. N.D. Tex. 1997) ("[E]ven if the window

27  under § 101(32)(C)(ii) is longer than next year's budget (Bridgeport, 129 B.R. at 338), and could
    be expanded to two and one-half years, there must be an 'inescapable quality of the obligation

28  and the certainty that it cannot be met . . .'") (quoting Hudson & Manhattan, 138 F. Supp. 195,
    200 (SDNY 1955)).

Farella Braun & Martel LLP
235 Montgomery Street
San Francisco, CA  94104
(415) 954-4400

UNIONS' PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW - Case No. 08-26813 MSM

- 36 -

23085\1692801.3

1    sales tax revenues, levels of state and federal aid, and other changes in the health of the regional,

2    state, and national economies.

3          157.    At a minimum, the City could have accepted the Unions' offer in order to

4    give time for its revenue efforts to work and to continue exploring new revenues in the 2008/09

5    fiscal year with the option of filing for Chapter 9 relief in a year if those efforts failed. (7/25/08

6    Tr. at 71:14-19.) Such efforts could have included completing the cost allocation and cost

7    recovery updates, implementing the EMS fees, collecting SB 90 reimbursements, increasing sales

8    tax collection rates, placing millions of dollars in new tax initiatives on the November 2009

9    ballot, implementing other revenue options for which voter approval is not required, selling

10    surplus properties, and accepting the State Controller's offer to assist.

11          158.    In sum, the Court finds that the Unions' offer, which is still on the table,

12    gives the City a realistic alternative to bankruptcy. To allow the petition where such alternatives

13    are available would encourage a city facing financial difficulty to avoid making the hard

14    decisions of cutting costs and raising revenues and essentially abdicate the job of running a city to

15    the courts.

16          159.    Such a result would be particularly problematic here where bankruptcy

17    proceedings threaten to worsen Vallejo's financial condition. First, the bankruptcy will entitle the

18    Unions to damage claims under the very collective bargaining agreements that the City had the

19    option to modify outside of bankruptcy. The bankruptcy has also led to increased interest rates on

20    the City's bonds and potential damage claims belonging to the bond trustees. (Trial Ex. 5 at ¶ 28;

21    Trial Ex. F.) Further, the City has incurred and will continue to incur attorneys' fees both for its

22    own attorneys and for the attorneys representing its bond trustees. (Trial Ex. G at 44-46.)

23    Finally, as admitted by the City's witnesses, City staff has been "preoccupied" with the

24    bankruptcy proceedings, creating delay in implementing new revenues. (7/25/08 Tr. at 69:8-13;

25    8/5/08 Tr. at 124:25-125:3; 8/19/08 Tr. at 35:3-8.)

26          160.    In sum, when presented with an offer to retire $12.3 million in labor debt

27    obligations, the City declined the offer, leaving those obligations in tact and proceeding to

28    bankruptcy where it would incur additional obligations while delaying new revenues. This is a

Farella Braun & Martel LLP
235 Montgomery Street
San Francisco, CA 94104
(415) 954-4400

UNIONS' PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW - Case No. 08-26813 MSM

- 37 -

23085\1692801.3

1   parody of the bankruptcy protections, and the Court will not entertain it.

2                      b.    *Vallejo Inappropriately Budgeted Itself Into Insolvency*

3          161.   As noted above, the definition of insolvency "does not appear to

4   encompass a situation where a municipality deliberately budgets or spends itself into insolvency

5   (so as to qualify under § 101(32)(C)(ii)), when other realistic avenues and scenarios are possible."

6   *In re Westlake*, 211 B.R. at 867.

7          162.   In *Westlake*, the city debtor had recently had a substantial portion of its tax

8   base disannexed, was embroiled in litigation, and was in a political dispute over who had

9   authority to sign checks (causing its funds to be frozen as a result). *Id.* at 862-63. The city filed a

10  Chapter 9 bankruptcy petition contending that it had "insufficient revenue to continue . . . to

11  provide basic municipal services to its citizens." *Id.* at 863. The city's total, non-contingent

12  obligations were approximately $122,199.00, and it had over $1.7 million in cash and reserves.

13  *Id.* at 864-65. On the eve of the hearing on objections to the city's bankruptcy petition, Westlake

14  purported to adopt a budget for the next fiscal year, which showed a substantial budget deficit and

15  a negative cash balance. *Id.* at 866. The *Westlake* court analyzed in detail the proposed budget,

16  finding numerous items lacking credibility, especially in light of the city's financial difficulties.

