FILED

September 03, 2008

CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

0001391874

**45**

1   MARC A. LEVINSON (SBN 57613)
    NORMAN C. HILE (SBN 57299)
2   KATHERINE THOMAS (DCBN 497321) (*pro hac vice*)
    ORRICK, HERRINGTON & SUTCLIFFE LLP
3   400 Capitol Mall, Suite 3000
    Sacramento, CA  95814
4   Telephone:    (916) 447-9200
    Facsimile:    (916) 329-4900
5   malevinson@orrick.com
    nhile@orrick.com
6   ksthomas@orrick.com

7   Attorneys for Debtor
    City of Vallejo, California

8

9                    UNITED STATES BANKRUPTCY COURT

10                   EASTERN DISTRICT OF CALIFORNIA

11                        SACRAMENTO DIVISION

12

13   In re:                              Case No.  2008-26813

14   CITY OF VALLEJO, CALIFORNIA,        **OHS-1**

15          Debtor.                      **Chapter 9**

16                                       **CITY'S PROPOSED FINDINGS OF**
                                         **FACT AND CONCLUSIONS OF LAW**
17
                                         **Date:**    **July 23, 2008**
18                                       **Time:**    **10:00 AM**
                                         **Dept:**    **A**
19                                       **Judge:**   **Hon. Michael McManus**

20

21          Pursuant to Federal Rule of Civil Procedure 52(a), made applicable to bankruptcy

22   proceedings by Federal Rules of Bankruptcy Procedure 7052 and 9014, Petitioner, the City of

23   Vallejo (the "City"), submits the following Proposed Findings of Fact and Conclusions of Law.

24                                       **I.**

25                              **INTRODUCTION**

26          On May 23, 2008, the City filed its Statement of Qualifications Under Section

27   109(c) of the Bankruptcy Code.  On June 27, 2008, the Vallejo Police Officers Association

28   ("VPOA"), the International Association of Firefighters ("IAFF") and the International

---

CITY'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Brotherhood of Electrical Workers ("IBEW"), collectively, the "Unions," filed an objection to the City's Statement of Qualifications. The City filed its papers in reply on July 18, 2008. Each of these filings included a number of declarations.

The Court commenced an evidentiary hearing on July 23, 2008, and concluded it on August 22, 2008. The evidentiary hearing addressed whether the City meets the chapter 9 eligibility criteria set forth in Section 109(c). Marc A. Levinson, Norman C. Hile and Michael Weed appeared for the City. Dean M. Gloster, Kelly A. Woodruff, and Monica M. Swanson appeared for the Unions. Robert Kaplan and Nicolas DeLancie appeared for Union Bank. Michael Buckley appeared for Wells Fargo Bank. Various other creditors and/or objectors appeared or attended the hearings.

## II.

## FINDINGS OF FACT

### A.    The City's Financial Situation and Insolvency at 7/1/08

1.    Over the past three fiscal years ending June 30, 2008, the City's General Fund has operated at deficits of $3.2 million, $4.2 million and (projected) $4.2 million, respectively. CTE 1, ¶ 6 & Exh. C, p. 1.

2.    The City projected that by the end of the fiscal year ending June 30, 2008, General Fund reserves would be depleted and the General Fund would begin fiscal year 2008-09 with no reserves. CTE 1, ¶¶ 15-16 & Exh. B, pp. 2, 9.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

3.      Updated projections show the General Fund may have begun fiscal year 2008-09 with a negative balance, not merely a zero balance.[1]  CTE 5, ¶ 7.

4.      The Government Finance Officers Association "best practices" states that, to maintain financial stability, a city should establish and preserve funding reserves of at least 5% of annual revenues.  CTE 1, ¶ 51 & n. 8.  The City Council's stated policy is to maintain a reserve of 5% to 15% of annual revenues.  CTE 5, ¶ 26; RT 8/19/08, pp. 116:21-117:11.[2]

5.      The City derives the majority of its General Fund revenues from payments received from the state or Solano County, such as property and sales taxes, and other collected fees and assessments, for which the City periodically receives lump-sum payments.  CTE 1, ¶ 16 & Exh. L, p. 2.  For example, the City receives property tax revenues into the General Fund twice in each fiscal year, in December and April.[3]  CTE 1, ¶ 16 & Exhs. C, p. 1, L, p. 2.  The City receives sales tax revenues on a monthly basis.  RT 7/23/08, pp. 84:21-85:1.  Other revenues come into the General Fund on a monthly, quarterly, or semi-annual basis, but no substantial amount of revenues are received into the General Fund on a daily basis.  CTE 1, ¶ 16.

6.      The City's revenues have been significantly affected by the housing market crash, California's struggling economy, and other events.  CTE 5, Exh. 0, pp. 1-6.  Adverse economic conditions have directly impacted the City's primary revenue sources: property taxes, sales taxes, assessments and fees.  CTE 1, ¶¶ 24, 26 & Exhs. B, p. 5, O, pp. 1-3.  The slowing economy has decreased sales tax revenues, as well as other important revenue sources, such as motor vehicle licensing fees and real estate development fees.  CTE 1, ¶¶ 26, 27.  In the 2007-08 fiscal year, the closing of the Vallejo Wal-Mart store significantly reduced the City's sale tax revenue.  CTE 1, ¶ 27.  The General Fund will no longer receive revenue sharing funds from Six

---

[1] The City does not yet know whether the General Fund actually ended the fiscal year 2007-08 with a negative balance because: (1) it does not yet know its final revenue figures and is still accruing receipts; (2) it has not finished paying its bills from fiscal year 2007-08; and (3) it does not know the transactions in the other funds that are the basis for inter-fund reimbursements.  Reporter's Transcript of Proceedings ("RT"), 8/5/08, p. 211:11-214:6.  However, the City does know that fiscal year 2007-08 labor costs were higher than budgeted, that revenues were less than expected, and that the General Fund likely ended the year with a negative balance.  Id. pp. 211:20-214:16.
[2] The City cites to drafts of the 8/19/08, 8/21/08 and 8/22/08 transcripts from the evidentiary hearing.  The City will submit amended Proposed Findings of Fact and Conclusions of Law, limited to updating citations based on the final transcripts, when it receives the final transcripts for those dates.
[3] Each installment of property taxes approximates $9 million.  CTE 1, ¶ 16 & Exh. L, p. 2.  The City's General Fund also receives a small installment of property taxes in June, approximately $400,000.  Id.

- 3 -

1  Flags/Marine World as a result of the owner's exercise in 2007 of its option to buy the

2  amusement park from the City.  CTE 1, ¶ 27 & n. 4.

3           7.      Current economic conditions affect the State of California's financial

4  situation as well, which in turn affects the City's financial situation.  RT 8/7/08, pp. 57:16-60:13;

5  RT 8/22/08, pp. 41:25-42:20, 44:19-45:25.  Based on a Legislative Analyst's Office's report and

6  the historical tendency of the state to withhold funds from cities to solve its fiscal challenges, the

7  City originally projected a $1 million decrease in state funds available to the City in fiscal year

8  2008-09.[4]  CTE 1, ¶ 31 & Exhs. M, p. 15, C, p. 1; RT 8/7/08, pp. 57:16-60:13.  Recent estimates

9  of the amount the state may withhold from Vallejo are $3 million.  CTE 39, pp. 1-3; RT 8/22/08,

10  pp. 45:15-23.  Historically, the state has withheld revenues from the City when the state has faced

11  its own budget difficulties.  RT 8/7/08, p. 58:10-14.

12           8.      Prior to filing its petition, the City projected that General Fund revenues in

13  fiscal year 2008-09 would be approximately $77.9 million.  CTE 1, ¶ 23 & Exh. C, p. 1, Column

14  A.  That revenue total is $5.3 million less than the revenue the City expects to collect for the

15  2007-08 fiscal year.  CTE 1, ¶ 25 & Exh. C, p. 1.

16           9.      The City's General Fund costs continue to rise, while General Fund

17  revenues decrease.  CTE 1, ¶ 6 & Exh. C, p. 1.  On May 16, 2008, the City projected expenditures

18  for fiscal year 2008-09 to be approximately $95 million, resulting in a projected General Fund

19  budget deficit approaching $17 million.  CTE 1, ¶ 23 & Exh. C, p. 1, Column A.

20           10.     The City prepared alternative financial projections for fiscal year 2008-09

21  based on severely reduced funding levels for City services and programs not controlled by

22  contract and the addition of $1.4 million in new revenue.  CTE 1, ¶ 54 & Exh. C, p. 1, Column B;

23  RT 7/23/08, pp. 93:8-24, 95:7-96:21, 99:5-100:17.  Under the City's alternative estimate, the

24  City's projected General Fund deficit remains over $10 million for fiscal year 2008-09.  CTE 1,

25  ¶¶ 54, 58 & Exh. C, p. 1, Column B; RT 7/23/08, pp. 93:8-24, 95:7-96:21.

26

27  [4] A Senate committee has voted to cut grant programs to local agencies.  CTE 1, ¶ 31 & Exh. M, pp. 1-15.  The
   Governor's proposed budget, as reaffirmed in his May 2008 revise, also identifies a 10% reduction in these state
28  programs.  *Id.*  The actual extent of the impact to cities will not be known until the state tackles its own budget
   challenges.  *Id.*

11.    The City cannot project a balanced General Fund budget for fiscal year 2008-09, while at the same time complying with its contractual labor cost obligations under the existing Collective Bargaining Agreements (each a "CBA" and together, the "CBAs"). CTE 1, ¶ 58, Exh. C, p. 1; RT 7/23/08, pp. 92:10-18, 96:4-97:5; RT 8/19/08, pp. 80:20-82:5, 84:6-15, RT 8/22/08, pp. 5:18-7:10. The CBAs provide the terms that determine the compensation represented employees receive, including base pay, overtime, health and medical benefits, minimum staffing levels, pension and retiree health benefits and other compensation components, such as vacation accrual. CTE 1, ¶ 35 & Exh. B, pp. 3-4; CTE 2, ¶ 4.

12.    The City's fiscal year 2008-09 budget and cash flow projections, based on current service levels and CBA obligations, show that the General Fund would end each month of the fiscal year with a negative cash balance ranging from $6.1 million to $22.7 million. CTE 1, ¶¶ 17, 23 & Exhs. C, p. 1, L, pp. 1, 3; RT 7/23/08, pp. 101:4-103:14; RT 8/7/08, pp. 5:10-8:25.

13.    Even assuming the alternative General Fund budget projection based on severe expenditure cuts in services not controlled by the CBAs and the addition of $1.4 million in new revenue, the General Fund would experience a $10 million deficit and, without reserves to begin the year, would operate at a negative cash balance in each month of fiscal year 2008-09. CTE 1, ¶¶ 54-58 & Exh. L, p. 4; CTE 5, Exh. D, pp. 1-5; RT 7/23/08, pp. 102:15-25; RT 7/24/08, pp. 31:10-32:6; RT 8/5/08, pp. 36:4-37:17.

14.    Absent its chapter 9 petition, the City would not have sufficient funds in any month in fiscal year 2008-09 to permit the City to pay all the General Fund obligations that it would incur. CTE 1, ¶ 17 & Exh. L, pp. 1, 3; CTE 5, Exh. D, pp. 1-5.

15.    On July 1, 2008, were it not for its chapter 9 petition in this case, the City would have begun incurring payment obligations that it could not pay and for which it could not show the ability to pay. CTE 1, ¶¶ 16-17 & Exh. L, p. 4.

16.    The City was obligated to make a payroll payment on July 11, 2008, for the pay period ending on July 4, 2008. CTE 1, ¶ 17 & Exh. L, p. 4; RT 8/7/08, pp. 5:8-8:4. Absent the City's chapter 9 petition, the City would have been obligated to pay CBA salary increases in

/ / /

the July 11th payroll for all City employees subject to the CBAs. CTE 1, ¶¶ 17, 39 & Exh. L, p. 4; CTE 5, ¶ 7; RT 8/19/08, pp. 84:17-85:3.

17.    Prior to filing its bankruptcy petition, the City projected that the amount of the July 11, 2008 General Fund payroll would be approximately $2.6 million. CTE 1, ¶ 17 & Exh. L, p. 4; RT 8/7/08, pp. 5:8-8:4.

18.    The actual amount of the July 11th General Fund payroll, which was based on salary levels established by the City under its Pendency Plan, was $2.4 million. CTE 5, ¶ 7 & Exh. D, p.1; RT 8/7/08, p. 7:4-8; RT 8/19/08, p. 126:8-13.

19.    As of July 11, 2008, the General Fund had not received sufficient revenues and did not have enough money to cover the July 11th payroll. CTE 5, ¶ 7 & Exh. D pp. 1-5. The General Fund cash flow in the first two weeks of July 2008 demonstrated that, absent this chapter 9 case, the General Fund would have been approximately $1.6 million short in paying the July 11, 2008 payroll. CTE 5, Exh. D, pp. 1-5; RT 8/7/08, pp. 5:8-8:4.

