

FILED

SEP - 5 2008

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

)
In re                              )      Case No. 08-26813-A-9
                                   )
CITY OF VALLEJO, CALIFORNIA        )
                                   )
                                   )
        Debtor.                    )
                                   )
_____    )

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Pursuant to Fed. R. Civ. P. 52(a), made applicable to
bankruptcy proceedings by Fed. R. Bankr. P. 7052 and 9014, the
court makes its findings of fact and conclusions of law
concerning the objections to the City of Vallejo's May 23, 2008
Statement of Qualifications pursuant to 11 U.S.C. § 109(c).  The
objections were interposed by the Vallejo Police Officers
Association ("VPOA"), the International Association of
Firefighters ("IAFF"), and the International Brotherhood of
Electrical Workers ("IBEW"), collectively, the "Unions."

The Statement of Qualifications and the objections to it
were supported by declarations.  Because those declarations
revealed material disputed factual issues, the court scheduled an
evidentiary hearing on the contested matter as required by Fed.
R. Bankr. R. 9014(d).  That hearing commenced on July 23, 2008,
and concluded on August 22, 2008.  At the hearing, the parties
addressed whether the City meets the chapter 9 eligibility
criteria.  See 11 U.S.C. § 109(c).

At the hearing, Marc A. Levinson, Norman C. Hile, and
Michael Weed appeared for the City of Vallejo (the "City").  Dean

M. Gloster, Kelly A. Woodruff, and Monica M. Swanson appeared for the Unions.  Robert Kaplan and Nicolas DeLancie appeared for Union Bank.  Michael Buckley appeared for Wells Fargo Bank. Other appearances were noted on the record.

FINDINGS OF FACT

1.    In the two fiscal years ending prior to the filing of the petition, July 1, 2005 through June 30, 2006, and July 1, 2006 through June 30, 2007, the City operated at deficits of $3.2 million and $4.2 million, respectively.  City's Trial Exhibits ("CTE") 1, ¶ 6 & Exh. C, p. 1.

The City estimates that in the fiscal year ending June 30, 2008, approximately one month after the bankruptcy petition was filed, it continued to operate at a deficit.  That deficit is projected to be $4.2 million.  Id.

2.    At this point it is unclear whether the City's General Fund began the current fiscal year with merely no reserve or a deficit.  CTE 1, ¶¶ 15-16, 5, ¶ 7 & Exh. B, pp. 2, 9.  This is uncertain because the City does not yet know its final revenue figures and it is still accruing receipts; it has not finished paying its bills from fiscal year 2007-08; and reimbursements due the General Fund by other funds have not been calculated. Reporter's Transcript of Proceedings ("RT"), 8/5/08, p. 211:11-214:6.

3.    Despite this uncertainty, because fiscal year 2007-08 labor costs were higher than budgeted, and because revenues were less than expected, the City's General Fund likely ended the year with a negative balance.  Id. pp. 211:20-214:16.

4.    To maintain financial stability, the Government Finance Officers Association recommends that a city establish and maintain funding reserves of at least 5% of annual revenues.  CTE 1, ¶ 51 & n. 8, 5, ¶ 26; RT 8/19/08, pp. 116:21-117:11.

5.    The City derives most of its General Fund revenues from payments received from the State of California and Solano County. These payments include property and sales taxes, and other fees and assessments, for which the City periodically receives lump-sum payments.  CTE 1, ¶ 16 & Exh. L, p. 2.

    a.    The City's General Fund receives the bulk of property tax revenues December and April each fiscal year.  CTE 1, ¶ 16 & Exhs. C, p. 1, L, p. 2.  Each of these payments is approximately $9 million.  CTE 1, ¶ 16 & Exh. L, p. 2.  It also receives a small installment of property taxes in June, approximately $400,000.  Id.

    b.    The City receives sales tax revenues on a monthly basis.  RT 7/23/08, pp. 84:21-85:1.

    c.    Other revenues are received into the General Fund on a monthly, quarterly, or semi-annual basis, but no substantial revenues are received on a daily basis.  CTE 1, ¶ 16.

6.    Recent adverse economic conditions have negatively impacted the City's primary revenue sources: property taxes, sales taxes, assessments, and fees.  CTE 5, Exh. 0, pp. 1-6; CTE 1, ¶¶ 24, 26 & Exhs. B, p. 5, O, pp. 1-3; CTE 1, ¶¶ 26, 27.  For instance, the prior fiscal year, the closing of the Vallejo Wal-Mart store significantly reduced the City's sales tax revenue.

1   CTE 1, ¶ 27.

2       7.   Also, the General Fund will no longer receive revenue

3   sharing funds from Six Flags/Marine World as a result of the

4   owner's exercise in 2007 of its option to buy the amusement park

5   from the City.  CTE 1, ¶ 27 & n. 4.

6       8.   Further complicating the City's 2008-09 revenue

7   projections is the possibility that the State of California will

8   decrease funding and reimbursements to cities.  RT 8/7/08,

9   pp. 57:16-60:13; RT 8/22/08, pp. 41:25-42:20, 44:19-45:25.  Based

10  on a Legislative Analyst's Office's report, the City initially

11  projected a $1 million decrease from 2007-08 levels of state

12  funds available to the City.  CTE 1, ¶ 31 & Exhs. M, p. 15, C, p.

13  1; RT 8/7/08, pp. 57:16-60:13.  This could increase to as much as

14  $3 million.  CTE 39, pp. 1-3; RT 8/22/08, pp. 45:15-23.

15      9.   Prior to filing its petition, the City projected that

16  General Fund revenues in fiscal year 2008-09 would be

17  approximately $77.9 million, $5.3 million less than it expects to

18  collect in 2007-08.  CTE 1, ¶ 23 & Exh. C, p. 1, Column A; CTE 1,

19  ¶ 25 & Exh. C, p. 1.

20      10.  While revenue has decreased, costs have increased.  CTE

21  1, ¶ 6 & Exh. C, p. 1.  On May 16, 2008, the City projected

22  expenditures for fiscal year 2008-09 to be approximately $95

23  million, resulting in a projected General Fund budget deficit

24  approaching $17 million.  CTE 1, ¶ 23 & Exh. C, p. 1, Column A.

25      11.  Faced with this deficit, the City prepared an

26  alternative 2008-09 financial projection based on the assumption

27  that it would be compelled to severely reduce funding for

28  services and programs not controlled by contract.  It also

-4-

investigated new revenue sources and projected an additional $1.4 million in revenue. CTE 1, ¶ 54 & Exh. C, p. 1, Column B; RT 7/23/08, pp. 93:8-24, 95:7-96:21, 99:5-100:17. However, even under this alternative projection, the City's General Fund deficit remains in excess of $10 million for fiscal year 2008-09. CTE 1, ¶¶ 54, 58 & Exh. C, p. 1, Column B; RT 7/23/08, pp. 93:8-24, 95:7-96:21.

12. Considering the City's falling revenues, its prior years of operating deficits, and the program cuts and deferrals those deficits have necessitated, continuing to shoulder the contractual obligations under the existing Collective Bargaining Agreements (each a "CBA" and together, the "CBAs") with the Unions makes projecting a realistic balanced 2008-09 General Fund budget exceedingly difficult and unlikely. CTE 1, ¶ 58, Exh. C, p. 1; RT 7/23/08, pp. 92:10-18, 96:4-97:5; RT 8/19/08, pp. 80:20-82:5, 84:6-15, RT 8/22/08, pp. 5:18-7:10. The CBAs dictate the employment terms of represented employees, including base pay, overtime, health and medical benefits, minimum staffing levels, pension and retiree health benefits and other compensation components, such as vacation accrual. CTE 1, ¶ 35 & Exh. B, pp. 3-4; CTE 2, ¶ 4.

13. The City's 2008-09 budget and cash flow projections, based on current service levels and CBA obligations, show that the General Fund would end each month of the fiscal year with a negative cash balance ranging from $6.1 million to $22.7 million. CTE 1, ¶¶ 17, 23 & Exhs. C, p. 1, L, pp. 1, 3; RT 7/23/08, pp. 101:4-103:14; RT 8/7/08, pp. 5:10-8:25.

14. Under the more austere alternative budget projection,

the General Fund would experience a $10 million deficit and,

without reserves to begin the year, would operate at a negative

cash balance in each month of fiscal year 2008-09.  CTE 1, ¶¶ 54-

58 & Exh. L, p. 4; CTE 5, Exh. D, pp. 1-5; RT 7/23/08, pp.

102:15-25; RT 7/24/08, pp. 31:10-32:6; RT 8/5/08, pp. 36:4-37:17.

15.  Without relief in this court, the City would not have

sufficient funds in any month in fiscal year 2008-09 to pay all

the General Fund obligations.  CTE 1, ¶ 17 & Exh. L, pp. 1, 3;

CTE 5, Exh. D, pp. 1-5; CTE 1, ¶¶ 16-17 & Exh. L, p. 4.

16.  The City was obligated to make payroll on July 11,

2008, for the pay period ending on July 4, 2008.  CTE 1, ¶ 17 &

Exh. L, p. 4; RT 8/7/08, pp. 5:8-8:4; CTE 1, ¶¶ 17, 39 & Exh. L,

p. 4; CTE 5, ¶ 7; RT 8/19/08, pp. 84:17-85:3.  Prior to filing

the bankruptcy petition, the City projected this payroll payment

would be approximately $2.6 million.  CTE 1, ¶ 17 & Exh. L, p. 4;

RT 8/7/08, pp. 5:8-8:4.  The actual amount was $2.4 million.  CTE

5, ¶ 7 & Exh. D, p.1; RT 8/7/08, p. 7:4-8; RT 8/19/08, p. 126:8-

13.

17.  As of July 11, 2008, the General Fund had not received

sufficient revenues and did not have enough money on hand to

cover the July 11th payroll.  CTE 5, ¶ 7 & Exh. D pp. 1-5.  The

General Fund was approximately $1.6 million short of making this

payroll.  CTE 5, Exh. D, pp. 1-5; RT 8/7/08, pp. 5:8-8:4.

18.  Without a balanced General Fund 2008-09 budget, the

City could not borrow money to pay the July 11, 2008 payroll.

CTE 5, ¶ 7; RT 8/5/08, pp. 22:4-24:13; RT 8/7/08, p. 8:5-25.

