



FILED

AUG 3 1 2009

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

|  |  |
|---|---|
| In re | Case No. 08-26813-A-9 |
| CITY OF VALLEJO, | Docket Control No. OHS-4 |
| Debtor. | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

On June 17, 2008, the City of Vallejo filed a Motion for Approval of Rejection of Collective Bargaining Agreements. The collective bargaining agreements (CBAs) affected by the motion are between the City and the Vallejo Police Officers Association ("VPOA"), the International Association of Firefighters, Local 1186 ("IAFF"), the International Brotherhood of Electrical Workers, Local 2376 ("IBEW"), and the Confidential, Administrative, Managerial and Professional Association of Vallejo ("CAMP").

VPOA, IAFF, and IBEW filed opposition to the motion, as did the California Public Employees' Retirement System ("CalPERS"), the California Labor Federation, AFL-CIO ("California Labor

1  Federation"), and the Official Unsecured Creditors Committee of
2  Retirees ("Retirees' Committee").
3      The court commenced an evidentiary hearing on February 3,
4  2009 and concluded it on February 10, 2009.  Marc A. Levinson,
5  Norman C. Hile and Michael Weed appeared for the City.  Kelly A.
6  Woodruff, Dean M. Gloster, Laura Roche, and Racheal Turner
7  appeared for IAFF and IBEW.  Steven H. Felderstein and Joan S.
8  Huh appeared for CalPERS.  R. Dale Ginter appeared for the
9  Retirees' Committee.  Donald C. Carroll appeared for California
10 Labor Federation.  Robert Kaplan and Nicolas DeLancie appeared
11 for creditor Union Bank.  Mike C. Buckley appeared for creditor
12 Wells Fargo Bank.
13      On January 27, 2009, the Vallejo City Council approved a
14 supplemental agreement between the City and VPOA.  At the
15 evidentiary hearing, the City voluntarily dismissed the motion
16 with respect to VPOA.
17      On January 30, 2009, CAMP approved a proposed supplemental
18 agreement with the City.  On February 10, 2009, the City Council
19 approved the supplemental agreement, and the City then
20 voluntarily dismissed the motion as to CAMP.
21      Next, the court issued a Memorandum Decision on March 13,
22 2009, concluding that a municipality operating under chapter 9 of
23 the Bankruptcy Code could reject a CBA with a public employee
24 union provided the requirements of 11 U.S.C. § 365, as
25 interpreted by the Supreme Court in N.L.R.B. v. Bildisco &
26 Bildisco, 465 U.S. 513, 521-22 (1984), were satisfied.  The
27 court, however, did not determine whether the City had satisfied
28 those requirements.  Instead, it deferred a ruling to permit

-2-

1  additional briefing and to require the remaining parties to

2  attend a judicially supervised settlement conference.

3      The post-hearing briefing was completed on April 6.

4      Thereafter, the City, IAFF, and IBEW attended a settlement

5  conference before Bankruptcy Judge Elizabeth Perris.   Judge

6  Perris advised the court that the City and IBEW were unable to

7  come to terms.   The City and IAFF, however, were able to reach an

8  agreement.   On August 24 the City and the IAFF filed a

9  stipulation for the rejection of their CBA.   Their stipulation

10 was approved by the court on August 26.

11      Consequently, the motion before the court seeks to reject

12 only the CBA between the City and the IBEW.   For the reasons

13 explained below, the court concludes that the motion must be

14 granted to permit the City to reject the IBEW CBA.

15

16                              I

17      In its March 13 Memorandum Decision the court concluded that

18 a municipality operating under chapter 9 may utilize 11 U.S.C. §

19 365 to reject an executory CBA if the debtor shows that: (1) the

20 collective bargaining agreement burdens the estate;[1] (2) after

21 careful scrutiny, the equities balance in favor of contract

22 rejection; and (3) "reasonable efforts to negotiate a voluntary

23 modification have been made, and are not likely to produce a

24 prompt and satisfactory solution."   Bildisco, 465 U.S. at 526.

25  _____

26      [1]    In a chapter 9 case there is no "estate."   Thus, a
   municipal debtor must demonstrate that the collective bargaining
27 agreement burdens its ability to reorganize by proposing and
   implementing a viable plan of adjustment.   Bildisco, 465 U.S. at
28 525-26.

                              -3-

1    Pursuant to Federal Rule of Civil Procedure 52(a), made
2  applicable to bankruptcy proceedings by Federal Rules of
3  Bankruptcy Procedure 7052 and 9014, the court finds and concludes
4  that the City debtor has made the necessary showing necessary to
5  reject the IBEW CBA.

6
7                                    II
8                             Findings of Fact

9        1.   In connection with the objections by the unions to the
10  City's eligibility to file a chapter 9 petition, the court made
11  detailed findings of fact to support its conclusion that the City
12  was eligible for chapter 9 relief.  See Eligibility Findings of
13  Fact and Conclusions of Law filed September 5, 2008.   Those
14  findings and conclusions are relevant here because they address
15  the City's deteriorating financial situation prior to the filing
16  of the petition, and its pre-petition and post-petition attempts
17  to negotiate modifications to the CBAs.   The court adopts all of
18  its prior findings of fact and notes the particular relevance of
19  Findings of Fact 1, 2, 3, 4, 6, 7, 9, 10, 11, 12, 13, 15, 19, 21,
20  22, 23, 24, 25, 33, 64, 66, 67, 68, 69, 70, 71, 72, 73, 74, 75,
21  76, 77, 78, 79, 80, 81, 82, 83, 84, 85, 86, 87, 88, 89, 90, 91,
22  92, 103, 108, and 109.

