FILED
November 19, 2009
CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
0002234703

Donald P. Rubenstein (SBN 121034)
Peter S. Muñoz (SBN 66942)
Jennifer J. Brady (SBN 233440)
REED SMITH LLP
101 Second Street, Suite 1800
San Francisco, CA  94105-3659

Telephone:	+1 415 543 8700
Facsimile:	+1 415 391 8269

Attorneys for Movants
Alco Iron & Metal Co. and
Kantor Mare Island Properties Ltd., LLC

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| In re<br><br>City of Vallejo,<br><br>　　　　　　Debtor. | Case No. 08-26813 (MSM)<br>DC No.: DPR-01<br><br>Chapter 9<br><br>**ALCO IRON & METAL COMPANY AND KANTOR MARE ISLAND PROPERTIES LTD., LLC'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR RELIEF FROM STAY**<br><br>Date:　　　　December 21, 2009<br>Time:　　　　9:00 a.m.<br>Place:　　　　Courtroom 28<br><br>Honorable Michael S. McManus |

## I. INTRODUCTION

This Motion is being brought by Alco Iron & Metal Co. ("Alco") and Kantor Mare Island Properties Ltd., LLC ("Kantor") (collectively "Movants") to compel the City of Vallejo ("City") to abide by its legal obligations to Movants in connection with an established community facilities district ("CFD") and to terminate such CFD. This is a remedy which the Bankruptcy Court is prohibited from resolving and must be resolved only by a California State court.

In 2002, the City approved a community facilities district ("CFD") to fund municipal services on Mare Island. The resolutions which created the CFD (hereafter defined as the "Resolutions") require Mare Island property owners to pay a special tax, in additional to their property taxes, to cover the costs of municipal services, despite the fact that the municipal services for the rest of the City are provided for out of the City's General Fund. Over the past few years, Movants, a property owner and lessee located on Mare Island, have disputed the amount and need for these taxes according to the terms of the Resolutions. Movants contend that there currently exists surplus funds in the CFD, which the City is failing to apply to fund municipal services on Mare Island, and the City is not uniformly enforcing the payment of the CFD taxes from all property owners which has resulted in Movants bearing a disproportionate share of the tax burden. Further, Movants contend that changed circumstances require termination of the CFD according to the express provisions of the Resolutions.

Moreover in its efforts to demonstrate the validity of its contentions, Movants have repeatedly requested that the City provide documentation sufficient for Movants to perform an accounting of the CFD. However, the City has failed to provide Movants with the complete records requested.

Accordingly, Movants respectfully requests relief from the automatic stay to pursue its claims against the City.

Movants' claims stem from the City's failure to comply with the terms of the Resolutions and its obligations regarding the CFD under those Resolutions. Relief from stay is proper because state court and not the Bankruptcy Court is the only appropriate forum to adjudicate. Moreover Movants' claims and the requested relief will not interfere with the bankruptcy case since Movants

have agreed not to enforce any decree without further order of this Court.

## II. FACTUAL BACKGROUND

The detailed facts and history related to Mare Island are set forth in detail in Movants' Petition for Writ of Mandate to CCP Section 1085; Complaint for Declaratory Relief and Accounting (the "Complaint"). [*See* Declaration of Jennifer J. Brady ("Brady Decl."), Ex. A.]

In short, on November 13, 1996, the City, as lessor, and Alco, as lessee, entered into a lease for certain real property located on Mare Island ("Lease"). As part of the Lease, Alco entered into an Option Agreement with the City, which provided that if the City were to acquire fee title to Mare Island within five years of the execution of Alco's lease, the City would grant Alco the exclusive right to purchase the leased property.

During the late 1990's, the City negotiated various agreements with Lennar Mare Island, LLC ("Lennar"), a private developer. Lennar became the City's agent in the management and development of Mare Island in return for substantial consideration, which included Lennar's eventual acquisition of most of the Mare Island property. On December 21, 1999, the City and Lennar entered into an Acquisition Agreement. The Acquisition Agreement provided, among other things, that the City would cooperate with Lennar in forming a community facilities district or other public financing mechanism proposed by Lennar to help finance Lennar's development project on Mare Island.

On July 31, 2001, Alco's Lease with the City expired. On October 28, 2003, Alco entered into an Amended and Restated Option Agreement with Lennar, which extended Alco's Option.