17  The court therefore concluded that the city was not ***unable*** to pay its debts as they came due,

18  regardless of the projected budget deficit. *Id.* at 867.

19         163.   The evidence shows that Vallejo's budget projections (Trial Ex. 1-C),

20  projected deflated revenues and inflated expenditures and ignored other realistic scenarios for the

21  upcoming fiscal year.

22         164.   In its Fund Balance projection used to support its claimed $16.9 million

23  deficit, Vallejo estimates revenues of less than $78 million. (Trial Ex. 1-C.) In addition to

24  ignoring the revenue that could be added to the General Fund by transferring back funds that were

25  previously advanced or loaned to other funds (as described above), Vallejo's revenue projection

26  assumes $1.0 million of unidentified revenue losses from the State, fails to account for the $1.4

27  million in Insurance Fund transfers and RDA payments approved by City Council, (Trial Ex. K at

28  iv & viii), and fails to account for the additional $518,301 of program revenues included in the

Farella Braun & Martel LLP
235 Montgomery Street
San Francisco, CA  94104
(415) 954-4400

UNIONS' PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW - Case No. 08-26813 MSM

- 38 -

23085\1692801.3

1  final adopted budget. (*Id.* at D-2.)

2       165.    Moreover, the City's projections assume no new revenues. At a minimum,

3  the City should project for proceeds from the completion of the four surplus property sales, which

4  Mr. England estimated at $1.4 million. (Trial Ex. RR.) And at a minimum, the City should

5  project revenues for council approved new revenues that the City is now implementing such as

6  EMS fees, SB 90 reimbursements, cost allocation plan updates, and recovery for city user fees.

7  (7/25/08 Tr. at 123:21-124:11; 8/5/08 Tr. at 110:19-111:24.)

8       166.    The City could also generate, by its own estimates, an additional $1.5

9  million from an additional 8 properties set to go to City Council. (Trial Ex. RR.) Both the

10  Municipal Code and the City's Asset Management Policy authorize the City Manager to dispose

11  of these properties. (Trial Exs. AA and KK.) As discussed above, these sales could generate

12  regular income for the General Fund, such as through property taxes, sales taxes, and lease

13  payments. (8/19/08 Tr. at 42:14-43:11.)

14       167.    The City concedes that revenue enhancements are "critical." (Trial Ex. 1-I

15  at 7.) The Court finds that, in light of its budget difficulties, it is reasonable to expect the City to

16  implement new revenues in this fiscal year. The City's outside consultant has offered a menu of

17  17 revenue options for which voter approval is not required, (Trial Ex. P at 7), and the City itself

18  notes $1.7 million in new revenues below the line in its budget projections. (Trial Ex. 1-C.)

19       168.    In its Fund Balance projection used to support its claimed $16.9 million

20  deficit, Vallejo also estimated $95 million of expenditures. The Court finds that not all of these

21  expenses are "inescapable" or "imminent."

22       169.    At a minimum, expenditure projections can be reduced by $4 million,

23  which includes: (1) adjusting vehicle maintenance and replacement costs from $4.7 million to the

24  $2.3 million ultimately budgeted (Trial Ex. K at D-2); (2) adjusting the $1.6 million in

25  contributions to other agencies to the $750,000 ultimately budgeted (7/23/08 Tr. at 113:22-

26  114:1); and (3) adjusting debt service projections from $3.0 million to $2.1 million based on the

27  City's actual interest rate. (7/24/08 Tr. at 19:14-18; Trial Ex. 1-B at 29.)

28

Parella Braun & Martel LLP
235 Montgomery Street
San Francisco, CA  94104
(415) 954-4400

UNIONS' PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW - Case No. 08-26813 MSM

- 39 -

23085\1692801.3

170.    The City's expenditure projections can be reduced further by reducing police positions from 134 to 124 consistent with actual positions filled, (7/24/08 Tr. at 32:14-19), thereby reducing costs by $1.9 million (Trial Ex. 1-C); accounting for $500,000 in vacancy assumptions, (8/5/08 Tr. at 55:3-19); and reducing the projected 5.5% COLA to the more likely 4% at a savings of over $500,000.  (Trial Ex. 2 at ¶¶ 9-10.)

171.    While the Court understands that some of these budget cuts cannot be sustained indefinitely, they are not unreasonable from a fiscal emergency standpoint and indeed have largely been adopted in the City's 2008/09 budget.  (Trial Ex. K at D-2.)