20.    Without a balanced General Fund budget, which was made possible only by the City's bankruptcy filing, the City would not have been able to borrow money to pay the July 11, 2008 payroll. CTE 5, ¶ 7; RT 8/5/08, pp. 22:4-24:13; RT 8/7/08, p. 8:5-25.

21.    Despite having insufficient money in the General Fund, the City was able to make the July 11th payroll payment because the City was able, based on the filing of its chapter 9 petition, to state and adopt a balanced budget for fiscal year 2008-09. CTE 5, ¶ 7; RT 8/7/08, p. 8:5-25. The City was able to adopt a balanced budget for fiscal year 2008-09 due to its ability to adjust its General Fund obligations after filing its chapter 9 petition and implementing its Pendency Plan. CTE 5, ¶¶ 5, 7.

22.    By adopting a balanced fiscal year 2008-09 General Fund budget based on the Pendency Plan, the City demonstrated the ability to repay borrowed money with revenues attributable to the 2008-09 fiscal year. CTE 5, ¶ 7; RT 8/7/08, p. 8:5-25.

23.    In light of the balanced budget, the City was permitted by the California Constitution and Government Accounting Standards Board ("GASB") regulations to use accepted cash flow management tools to cover the July 11, 2008 payroll, *i.e.*, the City could borrow money

in the short term from other City funds to cover its cash shortfall.[5]  CTE 5, ¶ 7 & Exh. E, pp. 1-4; RT 8/7/08, p. 8:9-25.

**B.     The City's Attempts to Avoid Insolvency**

24.     For the past several years, the City attempted to address the deficits in the General Fund and to implement measures to balance the General Fund and prevent the need for bankruptcy relief.  CTE 1, ¶¶ 7-15, 41-49; RT 8/19/08, pp. 97:16-98:2.

25.     The City Finance Department employs four Certified Public Accountants who, collectively, have over 57 years of government accounting and auditing experience.  CTE 5, ¶ 9 & n. 2.

26.     Susan Mayer, the City's Assistant Finance Director, testified by declaration, under extensive cross examination over several days, and on redirect examination.  CTE 1, CTE 5, RT 7/23/08; RT 7/24/08; RT 8/5/08; RT 8/7/08.  She also testified as the City's rebuttal witness after the Unions' case in chief, and under cross-examination in that role.  RT 8/22/08.  Ms. Mayer's testimony was clear, direct and knowledgeable.  She is a CPA and has twenty-two years of professional experience, with eighteen years in municipal financial accounting.  CTE 1, ¶ 2; RT 7/23/08, p. 81:15-20.  Under exhaustive cross examination, she was never impeached, and through examples and other means clearly explained the accounting concepts and rules that apply to municipal accounting.  The Court finds her credentials to be impeccable and her credibility to be of the highest order.

27.     The City has reduced expenditures to the point where the current level of service provided by the City is substantially decreased and under funded.  CTE 1, ¶¶ 41, 42, 45, 48; RT 7/23/08, pp. 110:6-15, 111:14-20; RT 8/19/08, pp. 109:25-110:15.

28.     At the time of the petition the City had reduced the General Fund employee rolls by 87 full-time positions since fiscal year 2003-04.  CTE 1, ¶ 41 & Exh. N, p. 1.  The loss of these positions has reduced the quantity and quality of the services the City provides to its residents.  CTE 1, ¶¶ 41-45; RT 8/19/08, pp. 109:25-110:3.  The City also has cut funding for

---

[5] Under GASB, inter-fund advances made when the City cannot demonstrate its ability to repay must be accounted for as transfers, rather than loans.  CTE 5, Exh. E, pp. 1-4.

1    community services, such as its senior center, library, parks, convention and visitors bureau,

2    symphony and other community programs and services. CTE 1, ¶ 48; RT 8/19/08, p. 110:11-15.

3           29.     The City also has cut funding for basic infrastructure, such as street

4    maintenance and vehicle replacement. CTE 1, ¶ 46. The General Fund finances 70% of the

5    maintenance and replacement costs of the City's 400-plus vehicles and pieces of equipment. CTE

6    1, ¶ 47. As of June 30, 2007, the fleet was 82% depreciated. *Id.* The City repeatedly has

7    extended the "lives" of the majority of its vehicles and equipment. *Id.* Approximately 70% of the

8    vehicles supported by the General Fund are 3 to 5 years beyond their expected life, which has

9    resulted in increased maintenance costs as an unintended side effect of the City's attempt to

10   reduce expenditures. CTE 1, ¶¶ 4, 47; RT 7/23/08, p. 110:6-15.

11          30.     From December 2006 through June 2007, as the City developed and

12   adopted the 2007-08 fiscal year budget, the City identified approximately $10 million in cuts to

13   City programs and service expenditures that did not require the mutual agreement of other parties

14   in order to be implemented. CTE 1, ¶ 8; CTE 11, pp. 1-57.

15          31.     On November 13, 2007, the General Fund budget update for the 2007-08

16   fiscal year showed an accelerated deterioration in the financial position of the General Fund

17   despite the City's cuts in expenditures. CTE 1, ¶ 9. Thereafter, the City Council and City staff

18   focused on developing immediate strategies to establish a General Fund financial structure that

19   could ensure the short and long term fiscal solvency of the City. CTE 1, ¶ 9 & Exhs. E, pp. 1-13,

20   F, pp. 1-10, G, pp. 1-55; CTE 11, pp. 1-57.

21          32.     On December 18, 2007, staff presented to the City Council an analysis of

22   the status of the General Fund and detailed financial projections for the General Fund through the

23   end of the 2009-10 fiscal year. CTE 1, ¶ 10 & Exh. H, pp. 1-2, 10. The analysis showed that, due

24   to greater than anticipated declines in revenues and increases in expenditures during the 2007-08

25   fiscal year, the General Fund would be depleted before the end of the fiscal year. CTE 1, ¶ 10.

26   City staff recommended that the City explore strategies for immediately reducing expenditures

27   and generating additional revenues. CTE 1, ¶ 10 & Exh. H, pp. 5-6.

28   / / /

33.    Staff also recommended that the City engage the City's four labor associations ("labor groups") in discussions addressing the City's financial circumstances and potential economic concessions the labor groups might make as a component of the City's financial recovery plan. CTE 1, ¶ 10 & Exh. H, pp. 1, 4-5. Staff acknowledged that the current CBAs were effective through June 30, 2010, and that the labor groups were not required to make any concessions. CTE 1, ¶ 10 & Exh. H, p. 2.

34.    Staff also agreed to assess the ramifications of the City's potential insolvency.[6] CTE 1, ¶ 10 & Exh. H, p. 4.

35.    On February 13, 2008, staff and the City Council conducted a public study session to explore in detail the City's financial position and strategies for recovery. CTE 1, ¶ 12 & Exh. I, pp. 1-3. At the study session, staff provided financial projections that expanded the General Fund budget analysis through the end of fiscal year 2011-12. CTE 1, ¶ 12 & Exh. I, pp. 1, 11. The study session and the information staff provided confirmed that, absent immediate action to reduce costs and increase revenues, it was likely that the reserves in the General Fund would be exhausted before the end of the 2007-08 fiscal year. CTE 1, ¶ 12 & Exh. I, p. 2.

36.    In February 2008, the City retained a consultant to identify potential sources of new and additional revenue. CTE 6, ¶ 8. The consultant prepared a draft report which preliminarily described a number of potential avenues by which the City might generate additional revenues. *Id.*; Unions' Trial Exhibit ("UTE") DD, pp. 1-23.

37.    Also in February 2008, numerous police and firefighters unexpectedly retired, which obligated the City to pay unbudgeted retiree payouts of approximately $3.4 million and which immediately exacerbated the imbalance in the General fund for fiscal year 2007-08. CTE 1, ¶ 12 & n. 1.

38.    In March 2008, the City adopted a Fiscal Emergency Plan and revised 2007-08 General Fund budget. CTE 5, ¶ 10; CTE 14, pp. 2, 9-11, 19-23; RT 7/23/08, pp. 85:20-

---

[6] During this same time period, voters elected three new members to the City Council. CTE 1, ¶ 11. Two new City Council members were seated following the November elections. *Id.* A new Mayor was also seated, and then unseated a week later following a dispute and recount. *Id.* The litigation that ensued was ultimately dismissed several months later. *Id.*

86:4, 86:9-12, 87:6-12, 88:19-89:3.  Among other things, the City identified and transferred a total of $2.4 million to the General Fund from available unrestricted funds, namely, the Vehicle Replacement Fund, Arts and Convention Fund, Repair and Demolition Fund, and Transportation Fund.  CTE 5, ¶ 10; CTE 14, pp. 9-11, 19-23; RT 8/19/08, pp 85:19-87:7.

39.    Absent the City's cuts in General Fund services and programs, one-time transfers of $2.4 million in funds from other City accounts pursuant to the Fiscal Emergency Plan, and the March 3, 2008 Interim Agreements between the City and the Unions (detailed below), the General Fund would have run out of money prior to the end of the 2007-08 fiscal year.  CTE 1, ¶ 14 & Exh. B, pp. 10-11; RT 8/19/08, pp. 73:20-76:6.

40.    Additional funding reductions beyond the cuts the City already has made in these areas threaten the City's ability to provide even minimal levels of service to its residents and, at some point, may create health and safety risks.  CTE 1, ¶ 49; RT 7/23/08, pp. 110:6-15; 111:14-20.

41.    The City has numerous special purpose and enterprise funds, apart from the General Fund.  CTE 1, Exh. A & Exh. K.  Nearly all of the cash in those funds is restricted by law or grant to specific uses and is not available to cover the operating expenses of the General Fund.  CTE 1, Exh. A, pp. 1-3; CTE 5, ¶ 8; RT 7/24/08, pp. 136:3-141:7; RT 8/5/08, pp. 23:17-25:13; RT 8/7/08, pp. 13:10-14:18.

42.    The General Fund is the only truly unrestricted fund of the City.  RT 8/5/08, p. 206:20-24.  When special purpose or enterprise funds are unable to break even, the General Fund is the fund of last resort that must make up for the deficiency.  *Id.*, pp. 205:15-207:18.

43.    As of June 30, 2008, there were no more legally-available funds in the City's special purpose or enterprise funds that could be used to cover operating expenses in the General Fund.  CTE 5, ¶ 10.

44.    For example, the Housing Authority's monies are restricted by the U.S. Department of Housing and Urban Development ("HUD"), and only available for housing operations. RT 7/24/08, pp. 136:16-19, 138:3-12, 18-25.  Similarly, constitutional protections

under Proposition 218, as well as bond covenants restrict, and protect revenues of the Water Fund. RT 8/7/08, pp. 13:20-14:5. The City's other special purpose & enterprise funds are restricted in how they may be used. CTE 1, Exh. A, pp. 1-3.

45.  Similarly, while the City's Risk Management/Self Insurance Fund ("Risk Management Fund") is lawfully available to support General Fund cash needs, as of June 2007 claim liabilities on the fund exceeded assets by $2.3 million. CTE 5, ¶ 11; RT 7/24/08, pp. 120:4-121:17; RT 8/5/08, pp. 151:5-155:13. Nonetheless, in response to its financial circumstances, the City in its Pendency Plan transferred $1 million from the Risk Management Fund to the General Fund for fiscal year 2008-09, which further decreased the Risk Management Fund's reserves and claims-paying ability. *Id.*; RT 8/19/08, pp. 120:2-121:1. Further drawing down the cash position in the Risk Management Fund creates the risk that the City could lose the state's self-insurance certification, which would require the City to then purchase outside insurance coverage at less favorable rates. CTE 5, ¶ 11.

46.  The Risk Management Fund's cash flow, and its corresponding availability to support General Fund needs, also is impacted by approximately $2 million in excess insurance premiums that are due at the start of the fiscal year. *Id.*; RT 7/24/08, pp. 119:24-121:17. The continual reduction in the City's employment rolls also reduces the contributions paid into the fund, further eroding the fund's cash flow and financial stability. CTE 5, ¶ 11.

C.    **The City and the Unions Attempt to Develop Acceptable Solutions to the City's Financial Situation**

47.  The City's labor cost is the largest General Fund expenditure the City incurs during the fiscal year. CTE 1, ¶ 34 & Exh. C, p. 1. For the 2007-08 fiscal year, the City's General Fund labor costs will total approximately $74.2 million. CTE 1, ¶ 36 & Exh. C, p. 1. The City's General Fund financial projections for fiscal year 2008-09, based on contractual obligations to raise salaries under the CBAs, estimated that the City's total labor costs would be $79.4 million. *Id.*; CTE 5, Exh. B, p. 1, Column A. Of the $79.4 million in projected labor costs for the 2008-09 fiscal year, expenditures on police and firefighter services comprise $56.8 million. CTE 1, ¶ 37 & Exh. C, p. 1, Column A; CTE 2, ¶ 22; CTE 5, Exh. B, p. 1, Column A.