19.  However, because it filed a chapter 9 petition, the

City was able to adopt a balanced 2008-09 budget.  CTE 5, ¶ 7; RT

8/7/08, p. 8:5-25.  It did so based on its ability to adjust General Fund obligations under chapter 9 of the Bankruptcy Code. These adjustments are reflected in the City's Pendency Plan.  CTE 5, ¶¶ 5, 7.

20.  In light of its now balanced budget for 2008-09, the City was permitted by the California Constitution and Government Accounting Standards Board ("GASB") regulations to borrow money in the short term from other City funds to cover its cash shortfall.  CTE 5, ¶ 7 & Exh. E, pp. 1-4; RT 8/7/08, p. 8:9-25.

21.  Over several years, the City has attempted to address the deficits in the General Fund and to implement measures to balance the General Fund and avoid bankruptcy.  CTE 1, ¶¶ 7-15, 41-49; RT 8/19/08, pp. 97:16-98:2.

22.  The City has reduced expenditures to the point that municipal services have been decreased and are under-funded.  CTE 1, ¶¶ 41, 42, 45, 48; RT 7/23/08, pp. 110:6-15, 111:14-20; RT 8/19/08, pp. 109:25-110:15.

23.  From the 2003-04 fiscal year to the date the bankruptcy petition was filed, the City reduced the General Fund employee rolls by 87 full-time positions.  CTE 1, ¶ 41 & Exh. N, p. 1; CTE 1, ¶¶ 41-45; RT 8/19/08, pp. 109:25-110:3.  The City also has cut funding for community services, such as its senior center, library, parks, convention and visitors bureau, symphony and other community programs and services.  CTE 1, ¶ 48; RT 8/19/08, p. 110:11-15.

24.  The City has cut funding for street maintenance and vehicle replacement.  CTE 1, ¶ 46.  The General Fund finances 70% of the maintenance and replacement costs of the City's 400-plus

1  vehicles and pieces of equipment.  CTE 1, ¶ 47.  As of June 30,

2  2007, the fleet was 82% depreciated.  Id.  The City repeatedly

3  has extended the "lives" of the majority of its vehicles and

4  equipment.  Id.  Approximately 70% of the vehicles supported by

5  the General Fund are 3 to 5 years beyond their expected life,

6  which has resulted in increased maintenance costs.  CTE 1, ¶¶ 4,

7  47; RT 7/23/08, p. 110:6-15.

8      25.  From December 2006 through June 2007, as the City

9  adopted its 2007-08 fiscal year budget, it identified

10  approximately $10 million in cuts to City programs and service

11  expenditures that did not require the mutual agreement of other

12  parties in order to be implemented.  CTE 1, ¶ 8; CTE 11, pp. 1-

13  57.

14     26.  On November 13, 2007, the General Fund budget update

15  for the 2007-08 fiscal year showed a deterioration in the

16  financial position of the General Fund despite the City's cuts in

17  expenditures.  CTE 1, ¶ 9.  The City Council then focused on

18  developing strategies to establish a General Fund financial

19  structure that could ensure the short-term and long-term fiscal

20  solvency.  CTE 1, ¶ 9 & Exhs. E, pp. 1-13, F, pp. 1-10, G, pp. 1-

21  55; CTE 11, pp. 1-57.

22     27.  On December 18, 2007, staff presented to the City

23  Council an analysis of the status of the General Fund and

24  detailed financial projections for the General Fund through the

25  end of the 2009-10 fiscal year.  CTE 1, ¶ 10 & Exh. H, pp. 1-2,

26  10.  The analysis showed that, due to greater than anticipated

27  declines in revenues and increases in expenditures, the General

28  Fund would be depleted before the end of the fiscal year of the

1   2007-08 fiscal year.  CTE 1, ¶ 10 & Exh. H, pp. 5-6.

2       28.   Staff also recommended that the City discuss with VPOA,

3   IAFF, IBEW, and CAMP modifications to the CBAs, which are

4   effective through June 30, 2010, to obtain economic concessions

5   in order to reduce the City's labor costs as one component of the

6   City's financial recovery plan.  CTE 1, ¶ 10 & Exh. H, pp. 1, 2,

7   4-5.

8       29.   On February 13, 2008, staff and the City Council

9   conducted a public study session to explore in detail the City's

10  financial position and strategies for recovery.  CTE 1, ¶ 12 &

11  Exh. I, pp. 1-3.  At the study session, staff provided financial

12  projections that expanded the General Fund budget analysis

13  through the end of fiscal year 2011-12.  CTE 1, ¶ 12 & Exh. I,

14  pp. 1, 11.  The study session indicated that, absent immediate

15  action to reduce costs and increase revenues, it was likely that

16  the reserves in the General Fund would be exhausted before the

17  end of the 2007-08 fiscal year.  CTE 1, ¶ 12 & Exh. I, p. 2.

18      30.   In February 2008, the City retained a consultant to

19  identify potential sources of new and additional revenue.  CTE 6,

20  ¶ 8.  The consultant prepared a draft report which preliminarily

21  described a number of potential avenues by which the City might

22  generate additional revenues.  Id.; Unions' Trial Exhibit ("UTE")

23  DD, pp. 1-23.

24      31.   In February 2008, several police officers and

25  firefighters unexpectedly retired, obligating the City to pay

26  unbudgeted retiree pay-outs of approximately $3.4 million.  These

27  pay-outs exacerbated the imbalance in the General Fund for fiscal

28  year 2007-08.  CTE 1, ¶ 12 & n. 1.

32.    In March 2008, the City adopted a Fiscal Emergency Plan and revised the 2007-08 General Fund budget.  CTE 5, ¶ 10; CTE 14, pp. 2, 9-11, 19-23; RT 7/23/08, pp. 85:20-86:4, 86:9-12, 87:6-12, 88:19-89:3.  As part of this plan, the City identified and transferred a total of $2.4 million to the General Fund from the Vehicle Replacement Fund, Arts and Convention Fund, Repair and Demolition Fund, and Transportation Fund.  CTE 5, ¶ 10; CTE 14, pp. 9-11, 19-23; RT 8/19/08, pp 85:19-87:7.

33.    Additional funding reductions threaten, in the judgment of the City, its ability to provide minimal levels of service to its residents and provide for their basic health and safety.  CTE 1, ¶ 49; RT 7/23/08, pp. 110:6-15; 111:14-20.

34.    As of May 2008, the City had over 100 special purpose and enterprise funds, apart from the General Fund, that had cash and investments totaling approximately $136 million.  CTE 1, Exhs. A, pp. 1-3, K, pp. 1-3.  The Unions contend that some of this $136 million in cash and investments could be transferred to, or borrowed by, the General Fund.  UTE U, ¶¶ 23-27, Exh. B, pp. 13-15; RT 8/21/08, p. 232:4-21.  However, nearly all of this cash and the investments are restricted by law or grant to specific uses and are not available to cover the operating expenses of the General Fund.  CTE 1, Exh. A, pp. 1-3; CTE 5, ¶ 8; RT 7/24/08, pp. 136:3-138:12, 138:13-141:7; RT 8/5/08, pp. 23:17-25:13; RT 8/7/08, pp. 13:10-14:18.

35.    The General Fund is the City's unrestricted fund.  RT 8/5/08, p. 206:20-24.  When special purpose or enterprise funds are unable to break even, the General Fund is the fund of last resort that must make up for the deficiency.  Id., pp. 205:15-

207:18.

36.   As of June 30, 2008, the City's special purpose or enterprise funds had no significant and legally available money that could be used to cover operating expenses in the General Fund.  CTE 5, ¶ 10.

37.   The Unions nonetheless contend that the City could transfer $1.7 million from the City's Public Finance Authority to the General Fund.  RT 8/19/03, pp. 181:24-182:8; RT 8/22/08, pp. 18:8-19:3.

38.   However, the Public Finance Authority funds pertain to the sale of Six Flags/Marine World.  RT 8/22/08, pp. 21:21-22:11. These funds were already budgeted and spent by the General Fund in fiscal year 2007-08.  RT 8/22/08, pp. 22:5-11; CTE 1, Exh. A, p. 3; CTE 1, Exh. B, p. 30.

39.   The Unions further contend that the Convention and Arts Fund could transfer $4.1 million in advances or loans receivable from the Empress Theatre to the General Fund, providing the General Fund with an additional $400,000 of cash, and $4.1 million in reserves.  RT 8/19/03, pp. 182:25-183:7.

40.   The unrestricted cash balance in the Convention & Arts Fund has already been appropriated for transfer to the General Fund in fiscal year 2007-08 as part of the Fiscal Emergency Plan. CTE 1, Exh. A, p. 3; CTE 1, Exh. J, pp. 7, 27; RT 8/19/08, pp. 85:19-86:23.  The remaining $4.1 million advance or loan receivable, whether recorded in the Redevelopment Agency or Convention & Arts Fund or moved to the General Fund, still represents a non-current asset and does not create any new available fund balance.  UTE J, p. 17.  The Merged Redevelopment

Project Area that has received this advance from the General Fund
does not have the additional $400,000 in surplus fiscal year
2008-09 cash flow to commence this repayment to the City.  CTE 5,
¶ 12; UTE K, p. F-8.

41.  The Unions contend that the Hiddenbrooke Overpass and
Bridge Construction Funds could loan the General Fund $4.1
million against the $4.1 million Empress Theatre loan receivable.
RT 8/19/03, pp. 185:1-186:12.

42.  Both the Hiddenbrooke Overpass and Bridge Construction
Funds are Development Impact Funds restricted in use by the state
Constitution.  CTE 1, Exh. A, p. 1.  Diversion of cash from
either of these two capital funds would impair progress on the
capital program for which the funds were collected.  UTE K, p. 8.
The Bridge Construction Fund is fully leveraged for the Vallejo
Station project, as the local contribution to a project that is
providing over $50 million in Federal and State grant investment
in the City's waterfront development project.  UTE K, p. I-1; RT
8/22/08, pp. 58:14-59:21.  Further, the $500,000 advance to the
Redevelopment Agency for the Empress Project by the Hiddenbrooke
Overpass Fund in fiscal year 2006-07 was not made from existing
cash reserves in the fund.  UTE J, p. 100; RT 8/22/08, pp. 58:14-
59:21.  The $500,000 advance was from new developer receipts into
the fund from an amendment to the development agreement that
changed the permitted use of this receipt to funding for the
Empress Theater project.  Id.