23       The court observes that these initial findings justify
24  granting this motion.   They clearly establish the City's
25  insolvency, its previous efforts at reducing expenses (without
26  modifications to the CBAs) and increasing revenues, its
27  persistent and good faith attempts to negotiate with the Unions
28  for modifications to the CBAs, and the need for economic

                                    -4-

concessions from its labor force given that labor costs represent approximately three-quarters of its annual expenditures. The additional evidence produced in connection with the motion served primarily to corroborate the foregoing and demonstrate the continuing good faith efforts by all parties to negotiate modifications to the CBAs in the face of the City's further declining revenues.

2.    On May 23, 2008, when the chapter 9 petition was filed, the court was convinced that the City was insolvent despite years of scaling back services, staff reductions, and deferring capital expenditures. See also City's Trial Exhibit ("CTE") 2, ¶¶ 10(a)-(j) & Exh. D, pp. 1-11. Further, reductions in the funding of services threatened the City's ability to provide for the basic health and safety of its residents.

3.    The City engaged in a concerted pre-petition effort to negotiate with the Unions in order to reduce its labor costs. This was prudent given that a majority of the City's employees are represented by the Unions, and given that labor cost is the largest annual General Fund expenditure. See also CTE 2, ¶ 14 & Exh. E, p. 4. Even though these facts suggested that achieving financial solvency required economic concessions from the City's labor groups, no pre-petition agreement with them could be reached.

4.    Unfortunately, in the months following the filing of the petition, the City's finances have not improved such that it can achieve solvency without concessions from the Unions.

A. The Continuing Deterioration in the City's Finances

-5-

5.    In June 2008, when the City filed the motion to reject the CBAs, it projected that by June 30, 2008, General Fund reserves would be depleted and the General Fund would begin fiscal year 2008-09 with no reserves.  CTE 2, ¶ 4 & Exh. A, pp. 2, 9.  The City has now completed preliminary (unaudited) annual operating results for fiscal year 2007-08.  CTE 7, ¶ 6; Unions' Trial Exhibit ("UTE") D, p. 1, Column C.  The preliminary results for fiscal year 2007-08 show that the General Fund operated at a deficit of approximately $3.7 million and ended the year with approximately $797,000 in unrestricted reserves.  CTE 7, ¶ 6; UTE D, Column C.

6.    When the motion was filed, the City estimated that, under the terms of the existing CBAs and then-current service levels, the General Fund would operate in fiscal year 2008-09 at a deficit approaching $17 million and, in each month of the fiscal year, end with a negative cash balance ranging from $6.1 million to $24 million.  CTE 2, ¶ 5 & Exh. B, p. 1, Column A, & Exh. C, pp. 1.

7.    The City also prepared an alternative 2008-09 financial projection based on reduced funding for services and programs not controlled by contract, and increased revenues of $1.4 million. CTE 2, Exh. B, p. 1, Column B; Reporter's Transcript ("RT") 2/3/09, pp. 146:1-16, 148:2-17.  Even under the City's alternative projection, the City's projected General Fund deficit remained in excess of $10 million for fiscal year 2008-09.  CTE 2, Exh. B, p. 1, Column B.

8.    For the past several years, the City's General Fund revenues have not kept up with General Fund expenditures.  CTE 2,

-6-

Exh. B, p. 1; UTE D, Columns A, B, C.   In its most recent update, the City estimates that fiscal year 2008-09 General Fund revenues will be more than $6 million below the General Fund revenues the City collected in fiscal year 2007-08.   Cf. UTE D, Column C, with UTE D, Column H.

9.   On June 26, 2008, the City was able to adopt a balanced fiscal year 2008-09 General Fund budget due to its ability to adjust its General Fund obligations after filing its chapter 9 petition.   CTE 7, ¶ 5; UTE D, Column F.   To balance the General Fund budget, the City infused $1.4 million in additional revenues ($1 million of which was a one-time transfer from the Risk Management Fund) and reduced expenditures by, among other things, reducing operations, further cutting programs and services, and maintaining employee compensation at the levels the City was paying on the petition date.   CTE 2, Exh. B, p. 1, Column C; CTE 7, ¶ 5; UTE D, Column F.

10.   The original 2008-09 budget established a $1 million reserve at the end of the year, approximately 1.3% of General Fund expenditures.   CTE 2, Exh. B, p. 1, Column C; CTE 7, ¶ 5; UTE D, Column F.   Given the volatility of revenues and the fact that the City cannot confirm the value of many of its revenues until later in the year, a reserve is required.   CTE 7, ¶ 5. Maintaining a minimum reserve of 5% is generally considered "best practices" in municipal finance.   CTE 2, ¶ 4 n.1.

11.   On July 1, 2008, the City implemented its Pendency Plan, which was consistent with the operations and expenditures authorized in the original 2008-09 budget.   CTE 2, ¶ 11 & Exh. E.

12.   General Fund revenues have not kept pace with the

-7-

revenues projected in the original 2008-09 budget.  CTE 2, ¶¶ 6-
7; CTE 7, ¶ 7; UTE D, Columns G-I.  Revenues have decreased to
the point that the City could not sustain the expenditure levels
established in the original 2008-09 budget.  CTE 7, ¶ 7; <u>cf</u>. UTE
D, Columns G-I (revenues), with UTE D, Column F (expenditures).

13.  Therefore, on November 6, 2008, the City adopted an
amended 2008-09 General Fund budget.  CTE 7, ¶ 9; UTE D, Column
G.