On September 12, 2001, the City and Lennar entered into a Development Agreement ("Development Agreement"). The Development Agreement, among other things, confirmed the City and Lennar's agreement that a community facility district ("CFD") on Mare Island should be created, which would provide for the imposition of a special levy on the property within the district.

On March 26, 2002, the City obtained fee title to Mare Island.

In 2002 the City proposed the special levy and CFD for Mare Island. The CFD and the requirements of the special tax are detailed in Resolution No. 02-150 N.C. – A Resolution of the City Council of the City of Vallejo of Intention to Establish Community Facilities CFD –

Community Facilities CFD No. 2002-1 (Mare Island Services) ("CFD No. 2002-1" or "CFD"). [*See* Brady Decl., Ex. A.] CFD No. 2002-1 recited that the special tax was required to pay for the services that were "necessary to meet increased demands placed upon local agencies as the result of development occurring within the CFD and the loss of federal funding as a result of the expiration" of the agreement with the Navy to fund these services on Mare Island.

Exhibit B to the CFD No. 2002-1 sets out the Rate and Method of Apportionment of Special Tax, which sets forth the manner in which the special tax will be levied against all non-exempt real property located in the CFD (the "Rate and Method of Apportionment"). The Rate and Method of Apportionment defines the "Special Tax Requirement" as the "amount necessary in any Fiscal Year":

> (i) to pay services costs for the Fiscal Year pursuant to the CFD budget prepared by the City, (ii) to repay the City for amounts advanced to cover the costs of services authorized to be funded by the CFD, (iii) to cure delinquencies in the payment of the Special Tax in prior Fiscal Years or… are expected to occur in the current Fiscal Year, (iv) to pay administrative expenses of the CFD, and (v) to maintain the Operating Reserve at $300,000.

The Rate and Method of Apportionment further provides that the "Special Tax Requirement "shall be reduced in any Fiscal Year" by:
> (i) surplus funds available, if any, from the Special Tax levy in the prior Fiscal Years, (ii) revenues generated from property or activities on Mare Island that are required to be applied to reduce the Special Tax Requirement … (iii) other revenues that, at the City's sole discretion, are determined to be available to be applied to reduce the Special Tax Requirement, including but not limited to, funds paid to the City by [Lennar] pursuant to the Acquisition Agreement, and funds paid to the City as a result of the City's lease of the dredge ponds.

The Rate and Method of Apportionment further provides that the CFD tax shall terminate when it is determined that the revenue from other sources on Mare Island are sufficient to exceed the costs of services supplied by CFD No. 2002-1. [The resolutions and exhibits thereto are referred to herein as the "Resolutions".]

On May 7, 2002, the City held an election in which the City approved the CFD tax on the real property located on Mare Island. Prior to and immediately after the creation of the CFD, the City assured property owners and tenants on Mare Island that the CFD tax levied on their property would decrease over time as Lennar developed and sold homes and other businesses came to Mare

Island. The City further agreed, both in the CFD No. 2002-1 and through its representations to Mare Island businesses and residents, that the CFD tax would eventually be terminated when no longer financially needed.

Following adoption of the foregoing Resolutions and based in part upon the representations of the City, Alco exercised its Purchase Option on or about December 26, 2003. Kantor purchased the property and leased it to Alco through a triple net lease. At the time of its purchase, Alco was paying approximately $50,000 annually in CFD taxes. Under the Rate and Method of Apportionment, the CFD tax levied against Alco's real property for the past 7 years has continued to increase, and is now almost triple what it was when Alco acquired the property. The exorbitant CFD tax in effect is rendering the property on Mare Island, and in particular Alco's property, valueless.

Alco has contested the calculations of its tax levies. Since early 2008, Alco has sought information from the City that should have been publically available and was related to the revenues generated from property and activities on Mare Island. Such revenues are required to be applied to reduce the CFD tax obligations, and expenditures for municipal services on Mare Island. To date, the City has provided only selective and incomplete information.

Further, contrary to the annual CFD budgets and contrary to the requirements in the Resolutions, the City has not and does not use the collections from the CFD tax to perform landscaping and road maintenance on Mare Island (and in particular near Alco's property). For example:

(i) During 2009, the City, through Vallejo Sanitation, informed Alco that a leaking sewer pipe servicing Alco's property, but not located on it, had to be replaced at Alco's cost. The City has asserted that the maintenance costs included in the CFD tax do not cover sewer maintenance.