172.    In addition, there are numerous steps the City can take to cut costs, repay loans to the general fund, or transfer assets from other city funds or agencies to allow it to meet its General Fund obligations in the 2008/09 fiscal year.

173.    The City can cut staffing and discretionary expenditures, which make up almost the entire General Fund budget.  (*See* Trial Ex. 1-B at 14, distinguishing between the short list of "fixed costs" and those which can be changed.)  Out of the $12.1 million in cash held by the Redevelopment Agency (Trial Ex. 1-A at 3), the City can repay a portion of the $9.2 million owed by the Redevelopment Agency to the General Fund or can transfer assets held by the Redevelopment Agency to the General Fund in satisfaction of that debt.  (*See* Trial Ex. J at 55, listing $15.2 million in notes receivable held by the Redevelopment Agency.)  The City can transfer assets from the Insurance Fund, which had $9.5 million in cash and receivables but only $3.3 million in current liabilities in the latest CAFR (Trial Ex. J at 113), or make a three year loan from the Insurance Fund to the General Fund (8/21/08 ROUGH Tr. at 101:4-25), or could even dissolve the Insurance Fund and pay much of the cash in that fund to the General Fund.  (*Id.* at 105:9-106:10.)  The City could cause the Local Transportation Fund to repay the General Fund a portion of the almost $3.2 million it owes.  (Trial Ex. K at E-5.)  The City could reinstate the interest forgiven in 1994 at the original 10% rate and cause its Flosden redevelopment area to repay the General Fund out of the $6.1 million it holds (Trial Ex. 1-A at 3), including the $1.7 million simply appropriated for the North Community Center.  (Trial Ex. K at F-8 and F-9.)

Farella Braun & Martel LLP
235 Montgomery Street
San Francisco, CA 94104
(415) 954-4400

UNIONS' PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW - Case No. 08-26813 MSM

- 40 -

23085\1692801.3

174. The city in *Bridgeport*, like Vallejo, was in extreme financial distress and had been for many years. *In re Bridgeport*, 129 B.R. at 335. Like Vallejo, Bridgeport claimed it was insolvent based on a $16 million budget deficit created by "unaffordable employee union contracts and inadequate state aid" on the one hand and by "the practical reality that it can neither cut essential services nor raise taxes to pay for them" on the other. *Id.* at 339. The *Bridgeport* court, although recognizing that the city's ability to provide even minimal services was strained and that the city's financial condition could get worse if drastic steps were not taken, held that the city was not eligible for Chapter 9 relief because it was not "insolvent" as defined in the Code. *Id.* The court noted that, even if the city's budget were to be adopted with the proposed deficit, it had sufficient cash available to cover the deficit. *Id.* at 337. Because the city could not prove it was ***unable*** to pay its debts for the following fiscal year, it was not insolvent and had "no choice but to continue with the budget and collective bargaining processes." *Id.* at 339.[9] This Court is persuaded by the *Bridgeport* court's rationale and adopts it here.

175. Accordingly, Vallejo has not satisfied its burden of establishing that it *cannot* meet its obligations when they become due and has not established that it is insolvent as required by 11 U.S.C. § 109(c)(3).

**D.    Desire To Effect Plan To Adjust Debts**

176. Section 109(c)(4) requires that the petitioner desire to effect a plan to adjust its debts. The intent to adjust the city's debts and obligations is measured from the petition date. *In re Westlake*, 211 B.R. at 867. "While the statutory requirement does not require a formal plan as such, some sort of comprehensive plan is required as one of the 'screening factors' to avoid a too early and rapid resort to the bankruptcy courts by municipalities." *In re Sullivan County Reg'l Refuse Disposal Dist.*, 165 B.R. 60, 78 (Bankr. D.N.H. 1994).

177. Vallejo offered no evidence that it ever generated, discussed or negotiated any components of a plan of arrangement with any creditor.

---

[9] *See also In re Ellicott Sch. Bldg. Auth.*, 150 B.R. 261, 265 (Bankr. D. Colo. 1992) (finding debtor failed to satisfy insolvency requirement where it (1) had recourse to a reserve fund and (2) had not taken formal action to try to collect certain rent obligations).