48.     The City Council and City staff recognized that achieving a balanced General Fund budget for the long term required that the City significantly restructure its labor costs, which would require economic concessions from the City's labor groups. CTE 1, ¶ 13; RT 7/25/08, pp. 34:5-12, 39:6-22, 92:22-93:2; RT 8/5/08, p. 89:15-21; RT 8/19/08, pp. 80:5-81:23, 96:12-98:7, RT 8/22/08, pp. 5:18-7:8.

49.     Staff acknowledged that, absent such agreements, insolvency could be inevitable. CTE 1, ¶ 13 & Exh. H, pp. 4-5; RT 8/19/08, pp. 72:23-73:19.

50.     The majority of City employees are represented by one of the four labor groups which are parties with the City in the CBAs. CTE 1, ¶ 34. Police officers are represented by the VPOA; firefighters are represented by the IAFF; various administrative, engineering, information technology and public works employees, are represented by the IBEW; and management employees are represented by Confidential, Administrative, Managerial and Professional Employees Association of Vallejo ("CAMP"). CTE 1, ¶ 34 & Exh. B, p. 3.

51.     The VPOA, IAFF and IBEW are the Unions that filed the objection which was the subject of the evidentiary hearing.

52.     The CBAs are effective through June 30, 2010, and, absent modification, the City is obligated to provide the compensation and staffing called for in the CBAs through that date. CTE 1, ¶ 35 & Exh. B, p. 3; CTE 2, ¶ 4.

53.     The CBA between the City and its firefighters requires that the City maintain minimum daily staffing of 28 firefighters, which equates to staffing 8 fire stations.[7] CTE 1, ¶ 40 & Exh. B, p. 4; CTE 2, ¶ 14. The City estimates that each fire station costs approximately $2 million per year. CTE 1, ¶ 40; UTE O, pp. 1-46; RT 7/24/08, pp. 67:21-25.

54.     In December 2007, the City engaged the labor groups in discussions to address the future solvency of the City's General Fund and the relationship of the existing CBAs to the City's financial difficulties. CTE 2, ¶ 22; RT 8/19/08, pp. 71:21-72:13.

/ / /

---

[7] The firefighter minimum daily staffing agreements require 28 personnel, which the City refers to in terms of station staffing as an eight station obligation. RT 7/25/08, p. 22:13-19.

55.     At the time, the City, VPOA and IAFF were involved in several disputes including arbitration, grievance procedures, and litigation. RT 8/19/08, pp. 24:5-12, 75:17-76:2, 76:7-77:9, 85:9-89:2.

56.     The City focused on discussions with the VPOA and the IAFF which, if successful, would have produced the greatest economic benefit. CTE 2, ¶ 22. Absent sufficient economic concessions from VPOA and IAFF, the City could not establish a General Fund financial plan that would prevent insolvency regardless of the funding reductions to which IBEW or CAMP agreed, or which the City applied to other services and programs.[8] *Id.*

57.     The first formal meeting between the City and the Unions occurred on December 10, 2007. CTE 11, pp. 1-58; RT 8/19/08, p. 77:16-22. VPOA President Kurt Henke and IAFF President Steve Gordon were at the December 10th meeting and represented the firefighter and police unions, respectively, throughout the ensuing negotiations and mediation, from December 2007 through May 2008. RT 8/19/08, pp. 82:15-83:1.

58.     At the December 10, 2007 meeting, the City's primary purpose was to discuss the City's financial situation so as to enable the City and the Unions to reach a common understanding regarding the current financial condition of the General Fund and the corresponding need for substantial action. RT 8/19/08, pp. 73:20-74:19.

59.     The City and the Unions met several times from December 2007 through January and February 2008. RT 8/19/08, pp. 81:20-82:14.

60.     Not having reached agreement at the end of February 2008, and with the General Fund on the verge of running out of money, on February 28, 2008, City staff submitted a recommendation to the City Council that the Council authorize the City to file a petition under chapter 9 of the Bankruptcy Code. CTE 1, ¶ 14 & Exh. J, p. 1; RT 8/19/08, pp. 83:13-84:16.

61.     Prior to City Council's consideration of the February 28, 2008 bankruptcy recommendation from staff, the City, VPOA and IAFF tentatively agreed on certain interim modifications to the CBAs, which were approved by the City Council on March 3, 2008. CTE

---

[8] However, discussions also included IBEW and CAMP. CTE 2, ¶ 22 & n. 6. The City estimated that in fiscal year 2008-09 its labor costs related to employees represented by IBEW would be approximate $13.7 million and those represented by CAMP approximately $9.0 million. *Id.*

13, pp. 1-11; UTE B, pp. 1-5; UTE C, pp. 1-7; UTE D, pp. 1-3; RT 8/19/08, pp. 83:2-84:16.  The

March 3, 2008 agreements are referred to as the Interim Agreements.  CTE 1, ¶ 14.

62.    In the Interim Agreements, among other things, VPOA and IAFF members

agreed to waive 1.7% and, effective March 1, 2008 through June 30, 2008, roll-back 6.5% of their

2007-08 salary increase under the CBAs.  CTE 2, ¶¶ 7, 23; RT 7/23/08, pp. 89:14-90:5.  IAFF

agreed that the City could reduce firefighter staffing to levels sufficient for 6 fire stations (22

firefighters), as opposed to the 8 stations required under the CBAs, through June 30, 2008.  Id.

Also, as part of the March 3, 2008 Interim Agreements, VPOA deferred its minimum staffing

requirement of 145 authorized sworn police positions to May 2010.  Id.; CTE 1, ¶ 8; UTE D, p. 1;

UTE N, p. 1.

63.    Department heads, distinct from employees represented by CAMP, took a

3% salary reduction concurrently with (though not as a term of) the Interim Agreements.  CTE 1,

Exh. C, p. 1; CTE 2, ¶ 20; RT 7/24/08, pp. 56:2-57:2, 59:5-12; RT 8/19/08, pp. 84:25-85:2.

64.    The Interim Agreements were effective through June 30, 2008, the end of

the 2007-08 fiscal year.  CTE 1, ¶ 14; CTE 2, ¶¶ 7, 8, 23; CTE 13, pp. 2-3; UTE B, pp. 2-3; UTE

C, pp. 2-3.  Without further agreement, the Interim Agreements would no longer be effective as

of July 1, 2008.  RT 8/19/08, pp. 84:17-85:3.

65.    On July 1, 2008, absent the City's bankruptcy petition, the City would have

been obligated under the terms of the again-controlling CBAs to increase staffing to the contract

levels (28 firefighters), restore the 1.7% and 6.5% salary increases that were waived and rolled-

back, respectively, in the Interim Agreements, and begin paying police and firefighters an

additional estimated 4% to 5.5%[9] salary increase, while paying IBEW and CAMP employees an

additional estimated 3% salary increase.  CTE 2, ¶¶ 8, 9, 12, 14, 20, & Exh. A, p. 1.

---

[9]  The CBAs require the City to provide annual salary increases to police and firefighters based on a formula that is
driven by salary increases given in a fiscal year by 14 neighboring cities, counties, and public districts.  CTE 2, ¶ 5.
Based on the information obtained prior to filing its petition from the comparison agencies that had acted, the City
estimated that the salary increase for police and firefighters for fiscal year 2008-09 would range from 4% to 5.5% on
top of the restored increases related to the Interim Agreements.  Id.  Salaries can be adjusted more than once during a
fiscal year, depending on when one or more comparison agencies implements a salary increase that triggers the CBA
formulas.  For instance, in fiscal year 2007-08, salary increases due to City police and firefighters were adjusted three
times, ultimately totaling a 10.2% salary increase.  Id.  Under the terms of the CBAs, salary increases are retroactive
to July 1st of the fiscal year, regardless of when an adjustment occurs.  Id.

66.     As an additional term of the Interim Agreements, the City, VPOA and IAFF agreed to engage in mediation for 45 days.  RT 8/19/08, p. 94:3-7.

67.     The Unions required as a condition to entering into the Interim Agreements and the mediation that the City resolve the grievances, arbitration and litigation that were pending between the City and the Unions.  CTE 13, pp. 8-10; CTE 14, pp. 2-3, 7-8; UTE D, pp. 1-2; RT 8/19/08, pp. 85:9-89:2, 90:22-93:22.

68.     Although there was opposition on the City Council, the City agreed to resolve these disputes to further the mediation.  CTE 13, pp. 8-10; CTE 14, pp. 2-3, 7-8; UTE D, pp. 1-3; RT 8/19/08, pp. 88:19-91:23.

69.     The parties agreed on a mediation objective:

> To discuss expenditure reductions, revenue enhancements and CBA modifications in an attempt to develop a General Fund budget plan that ensured funding for a range of city services (e.g., including, but not limited to, fire services, police services, street repair) and provided for a positive General Fund reserve at the end of each fiscal year through June 30, 2012.  CTE 2, ¶ 24; RT 7/25/08, p. 81:13-23.

70.     The mediation objective was negotiated and agreed to by the City and the Unions.  CTE 6, ¶ 5; RT 8/19/08, pp. 94:3-96:9.

71.     Consistent with that stated objective, from March 3, 2008 through May 14, 2008, the parties discussed in mediation potential revenue enhancements the City could pursue, expenditure reductions the City might be able to implement, and modifications to the CBAs.  CTE 2, ¶ 24; CTE 6, ¶ 4; RT 8/7/08, p. 19:9-25; RT 8/19/08, pp. 98:24-99:11, 101:15-110:19, 112:12-121:1, 121:18-128:4, 132:18-134:22, 135:13-138:12.

72.     With respect to revenue generation, on or about March 21, 2008, at the Unions' request, the City provided to the Unions a draft revenue enhancement report that had been prepared by the City's consultant.  UTE U, Exh. C, pp. 1-23; UTE DD, pp. 1-23; RT 7/25/08, pp. 64:9-65:21; RT 8/7/08, pp. 60:14-61:24.  The Unions requested that the City not present the draft report to the City Council at that time, but rather present it at the time the City and the Unions brought forward their anticipated agreements modifying the CBAs.  UTE P p. 1; RT 7/25/08, p. 65:10-19; RT 8/7/08, p. 61:5-20.

73.    In accordance with the mediation objective, the City included in each of its proposals to the Unions during the mediation potential avenues for new and increased revenues. CTE 15, pp. 2-4; CTE 17, p. 8; CTE 18, p. 8; UTE LL, pp. 2-3; RT 8/19/08, pp. 105:3-107:6, 117:16-121:1.

74.    From March 3rd through May 14th, the City, whose lead negotiator was Craig Whittom, Assistant City Manager/Community Development, engaged in discussions (through the mediator) with VPOA and IAFF, joined at times by IBEW. CTE 2, ¶¶ 21-24; CTE 10, p. 1. The City team met with the mediator and the Unions 11 times.[10] CTE 2, ¶ 24; RT 8/19/08, pp. 98:24-99:4. Throughout the mediation and negotiation process, the parties had less formal discussions not involving the mediator and City staff frequently reported to the City Council. CTE 2, ¶ 24; RT 8/19/08, pp. 98:24-99:11.

75.    As Assistant City Manager/Community Development, Craig Whittom has more than eighteen years of experience at the City. He has impressive educational credentials and a thorough knowledge of how the City operates and functions economically. Mr. Whittom testified by declaration and was extensively cross examined by the Unions. CTE 2; CTE 6; RT 7/25/08; RT 8/19/08. His testimony was direct, thoughtful and candid. He was never impeached. His testimony on redirect regarding the City's efforts to reach an agreement with the Unions during the many negotiation/mediation sessions was particularly useful in establishing the context of the negotiations and the City's good faith during those negotiations. The Court finds that Mr. Whittom's testimony is credible. RT 8/19/08, p. 216:19-21.

76.    The first mediation session took place on March 9, 2008. RT 8/19/08, p. 98:11-13. The City and Unions primarily discussed scheduling and exchanged information at this meeting. RT 8/19/08, pp. 99:12-101:14.

77.    The parties exchanged several proposals during the course of the various mediation sessions. RT 8/19/08, pp. 101:15-24, 112:15-23, 121:2-122:9, 134:19-22. The City made the first written proposal on March 17, 2008. UTE LL, pp. 1-14; RT 8/19/08, p. 101:15-24.

---

[10] The parties met with the mediator on March 11, March 17, March 31, April 4, April 9, April 16, April 17, April 18, May 4, May 9, and May 14. CTE 2, ¶ 24, n. 7.

With respect to salary levels, the City proposed a roll-back in salaries to June 30, 2006 levels. UTE LL, p. 4; RT 8/19/08, p. 103:18-23. This rollback would result in lower salaries than those that had been established under the Interim Agreements. RT 8/19/08, pp. 103:18-104:2.

78.    The City's March 17th proposal also offered a two-year extension of the CBAs (through June 30, 2012) and contained a salary reopener for these two years pursuant to which salary increases would be possible. UTE LL, pp. at 1; RT 8/19/08, p. 104:5-23. The City also proposed that the City work with the labor groups and the community to generate support for voter-approved revenue increases, such as a voter-approved tax measure. UTE LL, at pp. 2-3; RT 8/19/08, pp. 105:3-106:24.