43.  The Unions contend that the City could transfer more
money to the General Fund from the Redevelopment Agency.  RT
8/19/03, pp. 185:12-190:11.

44.    The Redevelopment Agency is a separate legal entity established under authority of the State of California's Health and Safety Code. RT 8/22/08, pp. 22:19-24:11.  It adopts its own budget, issues its own debt, maintains separate bank and investment accounts, receives separate tax allocations/ distributions from the City Council, and publishes separately audited financial statements.  <u>Id</u>.

45.    The City Council sits as the governing board of the Redevelopment Agency, but with separate meeting agenda and minutes.  RT 8/22/08, pp. 23:16-22.  The City Council has fiduciary duties to the agency as its board.  RT 8/22/08, pp. 23:18-22, 26:25-27:6.  Transactions between the City and the agency must be at arm's length transactions and properly documented.  <u>Id</u>.

46.    Redevelopment activities are authorized by the state law in geographic areas referred to as "Project Areas."  RT 8/22/08, p. 24:1-11.  Vallejo currently has two redevelopment project areas: Flosden and the "Merged" project areas.  RT 8/22/08, pp. 24:12-25:4.  The Flosden project area comprises the Six Flags/Marine World and the county fairgrounds area.  RT 8/22/08, p. 25:5-14.  The Merged Project Area comprises the waterfront and downtown area.  RT 8/22/08, p. 25:15-20.

47.    Flosden's remaining outstanding advances from the General Fund were retired in cash in 2001.  UTE  JJ, p. 2, Flosden Column; RT 8/22/08, p. 28:1-5.

48.    The City Council retired a portion of the Redevelopment Agency's advances to the General Fund fourteen years ago.  CTE 46, pp. 1-12; UTE HH, pp. 1-2; UTE II, pp. 1-6.  In 1994, the

City Council deliberated and determined that interest rate being charged on advances to agency, 10%, was too high because that rate was greater that the City's costs of funds.   It determined that the appropriate rate of interest was 4%.   This adjustment was made retroactively.   CTE 46, pp. 1-12; UTE HH, pp. 1-2; UTE II, pp. 1-6.   The Unions suggest that the 10% interest rate be reinstated.   RT 8/22/08, p. 28:6-25.

49.   In 1994, the City Council also authorized the retirement of debt in exchange for the transfer of infrastructure assets, including transfer of title to City Hall and the adjacent library, and project improvements such as roads and sidewalks. CTE 46, pp. 1-12; UTE HH, pp. 1-2; UTE II, pp. 1-6; RT 8/22/08, pp. 29:5-14, 32:14-33:6.   Despite these transfers to the City, the Unions believe the City Council, fourteen years after the fact, should reinstate the retired debt of the Redevelopment Agency.

50.   Consistent with its fiduciary obligations, the City cannot justify the reinstatement of these advances.   RT 8/22/08, pp. 28:6-25, 32:17-33:6.   Further, even if reinstated, there is no persuasive evidence that the Redevelopment Agency could repay the advances.

51.   The Merged Project Area has no cash available to pay the General Fund.   RT 8/22/08, pp. 35:24-38:21.   It receives approximately $2.2 million in tax revenues per year.   UTE K, p. F-8; RT 8/22/08, p. 36:13-16.   From this revenue, it has approximately $1.4 million in fixed costs for debt service, county and trustee fees, and tax pass-through obligations that are budgeted in its debt service funds.   RT 8/22/08, p. 36:16-20.

-14-

In addition, the Merged Project Area pays $331,323 in overhead to the City (i.e., payment for full cost recovery to the General Fund for City services), and has budgeted an annual $400,000 loan repayment to the City, leaving less than $100,000 per year in discretionary spending for all other development agreement obligations.  RT 8/22/08, p. 37:1-12.  The $400,000 is the maximum amount that can be repaid to the General Fund annually without jeopardizing the viability of the project area and its own debt service obligations.  RT 8/22/08, p. 38:5-21.

52.  With respect to the Flosden project area, the City Council shifted the entire housing set-aside requirement for the Redevelopment Agency onto Flosden.  RT 8/22/08, pp. 38:24-39:21.  The Redevelopment Agency pays $299,732 to the General Fund for overhead.  RT 8/22/08, p. 39:22-25.  After taking these two costs into account, only $700,000 remains in the fund for the annual redevelopment mission of the Flosden project area.  Id.  The fund also is obligated to build a $7 million parking garage pursuant to the Six Flags development agreement.  RT 8/22/08, pp. 40:9-41:2.  This obligation will be triggered when the county develops the fairgrounds along I-80 and eliminates a significant portion of the existing Six Flags/Marine World parking facilities.  RT 8/22/08, pp. 40:9-41:2.  There have been recent discussions between Solano County and the City Manager on this development.  RT 8/22/08, pp. 50:23-51:6.  The 2008-09 year budget appropriated $1 million of this $7 million obligation.  RT 8/22/08, pp. 40:1-14, 50:23-51:6.

53.  The Unions contend that Hiddenbrooke Overpass and Bridge Construction Funds could loan the General Fund monies

-15-

against $3 million in surplus properties.  RT 8/19/08, p. 186:5-11.

54.  Both the Hiddenbrooke Overpass and Bridge Construction Funds are Development Impact Funds restricted in use by the state Constitution.  CTE 1, Exh. A, p. 1.  The City would not meet its fiduciary responsibility to these restricted funds if it exchanged interest-earning cash for a non-productive surplus land asset of uncertain value in a declining real estate market.  RT 8/5/08, pp. 67:3-9, 71:19-72:3, 97:20-98:4.

55.  Also, the Unions' estimate of real estate value is based on a draft report that has since been updated.  UTE Q, p. 25; CTE 6, ¶ 8; RT 7/25/08, p. 70:8-15.  Further, the City's surplus land is not an asset reportable in the City's governmental fund financial statements.  These statements do not include either capital assets or long-term debt based upon the required GASB "modified accrual" accounting basis.  Instead, the focus is on "current financial resources."  UTE J, p. 37.  Thus, there is no "asset" to transfer from the General Fund to either of these restricted funds.  In addition to violating GASB and sound fiscal policy, the California Constitution prohibits the City from incurring in any year a debt which it cannot pay from revenues attributable to the same year.

56.  The Unions contend that the City could transfer money from the Transportation Fund to the General Fund.  RT 8/21/08, pp. 198:8-199:7.

57.  The Transportation Fund has significant financial challenges of its own, in large part due to increasing fuel costs and decreasing ridership.  CTE 1, Exh. A, p. 2; CTE 5, ¶ 14; RT

-16-

7/24/08, pp. 120:20-121:17; RT 8/5/08, pp. 107:12-24, 150:7-25, 152:23-155:13, 205:14-16.  The General Fund is the fund of last resort and is the fund that covers deficiencies in the City's enterprise funds.  RT 8/5/08, p. 206:20-24.  Because the Transportation Fund relies on federal and state reimbursement grants, it can be reimbursed only for its actual expenditures, and therefore does not earn a profit or surplus funds that can be made available for repayment of prior subsidies from the General Fund.  RT 8/5/08, p. 150:19-25.

58.  The Unions contend that the General Fund could reduce its subsidy to the Marina Fund by $200,000 a year.

59.  The General Fund subsidizes the Marina Fund because the Marina Fund cannot pay its debt service and the General Fund is obligated as the ultimate guarantor of Marina debt through bond documents.  CTE 1, ¶ 51; RT 7/23/08, p. 115:3-12; RT 8/7/08, p. 38:6-15.  All available Marina Fund revenues, including the 2008-09 CPI rate increase, have already been included in the 2008-09 budget.  UTE K, p. E-1.  The net assets of the Marina in the last audited financial statements, dated June 30, 2007, show that Marina Fund liabilities exceed its assets by $209,297, creating a deficit equity position.  UTE J, p. 26; RT 8/5/08, pp. 30:6-31:6.

60.  The City also has worked with outside parties to identify and consider ways to improve operations, including privatization, but has not identified any viable options to improve cash flow to permit the Marina Fund to fully cover its operation and debt obligations.  RT 8/5/08, pp. 18:6-25:13, 205:23-207:19; RT 8/7/08, pp. 39:16-40:10.

61.  The Housing Authority's monies are restricted by the

U.S. Department of Housing and Urban Development to use for housing operations.  RT 7/24/08, pp. 136:16-19, 138:3-12, 18-25.

62.  Constitutional protections under Proposition 218, as well as bond covenants restrict, and protect revenues of the Water Fund.  RT 8/7/08, pp. 13:20-14:5.

63.  The City's other special purpose & enterprise funds are similarly restricted.  CTE 1, Exh. A, pp. 1-3.

64.  The City's Risk Management/Self Insurance Fund ("Risk Management Fund") is available to support General Fund cash needs.  However, as of June 2007 claim liabilities on the fund exceeded assets by $2.3 million.  CTE 5, ¶ 11; RT 7/24/08, pp. 120:4-121:17; RT 8/5/08, pp. 151:5-155:13.  Despite this insolvency, the City in its Pendency Plan transferred $1 million from the Risk Management Fund to the General Fund for fiscal year 2008-09.  Id.; RT 8/19/08, pp. 120:2-121:1.  Further draws upon the Risk Management Fund creates the risk that the City could lose the state's self-insurance certification.  It would then be required to purchase outside insurance coverage.  CTE 5, ¶ 11.

65.  The Risk Management Fund's cash position also is negatively impacted by the approximate $2 million in excess insurance premiums that are due at the start of the fiscal year. Id.; RT 7/24/08, pp. 119:24-121:17.

66.  The City's labor cost is the largest annual General Fund expenditure.  CTE 1, ¶ 34 & Exh. C, p. 1.  For the 2007-08 fiscal year, the City's General Fund labor cost likely totaled $74.2 million.  CTE 1, ¶ 36 & Exh. C, p. 1.  For fiscal year 2008-09, based on contractual obligations to raise salaries under the CBAs, the total labor cost is projected to be $79.4 million.

1  Id.; CTE 5, Exh. B, p. 1, Column A.  Of this amount, $56.8

2  million represents the labor cost for police and firefighter

3  services.  CTE 1, ¶ 37 & Exh. C, p. 1, Column A; CTE 2, ¶ 22; CTE

4  5, Exh. B, p. 1, Column A.