14.  The updated fiscal year 2008-09 revenue projections in
the amended 2008-09 budget projected that the General Fund would
experience a decrease in revenues of $3.2 million compared to the
original 2008-09 budget.  CTE 7, ¶10; UTE D, Columns F, G.  The
mathematical decrease in revenues between the original 2008-09
budget and the amended 2008-09 budget is $2.2 million, while the
actual decrease in money coming into the General Fund is $3.2
million.  CTE 7, ¶ 10, n.2; <u>cf</u>. UTE D, Column G, with UTE D,
Column F.  The amended 2008-09 budget removed a $1 million state
budget risk revenue reduction that was projected in the original
2008-09 budget.  CTE 7, ¶ 10 n.2; <u>cf</u>. UTE D, Column G, with UTE
D, Column F.  As a result, in the amended 2008-09 budget a
projected $3.2 million revenue decrease has been reduced to a
$2.2 million decrease.  CTE 7, ¶ 10 n.2; <u>cf</u>. UTE D, Column G,
with UTE D, Column F.

15.  The decrease in projected revenues is comprised
primarily of the following:

(a)  Decreased property taxes by approximately $1.1 million.
CTE 7, ¶ 10(a); <u>cf</u>. UTE D, Column G, with UTE D, Column F.
This is a decrease of 5% in secured property taxes compared

to fiscal year 2007-08.  CTE 7, ¶ 10(a).

(b)  Decreased sales taxes by approximately $1.1 million, based on a 3% reduction for known store closures, a 2% reduction for potential additional store closures, and a 5% reduction to account for the effects of the continuing economic downturn.  CTE 7, ¶ 10(b); cf. UTE D, Column G, with UTE D, Column F.  In the fourth quarter of fiscal year 2007-08, the City's sales tax revenues dropped 19% from the fourth quarter of the prior year.  CTE 7, ¶ 10(b).

(c)  Decreased general revenues by $708,000, based on a projected decrease in vehicle license fees of $481,000, a decrease in excise, franchise, and utility user taxes, and rentals of $427,000, offset by a projected $200,000 increase in business license fees.  CTE 7, ¶ 10(c); cf. UTE D, Column G with Column F.

(d)  Decreased program revenues of $474,000 due to reduced new housing permit activity and a reduction in police grants, fees, and reimbursements.  CTE 7, ¶ 10(d); cf. UTE D, Column G, with UTE D, Column F.

(e)  Offset by one-time $120,000 inter-fund transfers to the General Fund comprised of $75,000 from the Solid Waste Fund and $45,000 from the Repair/Demolition Fund, resulting from lower than budgeted project expenditures in those funds.  CTE 7, ¶ 10(e); cf. UTE D, Column G, with UTE D, Column F.

16.  The City's worsening revenues can be seen by comparing the revenues in the amended 2008-09 budget with the revenues actually received in 2007-08.  Cf. UTE D, Column G, with UTE D, Column C.  The amended 2008-09 budget projects revenues of

approximately $6 million, or 7.5%, less than revenues in 2007-08, in which year the General Fund experienced a $3.7 million deficit.  Cf. UTE D, Column G, with UTE D, Column C.

17.  The City expects further revenue reductions even below the amended 2008-09 budget.  CTE 7, ¶¶ 20-24; cf. UTE D, Column H, with UTE D, Column G.

18.  In the amended 2008-09 budget, the City reduced General Fund expenditures by $1.2 million compared to the original 2008-09 budget.  CTE 7, ¶ 12; cf. UTE D, Column G, with UTE D, Column F.

19.  The reduced projected expenditures are comprised primarily of savings of approximately $1.2 million in salaries and benefits, and net savings of approximately $314,000 in services and supplies, offset by $152,000 increased inter-fund transfers out of the General Fund and a $165,000 reduction in inter-fund reimbursements into the General Fund.  CTE 7, ¶ 13; cf. UTE D, Column G, with UTE D, Column F.

20.  The approximate $1.2 million savings in salaries and benefits was achieved with slightly more than $1.4 million savings in vacancies, offset by $240,000 in additional costs for a fire training academy and a police cadet program.  CTE 7, ¶ 14; cf. UTE D, Column G, with UTE D, Column F.  Of the $1.4 million of savings in vacancies, $800,000 is attributed to police and $600,000 to fire.  CTE 7, ¶ 14.  The City also captured savings of $130,000 by instituting a two-day furlough program for all non-sworn employees.  CTE 7, ¶ 14 n.6.

21.  The City has more than 100 special purpose and enterprise funds, apart from the General Fund, that through which

-10-

some services to Vallejo residents are funded.  See Eligibility
Findings of Fact and Conclusions of Law, ¶¶ 34-65.  Some direct
and indirect labor costs are apportioned to these funds and are
paid by them.  See CTE 2, Exh. D; RT 2/3/09, pp. 156:2-157:18,
160:4-10; CTE 1 [Eligibility Hearing] Exh. G, p. 40.

22.  The City retained a consultant in prior years to review
and update the allocation of these labor costs to insure maximum
reimburse to the General Fund.  See RT 2/3/09, pp. 157:6-18; CTE
5 [Eligibility Hearing] ¶ 16; RT 8/5/08, pp. 81:2-19.

23.  To the extent possible, labor costs attributable to
IBEW employees has been allocated to funds other than the General
Fund.  See CTE 7, ¶ 61; RT 2/3/09, pp. 145:18-21, 152:11-13,
156:2-157:18, 160:4-10, 173:24-174:8.