(ii) The City previously represented that the roads and infrastructure on the North Island, where Alco's business is located, would be improved at the City's expense over time. In fact, no improvements on the North Island have been made, other than those improvements conducted and paid for by Alco itself.

(iii) The North Island contains abandoned buildings that remain in disrepair and adversely affect the property values, including the value of Alco's property.

In addition, the City has taken action which has adversely affected the value of the Movants' property. At the time Kantor purchased the property, an operating railroad was in existence and was a vital part of Mare Island and was beneficial to Movants' business. After Kantor's purchase the City has since removed the railroad from Mare Island purportedly to benefit residential home sales and residential homeowners, to the detriment of the industrial businesses, such as Movants' business.

On June 8, 2008, Lennar filed for protection under Chapter 11 in the United States Bankruptcy Court, District of Delaware.

Lennar has withheld its most recent CFD tax payment and that the City has not sought to compel Lennar to make its full CFD payment. Other property owners in addition to Lennar have failed to make CFD tax payments and the City has taken no enforcement action to collect the tax obligations. All of this has breached the City's obligations to treat all property owners similarly and has placed a higher proportionate obligation on Movants.

### III.    LEGAL ARGUMENT

A bankruptcy filing imposes an automatic stay on all litigation against the debtor. 11 U.S.C. § 362(a); *In re Tucson Estates, Inc.*, 912 F.2d 1162, 1166 (9th Cir. 1990). Bankruptcy Code section 362(d)(1) provides that a party in interest may request relief from the automatic stay for "cause."

Here, cause exists because the state court is the proper and only forum that has the power to determine and adjudicate Movants' rights and to enforce such obligations against the City. Further, any judgment obtained by Movants in the state court proceeding will not interfere with the bankruptcy case since Movants have agreed not to enforce any award, judgment or ruling from the state court without obtaining permission from this Court. Any monetary judgment will be asserted as a claim in this Bankruptcy Case.

**A.    Cause Exists To Grant Alco Relief From Stay Because Sections 903 and 904 Limit The Bankruptcy Court's Power Over The City's Operations**

Bankruptcy Code section 362(d)(1) provides that a party in interest may request relief from the automatic stay for "cause." Relief from the stay based on the equity and necessity tests under section 362(d)(1) is an alternative to the provisions for relief from stay based on the equity and necessity test under section 362(d)(2). *In re Sun Valley Ranches, Inc.*, 823 F.2d 1373, 1376 (9th Cir.

1987).

Neither the Bankruptcy Code nor its legislative history clearly defines the word "cause" as used in this section. Rather, "because there is no clear definition of what constitutes 'cause,' discretionary relief from the stay must be determined on a case by case basis." *In re Mac Donald*, 755 F.2d 715, 717 (9th Cir. 1985). "Cause" under section 362(d)(1) has been said to be an "intentionally broad and flexible concept that permits the Bankruptcy Court, as a court of equity to respond to inherently fact-sensitive situations." *In re Texas State Optical, Inc.*, 188 B.R. 552, 556 (Bankr. E.D. Tex. 1995).

Here, "cause" exists because the proper forum to adjudicate Movants' claims is state court and the bankruptcy court's ability to adjudicate such matters is restricted by the terms of the Bankruptcy Code. Sections 903 and 904 of the Bankruptcy Code were specifically designed to recognize the bankruptcy court's limited power over operations of the City. Section 903 states that:

> "chapter [9] does not limit or impair the power of a State to control, by legislation or otherwise, a municipality of or in such State in the exercise of the political or governmental powers of the municipality, including expenditures for such exercise...." [11 U.S.C. § 903.]

Further, section 904 specifically limits the power of the bankruptcy court to:

> "interfere with – (1) any of the political or governmental powers of the debtor; (2) any of the property or revenues of the debtor...." [11 U.S.C. § 904.]

Adjudication of this matter in the bankruptcy court is improper because of the nature of Movants' requested relief. First, Movants seek to force the City to act in accordance with the Resolutions relating to CFD by: (1) applying surplus funds to fund municipal services on Mare Island; (2) reimbursing CFD taxes overpaid by Alco and improperly collected by the City; and (3) requiring other property owners subject to the CFD to pay their allocated share of the CFD tax. Second, Movants seek to force the City to provide documents necessary to perform an accounting of revenues generated from property or activities on Mare Island and all sources and uses of the CFD tax. Lastly, Movants seek a judicial determination as to whether changed circumstances now necessitate the termination of the CFD. The requested relief deals solely with the City's expenditures and revenues collected by the City pertaining to the CFD. Since the claims do not deal

with indebtedness owed by the City and since Bankruptcy Code Section 904 limits the power of the Bankruptcy Court to interfere with the political and governmental powers of the City, the bankruptcy court is not the proper forum for this matter, therefore, cause exists to grant Movants relief from the stay to pursue their claims in state court.