Parella Braun & Martel LLP
235 Montgomery Street
San Francisco, CA 94104
(415) 954-4400

UNIONS' PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW - Case No. 08-26813 MSM

- 41 -

23085\1692801.3

178.    While Vallejo spoke with Union Bank generally about "what part the City and Union Bank could play together in helping the City stay out of bankruptcy" (7/24/08 Tr. at 84:7-13), there is no evidence or indication that the City filed its petitions with a desire to adjust its debts to Union Bank.

179.    Under its pendency plan, the City is current on all its debts to vendors other than employees and retirees.  (Trial Ex. 5-B at 5.)

180.    The City moved promptly in these proceedings to reject its collective bargaining agreements.  [Docket No. 69.]  The City has not moved to reject or modify any of its other obligations.

181.    The evidence shows that the petition is aimed not at restructuring all obligations fairly but rather at avoiding obligations to city workers and retirees under their collective bargaining agreements.  Indeed, Mr. Whittom specifically described the "threat of bankruptcy" as a tool for negotiating with the Unions.  (7/25/08 Tr. at 102:18.)

182.    Accordingly, Vallejo has not satisfied its burden to establish that it desires to effect a plan to adjust it debts as required by 11 U.S.C. § 109(c)(4).

### E.    Negotiation Requirement

183.    To be eligible for Chapter 9 bankruptcy, Vallejo must prove that it also satisfied at least one of the four alternative statutory requirements for negotiating with creditors over an adjustment plan, as listed in Section 109(c)(5).  In this case, Vallejo has focused upon subparagraphs B and C of the subsection (c)(5).

### Section 109(c)(5)(B)

184.    Section 109(c)(5)(B) requires the municipal debtor to show that "it has negotiated in good faith with creditors and has failed to obtain the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case."

185.    "The 'creditor protection' provided by section 109(c)(5) . . . insures that the creditors have an opportunity to negotiate concerning a plan on a level playing filed with the debtor before their rights are further impaired by the provisions of section 362 of the Code."  *In re*

Farella Braun & Martel LLP
235 Montgomery Street
San Francisco, CA  94104
(415) 954-4400

Unions' Proposed Findings of Fact and
Conclusions of Law - Case No. 08-26813 MSM

- 42 -

23085\1692801.3

*Sullivan County Reg'l Refuse Disposal Dist.*, 165 B.R. 60, 78-79 (Bankr. D.N.H. 1994). The evidence shows that Vallejo did not negotiate in good faith.

186.    As discussed above, months before the bankruptcy filing, the Unions agreed to interim contract modifications to give Vallejo an opportunity to negotiate a longer-term deal with the Unions to avoid the necessity of a bankruptcy filing. Among other things, under the Interim Agreements police and firefighters ("public safety employees") took a 6.5% pay cut, and Vallejo was allowed to close two fire stations despite an arbitration ruling that public safety required greater staffing. (Trial Exs. B, C, D, & 13.)

187.    Following the Interim Agreement, the Unions continued to negotiate a modification of their collective bargaining agreements in an effort to work out a longer term agreement that would avoid a bankruptcy filing. (Trial Ex. 2 at ¶ 24.)

188.    The Unions' offer gave up forever raises due in 2008/09 and 2009/10 and continued to take a 6.5% salary cut for a year. In all public safety workers offered pay reductions and raise give-backs totaling approximately 20% of their pay. The Unions also agreed that raises in future years would be subject to the City's ability to pay, including consideration of the need for a reasonable reserve, available revenue sources, and reasonable breadth of services. Public safety workers waived minimum staffing requirements. (Trial Ex. W.)

189.    As discussed above, the evidence shows and the City admits that the Unions' offer would have allowed Vallejo to remain solvent at least through the 2008/09 fiscal year. (7/25/08 Tr. at 87:8-18; Trial Ex. K at D-2.) Indeed, Vallejo is paying more in worker salaries under its pendency plan than it would be paying under the Unions' offer. This is because the pendency plan, while continuing the interim agreement salaries for public safety workers, does not incorporate the IBEW's offer to take a 3% pay cut in the form of a work furlough. (Trial Exs. 5-B, W.)[10]

190.    As also discussed above, the Unions' final offer likely would have allowed the City to remain solvent beyond fiscal year 2008/09 because (1) the City made a commitment in mediation to raise new revenues and (2) employee raises were made contingent on the City's

---

[10] The IBEW has taken a work furlough in the past. (Trial Ex. 1-B at 37.)