79.    The City's March 17, 2008, proposal also addressed General Fund expenditure reductions in the form of additional cuts to City services and positions, as well as negotiations with bond holders and banks to reduce the City's debt costs. UTE LL, p. 3; RT 8/19/08, p. 109:2-24.

80.    The City made a second proposal to the Unions on April 17, 2008. CTE 15, pp. 1-16; RT 8/19/08, p. 112:15-23. With respect to salary levels, the City proposed a 5% roll back in salaries from the March 1, 2008 levels (i.e., the Interim Agreement levels). CTE 15, p. 1; RT 8/19/08, p. 115:16-20. The City's proposal regarding salaries in its April 17th offer reflected movement on the City's part. CTE 15, p. 1; RT 8/19/08, p. 115:21-116:11. For example, the proposed 5% roll back was more favorable to the Unions than the rollback to June 30, 2006 salary levels proposed in the City's March 17th offer. CTE 15, p. 1; RT 8/19/08, p. 115:21-116:11.

81.    In its April 17th proposal, the City again offered a 2-year contract extension with salary reopeners for those years. CTE 15, p. 1; RT 8/19/08, p. 116:12-14. The City added a new proposed term providing for restoration of salaries in connection with the establishment of a 5% General Fund reserve. CTE 15, p. 1; RT 8/19/08, pp. 116:15-117:3. The City also added new commitments to increase revenues, including: (i) repayment of the Redevelopment Agency's debt to the General Fund in the Merged Project Area via the Flosden payment of the required 20% housing set aside; (ii) annually filing SB 90 claims and; (iii) a one-time transfer of $1,000,000 cash from the Risk Management Fund to the General Fund. CTE 15,

- 17 -

pp. 2-4; RT 8/19/08, pp. 117:16-121:1.  The City has subsequently implemented each of these revenue proposals.  RT 8/19/08, pp. 117:16-121:1.

82.    In its April 17th proposal, the City also proposed additional expenditure reductions.  CTE 15, pp. 4-5.

83.    On April 21, 2008, the Unions made a written proposal to the City.  RT 8/19/08, pp. 121:2-123:4.  Among other terms, the Unions proposed a two-year contract extension through June 30, 2012.  RT 8/19/08, pp. 122:23-123:16.

84.    The City responded to the Unions' proposal on May 4, 2008.  CTE 17, pp. 1-7; RT 8/19/08, pp. 121:18-122:9.  In its May 4th proposal, the City again moved its position with respect to salary levels, offering this time to maintain salaries at the levels established in the Interim Agreements, which was an improved offer compared to the 5% rollback previously proposed.  CTE 17, pp. 1, 4; RT 8/19/08, pp. 125:9-126:7.  The City's proposal again included a two-year contract extension with salary reopeners tied to the City's economic condition and the salaries paid by comparison cities to be agreed upon by the parties.  CTE 17, pp. 1, 2, 4, 5; RT 8/19/08, pp. 126:14-127:2.

85.    The Unions did not accept the City's May 4, 2008, offer.  RT 8/19/08, p. 132:15-17.  On May 6, 2008, the City Council, by a unanimous vote, authorized the City to file a petition under chapter 9 of the Bankruptcy Code.  CTE 2, ¶ 24; Statement of Qualifications Under Section 109(c), Exh. 1; RT 8/19/08, pp. 132:18-133:6.

86.    The City and the Unions continued the mediation after the City Council authorized the bankruptcy filing, meeting again with the mediator on May 9th and May 14th.  CTE 2, ¶ 24 & n. 7; RT 8/19/08, pp. 133:7-134:22.

87.    On May 13, 2008, despite their agreement to mediation confidentiality, the Unions held a press conference and released a report by their consultants, Harvey Rose Associates.  RT 7/25/08, p. 100:11-12 (last day of mediation May 14, 2008); RT 8/21/08, pp. 148:16-152:13.

88.    On May 14, 2008, the City made another written proposal to the Unions.  CTE 18, pp. 1-8; RT 8/19/08, p. 134:19-22.  This proposal again provided for salaries at the

- 18 -

Interim Agreement levels, a two-year contract extension, and salary reopeners.  CTE 18, pp. 1-8;
RT 8/19/08, pp. 134:19-22, 135:13-136:13.  The City also proposed revenue commitments and
expenditure reductions.  CTE 18, p. 8.

89.    The Unions did not accept the City's May 14, 2008 offer.  RT 8/19/08,
p. 136:14-16.  Nonetheless, discussions between the City and the Unions continued after the
mediation formally ended, from May 14, 2008 through May 16, 2008.  RT 8/19/08, pp. 136:17-
138:2.

90.    During this time, the City proposed additional terms, and the Unions made
their "final" offer (hereinafter "Final Offer").  UTE W, pp. 1-5; RT 8/19/08, pp. 136:17-138:2.

91.    The City did not accept the Unions' Final Offer because the economics of
that proposal did not provide General Fund solvency beyond one year.  CTE 24, pp. 1-6; CTE 25,
pp. 1-5; RT 8/19/08, pp. 138:13-141:6.

92.    Although the Court does not need to decide whether the Unions acted in
good faith, the Unions' Final Offer did not meet the agreed-to mediation objective that the parties
"develop a General Fund budget plan that ensured funding for a range of city services (e.g.,
including, but not limited to, fire services, police services, street repair) and provided for a
positive General Fund reserve at the end of each fiscal year through June 30, 2012."  CTE 2, ¶ 24;
RT 8/5/08, pp. 188:17-195:8, 203:6-204:1; RT 8/7/08, pp. 9:6-11:17; RT 8/19/08, pp. 97:2-15,
138:13-141:6.

93.    Under the terms of the Final Offer, the City would be obligated:
(1) beginning no later than July 1, 2009, and as early as March 1, 2009, to pay a 6.5% salary
increase over Interim Agreement levels to police and firefighters; (2) beginning July 1, 2010, to
pay another salary increase to police and firefighters, and a salary increase to employees
represented by IBEW, of at least 3% and up to 5%; (3) in the subsequent three fiscal years (2011-
12, 2012-13, and 2013-14), to pay an additional salary increase to police, firefighters and IBEW
members of at least 3% and up to 5% in each year; and (4) to return to full daily staffing of 28

1  firefighters on July 1, 2010 and minimum staffing of 145 sworn police positions in May 2010.[11]

2  CTE 6, ¶ 15; UTE W, pp. 1-5; RT 8/19/08, pp 138:13-141:6.

3       94.    The Final Offer also required that the CBAs be extended for four additional

4  years, through the end of fiscal year 2013-14. UTE W, pp. 1-5. The Unions required a four year

5  extension in their Final Offer to ensure that their members had a larger claim if the City accepted

6  their proposal but filed for bankruptcy sometime thereafter. RT 8/19/08, pp. 129:18-130:23,

7  143:12-144:16. This was an acknowledgement of the likely inevitability of a bankruptcy filing by

8  the City.

9       95.    Throughout the mediation, the City generated cost projections calculating

10 the economic results of the Unions' proposals. CTE 24, pp. 1-6; CTE 25, pp. 1-5; RT 7/25/08,

11 pp. 87:19-88:6; RT 8/5/08, pp. 38:18-24, 188:17-195:8, 195:15-201:24; RT 8/7/08, pp. 9:6-11:17.

12 The City's cost projections demonstrated that the Unions' proposals, including their Final Offer

13 did not generate solvency for the General Fund in any year beyond fiscal year 2008-09 (and that

14 solvency in fiscal year 2008-09 was only a potential). CTE 24, pp. 1-6; CTE 25, pp. 1-5; RT

15 7/25/08, pp. 87:19-88:6; RT 8/5/08, pp. 38:18-24, 188:17-195:8, 195:15-201:24; RT 8/7/08, pp.

16 9:6-11:17.

17      96.    For fiscal year 2009-10, the City's cost projection of the Final Offer

18 showed a substantial General Fund budget deficit. CTE 24, pp. 1-6; RT 8/5/08, pp. 192:25-

19 194:16, 198:2-201:2. The projections demonstrated that, once the 6.5% salary increase was

20 restored in fiscal year 2009-10, General Fund revenues could no longer cover expenses. RT

21 8/5/08, pp. 194:5-16. Likewise, in fiscal years 2010-11 and 2011-12, the Unions' proposal would

22 result in substantial and increasing General Fund budget deficits.[12] CTE 25, pp. 1-5; RT 8/5/08,

23 pp. 199:17-200:10.

---

24 [11] Under the Unions' proposal, the City could arbitrate the 3% to 5% salary increase in the applicable years if the City
25 did not believe it could afford to pay the increases. CTE 6, ¶ 15 n. 2. The City did not consider the right to arbitrate
   a disputed contractually-obligated salary increase a desirable term of the proposed modifications. RT 8/19/08, pp.
26 132:8-14, 139:12-140:10.
   [12] CTE 24 and CTE 25 do not factor in a 3% to 5% increase in the out years, the restoration of two fire stations
27 beginning fiscal year 2010-11 through 2013-14, or the increase of police officer staffing beginning fiscal year 2010-
   11 through 2013-14, all of which would be required by the Unions' offer. RT 8/7/08, pp. 9:10-11:17, 18:5-10. These
28 factors would have increased the deficit in the out years over and above the deficits calculated in CTE 24 and CTE
   25. *Id.*

97.     The Unions and their financial consultant who participated in the mediation, Roger Mialocq, did not present and apparently did not even prepare any budget projections that extended beyond fiscal year 2008-09.  UTE U, ¶¶ 1-40, Exh. B, Schedule 1; RT 8/21/08, p. 148:8-15.

98.     The City concedes that it did not discuss with the Unions at any time prior to the filing of its chapter 9 petition a specific "plan of adjustment" that would be part of a chapter 9 plan of adjustment.  However, the City and the Unions did discuss the fact of the City's potential chapter 9 filing and the ways in which that filing would affect the City's and the Unions' positions during: (a) the negotiations; (b) the mediation proceedings from March 3 until May 14; and (c) after the mediation concluded.  CTE 2, ¶¶ 21-25; CTE 4, ¶¶ 5-8; CTE 10, p. 1; RT 8/19/08, pp. 72:23-73:19, 83:13-84:16, 132:18-134:22, 135:13-138:12.  Those discussions addressed what claims the Unions would have in a chapter 9 case, how those claims could be enhanced by extending the Union contracts before a petition was filed, and how the City's acceptance of the Unions' offers might compel a later chapter 9 filing by the City.  RT 8/19/08, pp. 130:5-23, 138:3-141:6, 143:12-144:16.

**D.     The City's Attempt to Address its Outstanding Municipal Debt Obligations**

99.     The City has approximately $54 million in outstanding bonds (certificates of participation) that are obligations of the General Fund.  CTE 1, ¶¶ 50-53.  Much of this debt is secured by letters of credit, one of which will expire in December 2008.  CTE 1, ¶ 53.

100.    In its General Fund budget projections for fiscal year 2008-09, the City based its debt service expenditure projection on an assumed 9% debt service cost.  CTE 1, ¶ 51.  The City established the 9% projection based on discussions with the City's financial consultants and the terms of the bond documents.[13]  CTE 5, ¶ 28.  The 9% assumption was a reasonable one.

101.    The General Fund subsidizes the Marina Fund debt service obligation because the Marina Fund cannot pay its debt service and the General Fund is obligated as the

/ / /

---

[13] The City's financial consultants first suggested the City project its cost of debt service at 12%.  CTE 5, ¶ 28 & n. 7.  In May and June 2008, the City was paying up to 6% in interest on its bonds.  RT 7/24/08, p. 18:7-10.

1   guarantor of the Marina Fund debt.[14]  CTE 1, ¶ 51; RT 7/23/08, p. 115:3-12; RT 7/24/08, pp.

2   22:8-24:11; RT 8/5/08, pp. 21:15-22:3; RT 8/7/08, pp. 38:24-39:7.

3           102.    After the City implemented its Pendency Plan on July 1, 2008, the City's

4   letter of credit provider invoked a mandatory tender of approximately $47 million in outstanding

5   variable rate bonds backed by the General Fund.  CTE 5, ¶ 28.  The City is obligated to pay the

6   Reference Rate (*i.e.*, prime rate) plus 1% after 90 days on the tendered bonds and potentially

7   could be required to pay the Reference Rate plus 3% should a default be declared.  CTE 1, ¶ 51;

8   CTE 5, ¶ 28; UTE G, p. 5; RT 7/23/08, pp. 124:22-126:1, 129:21-25.

9           103.    The City Council has appropriated funds to retire approximately $7 million

10  of bonds by repaying cash derived from bond issuances that had not been used or dedicated to a

11  project.  CTE 5, ¶ 28 & n. 8; RT 7/24/08, pp. 25:3-26:18.