5      67.  Given the prior year reductions in funding for city

6  services, and given that the labor costs are a majority of the

7  City's General Fund expenditures, it is clear from the evidence,

8  that achieving solvency will require, among other things, serious

9  consideration of economic concessions from the City's labor

10  groups.  CTE 1, ¶ 13; RT 7/25/08, pp. 34:5-12, 39:6-22, 92:22-

11  93:2; RT 8/5/08, p. 89:15-21; RT 8/19/08, pp. 80:5-81:23, 96:12-

12  98:7, RT 8/22/08, pp. 5:18-7:8.

13      68.  The majority of City employees are represented by one

14  of the four labor groups, each of which is a party to a CBA.  CTE

15  1, ¶ 34.  Police officers are represented by the VPOA;

16  firefighters are represented by the IAFF; various administrative,

17  engineering, information technology and public works employees

18  are represented by the IBEW; and management employees are

19  represented by Confidential, Administrative, Managerial and

20  Professional Employees Association of Vallejo ("CAMP").  CTE 1,

21  ¶ 34 & Exh. B, p. 3.

22      69.  The CBAs are effective through June 30, 2010, and,

23  absent modification, the City is obligated to pay the

24  compensation and maintain the staffing required by the CBAs.  CTE

25  1, ¶ 35 & Exh. B, p. 3; CTE 2, ¶ 4.

26      70.  In December 2007, the City discussed with the labor

27  groups issues related to the future solvency of the City's

28  General Fund.  CTE 2, ¶ 22; RT 8/19/08, pp. 71:21-72:13.  The

City focused these discussions with the VPOA and the IAFF whose members would receive approximately $56.8 million of the $79.4 million budgeted for labor costs in 2008-09. CTE 1, ¶ 37 & Exh. C, p. 1, Column A; CTE 2, ¶ 22; CTE 5, Exh. B, p. 1, Column A. Hence, absent sufficient economic concessions from VPOA and IAFF, establishing and maintaining General Fund solvency would be unlikely regardless of any economic concessions IBEW or CAMP might make. Id. However, discussions included IBEW and CAMP, whose members would receive approximately $13.7 million and $9.0 million, respectively, in 2008-09 under existing contracts. CTE 2, ¶ 22 & n. 6.

71. The first formal meeting between the City and the Unions occurred on December 10, 2007. CTE 11, pp. 1-58; RT 8/19/08, p. 77:16-22. At this meeting, the City provided information to the Unions regarding its dire financial situation. RT 8/19/08, pp. 73:20-74:19.

72. The City and the Unions met several times from December 2007 through February 2008 but they came to no agreement. RT 8/19/08, pp. 81:20-82:14. With the General Fund on the verge of running out of money, on February 28, 2008, City staff recommended to the City Council that the City file a petition under chapter 9 of the Bankruptcy Code. CTE 1, ¶ 14 & Exh. J, p. 1; RT 8/19/08, pp. 83:13-84:16.

73. Before the City Council considered this recommendation, however, the City, VPOA, and IAFF tentatively agreed on certain interim modifications to the CBAs. These interim changes were approved by the City Council on March 3, 2008 (the "Interim Agreement"). CTE 1, ¶ 14; CTE 13, pp. 1-11; UTE B, pp. 1-5; UTE

C, pp. 1-7; UTE D, pp. 1-3; RT 8/19/08, pp. 83:2-84:16.

74.   Before entering into the Interim Agreement, the Unions required the City settle their grievances and all arbitration and litigation pending between the City and the Unions.  CTE 13, pp. 8-10; CTE 14, pp. 2-3, 7-8; UTE D, pp. 1-2; RT 8/19/08, pp. 85:9-89:2, 90:22-93:22.  The City agreed to this requirement.  CTE 13, pp. 8-10; CTE 14, pp. 2-3, 7-8; UTE D, pp. 1-3; RT 8/19/08, pp. 88:19-91:23.

75.   The Interim Agreement was effective through June 30, 2008, the end of the 2007-08 fiscal year; it was not effective from and after July 1, 2008.  CTE 1, ¶ 14; CTE 2, ¶¶ 7, 8, 23; CTE 13, pp. 2-3; UTE B, pp. 2-3; UTE C, pp. 2-3; RT 8/19/08, pp. 84:17-85:3.

76.   In the Interim Agreement, VPOA and IAFF members waived 1.7% and, effective March 1, 2008 through June 30, 2008, roll-back 6.5% of their 2007-08 salary increase due under the CBAs.  CTE 2, ¶¶ 7, 23; RT 7/23/08, pp. 89:14-90:5.  IAFF agreed that the City could reduce firefighter staffing to levels sufficient for 6 fire stations (22 firefighters), as opposed to the 8 stations (28 firefighters) required under the CBAs, through June 30, 2008.  Id.  Also, as part of the Interim Agreement, VPOA deferred its minimum staffing requirement of 145 authorized sworn police positions to May 2010.  Id.; CTE 1, ¶ 8; UTE D, p. 1; UTE N, p. 1.

77.   Department heads, distinct from employees represented by CAMP, took a 3% salary reduction concurrently with (though not as a term of) the Interim Agreements.  CTE 1, Exh. C, p. 1; CTE 2, ¶ 20; RT 7/24/08, pp. 56:2-57:2, 59:5-12; RT 8/19/08, pp.

84:25-85:2.

78.    As specified in the Interim Agreement, the City, VPOA, and IAFF agreed to engage in mediation for 45 days.    RT 8/19/08, p. 94:3-7.    The negotiated purpose of the mediation was "[t]o discuss expenditure reductions, revenue enhancements and CBA modifications in an attempt to develop a General Fund budget plan that ensured funding for a range of city services (e.g., including, but not limited to, fire services, police services, street repair) and provided for a positive General Fund reserve at the end of each fiscal year through June 30, 2012."    CTE 2, ¶ 24; CTE 6, ¶ 5; RT 7/25/08, p. 81:13-23; RT 8/19/08, pp. 94:3-96:9.

79.    Consistent with their agreed mediation objectives, from March 3, 2008 through May 14, 2008, the parties, joined on occasion by IBEW, met 11 times in mediation and discussed potential revenue enhancements the City could pursue, expenditure reductions the City might be able to implement, and modifications to the CBAs.    The City's lead negotiator was Craig Whittom, Assistant City Manager/Community Development.    CTE 2, ¶ 21-24; CTE 6, ¶ 4; CTE 10, p. 1; RT 8/7/08, p. 19:9-25; RT 8/19/08, pp. 98:24-99:11, 101:15-110:19, 112:12-121:1, 121:18-128:4, 132:18-134:22, 135:13-138:12.    Additionally, during this period of time, the parties had less formal discussions not involving the mediator.    CTE 2, ¶ 24; RT 8/19/08, pp. 98:24-99:11.

80.    With respect to potential revenue enhancements, at the Unions' request, the City provided their representatives with the draft revenue enhancement report that had been prepared by the City's consultant.    UTE U, Exh. C, pp. 1-23; UTE DD, pp. 1-23; RT

1   7/25/08, pp. 64:9-65:21; RT 8/7/08, pp. 60:14-61:24.  The Unions

2   requested that the City delay presentation of that report to the

3   City Counsel until such time as the City and the Unions were able

4   to simultaneously present their anticipated agreed modification

5   to the CBAs.  UTE P p. 1; RT 7/25/08, p. 65:10-19; RT 8/7/08, p.

6   61:5-20.

7        81.  The parties exchanged several proposals during the

8   course of mediation.  RT 8/19/08, pp. 101:15-24, 112:15-23,

9   121:2-122:9, 134:19-22.

10        a.   The City made a written proposal on March 17,

11        2008.  UTE LL, pp. 1-14; RT 8/19/08, p. 101:15-24.

12        With respect to salary levels, the City proposed a

13        roll-back in salaries to June 30, 2006 levels.  UTE LL,

14        p. 4; RT 8/19/08, p. 103:18-23.  This rollback would

15        result in lower salaries than those that had been

16        established under the Interim Agreement.  RT 8/19/08,

17        pp. 103:18-104:2.

18        b.   The City's March 17th proposal also offered a

19        two-year extension of the CBAs (through June 30, 2012)

20        and contained a salary re-opener for these two years

21        pursuant to which salary increases would be possible.

22        UTE LL, pp. at 1; RT 8/19/08, p. 104:5-23.  The City

23        also proposed that it work with the labor groups and

24        the community to generate support for voter-approved

25        revenue increases, such as a voter-approved tax

26        measure.  UTE LL, at pp. 2-3; RT 8/19/08, pp. 105:3-

27        106:24.

28        c.   The City's March 17, 2008, proposal also

                              -23-

1   addressed General Fund expenditure reductions in the

2   form of additional cuts to City services and positions,

3   as well as negotiations with bond holders and banks to

4   reduce the City's debt costs.   UTE LL, p. 3; RT

5   8/19/08, p. 109:2-24.

6       d.   The City made a second proposal to the Unions

7   on April 17, 2008.   CTE 15, pp. 1-16; RT 8/19/08, p.

8   112:15-23.   With respect to salary levels, the City

9   proposed a 5% roll back in salaries from the March 1,

10  2008 levels (i.e., the Interim Agreement levels).   The

11  proposed 5% roll back was more favorable to the Unions

12  than the rollback to June 30, 2006 salary levels

13  proposed in the City's March 17th offer.   CTE 15, p. 1;

14  CTE 15, p. 1; RT 8/19/08, p. 115:21-116:11; RT 8/19/08,

15  p. 115:16-20; RT 8/19/08, p. 115:21-116:11.

16      e.   In its April 17th proposal, the City again

17  offered a 2-year contract extension with salary re-

18  openers for those years.   CTE 15, p. 1; RT 8/19/08, p.

19  116:12-14.   The City added a new term providing for

20  restoration of salaries in connection with the

21  establishment of a 5% General Fund reserve.   CTE 15, p.

22  1; RT 8/19/08, pp. 116:15-117:3.