24.  Since November 2008, when the City adopted the amended
2008-09 budget, General Fund revenues have deteriorated.  CTE 7,
¶¶ 20-24; cf. UTE D, Column H, with UTE D, Column G.  Revenues
are expected to decrease to $76.8 million, $2.8 million less than
the original budget, and $600,000 less than the amended budget.
CTE 7, ¶ 20; cf. UTE D, Columns H, I, with UTE D, Columns G, F.

25.  General Fund revenues also have been affected by the
bankruptcy of the parent company of the Lennar Mare Island
developer of the former Mare Island Naval Base.  CTE 2 ¶ 7; CTE
7, ¶ 21.  The General Fund provides approximately $6 million of
municipal services on Mare Island through a Community Facilities
District ("CFD") of which Lennar Mare Island assessments
contribute approximately half.  Since the amended 2008-09 budget
was adopted, Lennar Mare Island has not paid its $1.5 million
semi-annual assessment due in December 2008 and its ability to

-11-

1  make further payments is in doubt.  CTE 7, ¶ 22.  As a result,

2  the City is formulating service reduction plans for the Mare

3  Island CFD and corresponding General Fund reimbursement.  Id.

4      26.  Property and sales tax revenue may decline further.

5  CTE 7, ¶ 24.  The Solano County Assessor has informed the City

6  that for fiscal year 2009-10 secured property tax revenues are

7  expected to decline by more than the fiscal year 2008-09 drop

8  from fiscal year 2007-08, which was 5%.  CTE 7, ¶ 24.

9      27.  The City projects that property and sales taxes, and

10  the City's other primary revenue sources, will be at best flat in

11  fiscal year 2009-10.  CTE 7, ¶ 45; UTE D, Columns J, K.

12      28.  In fiscal years 2007-08 and 2008-09, the City

13  supplemented its General Fund revenues with one-time transfers

14  from other funds, and deferred certain expenditures that it

15  otherwise would have made.  CTE 2, Exh. B, p. 1, Columns B, C;

16  CTE 7, ¶ 47; UTE D, Columns C-G.  These one-time transfers

17  temporarily inflated General Fund revenues, while the deferred

18  expenditures temporarily reduced General Fund costs.  CTE 7, ¶

19  46.  As a result, budgeted revenues will be lower than prior

20  years, and budgeted expenditures will be higher, necessitating

21  new sources of revenues, or alternatively, decreased expenditures

22  beyond what has already been deferred.  CTE 7, ¶ 46.

23      29.  The City also will have to address service and safety

24  issues created by prior expenditure deferrals.  CTE 7, ¶ 48.  For

25  example, the City deferred substantial expenditures on vehicle

26  maintenance and replacement in fiscal years 2007-08 and 2008-09,

27  after having already deferred such expenditures by "extending"

28  the useful life of City vehicles in prior years.  CTE 2, ¶ 11 &

-12-

1  Exh. B, p. 1, Column B, & Exh. E, p. 5; CTE 7, ¶ 48; UTE D,

2  Columns E-G.  The City estimates that there are approximately 286

3  vehicles and pieces of equipment that are supported by the

4  General Fund.  CTE 7, ¶ 48.  An increasing percentage are past

5  due for replacement.  CTE 2, ¶ 11; CTE 7, ¶ 48.

6

7  B.   The IBEW Collective Bargaining Agreement

8       30.   Most City employees are represented by one of the four

9  labor associations which are parties with the City in collective

10  bargaining agreements.  CTE 2, ¶ 16.  Police officers are

11  represented by VPOA; firefighters are represented by IAFF;

12  various city employees, such as administrative, engineering,

13  information technology and public works employees, are

14  represented by IBEW; and management employees are represented by

15  CAMP.  CTE 2, ¶ 16 n.2 & Exh. A, p. 3.

16       31.   The City initially moved to reject each of the CBAs.

17  However, as recounted above, as a result of agreements with VPOA,

18  IAFF, and CAMP, only the CBA with IBEW remains at issue.

19       32.   The cost of labor is the largest General Fund

20  expenditure the City incurs in each fiscal year.  CTE 2, ¶ 15;

21  UTE D, Columns C, F, G.  For the fiscal year ending June 30,

22  2008, the City's labor costs were approximately $75 million.  UTE

23  D, Column C.

24       33.   At the time it filed the Motion, the City projected

25  that General Fund labor costs for fiscal year 2008-09, based on

26  CBA terms effective July 1, 2008, would approximate $79.5 million

27  under current operations and $77 million under reduced

28  operations, equating to more than 74% of the total General Fund

-13-

1   expenditures the City projected for fiscal year 2008-09.  See CTE
2   2, Exh. B, p. 1, Columns A, B; UTE D, Columns A, B, C, D, E, F,
3   G, H, I.

4       34.  The CBA between the City and IBEW does not expire until
5   June 30, 2010.  CTE 1, ¶ 4; CTE 2, ¶ 16; CTE 5, Exh. C, p. 1.

6       35.  The CBA determines the compensation represented
7   employees receive, including base pay, overtime, health and
8   medical benefits, pension and retiree health benefits and other
9   compensation components, such as vacation accrual.  CTE 1, ¶ 4;
10  CTE 2, ¶ 16; CTE 7, ¶ 37; CTE 5, Exh. C, pp. 1-63.

11      36.  The CBA also provides for a salary increase in each
12  fiscal year.  CTE 5, Exh. C, pp. 10-15.  The City has a labor
13  projection model that looks at the cost of each individual
14  employee and the rate of pay and the benefits associated with
15  that employee.  RT 2/3/09, p. 135:2-4.