**B.  Granting Relief From Stay Will Not Interfere With The Bankruptcy Case And Will Not Prejudice Other Creditors**

Factors that courts consider in determining whether to grant relief from the stay to allow parties to litigate in another forum include:

(1) whether relief would result in resolution of the issues;
(2) lack of interference with the bankruptcy case;
(3) whether the other proceeding involves the debtor as a fiduciary;
(4) whether there is a specialized tribunal to hear the cause of action;
(5) whether debtor's insurer is defending it;
(6) whether the action primarily involves third parties;
(7) whether litigation in another forum would prejudice other creditors;
(8) whether the claim arising from the other action is subject to equitable subordination;
(9) whether the other proceeding would result in an avoidable judicial lien;
(10) the interests of judicial economy;
(11) whether the parties are ready for trial in the other proceeding;
(12) the impact of the stay on the parties and the balance of harms.

*In re Countryside Manor, Inc.*, 188 B.R. 489, 491 n.1 (Bankr. D. Conn. 1995); *In re Touloumis*, 170 B.R. 825, 828 n.3 (Bankr. S.D. N.Y. 1994) (citing *In re Sonnax Industries*, 907 F.2d 1280, 1286 (2d Cir. 1990)). Courts have also considered,

(1) whether the issues in the litigation involve only state law, so the expertise of the Bankruptcy Court is unnecessary;
(2) whether modifying the stay will promote judicial economy and whether there would be greater interference with the bankruptcy case if the stay were not lifted because matters would have to be litigated in bankruptcy court; and
(3) whether the estate can be protected properly by a requirement that creditors seek enforcement of any judgment through the bankruptcy court.

*In re Robbins*, 964 F.2d 342, 345 (4th Cir. 1992) (citing *In re Mac Donald*, 755 F.2d 715, 717 (9th Cir. 1985). *See In re Holtkamp*, 669 F.2d 505, 508-09 (7th Cir. 1982); *In re Revco D.S., Inc.*, 99 B.R. 768, 776-77 (N.D. Ohio 1989); *In re Pro Football Weekly, Inc.*, 60 B.R. 824, 826-27 (N.D. Ill. 1986); *Broadhurst v. Steamtronics Corp.*, 48 B.R. 801, 802-03 (D. Conn. 1985)).

Here, several of these factors weigh in favor of granting Movants relief from stay. First, the state court would provide a complete forum for relief since Movants' claims require applying state law exclusively. Second, Movants prosecution of their claims will not interfere with the bankruptcy case and will not affect other creditor's rights. Movants' claims arise solely out of the CFD tax funds. These amounts are not part of the bankruptcy estate and are solely used to fund municipal services on Mare Island. Therefore, a court determination as to whether surplus CFD tax funds exist and should be applied, will not prejudice other creditors because these funds are kept separate from the City's General Fund. Lastly, the majority of Movants' claims request a judicial determination that would require the City to either produce documents or act to collect money, not to pay any debts. The only requested relief that would require the City to pay Movants any monetary relief is the cause of action to reimburse Alco for amounts improperly collected. If Movants were to obtain a judgment on this matter, the estate is adequately protected by virtue of Movants' agreement to come back to this Court before seeking enforcement of its judgment against the City.

## IV. CONCLUSION

For the reasons stated above, cause exists to grant Movants relief from stay because the proper forum for Movants to adjudicate these matters is in the state court and relief from stay will not interfere with the bankruptcy case or prejudice the other creditors. Accordingly, Movants respectfully requests that the Court grant it relief from stay to resolve the issues set forth in its Complaint.

DATED: November 19, 2009.

REED SMITH LLP

By /s/ Peter S. Muñoz
Donald P. Rubenstein
Peter S. Muñoz (SBN 66942)
Jennifer J. Brady
Attorneys for Movants
Alco Iron & Metal Co. and
Kantor Mare Island Properties Ltd., LLC