Farella Braun & Martel LLP
235 Montgomery Street
San Francisco, CA 94104
(415) 954-4400

UNIONS' PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW - Case No. 08-26813 MSM

- 43 -

23085\1692801.3

1   ability to pay, including consideration of the need for a reasonable reserve, available revenue

2   sources, and reasonable breadth of services.  (Trial Ex. W.)

3          191.    Moreover, as discussed above, the evidence shows that Vallejo relied

4   almost entirely on labor concessions to balance its General Fund and failed to implement options

5   for cutting other expenditures and raising new revenue, further showing bad faith negotiation.

6   (Trial Ex. 25.)  *See In re Sullivan County Reg'l Refuse Disposal Dist.*, 165 B.R. 60, 76-79 (Bankr.

7   D.N.H. 1994) (failure to satisfy negotiation requirement where debtor never set forth a

8   comprehensive workout plan dealing with all of its assets and liabilities in terms comparable to a

9   plan of adjustment, ignored unambiguous contract rights of creditors and failed to exercise tax

10  assessment powers).  Mr. Whittom admitted that the City could have accepted the Unions' offer

11  while it continued to look into the menu of revenue options presented in the Management Partners

12  report.  (7/25/08 Tr. at 71:7-19.)

13         192.    Had Vallejo negotiated in good faith, it would have accepted the Unions'

14  offer and would have retired over 12 million dollars in debt in 2008/09, additional millions in

15  2009/10 and 2010/11, and made several million more dollars in debt contingent on ability to pay

16  through 2014.

17         193.    Had Vallejo negotiated in good faith, it would have explained its 12%

18  interest rate projection.

19         194.    Had Vallejo negotiated in good faith, it would have shown the Unions its

20  comparability study or at least not misrepresented the fact that it was conducting such a study.

21         195.    Had Vallejo negotiated in good faith it would have prepared budget

22  projections to reflect all three of the mediation objectives – expenditure reductions, revenue

23  enhancements, and labor modifications, including consideration of many of the cost savings and

24  transfers the City ultimately adopted as part of the 2008-9 budget.  (Comparing Trial Ex. 25 at 2

25  with Trial Ex. K at D-2.)

26         196.    Had Vallejo negotiated in good faith it would have accepted the Unions'

27  offer to extend the Interim Agreements past June 30, 2008 to give the parties more time to meet in

28  an effort to avoid a bankruptcy filing.  (8/19/08 Tr. at 148:10-21.)  It is surprising that the parties

Parella Braun & Martel LLP
235 Montgomery Street
San Francisco, CA  94104
(415) 954-4400

UNIONS' PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW - Case No. 08-26813 MSM

- 44 -

23085\1692801.3

did not continue to meet given how close they had come in their offers.[11]

197.    Had Vallejo negotiated in good faith, it would have accepted the Unions' proposal to arbitrate future disputes over the City's ability to pay or, at a minimum, it would have proposed an alternative dispute resolution mechanism. (8/19/08 Tr. at 145:19-146:3.)

198.    Vallejo presented no evidence showing that its final offer was limited to those concessions strictly necessary to balance the budget and to establish a reasonable reserve. Vallejo presented no evidence showing that its final offer attempted to maintain competitive salaries or otherwise address recruitment and retention issues.

199.    While the City's attorneys had Mr. Whittom walk through a number of offers that the City made during the mediation, (8/19/08 Tr. at 101:21-136:13), the fact that the City made numerous offers does not establish good faith.  This is particularly so where the City's original offer in the mediation would have required workers to stay at 2005/06 levels of compensation through fiscal year 2010, while significantly capping both raises and staffing in future years. (Trial Ex. LL; 8/19/08 Tr. at 178:8-180:8.)

200.    Finally, Bankruptcy Code Section 109(c)(5) requires a negotiation with creditors over their proposed treatment as impaired creditors ***under a plan* in a case"** under Chapter 9.  11 U.S.C. § 109(c)(5)(A) and (B).  *See also In re Cottonwood Water & Sanitation Dist.,* 138 B.R. 973, 975 (Bankr. D. Colo. 1992) ("The linkage of sections 109(c)(4) and 109(c)(5) lends support, in this Court's view, to the Objectors' position in this case.  The concept is that the entity must desire to effect a "plan" within the meaning of section 941 and must have negotiated in good faith *concerning that proposed plan.*") (emphasis added); *In re Sullivan County Reg'l Refuse Disposal Dist.,* 165 B.R. 60, 78 ("Congress consciously sought 'to limit accessibility to the bankruptcy court' by municipalities. [citation].  One way to do so was to require the municipal entity, before rushing to this Court, to first seek to negotiate in good faith concerning the treatment the creditors may be expected to receive under a plan to be filed under section 941 of the Code.")