12          104.    In March and April 2008, the City discussed its potential bankruptcy filing

13  and potential debt obligation adjustments with Union Bank, the credit enhancer of several of the

14  letters of credit supporting the City's bond obligations.  CTE, ¶¶ 5-8; RT 7/24/08, pp. 81:9-17,

15  83:3-14, 84:10-13.  The City requested that the bank extend the letter of credit that is scheduled to

16  come due December 1, 2008 and requested that the bank commit long term to a lower interest rate

17  on the City's outstanding debt obligations.  RT 7/24/08, pp. 85:19-87:2.

18          105.    Union Bank's CDTM Credit and Risk Management Division Senior Vice

19  President and Manager, Cecilia Valente, testified that the bank could not determine or implement

20  specific adjustments to the City's debt obligations without a viable, long term plan from the City

21  establishing General Fund solvency.  CTE, ¶¶ 5-8.  Ms. Valente testified that Union Bank

22  concluded that it should defer detailed discussions with the City regarding adjustments to the

23  City's General Fund bond obligations until the City and the labor groups finalized a viable

24  solution for the City's long term labor costs and, in turn, long term solvency.  CTE, ¶¶ 5-8; RT

25  7/24/08, pp. 93:11-94:5, 95:12-97:3.

26  _____
[14] The net assets of the Marina in the last audited financial statements, dated June 30, 2007, show that Marina Fund
27  liabilities exceed its assets by $209,297, creating a deficit equity position.  UTE J, p. 26 (6/30/07 CAFR); RT 8/5/08,
pp. 30:6-31:6.  The City has worked with outside parties to identify ways to improve operations, including
28  privatization, but has not identified a viable option to improve cash flow to permit the Marina Fund to fully cover its
debt obligations.  RT 8/5/08, pp. 18:6-25:13, 205:23-207:18; RT 8/7/08, pp. 39:16-40:10.

106.    Cecilia Valente testified by declaration and was extensively cross examined by the Unions.  Her explanations of the details of the financings at issue was precise and clear.  Her recollection of Union Bank's negotiations with the City was helpful to the Court.  Her testimony was not impeached.  The Court finds Ceclia Valente a credible witness.

**E.    The City Files Its Chapter 9 Petition**

107.    Prior to filing its petition, the City could not identify all its creditors for purposes of prepetition negotiation, including, in particular, an unknown number of retirees who collectively hold the largest claim against the City (approximating $215 million), as well as unknown bondholders and potential tort claimants who may or may not have yet asserted a claim against the City.  *See* City's List of Creditor's Holding 20 Largest Unsecured Claims, filed May 23, 2008; Statement of Position by California Public Employees Retirements System Regarding Motion for Order Appointing Unions as Retiree Benefit Representative for Retirees from their Work Units, filed July 23, 2008.

108.    On May 6, 2008, the City Council, by a unanimous vote, authorized the City to file a petition for bankruptcy under chapter 9 of the Bankruptcy Code.  CTE 2, ¶ 24; RT 8/7/08, p. 71:15-19; 8/19/08, pp. 132:18-133:6.

109.    The City filed its petition on May 23, 2008, after further but unsuccessful discussions with the Unions.  Chapter 9 Voluntary Petition, Form B-1, pp. 1-3.

110.    The City filed its petition in order to *implement a plan of adjustment that provides for the long term fiscal solvency of the City*.  CTE 2, ¶ 26; Statement of Qualifications Under 109(c), p. 2.

111.    The City certified its desire to effect a plan of adjustment in its Statement of Qualifications Under Section 109(c).  *See* Statement of Qualifications Under Section 109(c).

**F.    The City's Pendency Plan**

112.    On June 26, 2008, the City adopted a balanced budget for fiscal year 2008-09.  RT 8/5/08, p. 74:6-14. The City adopted the General Fund budget based upon its Pendency Plan.  CTE 5, ¶ 5, Exh. B, pp. 1-29; UTE K (City's 2008-09 Proposed Budget adopted in its entirety – RT 7/24/08, pp. 112:16-113:2).

- 23 -

113.    The City's Pendency Plan addresses all City employees' compensation and benefits, not just the members of the Unions; continues employee compensation (rather than cutting compensation) at the levels employees were being paid on the petition date; caps at 6% the debt service the City will pay to Union Bank and any other holder of the City's municipal debt obligations; identifies $1.4 million in new ($1 million) and on-going ($400,000) additional General Fund revenues;[15] cuts all General Fund expenditures for the City's library, parks, convention and visitor's bureau, senior center, symphony, community arts, and naval and historical museum; further reduces employment rolls to a total of 379 positions; and cuts spending on infrastructure and physical plant items such as street repair and vehicle replacement. CTE 5, ¶ 5 & Exh. B, pp. 1-8; RT 7/24/08, p. 63:13-25.

114.    The City implemented the Pendency Plan as a bridge between the City's filing of its petition and the development and implementation of a plan of adjustment.  CTE 2, ¶ 26; CTE 5, ¶ 5, Exh. B, pp. 1-29; RT 8/7/08, p. 8:9-25.

## G.    **The City Cannot Create Solvency by Loaning or Transferring Money to the General Fund**

115.    The Unions contend that the City had over $136 million in cash and investments, at least some of which could be transferred to or borrowed by the General Fund. UTE U, ¶¶ 23-27, Exh. B, pp. 13-15; RT 8/21/08, p. 232:4-21.  However, their consultant admitted that had not researched whether such cash could be transferred or borrowed.  RT 8/22/08, p. 198:3-7.  As of May 2008, the City had over 100 special purpose and enterprise funds, apart from the General Fund, that had cash and investments totaling approximately $136 million. CTE 1, Exhs. A, pp. 1-3, K, pp. 1-3.  But, nearly all of the cash and assets in those funds are restricted by law or grant to specific uses and are not available to cover the operating expenses of

---

[15] With respect to timing and cash flow, the City cannot transfer the $1.4 million in additional revenues to the General Fund as of July 1, 2008.  The Risk Management Fund (from which the $1 million transfer will come) is the City's primary source of working capital loans for grant reimbursements. RT 7/24/08, pp. 120:1-121:17.  The City's estimate as of June 2008 is that borrowing from the risk fund to cover these grant reimbursements could exceed $6 million. *Id.*  Also, within the first few weeks of the fiscal year, the Risk Management Fund is required to pay almost $2 million in self-insurance premiums to its excess insurance pools. *Id.*  Similarly, the first opportunity that the Redevelopment Agency could transfer money to the General Fund ($400,000) would be half in December 2008, after it receives property tax payments, with the remaining half being transferred in April 2009, after the Agency receives its second installment of property taxes. RT 7/24/08, p. 117:1-15.

the General Fund. CTE 1, Exh. A, pp. 1-3; CTE 5, ¶ 8; RT 7/24/08, pp. 136:3-138:12, 138:13-141:7; RT 8/5/08, pp. 23:17-25:13; RT 8/7/08, pp. 13:10-14:18.

116.    For example, the Unions contend that the City could transfer $1.7 million from the City's Public Finance Authority to the General Fund. RT 8/19/03, pp. 181:24-182:8; RT 8/22/08, pp. 18:8-19:3.  However, the Public Finance Authority funds pertain to the sale of Six Flags/Marine World. RT 8/22/08, pp. 21:21-22:11. These funds were already budgeted and spent by the General Fund in fiscal year 2007-08. RT 8/22/08, pp. 22:5-11; CTE 1, Exh. A, p. 3 (Fund Descriptions and Restrictions, Vallejo Public Finance Authority "[s]urplus appropriated for 07-08 transfer to General Fund.");  CTE 1, Exh. B, p. 30 (Six Flags line item).

117.    The Unions also contend, without providing any evidence, that the Convention and Arts Fund could transfer $4.1 million in advances or loans receivable from the Empress Theatre to the General Fund, providing the General Fund with an additional $400,000 of cash, and $4.1 million in reserves. RT 8/19/03, pp. 182:25-183:7.  The unrestricted cash balance in the Convention & Arts Fund has already been appropriated for transfer to the General Fund in fiscal year 2007-08 as part of the Fiscal Emergency Plan. CTE 1, Exh. A, p. 3 (Fund Descriptions and Restrictions, Arts & Convention "[s]urplus appropriated for 07-08 transfer to General Fund."); CTE 1, Exh. J, pp. 7, 27; RT 8/19/08, pp. 85:19-86:23. The remaining $4.1 million advance or loan receivable, whether recorded in the Redevelopment Agency or Convention & Arts Fund or moved to the General Fund, still represents a non-current asset and does not create any new available fund balance.[16] UTE J, p. 17 ("Fund balance reserved for: . . . advances to other funds").  The Merged Redevelopment Project Area that has received this advance from the General Fund does not have the Unions' proposed additional $400,000 in surplus fiscal year 2008-09 cash flow to commence this repayment to the City. CTE 5, ¶ 12; UTE K, p. F-8.

118.    The Unions contend, without providing any evidence, that Hiddenbrooke Overpass and Bridge Construction Funds could loan the General Fund $4.1 million against the $4.1 million Empress Theatre loan receivable. RT 8/19/03, pp. 185:1-186:12. Both the

---

[16] Advances and loans receivable assets in governmental funds are considered non-current and, as such, are required by GASB to be reported as restricted fund balance, net of any deferred interest income on the advances. UTE J, p. 17 ("Fund balance reserved for: . . . advances to other funds").

1    Hiddenbrooke Overpass and Bridge Construction Funds are Development Impact Funds restricted

2    in use by the state Constitution. CTE 1, Exh. A, p. 1. Diversion of cash from either of these two

3    capital funds would impair progress on the capital program for which the funds were collected.

4    UTE K, p. 84 (Fund description). The Bridge Construction Fund is fully leveraged for the

5    Vallejo Station project, as the local contribution to a project that is providing over $50 million in

6    Federal and State grant investment in the City's waterfront development project. UTE K, p. I-1;

7    RT 8/22/08, pp. 58:14-59:21. Further, the $500,000 advance to the Redevelopment Agency for

8    the Empress Project by the Hiddenbrooke Overpass Fund in fiscal year 2006-07 was not made

9    from existing cash reserves in the fund.   UTE J, p. 100 (Line item "licenses, permits, and fees");

10   RT 8/22/08, pp. 58:14-59:21.   The $500,000 advance was from new developer receipts into the

11   fund from an amendment to the development agreement that hanged the permitted use of this

12   receipt to funding for the Empress Theater project. *Id.*

13          119.   The Unions contend that the City could transfer more money to the General

14   Fund from the Redevelopment Agency. RT 8/19/03, pp. 185:12-190:11. The Redevelopment

15   Agency is a separate legal entity established under authority of the State of California's Health

16   and Safety Code. RT 8/22/08, pp. 22:19-24:11. It adopts its own budget, issues its own debt,

17   maintains separate bank and investment accounts, receives separate tax allocations/distributions

18   from the City Council, and publishes separately audited financial statements. *Id.*

19          120.   The City Council sits as the governing board of the Redevelopment

20   Agency, but with separate meeting agenda and minutes. RT 8/22/08, pp. 23:16-22. The City

21   council has fiduciary duties to the agency as its board. RT 8/22/08, pp. 23:18-22, 26:25-27:6.

22   City staff's responsibility is to ensure arm's length transactions between agencies, evidenced by

23   formal loans agreements and formal documentation of cost allocations. *Id.*

24   / / /

25   / / /

26   / / /

27   / / /

28

121.    Redevelopment activities are authorized by the state code in geographic areas referred to as "Project Areas."[17] RT 8/22/08, p. 24:1-11

122.    Vallejo currently has two redevelopment project areas: Flosden and the "Merged" project areas. RT 8/22/08, pp. 24:12-25:4. The Flosden project area comprises the Six Flags/Marine World and the county fairgrounds area. RT 8/22/08, p. 25:5-14. The Merged Project Area comprises the waterfront and downtown area. RT 8/22/08, p. 25:15-20.

123.    Flosden's remaining outstanding advances were retired in cash in 2001. UTE JJ, p. 2, Flosden Column; RT 8/22/08, p. 28:1-5.

124.    The City Council retired a portion of the Redevelopment Agency's advances to the General Fund fourteen years ago, in 1994 ("Prior City Council"). CTE 46, pp. 1-12; UTE HH, pp. 1-2; UTE II, pp. 1-6. The Prior City Council deliberated and determined that 4% was a more appropriate interest rate than 10%. CTE 46, pp. 1-12: UTE HH, pp. 1-2; UTE II, pp. 1-6. City staff has no basis for proposing that the City Council reinstate these advances. RT 8/22/08, pp. 28:6-25, 32:17-33:6. The 10% interest rate the Unions propose be reinstated is greater than the City's cost of funds. RT 8/22/08, p. 28:6-25. In 1994, the Prior City Council authorized the retirement of debt in consideration for infrastructure assets including the title transfer for City Hall and the adjacent library, and project improvements such as roads and sidewalks. CTE 46, pp. 1-12; UTE HH, pp. 1-2; UTE II, pp. 1-6; RT 8/22/08, pp. 29:5-14, 32:14-33:6.