23      f.   The City also added new commitments to

24  increase revenues, including: (i) repayment of the

25  Redevelopment Agency's debt to the General Fund in the

26  Merged Project Area via the Flosden payment of the

27  required 20% housing set aside; (ii) annually filing SB

28  90 claims and; (iii) a one-time transfer of $1,000,000

-24-

cash from the Risk Management Fund to the General Fund.
CTE 15, pp. 2-4; RT 8/19/08, pp. 117:16-121:1.   The
City has subsequently implemented each of these revenue
proposals.   RT 8/19/08, pp. 117:16-121:1.

g.   In its April 17th proposal, the City also offered
to make additional expenditure reductions.   CTE 15, pp.
4-5.

h.   On April 21, 2008, the Unions made a written
proposal to the City.   RT 8/19/08, pp. 121:2-123:4.
Among other terms, the Unions proposed a two-year
contract extension through June 30, 2012.   RT 8/19/08,
pp. 122:23-123:16.

i.   The City responded to the Unions' proposal on
May 4, 2008.   CTE 17, pp. 1-7; RT 8/19/08, pp. 121:18-
122:9.   In its May 4th proposal, the City again moved
its position with respect to salary levels, offering to
maintain salaries at the levels established in the
Interim Agreements, levels that were higher than the 5%
rollback previously offered by the City.   CTE 17, pp.
1, 4; RT 8/19/08, pp. 125:9-126:7.   The City's proposal
again included a two-year contract extension with
salary re-openers tied to the City's economic condition
and the salaries paid by comparison cities to be agreed
upon by the parties.   CTE 17, pp. 1, 2, 4, 5; RT
8/19/08, pp. 126:14-127:2.

j.   The Unions did not accept the City's May 4,
2008, offer.   RT 8/19/08, p. 132:15-17.

82.   On May 6, 2008, the City Council, by a unanimous vote,

1  authorized the City to file a petition under chapter 9 of the
2  Bankruptcy Code.  CTE 2, ¶ 24; Statement of Qualifications Under
3  Section 109(c), Exh. 1; RT 8/19/08, pp. 132:18-133:6.

4      83.  The City and the Unions continued the mediation after
5  the City Council authorized the bankruptcy filing, meeting again
6  with the mediator on May 9th and May 14th.  CTE 2, ¶ 24 & n. 7;
7  RT 8/19/08, pp. 133:7-134:22.

8      84.  On May 14, 2008, the City made another proposal to the
9  Unions.  CTE 18, pp. 1-8; RT 8/19/08, p. 134:19-22.  This
10  proposal again provided for salaries at the Interim Agreement
11  levels, a two-year contract extension, and salary re-openers.
12  CTE 18, pp. 1-8; RT 8/19/08, pp. 134:19-22, 135:13-136:13.  The
13  City also proposed to make certain revenue enhancements and
14  expenditure reductions.  CTE 18, p. 8.

15      85.  The Unions did not accept the City's May 14, 2008
16  offer.  RT 8/19/08, p. 136:14-16.  Nonetheless, discussions
17  between the City and the Unions continued after the mediation
18  formally ended, from May 14, 2008 through May 16, 2008.  RT
19  8/19/08, pp. 136:17-138:2.

20      86.  During this period of time, the City proposed
21  additional terms, and the Unions made their final offer.  UTE W,
22  pp. 1-5; RT 8/19/08, pp. 136:17-138:2.  The City did not accept
23  the Unions' final offer because it did not provide General Fund
24  solvency beyond one year.  CTE 24, pp. 1-6; CTE 25, pp. 1-5; RT
25  8/19/08, pp. 138:13-141:6.  In other words, the Unions' final
26  offer did not meet the agreed-to mediation objective that the
27  parties "develop a General Fund budget plan that ensured funding
28  for a range of city services (e.g., including, but not limited

to, fire services, police services, street repair) and provided for a positive General Fund reserve at the end of each fiscal year through June 30, 2012." CTE 2, ¶ 24; RT 8/5/08, pp. 188:17-195:8, 203:6-204:1; RT 8/7/08, pp. 9:6-11:17; RT 8/19/08, pp. 97:2-15, 138:13-141:6.

87. Under the terms of the Unions' final offer, the City would be obligated: (1) beginning no later than July 1, 2009, and as early as March 1, 2009, to pay a 6.5% salary increase over Interim Agreement levels to police and firefighters; (2) beginning July 1, 2010, to pay another salary increase to police and firefighters, and a salary increase to employees represented by IBEW, of at least 3% and up to 5%; (3) in the subsequent three fiscal years (2011-12, 2012-13, and 2013-14), to pay an additional salary increase to police, firefighters and IBEW members of at least 3% and up to 5% in each year; and (4) to return to full daily staffing of 28 firefighters on July 1, 2010 and minimum staffing of 145 sworn police positions in May 2010. CTE 6, ¶ 15; UTE W, pp. 1-5; RT 8/19/08, pp 138:13-141:6.

88. The Unions' final offer also required that the CBAs be extended four additional years, through the end of fiscal year 2013-14. UTE W, pp. 1-5. And, while the Unions' final offer would have allowed the City to arbitrate annual salary increases that would accrue during this extension if the City believed it could not afford those increases, the City did not consider the right to arbitrate contractually-obligated salary increases to be fiscally prudent given that the City's cost projections demonstrated that the Unions' proposals would not generate solvency for the General Fund except possibly in fiscal year

2008-09.  CTE 6, ¶ 15 n. 2; CTE 24, pp. 1-6; CTE 25, pp. 1-5; RT

7/25/08, pp. 87:19-88:6; RT 8/5/08, pp. 38:18-24, 188:17-195:8,

195:15-201:24; RT 8/7/08, pp. 9:6-11:17; RT 8/19/08, pp. 132:8-

14, 139:12-140:10.

89.  Throughout the mediation, the City generated cost

projections to calculate the economic results of the Unions'

proposals.  CTE 24, pp. 1-6; CTE 25, pp. 1-5; RT 7/25/08, pp.

87:19-88:6; RT 8/5/08, pp. 38:18-24, 188:17-195:8, 195:15-201:24;

RT 8/7/08, pp. 9:6-11:17.  For fiscal year 2009-10, the City's

cost projection of the Unions' final offer showed a substantial

General Fund budget deficit.  CTE 24, pp. 1-6; RT 8/5/08, pp.

192:25-194:16, 198:2-201:2.  The projections demonstrated that,

once the 6.5% salary increase was restored in fiscal year 2009-

10, General Fund revenues could no longer cover expenses.  RT

8/5/08, pp. 194:5-16.  Likewise, in fiscal years 2010-11 and

2011-12, the Unions' proposal would result in substantial and

increasing General Fund budget deficits.  CTE 25, pp. 1-5; RT

8/5/08, pp. 199:17-200:10.

90.  Further, the City's cost projection did not factor in a

3% to 5% increase in the out years, the restoration of two fire

stations beginning fiscal year 2010-11 through 2013-14, or the

increase of police officer staffing beginning fiscal year 2010-11

through 2013-14, all of which would be required by the Unions'

final offer.  RT 8/7/08, pp. 9:10-11:17, 18:5-10.  These facts

would have increased the deficits calculated in CTE 24 and CTE

25.  Id.

91.  The City concedes that prior to the filing of its

petition that it did not discuss with the Unions a specific

chapter 9 "plan of adjustment."  However, the City and the Unions
did discuss the City's potential chapter 9 filing and the ways in
which that filing would affect the City's and the Unions'
positions during: (a) the negotiations; (b) the mediation
proceedings from March 3 until May 14; and (c) after the
mediation concluded.  CTE 2, ¶¶ 21-25; CTE 4, ¶¶ 5-8; CTE 10, p.
1; RT 8/19/08, pp. 72:23-73:19, 83:13-84:16, 132:18-134:22,
135:13-138:12.  Those discussions addressed what claims the
Unions would have in a chapter 9 case, how those claims could be
enhanced by extending the Union contracts before a petition was
filed, and how the City's acceptance of the Unions' offers might
compel a later chapter 9 filing by the City.  RT 8/19/08, pp.
130:5-23, 138:3-141:6, 143:12-144:16.  Also, their discussions,
both in and out of the agreed mediation process, addressed not
only the Unions' rights under the CBAs and the modification of
those rights, but how the City might increase its revenues.  In
other words, the parties discussed both debt adjustment and
revenue enhancement in the context of an out-of-court-debt
restructure.  They attempted to negotiate a plan of arrangement
that would eliminate the need for a petition.

92.  The City has approximately $54 million in outstanding
bonds that are obligations of the General Fund.  CTE 1, ¶¶ 50-53.
Much of this debt is secured by letters of credit, one of which
will expire in December 2008.  CTE 1, ¶ 53.

93.  In its General Fund budget projections for fiscal year
2008-09, the City based its debt service expenditure projection
on an assumed 9% debt service cost.  CTE 1, ¶ 51.  The City
established the 9% projection based on discussions with the

City's financial consultants and the terms of the bond documents. CTE 5, ¶ 28.

94. The General Fund subsidizes the Marina Fund debt service obligation because the Marina Fund cannot pay its debt service and the General Fund is obligated as the guarantor of the Marina Fund debt. CTE 1, ¶ 51; RT 7/23/08, p. 115:3-12; RT 7/24/08, pp. 22:8-24:11; RT 8/5/08, pp. 21:15-22:3; RT 8/7/08, pp. 38:24-39:7.

95. After the City implemented its Pendency Plan on July 1, 2008, the City's letter of credit provider invoked a mandatory tender of approximately $47 million in outstanding variable rate bonds backed by the General Fund. CTE 5, ¶ 28. The City is obligated to pay the Reference Rate (i.e., prime rate) plus 1% after 90 days on the tendered bonds and potentially could be required to pay the Reference Rate plus 3% should a default be declared. CTE 1, ¶ 51; CTE 5, ¶ 28; UTE G, p. 5; RT 7/23/08, pp. 124:22-126:1, 129:21-25.

96. The City Council has appropriated funds to retire approximately $7 million of bonds by repaying cash derived from bond issuances that had not been used or dedicated to a project. CTE 5, ¶ 28 & n. 8; RT 7/24/08, pp. 25:3-26:18.

97. In March and April 2008, the City discussed its potential bankruptcy filing and potential debt obligation adjustments with Union Bank, the credit enhancer of several of the letters of credit supporting the City's bond obligations. CTE, ¶¶ 5-8; RT 7/24/08, pp. 81:9-17, 83:3-14, 84:10-13. The City requested that the bank extend the letter of credit that is scheduled to come due December 1, 2008 and requested that the

bank commit to a lower interest rate on the City's outstanding
debt obligations.  RT 7/24/08, pp. 85:19-87:2.