16      37.  For fiscal year 2008-09, the IBEW CBA provides: "The
17  wage increase scheduled for July 1, 2008 shall be increased by
18  the percentage change in the Consumer Price Index, Urban Wage
19  Earners and Clerical Workers, for San Francisco-Oakland-San Jose,
20  measured from April 2007 to April 2008."  CTE 5, Exh. C, p. 13.
21  Such wage increase shall not be less than three percent (3%) or
22  greater than five percent (5%).  CTE 5, Exh. C, p. 13.  The
23  salary increase due to IBEW employees for fiscal year 2008-09 was
24  3.2%.  RT 2/3/09, pp. 143:3-14, 151:14-23.

25      38.  IBEW salary increases in fiscal year 2009-10 are to be
26  determined under the same formula, but based on the next year's
27  Consumer Price Index information.  CTE 5, Exh. C, p. 13.

28      39.  Compensation under the CBA is comprised of several

-14-

components, all of which are included in the City's General Fund
labor cost projections.  With respect to IBEW, labor costs
include base pay, uniform allowances, union business leave pay,
holiday buy-back pay, bilingual pay, and overtime pay.  CTE 7, ¶
37.  Employee benefits include City contributions on behalf of
its employees to CalPERS, Medicare, social security, workers
compensation, health, dental, vision, disability, long-term care
and life insurance, employee assistance programs, and death and
dismemberment insurance.  CTE 7, ¶ 37; UTE H.

40.  The additional cost to the City, both immediate and
long-term, created by compensation components in addition to base
salary can be significant.  CTE 7, ¶ 38.  For instance, the costs
associated with longevity pay are substantial.  _Id_.

41.  Under the IBEW CBA, IBEW employees accrue twelve (12)
sick leave days per year.  CTE 5, Exh. C, p. 31.  "Sick leave
shall begin from the first day of employment, and the employees
may begin to use accrued sick leave for bona fide illness or
injury after six (6) months."  CTE 5, Exh. C, p. 31.  The IBEW
CBA does not contain a cap on sick leave.  CTE 5, Exh. C, pp. 31-
32.  "All employees with ten (10) or more years of employment
shall be entitled to a lump sum payment of their accumulated sick
leave in the event of resignation, retirement, death (in which
case payment shall be made to the employee's designated
retirement beneficiary), or layoff."  CTE 5, Exh. C, p. 31.
"Such lump sum payment shall be fifty percent (50%) of the
accumulated sick leave."  CTE 5, Exh. C, p. 31.  "An employee may
elect not to receive the lump sum payment and have the entire
accumulated sick leave balance converted to service credit in

-15-

accordance with PERS regulations. " CTE 5, Exh. C, p. 31.

42.   The potential costs of having no limit on sick leave accrual are significant.   RT 2/5/09, pp. 23:14-23; RT 2/3/09, pp. 36:6-9, 39:14-16.

43.   Many IBEW positions are necessary for the City to conduct business and, thus, must continue to be filled.   RT 2/3/09, pp. 150:14-151:2, pp. 162:10-14.   The IBEW CBA has no provision permitting the City to temporarily reduce service levels and salary costs by furloughing employees.   CTE 5, Exh. C.

44.   Under the IBEW CBA, the City pays 100% of the health benefit premiums for active employees up to the "Kaiser North" benefit plan.   CTE 5, Exh. C, pp. 17-18.   The 2008 monthly cost for the Kaiser North health plan for one employee with two dependents is $1,224.   UTE A, p. 1.   The cost to the City for IBEW members' dental and vision insurance is in addition to these costs.   UTE H.

45.   The City also incurs significant liabilities under the IBEW CBA related to health benefits for both active and retired employees.   CTE 7, ¶ 41; UTE D.   The City annually pays a portion of this liability as a pay-as-you-go General Fund cost.   CTE 7, ¶ 41; UTE D (line item: "Retiree Health pay as go").   In fiscal year 2008-09, the pay-as-you-go health benefit cost to the General Fund is approximately $3 million, which constitutes the actual cost of the health benefits the City will provide in 2008-09 to current retirees.   CTE 7, ¶ 41; UTE D, Columns F, G.   Of the $3 million, IBEW pay-as-you-go accounts for approximately 21%.   CTE 7, ¶ 41 n.23.

46.   The annual cost of the General Fund's pay-as-you-go

-16-

retiree health benefits is projected to grow from $3 million in fiscal year 2008-09 to approximately $6.3 million in fiscal year 2018-19 due to an increased number of retirees and increased health costs.[2]  CTE 7, ¶ 41.  In fiscal year 2018-19, this $6.3 million annual pay-as-you-go payment will amount to 13% of the City's payroll.  CTE 7, ¶ 41 n.24.

47.  The City has substantial unfunded accrued liabilities related to retiree health benefits.  CTE 2, Exh. A, pp. 42-48. The City's unreserved and unfunded liability for all labor groups is $135.4 million.  CTE 2, Exh. A, p. 43.

48.  The IBEW CBA requires the City to provide pension benefits under the 2.7% at 55 formula.  CTE 5, Exh. C, p. 17; RT 2/5/09, p. 30:10-11.