---

[11] When asked whether Mr. Whittom recalled Mr. Kagel asking the City "What more do you guys want?" Mr. Whittom admitted that "He may have said that during the course of the mediation or on the last day.  Possibly he did." (7/25/08 Tr. at 100:24-101:2.)

Farella Braun & Martel LLP
235 Montgomery Street
San Francisco, CA  94104
(415) 954-4400

UNIONS' PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW - Case No. 08-26813 MSM

- 45 -

23085\1692801.3

201.    The City produced no evidence showing that it discussed, let alone negotiated, with the Unions how it would treat the claims of the Unions and their workers in a plan of arrangement.  Mr. Whittom admitted that the City never discussed with the Unions possible components of a plan of arrangement in the bankruptcy.  (7/25/08 Tr. at 91:25-92:6.)

202.    Accordingly, the City did not satisfy its obligation to establish that it negotiated in good faith under Section 109(c)(5)(B).

### Section 109(c)(5)(C)

203.    Section 109(c)(5)(C) requires a municipal debtor to show that it "is unable to negotiate with creditors because such negotiation is impracticable."  Vallejo offered no evidence that it was impracticable to negotiate with its creditors.  While Vallejo offered evidence that Union Bank requested a comprehensive financial plan before it could discuss modifying the City's obligations to Union Bank, the City offered no evidence showing that it attempted to negotiate with any other creditors or that there were other creditors to be impaired, let alone innumerable ones.

204.    Indeed, the City offered no evidence that it seeks to impair its debts to Union Bank at all.  The evidence and the City's behavior in this matter point to the inevitable conclusion that the City filed the petition for the sole purpose of impairing its labor contracts. The City had multiple opportunities to show that it seeks a fair reorganization of all of its debts or at least some debts other than its labor debts.  It has never done so.

205.    In sum, the evidence shows that the City did not negotiate with creditors other than the three union objectors.  Either the City is ineligible because it has not negotiated with other creditors that it intends to impair, or the City does not intend to impair other classes of creditors, making it ineligible due to bad faith filing, as discussed below.

206.    Accordingly, the Court finds that Vallejo failed to meet its burden to show that it negotiated in good faith as required by Section 109(c)(5).

Farella Braun & Martel LLP
235 Montgomery Street
San Francisco, CA 94104
(415) 954-4400

UNIONS' PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW - Case No. 08-26813 MSM

- 46 -

23085\1692801.3

**F.    Good Faith Filing Requirement**

207.    As noted above, Section 921(c) provides that even a petition filed by an entity eligible for Chapter 9 relief is subject to dismissal "if the debtor did not file the petition in good faith." Where, as here, a purported debtor's good faith is in issue, the debtor bears the burden of affirmatively demonstrating that it filed the petition in good faith. *In re Powers*, 135 B.R. 980, 997 (Bankr. C.D. Cal. 1991).

208.    The essence of the good faith requirement is to "prevent abuse of the bankruptcy process." *In re Villages at Castle Rock Metro Dist. No. 4*, 145 B.R. 76, 81 (Bankr. D. Colo. 1990). Typically, dismissal for lack of good faith has been held to be appropriate in two different contexts: "(1) . . . because there were no reasonable prospects for reorganization and the petition served only to delay and hinder creditors; and (2) . . . because for other reasons the filing is deemed to be inappropriate, as being at odds with the legislatively intended scope of the chapter . . . ." *In re Sullivan County Reg'l Refuse Disposal Dist.*, 165 B.R. 60, 81 (Bankr. D. N.H. 1994). In this case, dismissal is warranted on both grounds.

209.    As discussed above, Vallejo has shown no intention of achieving a fair readjustment of all of its debts. The City offered no evidence that it seeks to impair any creditors other than City employees. Rather, the evidence shows that Vallejo's sole purpose in filing its bankruptcy petition is to reject its collective bargaining agreements.

210.    The City offered no explanation for turning down the State Controller's offer to provide accounting and legal assistance and to review and proscribe legal options for the City to make inter-fund loans to its General Fund from enterprise, internal service, and other funds, all without cost. (Trial Ex. U at ¶ 13.)