125.    The Merged Project Area has no cash available to pay the General Fund. RT 8/22/08, pp. 35:24-38:21. It receives approximately $2.2 million in tax revenues per year. UTE K, p. F-8; RT 8/22/08, p. 36:13-16. From this revenue, it has approximately $1.4 million in fixed costs for debt service, county and trustee fees, and tax pass-through obligations that are budgeted in its debt service funds. RT 8/22/08, p. 36:16-20. In addition, the Merged Project

---

[17] Each project area has two types of funds. RT 8/22/08, pp. 25:21-24. The debt service fund receives county tax and pays debt service and related expenditures, then transfers any year-end surplus to the capital project funds. RT 8/22/08, p. 28:3-19. The cash position at year-end is a restricted debt service reserve held by the trustee. Id. The capital projects funds accumulate any surplus from year-to-year and invests in redevelopment activities which objective of raising future tax revenues. RT 8/22/08, p. 26:19-24.

1    Area budgets to pay $331,323 in overhead to the City (i.e. payment for full cost recovery to the

2    General Fund for City services), and has also started budgeting an annual $400,000 loan

3    repayment to the City,[18] leaving less than $100,000 per year in discretionary spending for all

4    other development agreement obligations. RT 8/22/08, p. 37:1-12.

5            126.    With respect to the Flosden project area, the City Council shifted the entire

6    housing set-aside requirement for the Redevelopment Agency onto Flosden. RT 8/22/08, pp.

7    38:24-39:21. The Redevelopment Agency pays $299,732 to the General Fund for overhead. RT

8    8/22/08, p. 39:22-25. After taking these two costs into account, only $700,000 remains in the

9    fund for the annual redevelopment mission of the Flosden project area. *Id.* The fund also is

10   obligated to build a $7 million parking garage pursuant to the Six Flags development agreement.

11   RT 8/22/08, pp. 40:9-41:2. This obligation will be triggered when the county develops the

12   fairgrounds along I-80 and eliminates a significant portion of the existing Six Flags/Marine World

13   parking facilities. RT 8/22/08, pp. 40:9-41:2. There have been recent discussions between

14   Solano County and the City Manager on this development. RT 8/22/08, pp. 50:23-51:6. The

15   2008-09 year budget appropriated $1 million of this $7 million obligation. RT 8/22/08, pp. 40:1-

16   14, 50:23-51:6.

17           127.    The Unions contend, without providing any evidence, that Hiddenbrooke

18   Overpass and Bridge Construction Funds could loan the General Fund monies against $3 million

19   in surplus properties. RT 8/19/08, p. 186:5-11. Both the Hiddenbrooke Overpass and Bridge

20   Construction Funds are Development Impact Funds restricted in use by the state Constitution.

21   CTE 1, Exh. A, p. 1. The City would not meet its fiduciary responsibility to these restricted funds

22   if it exchanged interest-earning cash for a non-productive surplus land asset of uncertain value in

23   a declining real estate market. RT 8/5/08, pp. 67:3-9, 71:19-72:3, 97:20-98:4. The Unions'

24   figure for real estate value is based on a draft report that has since been updated. UTE Q, p. 25;

25   *see also* CTE 6, ¶ 8; RT 7/25/08, p. 70:8-15. Further, the City's surplus land is not an asset

26   reportable in the City's governmental fund financial statements. These statements do not include

27

28

---

[18] $400,000 is the maximum amount that can be repaid to the General Fund annually without jeopardizing the
viability of the project area and its own debt service obligations. RT 8/22/08, p. 38:5-21.

either capital assets or long-term debt based upon the required GASB "modified accrual" accounting basis. Instead, the focus is on "current financial resources." UTE J, p. 37. There is therefore no "asset" to transfer from the General Fund to either of these restricted funds.   In addition to violating GASB and sound fiscal policy, the California Constitution prohibits the City from incurring in any year a debt which it cannot pay from revenues attributable to the same year. *See* City's Memorandum of Fact and Law in Support of Statement of Qualifications Under Section 109(c), p. 4, line 14.

128.    The Unions also contend that the City could transfer money from the Transportation Fund to the General Fund. RT 8/21/08, pp. 198:8-199:7. The Transportation Fund has significant financial challenges, in large part due to increasing fuel costs and decreasing ridership. CTE 1, Exh. A, p. 2; CTE 5, ¶ 14; RT 7/24/08, pp. 120:20-121:17; RT 8/5/08, pp. 107:12-24, 150:7-25, 152:23-155:13, 205:14-16. The General Fund is the fund of last resort and is the fund that covers deficiencies in the City's enterprise funds. RT 8/5/08, p. 206:20-24. Because the Transportation Fund relies on federal and state reimbursement grants, it can be reimbursed only for its actual expenditures, and therefore by default cannot make a profit or earn surplus funds on its operations that can be available for repayment of prior subsidies from the General Fund. RT 8/5/08, p. 150:19-25.

129.    The Unions contend that the General Fund could reduce its subsidy to the Marina Fund by $200,000 a year. The General Fund subsidizes the Marina Fund because the Marina Fund cannot pay its debt service and the General Fund is obligated as the ultimate guarantor of Marina debt through bond documents. CTE 1, ¶ 51; RT 7/23/08, p. 115:3-12; RT 8/7/08, p. 38:6-15. All available Marina Fund revenues, including the 2008-09 CPI rate increase, have already been included in the 2008-09 budget. UTE K, p. E-1. The net assets of the Marina in the last audited financial statements, dated June 30, 2007, show that Marina Fund liabilities exceed its assets by $209,297, creating a deficit equity position. UTE J, p. 26; RT 8/5/08, pp. 30:6-31:6. The City has worked with outside parties to identify and consider ways to improve operations, including privatization, but has not identified any viable options to improve cash flow

///

to permit the Marina Fund to fully cover its operation and debt obligations. RT 8/5/08, pp. 18:6-25:13, 205:23-207:19; RT 8/7/08, pp. 39:16-40:10.

130.    Despite their contentions, the Unions acknowledge that the City cannot solve its financial problems with one-time transfers. RT 8/22/08, pp. 77:1-79:4, 91:12-92:6, 96:4-12.

**H.    The Evidence Regarding the Mialocq Declaration and the Rose Report**

131.    The Unions presented one witness at the evidentiary hearing, Roger Mialocq, a principal with Harvey Rose Associates ("Mialocq"). RT 8/21/08, p. 63:24-25.

132.    The Unions hired Harvey Rose Associates to analyze the City's fiscal year 2008-09 General Fund budget projections. UTE U, ¶ 3; RT 8/21/08, pp. 77:4-11, 77:23-78:11, 82:12-23, 140:19-141:14, 142:21-143:5. Mialocq and two assistants, Severin Campbell and Cheryl Solov, performed the analysis by Harvey Rose Associates on the Unions' behalf. RT 8/21/08, pp. 141:15-142:20.

133.    Mialocq's analysis, dated April 4, 2008, was produced in two weeks and has been referred to as the Rose Report. RT 8/19/08, p. 196:23-25. It was attached as Exhibit B to Mialocq's declaration, filed June 27, 2008. UTE U, Exh. B, pp. 1-15 & Attachments.

134.    Although Mialocq has been involved in public agency budgeting for a number of years, Mialocq is not a CPA, an accountant or a financial auditor. UTE U, Exh. A, pp. 1-2; RT 8/21/08, pp. 67:19, 137:5-9, 137:20-139:12. Neither of his two assistants who helped prepare the Rose Report is a CPA, an accountant or a financial auditor. RT 8/21/08, pp. 67:19, 137:14-16, 137:20-139:12, 141:15-142:20.

135.    Mialocq originally turned down the Unions' project because he felt he was too busy with projects for other clients. RT 8/21/08, p. 143:6-10. Mialocq changed his mind and took on the project because he felt that it would hurt his other clients if the City pursued a bankruptcy case. RT 8/21/08, pp. 143:11-144:2.

136.    Mialocq did not opine in his testimony, his declaration, or in the Rose Report that the City's General Fund is not insolvent or that the General Fund could be able to meet its debts as they come due in fiscal year 2008-09. UTE U, ¶¶ 1-40 & Exh. B, pp. 1-15 &

Attachments; RT 8/21/08, pp. 138:10-139:14, 140:19-21, 141:10-14, 158:5-8, 159:23-25, 160:9-19.

137.    Mialocq did not analyze or opine on the General Fund's cash flow for fiscal year 2008-09 in his testimony, in his declaration, or in the Rose Report. UTE U, ¶¶ 1-40 & Exh. B, pp. 1-15 & Attachments; RT 8/21/08, pp. 138:10-139:14, 160:8-19.

138.    In his testimony, his declaration, and in the Rose Report Mialocq did not analyze or opine on whether the City's General Fund would begin fiscal year 2008-09 with reserves. UTE U, ¶¶ 1-40 & Exh. B, pp. 1-15 & Attachments; RT 8/21/08, pp. 138:10-139:14, 140:19-21, 141:10-14.

139.    The evidence that the General Fund will begin fiscal year 2008-09 without reserves is uncontroverted. CTE 1,¶¶ 6, 15-17, Exh. B, pp. 9, 12; CTE 5, ¶ 7; UTE U. ¶¶ 1-40 & Exh. B, pp. 1-15 & Attachments; RT 8/5/08, pp. 138:10-139:14, 213:2-214:16.

140.    Neither the Rose Report nor Mialocq's declaration was an analysis of the General Fund's financial condition. RT 8/21/08, pp. 67:19, 138:10-139:14, 140:19-21, 158:5-159:5, 232:22-234:11. However, Mialocq did admit that the City's financial condition was dire. RT 8/21/08, pp. X.[19]

141.    The Rose Report was an analysis of the City's fiscal year 2008-09 General Fund budget projection dated March 6, 2008 and an analysis of what steps Mialocq thought the City could take to come closer to achieving a balance between General Fund revenues and expenditures in fiscal year 2008-09. CTE 40, pp. 1-2; UTE U, Exh. B, p. 16; RT 8/21/08, pp. 77:24-78:11, 82:12-23, 140:19-21, 141:3-14.

142.    After the mediator asked the City to provide Mialocq certain documents and other assistance, the City made room for Mialocq and his staff in at City facilities and cooperated with them to the best of their abilities. RT 8/21/08, pp. 146:24-147:6.

/ / /

---

[19] The City cites to the draft 8/21/08 transcript when possible. However, in certain instances, where the draft transcript is unclear, the City uses a placeholder, X. As previously noted, the City will submit amended Proposed Findings of Fact and Conclusions of Law finalizing its citations once it receives final transcripts for 8/19/08, 8/21/08 and 8/22/08.

143.    The Rose Report was presented to the mediator and the City at the April 4th mediation session. RT 8/21/08, p. 83:1-8.   The primary financial spreadsheet, Schedule 1 to the April 4, 2008 Rose Report, contained a $2 million accounting mistake and an erroneous revenue calculation that together resulted in an overstatement of $2,164,000 with respect to the budget deficit Mialocq claimed was appropriate ($5.51 million deficit compared to Mialocq's ultimate conclusion of a $3.35 million deficit).[20] CTE 35, pp. 1-2; RT 8/21/08, pp. 154:3-11, 156:24-157:21, 158:5-8. Sometime thereafter, Mialocq created a new Schedule 1 which stated that the projected budget deficit under his analysis was $3,355,031, not $5,519,031. CTE 35, pp. 1-2; RT 8/21/08, pp. 154:6-21, 158:5-8, 159:19-25, 210:10-211:14.

144.    Despite Mialcoq's testimony, "I haven't had a budget that I haven't balanced no matter what the situation," he did not balance the City's budget. RT 8/21/08, pp. 88:1-5, 158:5-8, 159:23-25.

145.    On more than one occasion, Mialocq corrected and revised the analysis in the Rose Report and Schedule 1 after the City pointed out his errors. CTE 5, Exhs. K, pp. 1-7, & L, pp. 1-12 (revised reports fixing fundamental mistakes in the Rose Report); RT 8/21/08, pp. 83:18-84:11, 152:14-159:14.

146.    In submitting the Rose Report to the Court as an exhibit to his declaration, Mialocq and the Unions replaced the erroneous Schedule 1 that was contained in the Rose Report as released on April 4th with a revised Schedule 1 that corrected some of Mialocq's mistakes. CTE 35, pp. 1-2; RT 8/21/08, pp. 154:3-21, 210:10-211:14.  However, the Schedule 1 Mialocq attached to his June 27 declaration still contained errors in labor expenses and debt service. *Compare* UTE U, Exh. B, Schedule 1 *with* CTE 5, Exhs. K, pp. 1-7, & L, pp. 1-12. Mialocq recognized and attempted to correct this in his April 15th and April 18th supplements.  CTE 5, Exhs. K, pp. 1-7, & L, pp. 1-12. None of Mialocq's Schedule 1's corrects a fundamental flaw in terminology: his erroneous use of the term "Total Expenditures" as the bottom line instead of "Surplus/Deficit," or words to that effect.  CTE L, Schedule 1; UTE U, Exh. B, Schedule 1.