98.  Union Bank's CDTM Credit and Risk Management Division
Senior Vice President and Manager, Cecilia Valente, testified
that the bank could not determine or implement specific
adjustments to the City's debt obligations without a viable,
long-term plan from the City establishing General Fund solvency.
CTE, ¶¶ 5-8.  Ms. Valente testified that Union Bank concluded
that it should defer detailed discussions with the City regarding
adjustments to the City's General Fund bond obligations until the
City and the labor groups finalized a viable solution for the
City's long-term labor costs.  CTE, ¶¶ 5-8; RT 7/24/08, pp.
93:11-94:5, 95:12-97:3.

99.  Prior to filing its petition, the City could not
identify all its creditors for purposes of pre-petition
negotiation, including, in particular, an unknown number of
retirees who collectively hold the largest claim against the City
(approximating $215 million), as well as unknown bondholders and
potential tort claimants who may or may not have yet asserted a
claim against the City.  See City's List of Creditor's Holding 20
Largest Unsecured Claims, filed May 23, 2008; Statement of
Position by California Public Employees Retirement System
Regarding Motion for Order Appointing Unions as Retiree Benefit
Representative for Retirees from their Work Units, filed July 23,
2008.

100. The sole witness called by the Unions to support their
objections was Roger Mialocq.  Mr. Mialocq was retained by the
Unions in the spring of 2008 to analyze the City's 2008-09 budget

and its underlying assumptions and projections.  While Mr.
Mialocq's profession entails assisting municipalities with public
agency budgeting, he is not a certified public accountant, an
accountant, or a financial auditor.

101. Neither Mr. Mialocq's report nor his testimony
persuades the court that the City is solvent or will be solvent
in 2008-09, has acted in bad faith, or has significantly
misstated its 2008-09 likely revenues or expenditures.  The basic
thrust of both his report and his testimony is that the City
could realize approximately $3.1 million in new revenues and it
has overstated its labor expenses by approximately $5 million.
The court is unpersuaded.

102. Mr. Mialocq damaged his credibility with the court when
he admitted that, after initially declining to assist the Unions,
he took the assignment because he felt that the City's bankruptcy
petition would harm his other clients.  RT 8/21/08, pp. 143:11-
144:2.

103. On the other hand, the court found the testimony of
Susan Mayer, the City's Assistant Finance Director, and Craig
Whittom, the City's Assistant City Manager/Community Development,
to be much more helpful and credible.  While the court is mindful
that each is a City employee and therefore could be expected to
testify in the City's interests, even counsel for the Unions
conceded at the hearing that the City was lucky to have Ms. Mayer
and Mr. Whittom helping it deal with its serious financial
problems.  The court agrees.

a.    Mr. Whittom has more than eighteen years of
experience at the City and has a thorough knowledge of

-32-

the City's financial operations.  It is primarily
because of his efforts during the negotiations with the
Unions that the court concludes, as indicated below,
that the City attempted in earnest to come to fair
terms with the Unions in order to avoid a bankruptcy
petition.

   b.   Ms. Mayer, unlike Mr. Mialocq, is a certified
public accountant.  She has twenty-two years of
professional experience, with eighteen years in
municipal financial accounting.  CTE 1, ¶ 2; RT
7/23/08, p. 81:15-20.  During a lengthy cross-
examination, she displayed a thorough knowledge of
municipal accounting in general and the City's finances
in particular.  As Ms. Mayer indicated, budgeting is
not a science.  Nonetheless, the court found her
analysis and opinions regarding the City's likely
insolvency in 2008-09 very persuasive, complete, and
based on sound analysis and assumptions.

   104. To the extent Mr. Mialocq may be of the opinion that
the City is or could be solvent, the persuasiveness of his
opinion was undercut by an admission by the Unions' attorney.
During argument counsel indicated that the Unions' final offer to
the City required a four-year extension of the CBAs in order to
ensure that their members had a larger rejection claim if the
City accepted their proposal but thereafter filed a bankruptcy
petition.  RT 8/19/08, pp. 129:18-130:23, 143:12-144:16.  To the
court, this was an acknowledgment that efforts to avoid
bankruptcy by further cost-cutting and attempting to enhance

1  revenues (along the lines suggested by Mr. Mialocq) were unlikely

2  to be successful.

3       105. The basic problem with Mr. Mialocq's report and

4  testimony was that he did not conclude that the City was not

5  insolvent or that the General Fund would be able to pay its debts

6  as they came due during 2008-09.  UTE U, ¶¶ 1-40 & Exh. B, pp. 1-

7  15 & Attachments; RT 8/21/08, pp. 138:10-139:14, 140:19-21,

8  141:10-14, 158:5-8, 159:23-25, 160:9-19.  In fact, Mialocq

9  concluded that in fiscal year 2008-09 the General Fund would

10 experience a deficit of $3,355,031, and he admitted the City's

11 financial condition was dire.  UTE U, Exh. B, p. 16, Schedule 1;

12 RT 8/21/08, pp. 232:1-234:5.

13      106. Mr. Mialocq's suggestions for enhancing City revenues

14 by approximately $3.1 million were taken from a draft report

15 commissioned by the City.  Cf. UTE U, Exh. B, Attachment 2 with

16 Exh. C; see also CTE 6, ¶ 8; UTE U, ¶¶ 11, 12, 15-27, p. 18

17 (Appendix 1), Exhs. B, pp. 3-5, 5-11, Attachment 2, & C; RT

18 8/21/08, pp. 176:25-177:18, 179:1-4, 179:20-180:6, 180:14-181:6,

19 185:5-11, 187:8-10.

20           a.   Mr. Mialocq asserted that the City might

21      obtain $1.3 million in new revenue by instituting a 911

22      service fee.  UTE U, Exh. B, Attachment 2.  The

23      legality of a non-voter approved 911 service fee,

24      however, has been called into question.  RT 8/5/08, pp.

25      102:10-103:13; see Bay Area Cellular Telephone Co. v.

26      City of Union City, 2008 Cal. App. LEXIS 634 (April 29,

27      2008); CTE 1, ¶ 32.  Mr. Mialocq conceded that a 911

28      service fee likely would require voter approval, and

therefore could not be feasibly included as revenue in fiscal year 2008-09.  UTE U, ¶ 12; RT 8/21/08, p. 183:5-9, 20-22.  Further, in the current economic and political environment, the City reasonably believes that voter approval of any additional taxes and assessments is unlikely.  CTE 1, ¶ 28; CTE 5, ¶ 23; RT 8/7/08, pp. 30:17-31:7; RT 8/19/08, pp. 105:20-107:9. And, seeking voter approval could be expensive.  A vote to increase or create new general taxes must occur in an election in which City Council membership is on the ballot, or be approved by unanimous City Council vote for placement on an off-Council year ballot.  CTE 5, ¶ 23.  An off-Council year ballot tax measure costs approximately $500,000 to $700,000 because the City is charged by the County.  Id.

b.    Mr. Mialocq also asserted that the City could raise $900,000 in new revenue by charging for Emergency Medical Services.  UTE U, Exh. B, Attachment 2.  The implementation and administration costs of an Emergency Medical Services fee program, in addition to the uncertainties involved in collecting the charges after services have been provided (to people who often lack the resources to pay), lessen the potential revenue-generating capacity of this program.  CTE 5, ¶ 19; RT 8/5/08, pp. 210:17-212:19; RT 8/7/08, pp. 47:19-48:20.

c.    Mr. Mialocq recommended the City attempt to collect an additional $350,000 from a Landscape Maintenance Assessment District expansion.  UTE U, Exh.

B, Attachment 2.  In order to implement an assessment
district, the favorable vote of all property owners
assessed is required, thus a city-wide landscape
assessment district would require the affirmative vote
of the owners of city property.  Id.  If the vote were
unfavorable, the City would bear the costs of
conducting the election.  Id.  However, no monies could
be recovered in fiscal year 2008-09 even if a vote were
successful because the City cannot implement an
assessment district mid-year.  CTE 5, ¶ 18.
Furthermore, assessment districts only can generate the
amount of money required to pay for the services
provided by the district.  CTE 5, ¶ 18.  Even if a
city-wide landscape district were implemented, the City
could replace only services costing $99,000 that are
currently paid out of the General Fund.  Id.; RT
8/5/08, pp. 118:7-120:1.

d.   Mr. Mialocq also recommended that the City
sell surplus properties.  He believed that $351,563
could be raised in fiscal year 2008-09.  However, the
City has a program in place to sell surplus property
and in October 2007, the City identified four such
properties for sale.  UTE Z, pp. 1-7.  However, the
City's ability to sell these or any of its surplus
properties before June 30, 2009 is speculative.  RT
8/5/08, pp. 67:3-9, 71:19-72:3, 97:20-98:4.

e.   Mr. Mialocq also suggested the City budget
$164,000 in fiscal year 2008-09 for revenues derived

-36-

from reimbursement to the City from the State of
California in connection with SB 90 claims.  UTE U,
Schedule 1.  However, the City received less than
$7,500 per year in reimbursements for the last two
years in which the City submitted eligible SB 90
claims.  CTE 5, ¶ 24 & Exh. H-1, pp. 1-7; UTE FF, pp.
1-5.  In fiscal year 2008-09, given the state's
financial situation, receipt of SB 90 reimbursements is
particularly speculative, and Mr. Mialocq acknowledged
that payment by the state on SB 90 claims is
"sporadic."  Id.; UTE U, Exh. B, p. 5.  Nevertheless,
the City has retained a consultant familiar with the
City's finances and records to prepare and file current
and delinquent SB 90 claims.  CTE 5, ¶ 24; RT 8/5/08,
pp. 135:23-137:18.

     f.  Mr. Mialocq suggested that the City increase
its fees.  UTE U, ¶ 20, Exh. B, p. 4; RT 8/21/08, pp.
188:9-189:6.  The City, however, previously updated
significant development-related fees on July 1, 2007 to
provide for full cost recovery.  CTE 5, ¶ 16; RT
8/5/08, pp. 106:4-107:5; RT 8/19/08, p. 189:2-6.  An
automatic annual Consumer Price Index ("CPI")
adjustment increase was applied to the remaining fees.
RT 8/5/08, pp. 84:6-7, 106:20-23.

     g.  Mr. Mialocq recommended that the City
increase fares for its ferry service.  UTE U, Exh. B,
p. 4; RT 8/21/08, pp. X.  The City recently increased
fares on its ferry service.  RT 8/5/08, p. 107:6-24.

1    Following the fare increase, ridership declined 21%.

2    Id.  Even had revenues increased, revenues generated

3    from the ferry are restricted to the Transportation

4    Fund and are not available for use in the General Fund.

5    RT 8/5/08, p. 107:19-24.

6        h.    In short, the City has taken steps to

7    increase its revenues where and when possible, and Mr.