49.  The City also incurs significant labor costs related to pay-outs to retiring and separating employees in the form of compensated absences.  CTE 7, ¶ 43; UTE D (line item: "compensated absences"); RT 2/3/09, pp. 36:6-9, 39:14-16.  Compensated absences are comprised of sick leave, vacation, holiday pay, and compensatory time.  CTE 7, ¶ 43.  In fiscal year 2007-08, due to the high number of retirements, that cost was approximately $5.3 million to the General Fund, $2 million of which was deferred under the Interim Agreements.  CTE 7, ¶ 43.  The City's liability related to compensated absences for all City employees as of June

---

[2]The annual cost of the City's total pay-as-you-go retiree health benefits will grow from $3.7 million in fiscal year 2008-09 to approximately $7.9 million in fiscal year 2018-19 due to an increased number of retirees and increased health costs.  CTE 7, ¶ 41 n.24.  The General Fund's portion of this liability is approximately 80%.  CTE 7, ¶ 41 n.24.

30, 2008, amounted to $22.2 million.  CTE 7, ¶ 43.  The City's liability related to compensated absence benefits for miscellaneous, IBEW, CAMP, and executive employees amounted to $5.7 million.  CTE 7, ¶ 43.

50.   If the IBEW CBA was in force, and the City were obligated to pay the 3.2% salary increase for fiscal year 2008-09, the increased costs to the City would be approximately $360,000.  Cf. UTE D, Column G, with UTE D, Column H.

51.   In fiscal year 2009-10, the IBEW CBA mandates another salary increase based on the Consumer Price Index.  CTE 5, Exh. C, p. 9.  Current projections estimate that the labor costs under the IBEW CBA will increase an additional $500,000 in fiscal year 2009-10.  UTE D, Columns H, J.

C.   Compensation Comparison Survey

52.   The Unions filed the declaration of Kenneth Akins of University Research & Associates, Inc., but failed to call Akins as a witness.  RT 2/5/09, p. 138:1-6; pp. 131:23-132:4.  His declaration compares salaries paid by the City to those paid in other jurisdictions.

53.   Akins' conclusion regarding IBEW salaries indicates that the salaries the City is paying under the Pendency Plan are mid-market.  Akins Decl. ¶ 29.  There are three reasons to discount his conclusion.

54.   First, Akins looked at "the salaries of those classifications," which were the current Pendency Plan salaries the City is paying, not the IBEW CBA salaries.  Akins Decl. ¶ 29.

55.   Second, based only on those positions that were below

-18-

the mean, Akins opined that IBEW salaries fell "on average" 3%
below the mean of the comparable jurisdictions.  Akins Decl. ¶
29.  Akins also did not consider any IBEW positions which had
salaries that were above the mean in deriving the 3% figure.
Akins Decl. ¶ 29.

56.  Third, had Akins compared the salaries required under
the IBEW CBA, the City salaries he compared to the other
jurisdictions would have been 3.2% higher. RT 2/3/09, p. 143:14-
22.

D.  Attempts to Reach Voluntary Modifications to the CBA

57.  Prior to filing its petition, the City engaged the
Unions in discussions to attempt to reach CBA modifications that
would help solve the City's financial crisis and avoid
bankruptcy.  CTE 1, ¶¶ 22, 22 n.6, 23.  On February 28, 2008, the
City, VPOA and IAFF reached the Interim Agreements, which the
City Council approved on March 3, 2008.  CTE 1, ¶¶ 7-8, 23.

58.  Among other things, the Interim Agreements provided
that IAFF and VPOA members would waive 1.7% of their 10.2% 2007-
08 salary increase and, effective March 1 through June 30, 2008,
roll-back another 6.5% of their 2007-08 salary increase.  CTE 1,
¶¶ 7-8, 23.

59.  With regard to minimum staffing, IAFF agreed that,
through June 30, 2008, the City could reduce daily minimum
firefighter staffing from 28 to 22 firefighters, which is
sufficient to staff 6, as opposed to 8, fire stations.  CTE 1, ¶
23.

60.  Concurrent with the Interim Agreements, department

-19-

heads (who are not represented by a labor association) agreed to roll back their salaries by 3% (despite taking no salary increase for fiscal year 2007-08).  CTE 1, ¶ 20; Eligibility Findings & Conclusions, p. 21, ¶ 77.

61.  Employees represented by IBEW did not incur a salary reduction in the Interim Agreements.  CTE 1, Exh. A.

62.  The Interim Agreements afforded the City and the Unions additional time to attempt to reach agreement on a longer term solution to the General Fund imbalance.  CTE 1, ¶ 23.  To attempt to accomplish that objective, the parties agreed to engage in mediation.  CTE 1, ¶ 24.  Between March 3rd and the filing of the City's chapter 9 petition, the parties met with the mediator multiple times.  CTE 1, ¶ 24 & n.7.  During the mediation sessions, the City and the labor unions exchanged multiple proposals regarding potential CBA modifications.  Despite these efforts, the parties did not reach agreement on long-term modifications to the CBAs.  CTE 1, ¶ 25.

63.  The City attempted in good faith to reach modifications to the CBAs prior to filing its bankruptcy petition.

64.  On May 23, 2008, the City filed its chapter 9 petition. Because the Unions objected to the City's eligibility under chapter 9, the court held an evidentiary hearing to determine the City's eligibility.  On September 5, 2008, the court issued its findings of fact and conclusion of law determining that the City was eligible for relief under chapter 9.  An order for relief was entered on September 9.