211.    Further, the City's delay in implementing the available revenue programs discussed above, while still seeking to avoid obligations under its collective bargaining agreements, demonstrates a lack of good faith. *See e.g. In re Sullivan County Reg'l Refuse Disposal Dist.*, 165 B.R. 60, 82 (Bankr. D.N.H. 1994) (failure of municipality to use powers to raise discretionary revenue demonstrates lack of good faith, particularly when, as here, the Chapter 9 is filed essentially to address the contractual rights of a specific creditor and is filed

Farella Braun & Martel LLP
235 Montgomery Street
San Francisco, CA  94104
(415) 954-4400

UNIONS' PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW - Case No. 08-26813 MSM

- 47 -

23085\1692801.3

1    even after years of financial mismanagement).  The evidence shows that even after operating at a

2    General Fund deficit since 2005/06 (Trial Ex. 1-C), the City did not appoint an official budget

3    team or even a point person until late 2007/early 2008.  (Trial Ex. 1-E; 7/25/08 Tr. at 36:7-17,

4    63:4-13, 64:24-65:2.)

5            212.    Even after retaining an outside consultant in early 2008 to explore options

6    for raising revenues and even after being presented with multiple draft reports discussing over 20

7    new revenue options, staff has still not presented the consultant's work to City Council. (7/25/08

8    Tr. at 68:18-20.)  Given that Vallejo's financial condition had been worsening for years prior to

9    the petition and given the City's awareness of its potential insolvency, this delay was excessive.

10            213.    While some revenue options have been or are being implemented, most

11    have not.  And the City offers no explanation for why some options, for which voter approval is

12    not even required, have not been implemented.  These include police service fees, fire inspection

13    fees, street sweeping fees, litter tax fees, ferry parking fees, business tax administration fees, and

14    new park admissions fees.  (8/5/08 Tr. at 83:17-84:10; 108:4-10; 127:2-15.)

15            214.    The City also delayed and continues to delay in presenting millions of

16    dollars in revenue options for voter approval.  City Council declined to place any tax measures on

17    the November 2007 or June 2008 ballots despite preliminary poll results showing that 70% of

18    voters agreed that maintaining police and fire services should be a "top priority, even if it means

19    raising taxes," and showing that a utility renewal tax was "definitely possible." (Trial Ex. R.)

20    Further, the City Council has declined to place tax measures on the upcoming November 2008

21    ballot despite the mayor's suggestion that a sales tax measure could be included and should be

22    included given the City's comparatively low sales tax rate. (8/19/08 Tr. at 27:12-29:23, 32:9-15.)

23            215.    Finally, the City delayed and continues to delay in selling off its surplus

24    properties.  Despite the fact that the first batch of four properties was approved by City Council

25    back in October 2007 with an estimated $1.4 million in proceeds from sale (Trial Exs. Z, RR),

26    these properties have yet to be listed. (8/19/08 Tr. at 46:16-19).  The second batch of 8

27    properties, which was initially set to go to City Council in March 2008, has been delayed

28    repeatedly, first from March to May, then from May to August, and again from August to

Farella Braun & Martel LLP
235 Montgomery Street
San Francisco, CA  94104
(415) 954-4400

UNIONS' PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW - Case No. 08-26813 MSM

- 48 -

23085\1692801.3

1    September. (8/19/08 Tr. at 46:23-49:14.)  The City Manager has authority to sell off these

2    properties without City Council approval but has not done so.  (Trial Ex. KK; 8/19/08 Tr. at 45:4-

3    45:6.)  This pattern of delay is inconsistent with the steps that a city facing bankruptcy should

4    appropriately take.

5         216.    The evidence shows that City Council itself often delayed revenue

6    enhancement efforts to see if the City could first extract labor concessions.  Mr. Whittom's

7    December 2007 memorandum made expenditure reductions and revenue enhancements an

8    approach to resolving the General Fund imbalance "in the event labor negotiations [were]

9    unsuccessful."  (Trial Ex. M.)  Councilmember Gomes stated that the City could not "talk about

10   bringing in revenues" until it dealt with the battle with the unions.  (7/25/08 Tr. at 46:16-23), and

11   Mr. Whittom stated that the City postponed bringing new revenues to City Council until it had a

12   labor deal to bring at the same time, in order to make the revenue decisions more "palatable."