/ / /

---

[20] The April 4, 2008 Schedule 1 assumes that the City must comply with the CBAs. RT 8/22/08, pp. 208:21-209:24.

147.    In all versions of his Schedule 1, Mialocq adopted the City's fiscal year 2008-09 budgeted existing revenues. RT 8/21/08, p. 161:5-20.

148.    Mialocq agreed with the City's original budgeting for a reduction in revenues by $1 million due to the State of California budget risk. UTE U, Exh. B, p. 3; RT 8/21/08, pp. 162:20-22, 165:6-11. He is aware that the State of California budget risk has grown since then and is uncertain what the impact will be on the City. RT 8/21/08, pp. 162:23-163:2.

149.    Mialocq conceded that budgeting for speculative revenues is risky and that, where an entity lacks reserves to cover for unexpected circumstances, new revenues should be budgeted conservatively. RT 8/21/08, pp. 169:11-19, 175:25-176:4, 194:20-24.

150.    Nevertheless, in analyzing the City's General Fund budget projection for fiscal year 2008-09, in his declaration and in the Rose Report Mialocq included approximately $3.1 million of uncertain and speculative revenues that he claimed the City could realize in fiscal year 2008-09. CTE 5, ¶¶ 18-26; UTE U, ¶¶ 12, 15-27, Exh. B, pp. 3-5, 11-15, Attachment 2; RT 8/5/08, pp. 99:9-128:25; RT 8/21/08, pp. 176:25-189:6, 190:14-200:11. In his budget analysis, Mialocq also reduced the City's projected fiscal year 2008-09 labor costs by approximately $5 million by accounting for savings that the City could not actually realize. CTE 5, ¶ 30, Exhs. K, pp. 5-6 & L, pp. 1, 12; UTE U, Schedule 1; RT 8/21/08, pp. 202:3-209:24, 212:19-213:9, 219:18-220:18.

151.    Mialocq drew his revenue recommendations directly from the draft revenue report prepared by the City's consultant and provided by the City to the Unions in the mediation on or around March 21, 2008. *Compare* UTE U, Exh. B, Attachment 2 *with* Exh. C; *see also* CTE 6, ¶ 8; UTE U, ¶¶ 11, 12, 15-27, p. 18 (Appendix 1), Exhs. B, pp. 3-5, 5-11, Attachment 2, & C; RT 8/21/08, pp. 176:25-177:18, 179:1-4, 179:20-180:6, 180:14-181:6, 185:5-11, 187:8-10.

152.    Mialocq did not conduct an independent evaluation of whether the various revenue-generating concepts in the draft report were legal or otherwise viable, and he admitted that the draft report was not a document ready to be presented to, much less acted upon by, the City Council. RT 8/21/08, pp. 176:25-179:4, 181:9-189:6, 189:22-200:11.

/ / /

153.    Many of the projected revenues that Mialocq accounted for in his declaration and the Rose Report cannot possibly be realized by the City in fiscal year 2008-09. CTE 5, ¶¶ 17-26; RT 8/5/08, pp. 99:9-128:25; RT 8/21/08, 182:6-189:6, 190:1-200:11.

154.    The largest component ($1.3 million) of the $3.1 million in new revenues Mialocq asserted the City should budget for in fiscal year 2008-09 derived from the institution of a 911 service fee. UTE U, Exh. B, Attachment 2. The legality of a non-voter approved 911 service fee has been called into question. RT 8/5/08, pp. 102:10-103:13; *see Bay Area Cellular Telephone Co. v. City of Union City*, 2008 Cal. App. LEXIS 634 (April 29, 2008); CTE 1, ¶ 32. Mialocq conceded that a 911 service fee likely would require voter approval prior to implementation, and should not be included as fiscal year 2008-09 revenues. UTE U, ¶ 12; RT 8/21/08, p. 183:5-9, 20-22.

155.    The second largest component ($900,000) of the fiscal year 2008-09 new revenues Mialocq asserted should be included in the budget derived from a proposed charge for Emergency Medical Services. UTE U, Exh. B, Attachment 2. The evidence shows that the implementation and administration costs of an Emergency Medical Services fee program, in addition to the uncertainties involved in collecting the charges after services have been provided (or from people who lack the resources to pay), lessen the potential revenue-generating capacity of this program. CTE 5, ¶ 19; RT 8/5/08, pp. 210:17-212:19; RT 8/7/08, pp. 47:19-48:20.

156.    The third target component of fiscal year 2008-09 new revenues Mialocq asserted should be included in the fiscal year 2008-09 budget was $350,000 from a Landscape Maintenance Assessment District Expansion. UTE U, Exh. B, Attachment 2. In order to implement an assessment district, the favorable vote of all property owners assessed is required, thus a city-wide landscape assessment district would require the affirmative vote of the owners of city property.[21] *Id.* If the vote were unfavorable, the City would bear the costs of conducting the election. *Id.* However, no monies could be recovered in fiscal year 2008-09 even if a vote were successful because the City cannot implement an assessment district mid-year. CTE 5, ¶ 18.

---

[21] Mialocq acknowledges that he does not know whether a vote is required to implement an assessment district. RT 8/21/08, p. 184:7-18.

- 34 -

Furthermore, the evidence demonstrates that assessment districts only can generate the amount of money required to pay for the services provided by the district. CTE 5, ¶ 18. Even if a city-wide landscape district were implemented, the City could replace only services costing $99,000 that are currently paid out of the General Fund. *Id*; RT 8/5/08, pp. 118:7-120:1.

157.    The fourth target component of fiscal year 2008-09 new revenues that Mialocq included in his new revenue assumption for fiscal year 2008-09, was $351,563 for the sale of surplus properties. He acknowledged, however, that he did not take into consideration the time it would take to sell the properties, or to resolve any title, zoning or legal issues. RT 8/21/08, pp. 190:18-192:9. In October 2007, the City identified for sale four surplus properties. UTE Z, pp. 1-7. The City's ability to sell any of its surplus properties before June 30, 2009 is speculative. RT 8/5/08, pp. 67:3-9, 71:19-72:3, 97:20-98:4.

158.    At the hearing, Mialocq agreed that the City's decision to earmark any revenues that may be generated by any sale of its four surplus properties to a capital reserve was reasonable. CTE 5, ¶ 26; RT 8/21/08, pp. 192:22-193:5, 194:4-10, 195:5-9. One-time proceeds from the sale of assets such as real property should as a general principle be invested in other capital improvements or assets. CTE 5, ¶ 26; RT 8/21/08, pp. 192:11-193:5, 194:20-195:9.

159.    The remaining new revenues Mialocq included in the Rose Report pertained to a new or increased business tax administration fee, road impact fees, corporate sponsorships, and monies from unclaimed property. UTE U, Exh. B, Attachment 2. The evidence shows that the majority of these revenues are speculative with respect to viability or timing, or both. CTE 5, ¶¶ 20-22, 25; RT 8/5/08, pp. 109:17-110:18, 115:3-18.

160.    Mialocq also suggested the City budget $164,000 in fiscal year 2008-09 for revenues derived from reimbursement to the City from the State of California in connection with SB 90 claims. UTE U, Schedule 1. However, the City received less than $7,500 per year in reimbursements for the last two years in which the City submitted eligible SB 90 claims. CTE 5, ¶ 24 & Exh. H-1, pp. 1-7; UTE FF, pp. 1-5.

/ / /

/ / /

161.    In fiscal year 2008-09, given the state's financial situation, receipt of SB 90 reimbursements is particularly speculative. *Id.* Mialocq acknowledged that payment by the state on SB 90 Claims is "sporadic." UTE U, Exh. B, p. 5.

162.    Nevertheless, the City has retained a consultant familiar with the City's finances and records to prepare and file current and delinquent SB 90 claims. CTE 5, ¶ 24; RT 8/5/08, pp. 135:23-137:18.

163.    As discussed above, in his declaration and in the Rose Report Mialocq suggested two potential revenue generation methods which would require voter approval. UTE U, ¶¶ 11-12, 15-27, Exh. B, pp. 3-5, 11-15, Attachment 2; CTE 1, ¶ 32; CTE 5, ¶ 1. In the current economic and political environment, voter approval of additional taxes and assessments is unlikely. CTE 1, ¶ 28; CTE 5, ¶ 23; RT 8/7/08, pp. 30:17-31:7; RT 8/19/08, pp. 105:20-107:9. A vote to increase or create new general taxes (those not earmarked for a specific purpose) must by law occur in an election in which City Council membership is on the ballot, or be approved by unanimous City Council vote for placement on an off-Council year ballot. CTE 5, ¶ 23. An off-Council year ballot tax measure costs approximately $500,000 to $700,000 dollars because the City is charged by the County. *Id.*

164.    In his testimony, in his declaration, and in the Rose Report, Mialocq suggested that the City increase its fees. UTE U, ¶ 20, Exh. B, p. 4; RT 8/21/08, pp. 188:9-189:6. As the result of a study of its fee structure, the City previously updated the most significant development-related fees on July 1, 2007 to provide for full cost recovery. CTE 5, ¶ 16; RT 8/5/08, pp. 106:4-107:5; RT 8/19/08, p. 189:2-6. An automatic annual Consumer Price Index ("CPI") adjustment increase was applied to the remaining fees. RT 8/5/08, pp. 84:6-7, 106:20-23.

165.    In the Rose Report, Mialocq suggested the City increase fares for its ferry service. UTE U, Exh. B, p. 4; RT 8/21/08, pp. X. The City recently increased fares on its ferry service. RT 8/5/08, p. 107:6-24. Following the fare increase, ridership declined 21%. *Id.* More importantly, revenues generated from the ferry are restricted to the Transportation Fund and are not available for use in the General Fund. RT 8/5/08, p. 107:19-24.

///

166.   The City and Six Flags/Marine World were parties to multiple agreements (e.g. revenue sharing agreement, option to purchase agreement) prior to July 2007. CTE 6, ¶ 13. In July 2007, Six Flags/Marine World exercised its option to purchase the property from the City. *Id*. This resulted in the termination of the revenue sharing agreement. *Id*. The sale of the property resulted in the retirement of more than $50 million in certificates of participation backed by the General Fund. *Id*.

167.   Mialocq acknowledged that a major problem with one time sales or transfers to obtain revenues is that in succeeding years, the City will not have continuing revenue to meet its expenses. RT 8/21/08, pp. 194:5-10.

168.   Mialocq also analyzed and drew conclusions regarding the City's projected General Fund expenditures for fiscal year 2008-09. UTE U, Exh. B, pp. 1-15 & Attachments.

169.   Mialocq based his analysis of the General Fund labor expenses for fiscal year 2008-09 on a single pay period, February 29, 2008. CTE 5, ¶ 30, Exh. B, pp. 9, 10; RT 8/21/08, p. 202:3-16. By doing so, Mialocq failed to account for the cost of certain lump sum compensation the City is required to provide to police and firefighters at different times during the fiscal year, such as holiday leave bank withdrawals and uniform allowances. CTE 5, ¶ 30; RT 8/21/08, pp. 202:17-203:19. Additionally, he failed to account for step-increases. RT 8/21/08, p. 202:17-24.

170.   Mialocq subsequently discovered this error, which he acknowledged in an April 15, 2008 revision of his labor expense analysis. CTE 5, ¶ 30, Exh. L. p. 1; RT 8/21/08, pp. 203:15-19, 204:8-205:19.

171.   Mialocq erroneously discounted the City's projected labor costs based on vacancies identified from the February 29, 2008 payroll, thereby mistakenly asserting that $5.1 million of the City's projected General Fund labor costs could be eliminated. CTE 5, ¶ 30, Exhs. K, p. 5 & L, pp. 1, 12; RT 8/21/08, pp. 204:2-6, 205:5-19. Due to minimum staffing requirements in the IAFF CBA, and the overtime the City must pay to meet those staffing requirements when firefighter positions are vacant, the City would not realize the $3.3 million

///

- 37 -

1    labor cost savings Mialocq attributed to the vacant firefighter positions. CTE 5, ¶ 30, Exhs. K, p.

2    5 & L, pp. 1, 12; RT 8/21/08, pp. 207:1-209:24

3            172.    Another error in the Rose Report's conclusions regarding the City's fiscal

4    year 2008-09 labor expenses is that it did not to take into account that the General Fund would

5    lose revenue related to labor services provided to other fund projects. CTE 5, ¶ 30, Exhs. K, p. 6

6    & L, pp. 1, 12; RT 8/21/08, pp. 218:16-220:18.  Mialocq reduced the City's projected labor

7    expenses based on vacant positions within the group of reimbursable job classifications, but he

8    did not correspondingly decrease projected General Fund revenues that would not be received

9    because the positions were vacant. *Id.*

10           173.    Mialocq acknowledges that he was unaware of the assumptions used in

11   calculating the Harvey Rose labor expense estimate because he had relied on a Harvey Rose team

12   member. RT 8/21/08, pp. 213:1-4.