8    Mialocq appears to have seriously miscalculated the

9    feasibility and timing of obtaining new revenues.  And,

10   to the extent potential new revenues are derived from

11   sales or transfers, such revenue is a one-time

12   occurrence that cannot be prudently budgeted to meet

13   recurring expenses.  RT 8/21/08, pp. 194:5-10.

14   107. Mr. Mialocq also analyzed the City's projected General

15   Fund expenditures for fiscal year 2008-09.  UTE U, Exh. B, pp. 1-

16   15 & Attachments.

17       a.    Mr. Mialocq erroneously discounted the City's

18   projected labor costs based on vacancies identified

19   from the February 29, 2008 payroll, thereby mistakenly

20   assuming that $5.1 million of the City's projected

21   General Fund labor costs could be eliminated. CTE 5, ¶

22   30, Exhs. K, p. 5 & L, pp. 1, 12; RT 8/21/08, pp.

23   204:2-6, 205:5-19.  Due to minimum staffing

24   requirements in the IAFF CBA, and the overtime the City

25   must pay to meet those staffing requirements when

26   firefighter positions are vacant, the City could not

27   realize the labor cost savings Mr. Mialocq attributed

28   to the vacant firefighter positions without breaching

-38-

the CBA. CTE 5, ¶ 30, Exhs. K, p. 5 & L, pp. 1, 12; RT 8/21/08, pp. 207:1-209:24

b.   Mr. Mialocq also failed to take into account that if the City's fiscal year 2008-09 labor expenses were reduced based on vacant positions, the General Fund would lose revenue for services no longer provided to other fund projects.  CTE 5, ¶ 30, Exhs. K, p. 6 & L, pp. 1, 12; RT 8/21/08, pp. 218:16-220:18.  Mr. Mialocq reduced the City's projected labor expenses based on vacant positions within the group of reimbursable job classifications, but he did not correspondingly decrease projected General Fund revenues that would not be received because the positions were vacant.  Id.  The General Fund provides services to other funds and City programs and is, in return, reimbursed by those funds.  CTE 5, ¶ 16; RT 8/5/08, p. 81:2-19.  The City has retained a consultant in each of the past two fiscal years to update its cost allocation plan to ensure full cost recovery to the General Fund from all City funds receiving General Fund services.  CTE 5, ¶ 16.  The City updated its cost allocation plan during the 2007-08 fiscal year, and the City will update the plan again for fiscal year 2008-09.  RT 8/5/08, p. 81:2-19.

c.   Mr. Mialocq used a 4.8% interest rate to calculate the City's projected debt service obligation for fiscal year 2008-09.  UTE U, ¶ 32 (weighted average of 4.0% and 6.0%); CTE 5, ¶ 29, Exhs. B, pp. 7-8 & K,

p. 3; RT 8/21/08, pp. 228:5-7.  However, a member of
his staff acknowledged that a 4.8% interest rate was
too low.  CTE 45, p. 1; RT 8/21/08, 229:24-231:1.  And,
Mr. Mialocq also acknowledged in a memorandum to Alan
Davis (counsel to the Unions), dated April 18, 2008,
that his debt service calculation was incorrect.  Cf.
CTE 5, Exh. K, p. 3 (General Fund debt "$1,390,419"),
with UTE U, Exh. B, Schedule 1 (General Fund debt
"$1,018,057").

     d.    Mr. Mialocq recommended reduced vehicle
replacement and maintenance expenditures.  UTE U, ¶ 31,
Exh. B, p. 6, Schedule 1.  The City, however, has
reduced vehicle expenditures in fiscal year 2008-09,
both in the Pendency Plan and its adopted budget for
the 2008-09 fiscal year.  CTE 5, ¶ 31 & Exh. B.

     e.    Mr. Mialocq suggested that the City prepay
its CalPERS contribution to save money.  UTE U, ¶ 33,
Exh. B, p. 8.  The liquid funds held by the City in the
State Local Agency Investment Fund ("LAIF"), however,
are not sufficient to cover the CalPERS prepayment
proposed by Mr. Mialocq as well as the other General
Fund cash flow requirements the City will encounter
during the fiscal year.  CTE 5, ¶ 33.

     f.    Mr. Mialocq suggested that the City
overstated its projection of expenditures on
compensated absences in fiscal year 2008-09 by
approximately $336,000.  UTE U, ¶ 34, Exh. B, pp. 10-
11.  The evidence shows, however, that in fiscal year

1    2007-08, due to the extraordinary number of police and

2    firefighters that departed, the City incurred

3    compensated absence payout obligations totaling $5.3

4    million.  CTE 5, ¶ 34.  Under the Interim Agreements,

5    the City and the Unions and those departing individuals

6    agreed that the City could defer payment of $1.7

7    million of that total until December 2008.  Id.

8    Anticipating further departures, as opposed to an

9    average year based on prior "normal" years as

10   calculated by Mr. Mialocq, the City projected an

11   additional $1.75 million in employee payout expenses,

12   for a total projected of $3.45 million.  Id.  Mr.

13   Mialocq did not account for any anticipated departures

14   above normal attrition in his compensated absences

15   calculation.  Id.; RT 8/21/08, pp. 222:23-226:4.

16   108. With no General Fund reserves to start fiscal year

17   2008-09, even if one were to accept all of Mr. Mialocq's opinions

18   and recommendations, his conclusion that the General Fund budget

19   will operate at a $3.3 million deficit confirms that, absent its

20   chapter 9 filing, the General Fund would not have sufficient

21   funds and cash flow to pay its bills as they become due in fiscal

22   year 2008-09.  RT 8/21/08, pp. 159:19-25, 232:2-234:5.

23   109. On May 6, 2008, the City Council, by a unanimous vote,

24   authorized the City to file a petition for bankruptcy under

25   chapter 9 of the Bankruptcy Code.  CTE 2, ¶ 24; RT 8/7/08, p.

26   71:15-19; 8/19/08, pp. 132:18-133:6.  The City filed its petition

27   on May 23, 2008.  See Chapter 9 Voluntary Petition, Form B-1, pp.

28   1-3.

110. The City filed its petition in order to implement a plan of adjustment that provides for the long-term fiscal solvency of the City. CTE 2, ¶ 26; Statement of Qualifications Under 109(c), p. 2.

111. The City certified its desire to effect a plan of adjustment in its Statement of Qualifications Under Section 109(c).

112. On June 26, 2008, the City adopted a balanced budget for fiscal year 2008-09. RT 8/5/08, p. 74:6-14. The City adopted this budget based upon its Pendency Plan. CTE 5, ¶ 5, Exh. B, pp. 1-29; UTE K; RT 7/24/08, pp. 112:16-113:2).

113. The City's Pendency Plan addresses all City employees' compensation and benefits, not just the members of the Unions; continues employee compensation (rather than cutting compensation) at the levels employees were being paid on the petition date; caps at 6% the debt service the City will pay to Union Bank and any other holder of the City's municipal debt obligations; identifies $1.4 million in new ($1 million) and on-going ($400,000) additional General Fund revenues; cuts all General Fund expenditures for the City's library, parks, convention and visitor's bureau, senior center, symphony, community arts, and naval and historical museum; further reduces employment rolls to a total of 379 positions; and cuts spending on infrastructure and physical plant items such as street repair and vehicle replacement. CTE 5, ¶ 5 & Exh. B, pp. 1-8; RT 7/24/08, p. 63:13-25.

114. The City is unable to transfer the $1.4 million in additional revenues to the General Fund as of July 1, 2008. The

1 | Risk Management Fund (from which the $1 million transfer will
2 | come) is the City's primary source of working capital loans for
3 | grant reimbursements.  RT 7/24/08, pp. 120:1-121:17.  The City's
4 | estimate as of June 2008 is that borrowing from the risk
5 | management fund to cover grant reimbursements could exceed $6
6 | million.  Id.  Also, within the first few weeks of the fiscal
7 | year, the Risk Management Fund is required to pay almost $2
8 | million in self-insurance premiums to its excess insurance pools.
9 | Id.  Similarly, the Redevelopment Agency will be unable to
10 | transfer $200,000 of $400,000 to the General Fund until December
11 | 2008 when it receives property tax payments.  The remaining
12 | $200,000 would be transferred in April 2009, after receipt of the
13 | second installment of property taxes.  RT 7/24/08, p. 117:1-15.

14 |     115. The City implemented the Pendency Plan as a bridge
15 | between the City's filing of its petition and the development and
16 | implementation of a plan of adjustment.  CTE 2, ¶ 26; CTE 5, ¶ 5,
17 | Exh. B, pp. 1-29; RT 8/7/08, p. 8:9-25.

18 |
19 |                         CONCLUSIONS OF LAW
20 |     1.   To be eligible for relief under chapter 9, a petitioner
21 | must meet certain statutory criteria that "are to be construed
22 | broadly to provide access to relief in furtherance of the Code's
23 | underlying policies."  In re Valley Health Systems, 383 B.R. 156,
24 | 163 (C.D. Cal. 2008).  "The general policy of chapter 9 is to
25 | give a debtor a breathing spell from debt collection efforts so
26 | that it can work out a repayment plan with creditors."  In re
27 | County of Orange, 183 B.R. 594, 608 (C.D. Cal. 1995).
28 |     2.   Section 109(c) of the Bankruptcy Code provides that an

entity is eligible to be a debtor under chapter 9 if such entity:

> (1) is a municipality;
> (2) is specifically authorized, in its capacity as a municipality or by name, to be a debtor under such chapter by State law, or by a governmental officer or organization empowered by State law to authorize such entity to be a debtor under such chapter;
> (3) is insolvent;
> (4) desires to effect a plan to adjust such debts; and
> (5)  (A) has obtained the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;
> (B) has negotiated in good faith with creditors and has failed to obtain the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;
> (C) is unable to negotiate with creditors because such negotiation is impracticable; or
> (D) reasonably believes that a creditor may attempt to obtain a transfer that is avoidable under section 547 of this title.

11 U.S.C. § 109(c).

3.   The City has the burden of establishing its eligibility under chapter 9 by a preponderance of the evidence. See <u>Orange County</u>, 183 B.R. at 599.

4.   The City is a political subdivision of the state of California and is a municipality within the meaning of section 109(c)(1).