65.  Following the order for relief, the City and the Unions again engaged in discussions to try to reach agreement on

-20-

voluntary CBA modifications short of contract rejection.  UTE K,
L, P; RT 2/5/09, pp. 9:5-16, 71:13-72:21, 85:23-86:5.  From
September 2008 through January 2009, and into February 2009, the
City met individually with IAFF, IBEW, VPOA and CAMP on multiple
occasions.  RT 2/5/09, pp. 9:5-16, 71:13-72:21, 85:23-86:5.  The
parties engaged in both on and off the record discussions.  RT
2/5/09, pp. 71:13-72:21, 85:23-86:5.  The City and the Unions
exchanged written proposals as well.  Id.; UTE K, L, M, N, O, P,
Q, R, Z, AA.

    66.  As noted above, post-petition negotiations with IAFF,
VPOA, and CAMP at various stages of this case eventually bore
fruit.

    67.  As to IBEW, the City made its first offer following the
eligibility ruling on September 29, 2008.  UTE P.  The City and
IBEW have met several times and several offers have been
exchanged between the City and IBEW since that proposal.  RT
2/5/09, pp. 8:20-9:4, 85:23-86:5.  Proposals were made by the
City on February 4, 2009.  UTE Z & AA; RT 2/5/09, p. 86:6-18.
The City also requested to meet with IBEW on February 6, 2009,
but IBEW was not available until the week of February 16.  RT
2/5/09, pp. 86:24-87:3.

    68.  Since its initial proposal to IBEW on September 29,
2008, the City agreed to abandon terms that would have expanded
the City's management rights power and its ability to contract
out IBEW-related work.  UTE Z & A, ¶¶ 2- 3; RT 2/5/09, pp. 87:18-
15, 88:22-17.  IBEW included in its proposal a formula for salary
increases based on a fixed percentage increase per year, not
linked to market wages or to the economy as a whole.  UTE R; RT

-21-

2/5/09, p. 93:18-21.   IBEW also declined to waive any bankruptcy
claims absent a negotiated cash payment, while the City proposed
an alternative that treated such claims in a manner similar to
that negotiated with VPOA.   UTE M, R, AA; RT 2/5/09, pp. 94:22-
95:5, 95:8-95:19.

   69.   The contention that the City has not made a reasonable
effort to negotiate a voluntary modification of the IBEW CBA
under the <u>Bildisco</u> standard because the City tailored its
negotiations to each individual union is unpersuasive.

   (a)   There are differences in labor markets between
   employees represented by different unions.   RT 2/5/09, pp.
   56:17-57:7.

   (b)   There are general differences in terms of recruitment
   of new employees depending on the types of employees.   RT
   2/5/09, pp. 56:17-57:7.

   (c)   The existing CBAs between the City and its four labor
   unions do not have identical terms.   They have very
   different terms.   RT 2/5/09, p. 60:19-23; <u>cf</u>. CTE 5, Exh. A,
   with CTE 5, Exh. B, with CTE 5, Exh. C, & with CTE 5, Exh.
   D.

   (d)   The City's proposals to each union are different
   because the issues and labor markets are different.   RT
   2/5/09, pp. 56:17-57:10.

   70.   Indeed, the City has tailored alternative, different
proposals to the IBEW.   RT 2/5/09, p. 87:4-87:14.

   71.   The City is not unfairly targeting IBEW while leaving
its other creditors unimpaired.

   (a)   Prior to filing its petition, the City could not

-22-

identify all its creditors for purposes of pre-petition
negotiation, including, in particular, an unknown number of
retirees who collectively hold the largest claim against the
City (approximating $215 million), as well as unknown
bondholders and potential tort claimants who may or may not
have yet asserted a claim against the City.

(b)   The City is reducing the interest payments owed to
Union Bank by the same percentage it has reduced salary
payments to its employees.[3]  RT 2/3/09, pp. 169:22-170:6-17.

(c)   Given the that labor costs are such a large portion of
the General Fund expenses, it is reasonable that the City
first determine if it is able to negotiate economic
concessions from the Unions and if such negotiations are not
successful, seek relief under section 365.  Once the City
knows the result of its negotiations and this motion, it can
then determine what additional concessions it may need from
its other creditors.

E.   The Evidentiary Hearing

     72.   At the evidentiary hearing, the City presented `three
witnesses: Susan Mayer, the City's Assistant Finance Director;
Craig Whittom, the City's Assistant City Manager/Community
Development; and Andrew Belknap of Management Partners, Inc., the
City's expert witness.  RT 2/3/09 85:16-25, 121:5-16, 187:17-

_____

     [3]The City has approximately $54 million in outstanding bonds
that are obligations of the General Fund.  CTE 2, ¶ 13 & Exh. E,
p. 4.  Much of this debt is secured by letters of credit.  CTE 2,
¶ 13 & Exh. E, p. 4.

188:2.  As at the eligibility trial, the court again found the testimony of Susan Mayer and Craig Whittom to be highly credible.

73.  IBEW called no witnesses and presented no case in opposition at the evidentiary hearing.


III

Conclusions of Law

1.  The court issued a Memorandum Decision on March 13, 2009, concluding that a municipality operating under chapter 9 of the Bankruptcy Code could reject a CBA with a public employee union provided the requirements of 11 U.S.C. § 365, as interpreted by the Supreme Court in <u>N.L.R.B. v. Bildisco & Bildisco</u>, 465 U.S. 513, 521-22 (1984), were satisfied.

2.  In its Memorandum Decision the court concluded that a municipality operating under chapter 9 may utilize 11 U.S.C. § 365 to reject an executory CBA if the debtor shows that: (1) the collective bargaining agreement burdens the estate; (2) after careful scrutiny, the equities balance in favor of contract rejection; and (3) "reasonable efforts to negotiate a voluntary modification have been made, and are not likely to produce a prompt and satisfactory solution." <u>Bildisco</u>, 465 U.S. at 526.