13   (Trial Ex. P.)  Even after the bankruptcy filing, Ms. Gomes stated that the City could not consider

14   a sales tax, saying that the City had to first set "salaries at a fair level to everybody" and that the

15   City had "not cleaned house yet."  (8/19/08 Tr. at 30:2-31:15.)  The City offered no explanation

16   of why it could not negotiate contract modifications while simultaneously working to raise

17   revenue.  The Court finds that the City's singular focus on rejecting its labor obligations

18   demonstrates bad faith.

19        217.    In addition, Vallejo's conduct post-petition also demonstrates bad faith.  As

20   discussed above, after filing its petition, the City promptly moved to reject its collective

21   bargaining agreements but remains silent as to its obligations to other creditors.  And under its

22   pendency plan and related budget, the City continues to voluntarily pay holders of bonds, but

23   unilaterally cuts pay and eliminates contractually required pay raises for its Union-represented

24   workers.  (Trial Ex. 5-B.)  Additionally, workers who retire or lose their jobs lose their vested

25   rights to be paid their accrued vacation, sick time and compensated absences on the day of

26   termination and instead have to wait until 2010 for half of what they are owed.  (*Id.* at 3, Section

27   V.)  The Court finds bad faith in this singling out of one class of creditors.  *See* 6 King, *Collier on*

28   *Bankruptcy*, ¶ 900.02[2][d] (15th ed. 2008) ("[The] 'desire to effect a plan to adjust such debts' . .

Farella Braun & Martel LLP
235 Montgomery Street
San Francisco, CA 94104
(415) 954-4400

UNIONS' PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW - Case No. 08-26813 MSM

- 49 -

23085\1692801.3

1    . is an element of the 'good faith' requirement contained in section 921(c).  [It] requires that the

2    purpose of the filing of the chapter 9 petition not be simply to buy time or to evade creditors.").

3         218.    Finally, as discussed at length above, the evidence shows and Vallejo

4    admits that the Unions made an offer that would have allowed the City to remain solvent through

5    fiscal year 2008/09 by retiring $12.3 million in salary obligations.  Failure to accept this offer

6    shows bad faith.  By not taking the offer, the City elected to leave intact avoidable salary

7    obligations and then turn around to use those avoidable obligations to support its claim of

8    insolvency.  This decision has resulted in and/or will result in millions of dollars in attorneys'

9    fees, millions of dollars in damage claims, and millions of dollars in increased debt service, not to

10   mention other less quantifiable costs to the City such as worker attrition, increased crime, and loss

11   of existing and future business.  The Court finds that Vallejo's recourse to bankruptcy, where

12   other reasonable and less costly options were available, was bad faith use of bankruptcy process.

13   *See In re Valley Health Sys.*, 383 B.R. 156, 161 n.8 (Bankr. C.D. Cal. 2008) ("The absence of

14   good faith pre-petition negotiations is a factor that may be considered in determining whether a

15   chapter 9 petition was filed in good faith.").

16        219.    Accordingly, the Court finds that Vallejo filed this case for an improper

17   purpose, specifically to avoid its obligations to city workers and retirees under current collective

18   bargaining agreements.

19

20        220.    To the extent that any of the foregoing conclusions of law should more

21   properly be considered findings of fact, they shall be deemed as such.

22

23

24

25

26

27

28

Farella Braun & Martel LLP
235 Montgomery Street
San Francisco, CA  94104
(415) 954-4400

UNIONS' PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW - Case No. 08-26813 MSM

- 50 -

23085\1692801.3

## IV.    CONCLUSION AND ORDER

221.    Based on the foregoing, the Court concludes that the City of Vallejo has failed to establish the requisites for Chapter 9 relief under of 11 U.S.C. § 109(c).

222.    The Unions' objection to the petition is SUSTAINED.  Vallejo's petition is DISMISSED.  IT IS SO ORDERED.

Dated:_____

_____
The Honorable Michael S. McManus
Chief Judge of the United States Bankruptcy
Court for the Eastern District of California

Dated:  August 29, 2008                    FARELLA BRAUN + MARTEL LLP

By:_____/s/ Monica M. Swanson_____
              Monica M. Swanson

Attorneys for Creditors
International Association of Firefighters Local
1186 ("IAFF"), Vallejo Police Officers'
Association ("VPOA"); and International
Brotherhood of Electrical Workers, Local 2376
("IBEW")

Farella Braun & Martel LLP
235 Montgomery Street
San Francisco, CA  94104
(415) 954-4400

UNIONS' PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW - Case No. 08-26813 MSM

- 51 -

23085\1692801.3