13           174.    The General Fund provides services to other funds and City programs and

14   is, in return, reimbursed by those funds. CTE 5, ¶ 16; RT 8/5/08, p. 81:2-19.  The City has

15   retained a consultant in each of the past two fiscal years to update its cost allocation plan to

16   ensure full cost recovery to the General Fund from all City funds receiving General Fund

17   services. CTE 5, ¶ 16.  The City updated its cost allocation plan during the 2007-08 fiscal year,

18   and the City will update the plan again for fiscal year 2008-09. RT 8/5/08, p. 81:2-19.

19           175.    Mialocq acknowledged that the City's cost allocation and recovery plan is

20   consistent with recommended practices and regulations. CTE 5, ¶ 16 & Exh. F.

21           176.    The Rose Report used a 4.8% interest rate to calculate the City's projected

22   debt service obligation for fiscal year 2008-09. UTE U, ¶ 32 (weighted average of 4.0% and

23   6.0%); CTE 5, ¶ 29, Exhs. B, pp. 7-8 & K, p. 3; RT 8/21/08, pp. 228:5-7.  However, a Harvey

24   Rose team member acknowledged that a 4.8% interest rate was too low. CTE 45, p. 1; RT

25   8/21/08, 229:24-231:1.

26           177.    Subsequent to the issuance of the Rose Report, Mialocq also acknowledged

27   in a memorandum to Alan Davis (counsel to the Unions), dated April 18, 2008, that his debt

28   service calculation was incorrect. *Compare* CTE 5, Exh. K, p. 3 (General Fund debt

                                        - 38 -

"$1,390,419"), *with* UTE U, Exh. B, Schedule 1 (General Fund debt "$1,018,057").

178.    Mialocq accounted for reduced vehicle replacement and maintenance expenditures in his declaration and in the Rose Report. UTE U, ¶ 31, Exh. B, p. 6, Schedule 1. The City has reduced vehicle expenditures in fiscal year 2008-09, both in the Pendency Plan and its adopted budget for the 2008-09 fiscal year. CTE 5, ¶ 31 & Exh. B.

179.    Mialocq suggested that the City prepay its CalPERS contribution to save money. UTE U, ¶ 33, Exh. B, p. 8. The liquid funds held by the City in the in the State Local Agency Investment Fund ("LAIF"), however, are not sufficient to cover the CalPERS prepayment proposed by Mialocq as well as the other General Fund cash flow requirements the City will encounter during the fiscal year. CTE 5, ¶ 33.

180.    Mialocq suggested that the City overstated its projection of expenditures on compensated absences in fiscal year 2008-09 by approximately $336,000. UTE U, ¶ 34, Exh. B, pp. 10-11. The evidence shows, however, that in fiscal year 2007-08, due to the extraordinary number of police and firefighters that departed, the City incurred compensated absence payout obligations totaling $5.3 million. CTE 5, ¶ 34. Under the Interim Agreements, the City and the Unions and those departing individuals agreed that the City could defer payment of $1.7 million of that total until December 2008.[22] *Id.* Anticipating further departures, as opposed to an average year based on prior "normal" years as calculated by Mialocq, the City projected an additional $1.75 million in employee payout expenses, for a total projected of $3.45 million. *Id.* Mialocq did not account for any anticipated departures above normal attrition in his compensated absences calculation. *Id.*; RT 8/21/08, pp. 222:23-226:4.

181.    Even accounting for such unwarranted budget assumptions such as the $3.1 million in uncertain revenues and unavailable labor cost reductions that Mialocq included in the Rose Report and in his declaration, after correction for several errors, Mialocq and the Rose Report concluded that in fiscal year 2008-09 the General Fund would experience a deficit of $3,355,031. UTE U, Exh. B, p. 16, Schedule 1; RT 8/21/08, pp. 232:1-234:5.

---

[22] Each affected departing employee signed an agreement permitting the City to defer such payments. CTE 5, ¶ 34 n. 14.

1    182.    The evidence is undisputed that the General Fund will begin fiscal year

2  2008-09 with, at best, zero reserves. CTE 1, ¶¶ 15-16 & Exh. B, pp. 2, 9; CTE 5, ¶ 7; RT 8/5/08,

3  pp. 213:2-214:16.

4    183.    With no General Fund reserves to start fiscal year 2008-09, even if one

5  were to accept all of Mialocq's and the Rose Report's analysis, Mialocq's and the Rose Report's

6  conclusion that the General Fund budget will operate at a $3.3 million deficit confirms that,

7  absent its chapter 9 filing, the General Fund would not have sufficient funds and cash flow to pay

8  its bills as they become due in fiscal year 2008-09. RT 8/21/08, pp. 159:19-25, 232:2-234:5.

9                                **III.**

10                          **CONCLUSIONS OF LAW**

11    184.    To be eligible for relief under chapter 9, a petitioner must meet certain

12  criteria. Those criteria "are to be construed broadly to provide access to relief in furtherance of

13  the Code's underlying policies." *In re Valley Health Systems*, 383 B.R. 156, 163 (C.D. Cal.

14  2008). "The general policy of chapter 9 is to give a debtor a breathing spell from debt collection

15  efforts so that it can work out a repayment plan with creditors." *In re County of Orange*, 183

16  B.R. 594, 608 (C.D. Cal. 1995).

17    185.    Bankruptcy Code § 109(c) provides that an entity is eligible to be a debtor

18  under chapter 9 if such entity:

19        (1) is a municipality;

20        (2) is specifically authorized, in its capacity as a municipality or by
          name, to be a debtor under such chapter by State law, or by a
21        governmental officer or organization empowered by State law to
          authorize such entity to be a debtor under such chapter;
22
23        (3) is insolvent;

          (4) desires to effect a plan to adjust such debts; and
24
25        (5)(A) has obtained the agreement of creditors holding at least a
          majority in amount of the claims of each class that such entity
26        intends to impair under a plan in a case under such chapter;

27        (B) has negotiated in good faith with creditors and has failed to
          obtain the agreement of creditors holding at least a majority in
28        amount of the claims of each class that such entity intends to impair
          under a plan in a case under such chapter;

                              - 40 -

(C) is unable to negotiate with creditors because such negotiation is impracticable; or

(D) reasonably believes that a creditor may attempt to obtain a transfer that is avoidable under section 547 of this title.

11 U.S.C. § 109(c).

186.    The City has the burden of establishing its eligibility under chapter 9. *See Orange County*, 183 B.R. at 599 ("The burden of proving eligibility under § 109(c) is on the party filing the petition.").

187.    The City is a political subdivision of the state of California and is a municipality within the meaning of Section 109(c)(1). Accordingly, the City satisfies the eligibility requirements set forth under Section 109(c)(1).

188.    The City is authorized by California law to bring a petition under chapter 9. California Government Code Section 53760 states:

(a)  Except as otherwise provided by statute, a local public entity in this state may file a petition and exercise powers pursuant to applicable federal bankruptcy law.

Cal. Gov't Code § 53760(a). "Local public entity" includes a city. *Id.* § 53760(b).

189.    The City satisfies the eligibility requirements set forth in Section 109(c)(2).

190.    A municipality is insolvent under the Bankruptcy Code when its financial condition is such that it is (i) generally not paying its debts as they become due unless such debts are the subject of a bona fide dispute; or (ii) unable to pay its debts as they become due. 11 U.S.C. § 101(32)(C).

191.    Insolvency is determined based on the debtor's financial condition as of the date the petition was filed. *In re City of Bridgeport*, 129 B.R. 332, 337 (Bankr. D. Conn. 1991).

192.    Insolvency is determined under a cash flow analysis. *Bridgeport*, 129 B.R. at 337. Whether a city is unable to pay debts as they become due is determined prospectively. *Id.* A municipality is not required to wait until it runs out of money and defaults on its debts before it is deemed to be insolvent. *Id.*

193.    Because the City cannot demonstrate the ability (*e.g.*, through an adopted balanced budget) to pay back any such loan with revenues generated in fiscal year 2008-09, it cannot lawfully borrow from the private market or other city funds  Cal. Const., art. XVI, § 18; *Rider v. City of San Diego*, 18 Cal. 4th 1035 (1998); *Starr v. San Francisco*, 72 Cal. App. 3d 164, 174-75 (1997).

194.    The evidence establishes that the City was insolvent as of the date the petition was filed.  In particular, the City proved that:

a.    the City's General Fund will begin fiscal year 2008-09 with no reserves, and possibly with a negative balance;

b.    absent this case, the General Fund would operate at a multi-million dollar deficit in fiscal year 2008-09, with projections by the City ranging from a $10 million to $17 million deficit, and by the Unions of a deficit approximating at least $3.34 million;

c.    with no reserves and a multi-million dollar deficit, the General Fund would not have sufficient available funds and cash flow to pay its debts as they become due; and

d.    the General Fund cash flow experienced in the first two weeks of the 2008-09 fiscal year demonstrated that, absent this case, the General Fund would not have been able to pay its debts as they became due and, in particular, the City would not have been able to pay the General Fund payroll that became due on July 11, 2008.

195.    Accordingly, the City satisfies the eligibility requirements set forth in Section 109(c)(3).

196.    The evidence establishes the City desires to effect a plan to adjust its debts within the meaning of Section 109(c)(4).  Undisputed evidence, as well as the City's prepetition efforts to develop and implement a plan to avoid the need for bankruptcy relief, corroborates the City's certification filed on the petition date.

197.    The City is not required to have proposed a plan of adjustment in this case for the Court to determine that the City desires to effect a plan of adjustment.  *See* 11 U.S.C. § 109(c)(4) (requiring for eligibility a "desire" to effect a plan of adjustment, not a proposed plan).

- 42 -

of Section 109(c)(5)(C). In particular, the City has established that:

a.    the City could not negotiate firm or meaningful adjustments to its municipal debt obligations with Union Bank unless the City first reached a viable, long term financial plan founded on adjustments to the City's General Fund labor costs;

b.    prior to filing its petition, the City could not identify all its creditors for purposes of prepetition negotiation, including, in particular, an unknown number of retirees who collectively hold the largest claim against the City (approximating $215 million), as well as unknown bondholders and potential tort claimants who may or may not have yet asserted a claim against the City;

c.    even if such unknown creditors could have been identified prior to filing its petition, the City could not succeed in prepetition negotiations if it involved the numerous individual creditors in the complex and extensive negotiations the City undertook with the Unions regarding the CBAs (*see In re Villages at Castle Rock Metropolitan Valley Health*, 145 B.R. 76, 85 (Bankr. D. Colo. 1990);

d.    the City had to act to preserve its assets and continue operations to provide uninterrupted services to the community, and a delay in filing in order to negotiate with all creditors, known or unknown, would put those assets and functions at risk (*see Valley Health*, 383 B.R. at 163); and

e.    prepetition negotiation with the City's creditors other than the Unions was futile until the City and the Unions reached a firm, viable plan modifying the City's obligations under the CBAs (*see Valley Health*, 383 B.R. at 165).

204.    Section 109(c)(5)(C) does not require that the City satisfy a numerosity requirement before it can be determined that prepetition negotiation with its creditors was impracticable. *See Valley Health*, 383 B.R. at 163.

205.    Accordingly, the City satisfies the eligibility requirements set forth under Section 109(c)(5)(C).

206.    Because the City satisfies each of the criteria set forth under Section 109(c), the Court concludes that the City is eligible to be a debtor under Section 109(c).

- 44 -

207.    The evidence further establishes, and the Court hereby concludes, that the City filed its petition in good faith within the meaning of Section 109(c).

208.    Therefore, this case should not be dismissed under Section 921(c), and an order for relief should be entered.

209.    The Court cannot conclude as a matter of law that the City is not an eligible debtor under chapter 9 based on the existence of the Unions' offer to modify the CBAs. Insolvency is determined based on the City's obligations as of the petition date as those obligations actually exist, not as they could exist under hypothetical circumstances. *See Bridgeport*, 129 B.R. at 337; Sullivan, 165 B.R. at 76.  Moreover, a conclusion that the City was not insolvent or did not act in good faith based on the City's rejection of the Unions' contract proposal would be contrary to the mandate of the Tenth Amendment and Sections 903 and Section 904 of the Bankruptcy Code. *See, e.g.*, 11 U.S.C. § 904 (bankruptcy court may not "interfere with. . . any of the political or governmental powers of the debtor[.]"); *In re City of Wellston*, 42 B.R. 282, 285 (Bankr. E.D. Mo. 1984).  Concluding that the City was not eligible to file a chapter 9 petition based on its rejection of the Unions' contract proposal would, in effect, accomplish through denying access to the bankruptcy court what the Court would be prohibited from ordering within a chapter 9 bankruptcy case.

210.    To the extent that any portion of a Finding of Fact contains or constitutes a Conclusion of Law, such portion shall be deemed to be a Conclusion of Law, and to the extent that any portion of a Conclusion of Law contains or constitutes a Finding of Fact, such portion shall be deemed a Finding of Fact.


Dated: _____, 2008


_____
Michael S. McManus
United States Bankruptcy Judge

OHS West:260498436.8

- 45 -