5.   The City satisfies the eligibility requirement set out in section 109(c)(1).

6.   The City is authorized by California law to bring a petition under chapter 9.  California Government Code section 53760 provides that "[e]xcept as otherwise provided by statute, a local public entity in this state may file a petition and exercise powers pursuant to applicable federal bankruptcy law."

Cal. Gov't Code § 53760(a).  A local public entity includes a city.  Cal. Gov't Code § 53760(b).

7.  The City satisfies the eligibility requirement set out in section 109(c)(2).

8.  A municipality is insolvent under the Bankruptcy Code when its financial condition is such that it is (i) generally not paying its debts as they become due unless such debts are the subject of a bona fide dispute; or (ii) unable to pay its debts as they become due.  11 U.S.C. § 101(32)(C).

9.  Insolvency is determined based on the debtor's financial condition on the date the petition is filed.  In re City of Bridgeport, 129 B.R. 332, 337 (Bankr. D. Conn. 1991).

10.  Insolvency is determined using a cash flow analysis. Bridgeport, 129 B.R. at 337.  It is not enough to show that the City has a budget gap, that is, for the coming fiscal year its total revenues will be outstripped by expenditures.  Id. Instead, the City must demonstrate that, taking into account cash on hand and cash to be received, it will be unable to pay debts as they become due.  Id.  The analysis is prospective.  The City is not required to wait until it runs out of money and defaults on its debts before it is deemed to be insolvent.  Id.

11.  Because the City was unable to adopt a balanced budget for fiscal year 2008-09, it could not demonstrate the ability to pay back any loan with revenues generated in fiscal year 2008-09. Therefore, it cannot lawfully borrow from the private market or other city funds.  See Cal. Const., art. XVI, § 18; Rider v. City of San Diego, 18 Cal. 4th 1035 (1998); Starr v. San Francisco, 72 Cal. App. 3d 164, 174-75 (1997).

12.   The City was insolvent as of the date the petition was filed.

    a.   The City's General Fund will begin fiscal year 2008-09 with no reserves, and possibly with a negative balance;

    b.   absent this case, the General Fund would operate at a multi-million dollar deficit in fiscal year 2008-09, with projections by the City ranging from a $10 million to $17 million deficit;

    c.   with no reserves and a multi-million dollar deficit, the General Fund would not have sufficient available funds and cash flow to pay its debts as they become due; and

    d.   the General Fund cash flow experienced in the first two weeks of the 2008-09 fiscal year demonstrated that, absent this case, the General Fund would not have been able to pay its debts as they became due and, in particular, the City would not have been able to pay the General Fund payroll that became due on July 11, 2008.

13.   The court rejects the Unions' argument that the City is not an eligible debtor under chapter 9 based on the existence of the Unions' offer to modify the CBAs.   Insolvency is determined based on the City's obligations as of the petition date as those obligations actually exist, not as they could exist under hypothetical circumstances.   See Bridgeport, 129 B.R. at 337; In re Sullivan County Regional Refuse Disposal District, 165 B.R. 60, 76 (Bankr. D.N.H. 1994).   Further, the court was not

-46-

persuaded that if the offer had been accepted by the City, that it would not operate with a General Fund deficit. The evidence offered by the Unions suggested that the deficit would be approximately $3.34 million.

14. Accordingly, the City satisfies the eligibility requirement set out in section 109(c)(3).

15. The evidence establishes the City desires to effect a plan to adjust its debts within the meaning of section 109(c)(4). The evidence, as well as the City's pre-petition efforts to develop and implement a plan to avoid the need for bankruptcy relief, corroborates the City's certification filed on the petition date.

16. The City is not required to have proposed a plan of adjustment in this case in order for the court to determine that the City desires to effect a plan of adjustment. See 11 U.S.C. § 109(c)(4) (requiring for eligibility a "desire" to effect a plan of adjustment, not a proposed plan).

17. Accordingly, the City satisfies the eligibility requirement set out in section 109(c)(4).

18. To the extent possible, the City negotiated with its creditors prior to filing its petition.

19. As required by section 109(c)(5)(B), the City negotiated in good faith with the Unions prior to filing its petition but failed to obtain their agreement to a plan adjusting the City's debts. See Valley Health Systems, 383 B.R. at 162. In particular, the City established that:

    a.   the City engaged in extensive negotiations with the Unions in an attempt to develop a comprehensive

-47-

1 plan that would provide solvency for the City in fiscal

2 year 2008-09 and several years thereafter;

3 b. the City's negotiations with the Unions addressed

4 potential revenue increases and expenditure reductions,

5 in addition to potential modifications to the CBAs;

6 c. the City's negotiations with the Unions were in

7 good faith as evidenced by the many attempts at a

8 negotiated settlement both with and without the aid of

9 a mediator, its cooperation with the Unions'

10 negotiating team and experts, its settlement of

11 litigation/arbitrations with the Unions, the scope of

12 the negotiations addressing both the terms of the CBAs

13 and revenue enhancements, and the City's willingness to

14 discuss different possible resolutions (cf. Ellicott

15 Schapter Bldg. Auth., 150 B.R. 261, 266 (Bankr. D.

16 Colo. 1992) (public agency did not negotiate in good

17 faith when it told creditors that its plan was

18 nonnegotiable); and

19 d. the City did not reach agreement on such a plan or

20 plans with the Unions.

21 20. The City also attempted to negotiate an adjustment to

22 the City's municipal debt obligations with Union Bank, the holder

23 of the majority in amount of the City's municipal debt

24 obligations, as part of a comprehensive plan providing for long

25 term General Fund solvency but was unable to reach any agreement.

26 21. Section 109(c)(5)(B) does not require that the City

27 engage in pre-petition negotiations concerning a specific plan of

28 adjustment. See 11 U.S.C. § 109(c)(5)(B) (requiring that the

City have "negotiated in good faith with creditors" but not
requiring negotiations to involve a specific "plan of
adjustment"); Sullivan, 165 B.R. at 78; Collier on Bankruptcy, ¶
900.02[2][e][ii] at 900-21 (15th ed. Rev. 1996).  Cf. former 11
U.S.C. § 404 (1976).

    22.  Accordingly, the City satisfies the eligibility
requirement set out in section 109(c)(5)(B).

    23.  As an adequate, independent basis for satisfying
section 109(c)(5), the City's pre-petition negotiation with
creditors was impracticable within the meaning of section
109(c)(5)(C).  In particular:

    a.  the City could not negotiate firm or meaningful
    adjustments to its municipal debt obligations with
    Union Bank unless the City first reached a viable,
    long-term financial plan founded on adjustments to the
    City's General Fund labor costs;

    b.  prior to filing its petition, the City could not
    identify all its creditors for purposes of pre-petition
    negotiations, including, in particular, an unknown
    number of retirees who collectively hold the largest
    claim against the City (approximating $215 million), as
    well as unknown bondholders and potential tort
    claimants who may or may not have yet asserted a claim
    against the City;

    c.  even if such unknown creditors could have been
    identified prior to filing its petition, the City could
    not succeed in pre-petition negotiations if it involved
    the numerous individual creditors in the complex and

-49-

1    extensive negotiations the City undertook with the

2    Unions regarding the CBAs (see In re Villages at Castle

3    Rock Metropolitan Valley Health, 145 B.R. 76, 85

4    (Bankr. D. Colo. 1990);

5        d.    the City had to act to preserve its assets and

6    continue operations to provide uninterrupted services

7    to the community, and a delay in filing in order to

8    negotiate with all creditors, known or unknown, would

9    put those assets and functions at risk (see Valley

10   Health, 383 B.R. at 163);

11       e.    because the City's labor costs comprise the most

12   significant element of its annual budget, pre-petition

13   negotiation with the City's creditors other than the

14   Unions was futile unless and until the City and the

15   Unions reached a firm, viable plan modifying the City's

16   obligations under the CBAs (see Valley Health, 383 B.R.

17   at 165).  Without an agreement with the Unions,

18   agreements with other creditors either were not

19   possible or, if possible, would not resolve the City's

20   insolvency; and

21       f.    because no agreement was reached with the Unions

22   on a resolution that would avoid a bankruptcy filing,

23   it was doubtful in the extreme that they would reach

24   consensus on a plan of arrangement.

25       24.   Section 109(c)(5)(C) does not require that the City

26   satisfy a numerosity requirement before it can be determined that

27   pre-petition negotiation with its creditors was impracticable.

28   See Valley Health, 383 B.R. at 163.  Impracticality is determined

-50-

based on the facts of each case.   Here, other than the Unions,

negotiating with creditors was impractical because some were

unknown, comprised an insignificant portion of the City's debt,

or were unwilling to negotiate absent an agreement with the

Unions.

25.   Accordingly, the City satisfies the eligibility

requirement set out in section 109(c)(5)(C).

26.   The court rejects the argument that the City has acted

in bad faith, either in connection with its negotiations with the

Unions or in connection with the filing of the petition because

it rejected the Unions' proposal for the modification of the

CBAs.   This would be contrary to the mandate of the Tenth

Amendment and sections 903 and 904 of the Bankruptcy Code.   See,

e.g., 11 U.S.C. § 904 (bankruptcy court may not "interfere with

. . . any of the political or governmental powers of the

debtor[.]"); In re City of Wellston, 42 B.R. 282, 285 (Bankr.

E.D. Mo. 1984).   Concluding that the City was not eligible to

file a chapter 9 petition based on its rejection of the Unions'

contract proposal would, in effect, accomplish through denying

access to the bankruptcy court what the court would be prohibited

from ordering within a chapter 9 bankruptcy case.   Further, the

Unions' proposal did not assure the City's solvency.

27.   Because the City satisfies each of the eligibility

requirements of section 109(c), the court concludes that the City

is eligible to be a debtor under section 109(c).

28.   The court also concludes that the City filed its

petition in good faith within the meaning of section 109(c).

29.   Therefore, this case shall not be dismissed under

-51-

section 921(c), and an order for relief shall be entered.

        To the extent that any portion of a Finding of Fact contains
or constitutes a Conclusion of Law, such portion shall be deemed
to be a Conclusion of Law, and to the extent that any portion of
a Conclusion of Law contains or constitutes a Finding of Fact,
such portion shall be deemed a Finding of Fact.

        A separate order for relief shall be entered.

Dated: 5 Sept. 2008

                                By the Court

                                Michael S. McManus, Chief Judge
                                United States Bankruptcy Court