3.  Under section 365, a debtor must reject an executory contract, including a collective bargaining agreement, in its entirety.  A debtor cannot selectively reject or retain particular contract provisions.  <u>See</u> 11 U.S.C. § 365(a); <u>Stewart Title Guar. Co. v. Old Republic Nat'l Title Ins. Co.</u>, 83 F.3d 735, 741 (5th Cir. 1996).

4.  After a chapter 9 petition is filed, a collective

-24-

bargaining agreement is no longer enforceable.  Bildisco, 465
U.S. at 531.  A chapter 9 debtor has the authority to
unilaterally modify a collective bargaining agreement upon filing
its petition.  Bildisco, 465 U.S. at 531; In re S.A. Mechanical,
51 B.R. 130, 131 (Bankr. D. Ariz. 1985).

5.    Based on and incorporating each of the Findings of Fact
detailed above, the court now concludes that the City has
satisfied the Bildisco standard.

6.    The City has established that the IBEW CBA is
burdensome within the meaning of Bildisco.  Among other Findings
of Fact detailed above:

(a)    The City would incur an additional approximately
$360,000 obligation in fiscal year 2008-09 if it were
required to perform the IBEW CBA by, among other things,
paying increased salaries.

(b)    Because the IBEW CBA is effective through June 30,
2010, and mandates another salary increase in fiscal year
2009-10, absent rejection the City would be obligated in
fiscal year 2009-10 to pay approximately $500,000 in
additional compensation to IBEW employees above the current
Pendency Plan rates.

(c) In addition to salary compensation, the IBEW CBA imposes
significant burdens, such as costs related to active and
retiree health benefits and compensated absences.

(d)    The City's financial situation likely will continue to
deteriorate in the remaining months of fiscal year 2008-09
and in fiscal year 2009-10.  General Fund revenues are
expected to continue to decrease, with revenues in this

-25-

1    fiscal year already projected to be down $3.8 million from

2    the original 2008-09 General Fund budget adopted on June 26,

3    2008, and revenues projected to decrease an additional

4    approximately $4 million from this year's levels in fiscal

5    year 2009-10.

6    (e)    Given the state of the City's financial situation, the

7    City cannot afford the IBEW CBA.

8    7.    The City has established that the balance of the

9 equities, within the meaning of <u>Bildisco</u>, favors rejection of the

10 IBEW CBA.    Among other Findings of Fact detailed above:

11    (a)    Absent rejection of the IBEW CBA, it is unlikely that

12    the City will be able to implement a viable plan of

13    adjustment and emerge from bankruptcy.

14    (b)    Compensation under the IBEW CBA is above market.    The

15    reduced salaries the City is currently paying IBEW members

16    under the Pendency Plan are competitively in the middle of

17    the comparable labor market.

18    (c)    The City has allocated labor costs attributable to IBEW

19    employees to funds and programs other than the General Fund

20    to the extent possible.    Notwithstanding this, the General

21    Fund continues to bear significant labor costs for IBEW

22    employees as wells as benefits for IBEW retirees that are

23    burdensome to the City.

24    (d)    In the prior several years, the City already has cut

25    General Fund funding for numerous programs and services.

26    There is little, if anything, left for the City to cut apart

27    from its labor expenses.

28    (d)    The VPOA and CAMP voluntarily agreed to modify their

-26-

respective CBAs.  The IAFF has stipulated to the rejection of its CBA.

It is equitable to reject the IBEW CBA.

8.   The City has established that reasonable efforts have been made to reach voluntary modifications with IBEW but a prompt and satisfactory solution is not forthcoming.  Among other Findings of Fact detailed above:

(a)   Prior to bringing its petition, the City attempted in good faith to reach a long-term solution with all its labor unions, including the IBEW.

(b)   Since the entry of the order for relief, the City has met numerous times individually with IBEW in both on and off the record discussions.

(c)   The City reached voluntary modifications of the CBAs with VPOA and CAMP, and an agreement for the rejection of the IAFF CBA, demonstrating that the City has been acting reasonably and making proposals that are reasonable.

(d)   The City and IBEW have exchanged several proposals, and the court finds that all parties have made those proposals in a reasonable and good faith attempt to reach agreement. The court rejects the contention that the City is acting unreasonably or in bad faith.

(e)   Given the differences among the City and IBEW in the respective discussions and the differences in the terms of their respective proposals, the court does not believe that a prompt and satisfactory resolution short of contract rejection is forthcoming.

9.   For the reasons above, and based on applicable law and

on each and all of the Findings of Fact above, the court
concludes that the City has satisfied each of the standards under
Bildisco and may reject the IBEW CBA.

                                    IV

        Accordingly, the court will grant the City's Motion for
Approval of Rejection of Collective Bargaining Agreements with
respect to the IBEW CBA and it will overrule all objections filed
in response to the motion.   Further, the objection filed by the
California Labor Federation will be dismissed because it is not a
creditor or party in interest.

        To the extent that any portion of a finding of fact contains
or constitutes a conclusion of law, such portion shall be deemed
to be a conclusion of law, and to the extent that any portion of
a conclusion of law contains or constitutes a finding of fact,
such portion shall be deemed a finding of fact.

        Counsel for the City shall lodge an order conforming with
these findings and conclusions.

Dated: August 31, 2009          By the Court

                                _____
                                Michael S. McManus
                                United States Bankruptcy Judge