**59**

1  MARC A. LEVINSON (SBN 57613)
   NORMAN C. HILE (SBN 57299)
2  JOHN H. KNOX (SBN 129777)
   JOHN W. KILLEEN (SBN 258395)
3  ORRICK, HERRINGTON & SUTCLIFFE LLP
   400 Capitol Mall, Suite 3000
4  Sacramento, CA 95814
   Telephone:   (916) 447-9200
5  Facsimile:   (916) 329-4900
   malevinson@orrick.com
6  nhile@orrick.com
   jknox@orrick.com
7  jkilleen@orrick.com

8  Attorneys for Debtor
   City of Vallejo
9

10              UNITED STATES BANKRUPTCY COURT

11                EASTERN CITY OF CALIFORNIA

12                    SACRAMENTO DIVISION

13

| 14 | In re | Case No. 2008-26813 |
|----|-------|---------------------|
| 15 | CITY OF VALLEJO, CALIFORNIA, | **Chapter 9** |
| 16 | Debtor | **PLAN FOR THE ADJUSTMENT OF DEBTS OF CITY OF VALLEJO, CALIFORNIA, DATED JANUARY 18, 2011** |
| 17 | | |
| 18 | | **Date:** **March 7, 2011** |
| 19 | | **Time:** **1:30 p.m.** |
| | | **Dept:** **A** |
| 20 | | **Judge:** **Hon. Michael S. McManus** |

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

|   |   |   | Page |
|---|---|---|------|
| I. | | **DEFINITIONS, INTERPRETATION AND RULES OF CONSTRUCTION** ...........1 | |
| | A. | Definitions ............1 | |
| | B. | Rules of Construction ............13 | |
| II. | | **TREATMENT AND DEADLINE FOR THE ASSERTION OF ADMINISTRATIVE CLAIMS AND PROFESSIONAL CLAIMS**............**13** | |
| | A. | Treatment of Administrative Claims ............13 | |
| | B. | Treatment of Professional Claims ............13 | |
| | C. | Priority Claims In Chapter 9............14 | |
| | D. | Deadline for the Filing and Assertion of Administrative Claims (Other Than Ordinary Course Administrative Claims) and Professional Claims............14 | |
| III. | | **DESIGNATION OF CLASSES OF CLAIMS** ............**14** | |
| IV. | | **TREATMENT OF CLAIMS** ............**15** | |
| | A. | Class 1A through Class 1D, Inclusive – Claims of Union Bank With Respect to the Union Bank COPs............15 | |
| | B. | Classes 2A and 2B – Claims of The Indenture Trustee and of National With Respect to the Series 1999 COPs............16 | |
| | C. | Class 3 Claims of the MPA Assignees under the MPA Lease ............18 | |
| | D. | Class 4 Claims of Westamerica under the Westamerica Lease............19 | |
| | E. | Class 5 Claims of CalPERS with Respect to the CalPERS Pension Plan, as Trustee Under the CalPERS Pension Plan for the Benefit of CalPERS Pension Plan Participants............19 | |
| | F. | Class 6 – General Unsecured Claims............19 | |
| | G. | Class 7 – General Liability Claims............20 | |
| | H. | Class 8 –Workers Compensation Claims ............20 | |
| | I. | Class 9 – Holders of Restricted Revenue Bonds and Note Payable Obligations............21 | |
| V. | | **ACCEPTANCE OR REJECTION; CRAM DOWN**............**22** | |
| | A. | Voting of Claims............22 | |
| VI. | | **TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**............**22** | |
| | A. | Assumption of Executory Contracts and Unexpired Leases ............22 | |
| | B. | Cure Payments ............22 | |
| | C. | Rejection of Executory Contracts and Unexpired Leases ............23 | |
| | D. | Claims Arising From Rejection ............23 | |
| | E. | Executory Contracts and Unexpired Leases Not Included In Motion............23 | |
| VII. | | **IMPLEMENTATION AND MEANS FOR IMPLEMENTATION OF THIS PLAN** ............**23** | |

|  |  |  |  |
|---|---|---|---|
|  | A. | Claims and Causes of Action | 24 |
| **VIII.** | **DISTRIBUTIONS** | | **24** |
|  | A. | Distribution Agent | 24 |
|  | B. | Delivery of Distributions | 24 |
|  | C. | Undeliverable Distributions | 25 |
|  | D. | Distributions of Cash | 25 |
|  | E. | Timeliness of Payments | 26 |
|  | F. | Compliance With Tax Requirements | 26 |
|  | G. | Time Bar to Cash Payments | 26 |
|  | H. | No De Minimis Distributions | 27 |
|  | I. | No Distributions on Account of Disputed Claims | 27 |
|  | J. | No Postpetition Accrual | 27 |
| **IX.** | **DISPUTED CLAIMS; OBJECTIONS TO CLAIMS; PROSECUTION OF OBJECTIONS TO DISPUTED CLAIMS** | | **27** |
|  | A. | Claims Objection Deadline; Prosecution of Objections | 27 |
|  | B. | Reserves, Payments, and Distributions With Respect to Disputed Claims | 27 |
| **X.** | **EFFECT OF CONFIRMATION** | | **28** |
|  | A. | Discharge of the City | 28 |
|  | B. | Injunction | 29 |
|  | C. | Term of Existing Injunctions or Stays | 29 |
| **XI.** | **RETENTION OF AND CONSENT TO JURISDICTION** | | **29** |
| **XII.** | **CONDITIONS PRECEDENT** | | **31** |
|  | A. | Condition Precedent to Confirmation | 31 |
|  | B. | Conditions Precedent to Effective Date | 31 |
|  | C. | Waiver of Conditions to Effective Date | 32 |
|  | D. | Effect of Failure of Conditions | 32 |
| **XIII.** | **MISCELLANEOUS PROVISIONS** | | **32** |
|  | A. | Dissolution of the Committee | 32 |
|  | B. | Severability | 33 |
|  | C. | Governing Law | 33 |
|  | D. | Effectuating Documents and Further Transactions | 33 |
|  | E. | Notice of Effective Date | 34 |

CITY OF VALLEJO'S PLAN OF ADJUSTMENT

**TABLE OF AUTHORITIES**

**Page**

**FEDERAL STATUTES**

11 U.S.C. § 101 ............................................................................................................3

11 U.S.C. § 102 ......................................................................................................3, 13

11 U.S.C. § 105 ..........................................................................................................29

11 U.S.C. § 362 ..........................................................................................................29

11 U.S.C. § 365 ..................................................................................................2, 8, 22

11 U.S.C. § 501 ............................................................................................................1

11 U.S.C. § 502 ............................................................................................................1

11 U.S.C. § 503 ............................................................................................................1

11 U.S.C. § 506 ............................................................................................................9

11 U.S.C. § 507 ......................................................................................................1, 14

11 U.S.C. § 553 ......................................................................................................9, 29

11 U.S.C. § 901 ..........................................................................................................14

11 U.S.C. § 902 ..........................................................................................................21

11 U.S.C. § 922 ..........................................................................................................29

11 U.S.C. § 941 ............................................................................................................1

11 U.S.C. § 943 ......................................................................................................3, 13

11 U.S.C. § 944 ..........................................................................................................28

11 U.S.C. § 1122 ....................................................................................................3, 14

11 U.S.C. § 1124 ....................................................................................................5, 11

11 U.S.C. § 1129 ........................................................................................................22

**STATE STATUTES**

California Government Code § 810 ...............................................................................5

California Government Code § 37351.5 ................................................................16, 18

California Labor Code § 3200 ....................................................................................12

**NOTE:  The Bankruptcy Court Has Not Yet Approved A Disclosure Statement With Respect To The Proposed Plan Of Adjustment Of Debts.  The Filing Of This Proposed Plan Is Not Intended To And Should Not Be Construed To Be A Solicitation Of Acceptances Of The Plan.**

The City of Vallejo, California (the "<u>City</u>"), a debtor under chapter 9 of the United States Bankruptcy Code, hereby proposes the following Plan of Adjustment of Debts (this "<u>Plan</u>") pursuant to section 941 of the Bankruptcy Code.[1]

Please refer to the accompanying Disclosure Statement for a discussion of the City's financial condition, the developments throughout the Chapter 9 Case, for a summary and analysis of this Plan and for other important information. The City encourages you to read this Plan and the Disclosure Statement in their entirety before voting to accept or reject this Plan. No materials other than the Disclosure Statement and the various Exhibits and Schedules attached to or incorporated therein have been approved for use in soliciting acceptance or rejection of this Plan.

## I.     <u>DEFINITIONS, INTERPRETATION AND RULES OF CONSTRUCTION</u>

     A.     <u>Definitions</u>.

        1.     **<u>Administrative Claim</u>** means any Claim for an administrative expense of the kind described in sections 503(b) or 507(a)(2) of the Bankruptcy Code.

        2.     **<u>Allowed</u>** means a Claim that:

           a.     Is asserted in a proof of claim filed in compliance with section 501 of the Bankruptcy Code and any applicable orders of the Bankruptcy Court and as to which: (i) no objection has been filed within the deadline established pursuant to Section IX of the Plan; (ii) the Bankruptcy Court has entered a Final Order allowing all or a portion of such Claim (but only in the amount so allowed); or (iii) the Bankruptcy Court has entered a Final Order under section 502(c) of the Bankruptcy Code estimating the amount of the Claim for purposes of allowance;

           b.     Is subject to a stipulation between the City and the holder of such Claim providing for the allowance of such Claim;

           c.     Is deemed "allowed" pursuant to this Plan;

/ / /

/ / /

---

[1]   The definitions of capitalized terms used throughout this Plan are set forth in Section I.A.

d.   Is designated as "allowed" in a pleading entitled "Designation of Allowed Claims" (or a similar title of the same import) filed with the Bankruptcy Court by the City on or after the Effective Date; or

e.   Is an Administrative Claim as to which the Bankruptcy Court has entered a Final Order allowing all or a portion of such claim (but only in the amount so allowed).

3.   **Assumption Motion** means the motion to be filed by the City pursuant to section 365(a) of the Bankruptcy Code pursuant to which the City shall seek approval and authorization for its assumption of such executory contracts and unexpired leases as shall be identified in the Assumption Motion.

4.   **Authority** means the Vallejo Public Financing Authority.

5.   **Ballot** means the ballot(s), in the form(s) approved by the Bankruptcy Court in the Plan Solicitation Order, accompanying the Disclosure Statement and provided to each holder of a Claim entitled to vote to accept or reject this Plan.

6.   **Bankruptcy Code** means title 11 of the United States Code, as amended from time to time, as applicable to the Chapter 9 Case.

7.   **Bankruptcy Court** means the United States Bankruptcy Court for the Eastern District of California, Sacramento Division, or such other court that lawfully exercises jurisdiction over the Chapter 9 Case.

8.   **Bankruptcy Rules** means the Federal Rules of Bankruptcy Procedure, as amended from time to time, as applicable to the Chapter 9 Case, together with the local rules of the Bankruptcy Court applicable to the Chapter 9 Case.  Unless otherwise indicated, references in this Plan to "Bankruptcy Rule _____" are to the specifically identified rule of the Federal Rules of Bankruptcy Procedure.

9.   **Bar Date** means the applicable date by which a particular proof of claim must be filed, as established by the Bankruptcy Court.

10.   **CalPERS** means the California Public Employees' Retirement System.

11. **CalPERS Pension Plans** means, collectively, the following pension plan contracts between CalPERS and the City: (1) Safety Plan of the City of Vallejo (Employer # 527); and (2) Miscellaneous Plan of the City of Vallejo (Employer # 527).

12. **CalPERS Pension Plan Participants** means those current and former City employees and their survivors and other dependants who are the beneficiaries of one or both of the CalPERS Pension Plans.

13. **Cash** means cash and cash equivalents, including withdrawable bank deposits, wire transfers, checks, and other similar items.

14. **Chapter 9 Case** means the case under chapter 9 of the Bankruptcy Code commenced by the City, styled as *In re City of Vallejo, California*, Case No. 2008-26813, currently pending in the Bankruptcy Court.

15. **City** means the City of Vallejo, California, the debtor in the Chapter 9 Case.

16. **City Council** means the duly elected legislative body of the City.

17. **Claim** means a claim against the City or the property of the City within the meaning of section 101(5) of the Bankruptcy Code.

18. **Class** means one of the classes of Claims established under Section III pursuant to section 1122 of the Bankruptcy Code.

19. **Committee** means the Official Unsecured Creditors Committee of City of Vallejo Retirees, appointed in the Chapter 9 Case by the Office of the United States Trustee pursuant to section 1102(a)(1) of the Bankruptcy Code as the membership thereof has been reconstituted from time to time by the Office of the United States Trustee.

20. **Confirmation Date** means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

21. **Confirmation Order** means the order of the Bankruptcy Court confirming this Plan pursuant to section 943 of the Bankruptcy Code.

22. **Controller** means the California State Controller's Office.

23. **COPs** means certificates of participation.

24. **COPs Documents** means, with respect to each of the Series 1999 COPs, the Series 2000 COPs, the Series 2001 COPs, the Series 2002 COPs and the Series 2003 COPs, the leases, assignment agreement and trust agreement or indenture, as applicable, the Letter of Credit Reimbursement Agreement (with respect to the Union Bank COPs) and Financial Guaranty Agreement (with respect to the Series 1999 COPs) providing for the payment obligations of the City evidenced and represented by the respective series of COPs and execution, delivery and terms thereof and other payment obligations of the City associated with the various COPs.

25. **Disallowed** means a Claim or portion thereof that has been disallowed by an Order.

26. **Disclosure Statement** means the disclosure statement, and all exhibits and schedules incorporated therein, that relates to this Plan and that is approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code, as the same may be amended, modified or supplemented in accordance with the Bankruptcy Code.

27. **Disputed Claim** means any Claim or portion thereof that has not become Allowed and that is not Disallowed. In the event that any part of a Claim is Disputed, except as otherwise provided in this Plan, such Claim shall be deemed Disputed in its entirety for purposes of distribution under this Plan unless the City otherwise agrees in writing in its sole discretion. Without limiting the foregoing, a Claim that is the subject of a pending application, motion, complaint, objection, or any other legal proceeding seeking to disallow, limit, reduce, subordinate, or estimate such Claim shall be deemed to be Disputed.

28. **Effective Date** means the first business day after the date on which the conditions specified in Section XII have been satisfied or waived.

29. **Final Order** means a judgment, order, ruling, or other decree issued and entered by the Bankruptcy Court or by any state or other federal court or other tribunal having jurisdiction over the subject matter thereof which judgment, order, ruling, or other decree has not been reversed, stayed, modified, or amended and as to which: (a) the time to appeal or petition for review, rehearing or certiorari has expired and no appeal or petition for review, rehearing or

certiorari is then pending; or (b) any appeal or petition for review, rehearing or certiorari has been finally decided and no further appeal or petition for review, rehearing or certiorari can be taken or granted.

30.     **Five-Year General Fund Business Plan** means the financial planning document adopted by the City Council by resolution dated November 30, 2010, that presents strategies to maintain a balanced operating budget, address the City's debts, rebuild fiscal stability, and enable the City to continue to provide municipal services to its residents, and covers the City's five fiscal years commencing on July 1, 2010 and ending on June 30, 2015.

31.     **General Fund** means the City's chief operating fund, which is used to account for all financial resources except those required to be accounted for in another fund (such as the Restricted Funds).

32.     **General Liability Claim** means a tort or contract Claim filed against the City pursuant to the Government Claims Act, California Government Code section 810 *et seq*.

33.     **General Unsecured Claim** means any unsecured Claim that is not (1) an Administrative Claim; (2) a General Liability Claim; or (3) a Workers Compensation Claim.

34.     **General Unsecured Claims Pool** means the aggregate of $6 million for payment to holders of Allowed General Unsecured Claims, of which $5 million will be contributed by the General Fund (as described in the Five-Year General Fund Business Plan) and $1 million will be contributed by Restricted Funds (on account of their estimated pro rata share of General Unsecured Claims).

35.     **Impaired** means a Claim or Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

36.     **Indenture Trustee** means the financial institution acting in the capacity of indenture trustee with respect of the Series 1999 COPs. As of the date of this Plan, the Indenture Trustee is Wells Fargo Bank, National Association.

37.     **Insured Portion** means that portion of an Allowed Workers Compensation Claim or an Allowed General Liability Claim that is covered by insurance provided by one or

more of the insurance pools of which the City is a member, up to the amount of the policy limits, including any excess coverage policies.

38. **MPA Assignees** means the assignees of the MPA Lease, being the Peg Yorkin Living Trust, and William D. and Francine M. Osenton, pursuant to Assignment Agreements dated as of December 27, 2001 by and between each MPA Assignee and MPA Leasing Corporation.

39. **MPA Lease** means the Lease Agreement by and between the City and MPA Leasing Corporation, dated as of December 27, 2001, under which remain aggregate principal components of unpaid lease payments in the amount of approximately $829,248.

40. **MVLF Intercept** means the election by the City with respect to the Series 1999 COPs and the Series 2000 COPs to guarantee payments evidenced and represented thereby pursuant to California Government Code Section 37351.5.

41. **MVLF Revenues** means the motor vehicle license fee revenues allocable to the City and subject to the election of the City pursuant to the MVLF Intercept.

42. **National** means National Public Finance Guaranty Corporation, as the reinsurer to MBIA Insurance Corporation and MBIA Insurance Corp. of Illinois pursuant to a Quota Share Reinsurance Agreement.

43. **National MVLF Adversary** means Adversary Proceeding No. 10-02722 pending in the Bankruptcy Court commenced by National against the City with respect to MVLF Intercept and MVLF Revenues.

44. **National Policies** means, collectively, the Debt Service Reserve Surety Bond and the Financial Guaranty Insurance Policy issued by MBIA Insurance Corporation with respect to the Series 1999 COPs.

45. **National Settlement Agreement** means the settlement agreement, dated as of January 25, 2011 by and among the City, National and the Controller, and acknowledged by the Indenture Trustee. A copy of the National Settlement Agreement is attached as Exhibit A.

46. **National Settlement Agreement Motion** means the motion filed on January [26], 2011 in the National MFLV Adversary.

47. **New MPA Lease Payment Schedules** means the new schedule of lease payments applicable to the MPA Lease reflecting the City's revised payment obligations under the MPA Lease as discussed in Section IV(C) and memorialized in Exhibit B.

48. **New Union Bank Documents** means a new site lease, pursuant to which all of the real property currently leased under the COPs Documents for the Union Bank COPs (as shown in Exhibit C) will be leased to the Authority, a new facilities lease, pursuant to which such real property will be leased back to the City with rental payments as shown in Exhibit D, and a new assignment agreement pursuant to which the Authority's rights under the new facilities lease and the new site lease will be assigned to Union Bank. The form of the New Union Bank Documents shall be filed in the Chapter 9 Case no later than 14 days prior to commencement of the hearing on confirmation of the Plan.

49. **Notice of the Effective Date** shall have the meaning ascribed to such phrase in Section XIII(E) of the Plan.

50. **Omitted Agreements** shall have the meaning ascribed to such phrase in Section XI(E).

51. **Ordinary Course Administrative Claim** means an Administrative Claim, other than a Professional Claim, that represents an obligation incurred in the ordinary course of business of the City (as determined by the City in its sole discretion).

52. **Payment Dates** shall mean the first business day following the six month anniversary of the Effective Date and January 31, 2013.

53. **Petition Date** means May 23, 2008.

54. **Plan** means this Plan for the Adjustment of Debts of City of Vallejo, California Dated January 18, 2011, together with any Exhibits, each in their present form or as they may be altered, amended or modified from time to time in accordance with the provisions of this Plan, the Confirmation Order, the Bankruptcy Code, and the Bankruptcy Rules.

55. **Plan Solicitation Order** means the Order Approving (1) Adequacy Of Information In Disclosure Statement With Respect To The City's Plan Of Adjustment; (2) Form, Scope And Nature of Solicitation, Balloting, Tabulation And Notices With Respect Thereto; And

(3) Related Confirmation Procedures, Deadlines And Notices, by which the Bankruptcy Court approved the Disclosure Statement as containing adequate information for the purpose of dissemination and solicitation of votes on and confirmation of this Plan, and established certain rules, deadlines, and procedures for the solicitation of votes with respect to and the balloting on this Plan.

56.     **Pre-Effective Date Claims** shall have the meaning ascribed to such phrase in Section X(A).

57.     **Professional Claim** means a Claim required to be filed pursuant to Section II(D) of the Plan for approval of amounts, if any, to be paid after the Effective Date for services or expenses in the Chapter 9 Case or incident to this Plan.

58.     **Rejection Motion** means the motion to be filed by the City pursuant to section 365(a) of the Bankruptcy Code by which the City shall seek approval and authorization for the rejection of such executory contracts and unexpired leases as shall be identified in the Rejection Motion.

59.     **Restricted Funds** means the over 100 special purpose and enterprise funds administered by the City, the use of which is restricted by, among other things, grants, federal law, the California Constitution or other California law, such that the assets of the Restricted Funds may not lawfully be used to pay obligations of the General Fund.  Among the uses of the assets in the Restricted Funds are payment of the Restricted Revenue Bond and Note Payable Obligations.

60.     **Restricted Revenue Bond and Note Payable Obligations** means, collectively, the (i) Water Enterprise Revenue Bond and Notes Payable Obligations; and (ii) Special Assessment and Special Tax Obligations.

61.     **Rights of Action** means any rights, claims, or causes of action owned by, accruing to, or assigned to the City pursuant to the Bankruptcy Code or pursuant to any contract, statute, or legal theory, including without limitation any rights to, claims, or causes of action for recovery under any policies of insurance issued to or on behalf of the City.

62.    **Risk Management Internal Service Fund** means the fund established by the City to accumulate resources for interdepartmental charges expended on self insurance for General Liability Claims and Workers Compensation Claims.

63.    **Secured Claim** means a Claim that is secured, in whole or in part, (a) by a lien that is not subject to avoidance or subordination under the Bankruptcy Code or applicable non-bankruptcy law; or (b) as a result of rights of setoff under section 553 of the Bankruptcy Code; but in any event only to the extent of the value, determined in accordance with section 506(a) of the Bankruptcy Code, of the holder's interest in the City's interest in property or to the extent of the amount subject to such setoff, as the case may be.

64.    **Series 1999 COPs** means the instruments entitled "Certificates of Participation (1999 Capital Improvement Project) Evidencing Direct, Undivided, Fractional Interests of the Owners Thereof in Lease Payments to be made by the City of Vallejo, California, as Rental for Certain Property Pursuant to a Lease Agreement with the Vallejo Public Financing Authority," currently evidencing aggregate principal components of unpaid lease payments in the amount of $3,785,000.

65.    **Series 2000 COPs** means the "Certificates of Participation (2000 Capital Improvement Project) Evidencing Direct, Undivided, Fractional Interests of the Owners Thereof in Lease Payments to be made by the City of Vallejo, California, as Rental for Certain Property Pursuant to a Lease Agreement with the Vallejo Public Financing Authority," currently evidencing aggregate principal components of unpaid lease payments in the amount of $22,050,000.

66.    **Series 2001 COPs** means the "Certificates of Participation (2001 Capital Improvement Project) Evidencing Direct, Undivided, Fractional Interests of the Owners Thereof in Lease Payments to be made by the City of Vallejo, California, as Rental for Certain Property Pursuant to a Lease Agreement with the Vallejo Public Financing Authority," currently evidencing aggregate principal components of unpaid lease payments in the amount of $9,490,000.

67. **Series 2002 COPs** means the "Certificates of Participation (2002 Capital Improvement Project) Evidencing Direct, Undivided, Fractional Interests of the Owners Thereof in Lease Payments to be made by the City of Vallejo, California, as Rental for Certain Property Pursuant to a Lease Agreement with the Vallejo Public Financing Authority," currently evidencing aggregate principal components of unpaid lease payments in the amount of $8,190,000.

68. **Series 2003 COPs** means the "Certificates of Participation (2003 Capital Improvement Project) Evidencing Direct, Undivided, Fractional Interests of the Owners Thereof in Lease Payments to be made by the City of Vallejo, California, as Rental for Certain Property Pursuant to a Lease Agreement with the Vallejo Public Financing Authority," currently evidencing aggregate principal components of unpaid lease payments in the amount of $6,132,760.

69. **SIR Claim** means a Workers Compensation Claim or General Liability Claim subject to the City's self insurance retention, which in the case of the City's insurance policies, means that the first $500,000 of any resolved claim against the City is an obligation of the City rather than an obligation of an insurance pool of which the City is a member.

70. **Special Assessment and Special Tax Obligations** means, collectively:

a. Vallejo Public Financing Authority, Local Agency Revenue Bonds (Hiddenbrooke Improvement District), 2004 Series A, originally issued in the aggregate principal amount of $22,400,000, of which $16,095,000 remains outstanding (which include underlying City assessment obligations securing the bonds);

b. Hiddenbrooke Improvement District No. 1998-1 of the City of Vallejo Improvement Bonds, 1998 Series A and Improvement Bonds, 1998 Series B (Federally Taxable), originally issued in the aggregate principal amount of $39,945,000, of which $16,095,000 remains outstanding;

c. Vallejo Public Financing Authority Local Agency Revenue Bonds 2003 Series B (Northeast Quadrant), originally issued in the aggregate principal amount of

$5,100,000, of which $825,000 remains outstanding (which include underlying City assessment obligations securing the bonds);

        d.      Vallejo Public Financing Authority Local Agency Revenue Bonds 2003 Series A (Glen Cove), originally issued in the aggregate principal amount of $10,800,000 of which $1,285,000 remains outstanding (which include underlying City assessment obligations securing the bonds);

        e.      Northeast Quadrant Improvement District No. 2003-1 of the City of Vallejo Improvement Bonds, 2003 Series A, originally issued in the aggregate principal amount of $8,170,000, of which $7,395,000 remains outstanding; and

        f.      Vallejo Public Financing Authority 1998 Limited Obligation Revenue Bonds (Fairgrounds Drive Assessment District Refinancing), originally issued in the aggregate principal amount of $6,055,000, of which $605,000 remains outstanding (which include underlying City assessment obligations securing the bonds).

69.    **Unclaimed Property** shall have the meaning ascribed to such phrase in Section VIII(C)(2).

70.    **Unimpaired** means a Claim that is not Impaired within the meaning of section 1124 of the Bankruptcy Code.

71.    **Uninsured Portion Claim** means the amount of a resolved Insured Claim in excess of the Insured Amount.

72.    **Union Bank** means Union Bank, N.A., as successor to Union Bank of California.

73.    **Union Bank COPs** means, collectively, the Series 2000 COPs, the Series 2001 COPs, the Series 2002 COPs and the Series 2003 COPs.

74.    **Unspent Proceeds** means, with respect to the Series 2000 COPs, the Series 2001 COPs and the Series 2002 COPs, the amount of original proceeds of such COPs, together with interest earnings thereon, held by the trustee for such COPs and remaining unspent as of January 18, 2011, which amounts are pledged to the respective COPs pursuant to the COPs Documents.  As of the date of this Plan, the amount of the Unspent Proceeds is as follows:

| Series | Unspent Proceeds Amount |
|--------|------------------------|
| 2000 | $ 222,400 |
| 2001 | $ 844,000 |
| 2002 | $5,071,000 |

75. **<u>Water Enterprise Revenue Bond and Notes Payable Obligations</u>** means, collectively:

a. City of Vallejo Variable Rate Demand Water Revenue Bonds, 2001 Series A, originally issued in the aggregate principal amount of $23,075,000, of which $19,305,000 remain outstanding;

b. City of Vallejo Water Revenue Refunding Bonds, Series 2006, originally issued in the aggregate principal amount of $45,790,000 of which $41,245,000 remain outstanding;

c. Loan from the United States Department of Commerce, Water Fund maturing on July 1, 2017, in the original principal amount of $2,560,923, of which $671,139 remains unpaid;

d. Loan from the State of California, Department of Water Resources maturing on January 1, 2025, in the original principal amount of $68,080, of which $49,358 remains unpaid; and

e. Loan from the State of California, Department of Water Resources maturing on January 2, 2021, in the original principal amount of $6,675,000, of which $3,842,825 remains unpaid.

76. **<u>Westamerica</u>** means Westamerica Bank.

77. **<u>Westamerica Lease</u>** means the lease agreement dated as of October 9, 1997, by and between the City and Municipal Leasing Associates, Inc. of which Westamerica is the assignee, under which remain aggregate principal components of unpaid lease payments in the approximate amount of $186,236.

78. **<u>Workers Compensation Claims</u>** means those Claims pursuant to California workers compensation law (California Labor Code section 3200 et *seq.*) of current and former City employees who have suffered an eligible injury while employed by the City.

**B.      Rules of Construction**.

The following rules of construction apply to this Plan:  (a) unless otherwise specified, all references in this Plan to "Sections" and "Exhibits" are to the respective Section in or Exhibit to this Plan, as the same may be amended or modified from time to time; (b) the headings in this Plan are for convenience of reference only and do no limit or otherwise affect the provisions of this Plan; (c) words denoting the singular number include the plural number and vice versa; (d) the rules of construction set forth in section 102 of the Bankruptcy Code apply; (e) in computing any period of time prescribed or allowed by this Plan, the provisions of Bankruptcy Rule 9006(a) apply; and (f) the words "herein," "hereof," "hereto," "hereunder," and others of similar import refer to this Plan as a whole and not to any particular Section, subsection, or clause contained in this Plan.

**II.      TREATMENT AND DEADLINE FOR THE ASSERTION OF ADMINISTRATIVE CLAIMS AND PROFESSIONAL CLAIMS**

**A.      Treatment of Administrative Claims.**

Except to the extent that the holder of an Allowed Administrative Claim agrees to a different treatment, the City or its agent shall pay to each holder of an Allowed Administrative Claim, in full satisfaction, release and discharge of such Claim, Cash in an amount equal to such Allowed Administrative Claim on the later of (i) the Effective Date, (ii) the date on which such Claim becomes an Allowed Administrative Claim, or as soon thereafter as is practicable.

**B.      Treatment of Professional Claims**.

Pursuant to section 943(a)(3) of the Bankruptcy Code, all amounts paid following the Effective Date or to be paid following the Effective Date for services or expenses in the Chapter 9 Case or incident to this Plan must be disclosed to the Bankruptcy Court and must be reasonable.  There shall be paid to each holder of a Professional Claim, in full satisfaction, release and discharge of such Claim, Cash in an amount equal to that portion of such Claim that the Bankruptcy Court approves as reasonable, on or as soon as reasonably practicable following the date on which the Bankruptcy Court enters an Order determining such reasonableness.  The City, in the ordinary course of its business, and without the requirement for Bankruptcy Court

approval, may pay for those attorney services rendered and those costs incurred following the Effective Date.

### C. Priority Claims In Chapter 9.

The only kind of priority claims incorporated into chapter 9 through Section 901 are Administrative Claims allowed under section 507(a)(2) of the Bankruptcy Code. The treatment of all such Administrative Claims is set forth above in Section II(A). No other kinds of priority claims set forth in section 507 of the Bankruptcy Code are recognized in chapter 9 cases, and Claims that would constitute administrative claims in a case under another chapter of the Bankruptcy Code are treated in chapter 9 and in this Plan as General Unsecured Claims.

### D. Deadline for the Filing and Assertion of Administrative Claims (Other Than Ordinary Course Administrative Claims) and Professional Claims.

**All requests for payment or any other means of preserving and obtaining payment of Administrative Claims (other than ordinary course Administrative Claims) that have not been paid, released, or otherwise settled, and all requests for approval of Professional Claims, must be filed with the Bankruptcy Court and served upon the City no later than thirty (30) days after the date on which the Notice of Effective Date is mailed.** Any request for payment of an Administrative Claim or a Professional Claim that is not timely filed by such date will be forever barred, and holders of such Claims shall be barred from asserting such Claims in any manner against the City.

## III. DESIGNATION OF CLASSES OF CLAIMS

Pursuant to section 1122 of the Bankruptcy Code, all Claims other than Administrative Claims and Professional Claims are classified for all purposes, including voting, confirmation, and distribution pursuant to this Plan, as follows:

- Class 1A – Claims Union Bank as sole holder of the Series 2000 COPs.
- Class 1B – Claims of Union Bank as sole holder of the Series 2001 COPs.
- Class 1C – Claims of Union Bank as sole holder of the Series 2002 COPs.
- Class 1D – Claims of Union Bank as sole holder of the Series 2003 COPs.

- Class 2A – Claims of the Indenture Trustee as trustee for the holders of the Series 1999 COPs.
- Class 2B - Claims of National as insurer of the Series 1999 COPs to the extent National is subrogated to the rights of the Indenture Trustee, or due payment by the City under the Financial Guaranty Agreement between National and the City, dated as of July 13, 1999, as a result of payment by National on the National Policies.
- Class 3 - Claims of the MPA Assignees under the MPA Lease.
- Class 4 - Claims of Westamerica under the Westamerica Lease.
- Class 5 - Claims of CalPERS with respect to the CalPERS Pension Plan, as trustee under the CalPERS Pension Plan for the benefit of CalPERS Pension Plan Participants.
- Class 6 - General Unsecured Claims
- Class 7 - General Liability Claims
- Class 8 - Workers Compensation Claims
- Class 9 - Restricted Revenue Bond and Note Payable Obligations

## IV. TREATMENT OF CLAIMS

### A. Class 1A through Class 1D, Inclusive – Claims of Union Bank With Respect to the Union Bank COPs.

#### 1. Impairment and Voting.

Classes 1A, 1B, 1C and 1D are Impaired by this Plan since the treatment of these Classes will affect the legal, equitable or contractual rights to Union Bank, the holder of Claims in these Class is entitled and, accordingly, each of these Classes is entitled to vote to accept or reject this Plan in accordance with the Plan Solicitation Order.

#### 2. Treatment.

The COPs Documents with respect to the Union Bank COPs will be amended and restated as a single lease/leaseback transaction effective on the Effective Date pursuant to the New Union Bank Documents. The City's required lease payments under the New Union Bank

Documents will be as set forth in Exhibit D.  In recognition of the MVLF Intercept guaranteeing the payment of the 2000 COPs, a portion of these payments, as shown in Exhibit D, will be deemed to be guaranteed by the City's election under California Government Code Section 37351.5, and the City will file any and all necessary notices with the Controller to give continuing effect to such election; *provided*, *however*, that no such new election or notice shall be deemed to provide Union Bank with any greater rights with respect to the MVLF Intercept than it would have had with respect to the Series 2000 COPs, nor shall it have any effect on any rights or remedies relating to MVLF Revenues that any other creditor of the City may have under the MVLF Intercept.  As to the JFK Library, the New Union Bank Documents will retain priority over the MPA Lease which shall be a form acceptable to Union Bank, the Authority and the City.

The City, the Authority and Union Bank will be required to approve the execution and delivery of the New Union Bank Documents, which shall be acceptable in form by each.  In addition, the Unspent Proceeds will be paid to Union Bank upon execution and delivery of the New Union Bank Documents on the Effective Date, and on such date Union Bank will surrender all of the Union Bank COPs for cancellation.  Upon cancellation, the Union Bank COPs and the COPs Documents shall be terminated and have no further force or effect, with the result being that there will be no fractionalized interest in the New Union Bank Documents.

**B.**     **Classes 2A and 2B – Claims of The Indenture Trustee and of National With Respect to the Series 1999 COPs**.

**1.**     **Impairment and Voting.**

Classes 2A and 2B are Impaired by this Plan since the treatment of these Classes will affect the legal, equitable or contractual rights of the holders of the Claims, and, accordingly, the holders of the Claims in each of these Classes are entitled to vote to accept or reject this Plan in accordance with the Plan Solicitation Order.  Pursuant to the terms of the indenture for the Series 1999 COPs, in the event of a default by the City with requires National to make a payment to the Indenture Trustee on behalf of the holders of the COPs, then, so long as National is not in default of its obligations under the applicable documents, National shall be entitled to control and direct the exercise of remedies available to holders against the City under such indenture,

including voting on a plan of adjustment. National has made a payment under the on account of the City's payment default, and National is not in default of its obligations thereunder and is thereby entitled to vote the interests of the holders of the Series 1999 COPs under the Plan. If National ceases to make payments or is in default of its obligations in the future, the Indenture Trustee shall nevertheless forbear from exercising any remedies under the indenture for the Series 1999 COPs so long as the City performs its obligations to make lease payments pursuant to the National Settlement Agreement.

## 2. **Treatment.**

National filed the National MVLF Adversary seeking to establish that it has the right to access the MVLF Intercept to recover payments due and unpaid with respect to the Series 1999 COPs. The City opposed the grant of such relief. The City, National and other parties entered into the National Settlement Agreement, a copy of which is Exhibit A[2]. Pursuant to the National Settlement Agreement, the City made [on or about February 1, 2011] an initial payment to National, the National MVLF Adversary will be dismissed with prejudice upon entry of a Final Order approving the National Settlement Agreement Motion, and the City will be required to make payments equal to 75% of the amounts due with respect to the Series 1999 COPs until fiscal year 2013-14, with full payments from fiscal year 2013-14 and thereafter, and will be required to make arrearage payments to National, with interest, from excess MVLF Revenues, if any, commencing on January 15, 2014. In addition to an initial payment in a compromised amount of attorney fees incurred by National, the City also will reimburse National for its reasonable attorney fees incurred in connection with the Chapter 9 Case on and after February 1, 2011.

The COPs Documents with respect to the Series 1999 COPs will be assumed by the City in the Assumption Motion, and will remain in full force and effect; provided that pursuant to the National Settlement Agreement, National and the Indenture Trustee will forebear from enforcing any remedies against the City or the real property leased under the COPs Documents for the Series 1999 COPs provided that the City honors its obligations under the

---

[2] In the event of any discrepancy between the terms of the Plan and the terms of the National Settlement Agreement, the terms of the National Settlement Agreement shall control.

National Settlement Agreement and this Plan. Because the COPs Documents for the Series 1999 COPs are not altered by this Plan or otherwise, the holders of the Series 1999 COPs remain entitled to payment in full of any shortfall as a result of the lower than contract payments made by the City under the National Settlement Agreement by virtue of National's obligations under the National Policies.

Pursuant to the National Settlement Agreement and this Plan, the City acknowledges that, in the event the City fails to honor its obligations to National or the Indenture Trustee under the National Settlement Agreement or this Plan, the City will not oppose the filing by the Indenture Trustee of a notice with the Controller to intercept MVLF Revenues or the payment of MVLF Revenues by the Controller to the Indenture Trustee or to National. The Controller has agreed that it will intercept such MVLF Revenues, pursuant to Section 37351.5 of the California Government Code; and pay such MVLF Revenues to the Indenture Trustee without further order of any court; *provided*, *however*, that nothing in this Plan or in the National Settlement Agreement shall have any effect on any rights or remedies relating to MVLF Revenues that Union Bank or any other creditor of the City may have under the MVLF Intercept.

**C.** **Class 3 - Claims of the MPA Assignees under the MPA Lease**.

**1.** **Impairment and Voting.**

Class 3 is Impaired by this Plan since the treatment of this Class will affect the legal, equitable or contractual rights of the holders of the Claims, and, accordingly, the holders of the Claims in this Class are entitled to vote to accept or reject this Plan in accordance with the Plan Solicitation Order.

**2.** **Treatment.**

The City will assume the MPA Lease, and in connection therewith, the schedule of the City's payment obligations under the MPA Lease shall be replaced by the New MPA Lease Payment Schedule, which reflects a reduction in the principal components of unpaid lease payments as well as the reduction of other of the City's obligations under the MPA Lease. In addition, the City will pay up to a maximum of $20,000 to the Peg Yorkin Living Trust, one of the MPA Lease Assignees, to cover attorney fees associated with the Chapter 9 Case and the

Plan. The documents with respect to the MPA Lease shall be junior in priority to the New Union

Bank Documents with respect to the JFK Library.

**D.**     <u>Class 4 - Claims of Westamerica under the Westamerica Lease</u>.

    **1.**     <u>Impairment and Voting.</u>

    Class 4 is not Impaired by this Plan because the treatment of this Class will not

affect the legal, equitable or contractual rights of the holder of the Claim, and, accordingly, the

holder of the Claim in this Class is not entitled to vote to accept or reject this Plan.

    **2.**     <u>Treatment.</u>

    The City will continue honor its obligations under the Westamerica Lease, and

WestAmerica retains all of its rights and remedies under applicable nonbankruptcy law.

**E.**     <u>Class 5 - Claims of CalPERS with Respect to the CalPERS Pension Plan, as Trustee Under the CalPERS Pension Plan for the Benefit of CalPERS Pension Plan Participants</u>.

    **1.**     <u>Impairment and Voting.</u>

    Class 5 is not Impaired by this Plan because the treatment of this Class will not

affect the legal, equitable or contractual rights of the holder of such Claims, and, accordingly, the

holder of the Claims in this Class is not entitled to vote to accept or reject this Plan.

    **2.**     <u>Treatment.</u>

    The City will continue to honor its obligations under the CalPERS Pension Plan,

and CalPERS as trustee and the CalPERS Pension Plan Participants retain all of their rights and

remedies under applicable nonbankruptcy law. Thus, CalPERS and the CalPERS Pension Plan

Participants will be entitled to the same rights and benefits to which they are currently entitled

under the CalPERS Pension Plan. CalPERS, pursuant to the CalPERS Pension Plan, will continue

to be made available to provide pension benefits for participants in the manner indicated under

the provisions of the CalPERS Pension Plan and remedies under applicable nonbankruptcy law.

**F.**     <u>Class 6 – General Unsecured Claims</u>

    **1.**     <u>Impairment and Voting.</u>

    Class 6 is Impaired by this Plan since the treatment of this Class will affect the

legal, equitable or contractual rights of the holders of the Claims, and, accordingly, the holders of

Claims in this Class are entitled to vote to accept or reject this Plan in accordance with the Plan Solicitation Order.

### 2. Treatment

Holders of Allowed General Unsecured Claims will share *pro rata* in distributions from the General Unsecured Claims Pool made on the Payment Dates.

**G. Class 7 – General Liability Claims**

### 1. Impairment and Voting.

Class 7 is Impaired by this Plan since the treatment of this Class will affect the legal, equitable or contractual rights of the holders of the Claims, and, accordingly, the holders of the Claims in this Class are entitled to vote to accept or reject this Plan in accordance with the Plan Solicitation Order.

### 2. Treatment.

The SIR Claim portion of each Allowed General Liability Claim will be paid on the Payment Dates from the Risk Management Internal Service Fund, and will receive the same percentage payment on the dollar of Allowed Claim as will the holders of Allowed Class 6 Claims. The Insured Portion of each Allowed General Liability Claim is not Impaired, and shall be paid by the applicable insurance pool.

**H. Class 8 –Workers Compensation Claims**

### 1. Impairment and Voting.

Class 8 is not Impaired by this Plan since the treatment of this Class will not affect the legal, equitable or contractual rights of the holders of the Claims, and, accordingly, the holders of the Claims in this Class are not entitled to vote to accept or reject this Plan in accordance with the Plan Solicitation Order.

### 2. Treatment.

The City must pay Allowed SIR Claims related to Worker Compensation Claims in full. If not, the City will lose its State workers compensation insurance for those claims in excess of the SIR, exposing the City's current and former workers at grave risk. The City will pay the SIR Claims related to Worker Compensation Claims from the Risk Management Internal

1  Service Fund.

2  **I.      Class 9 – Holders of Restricted Revenue Bonds and Note Payable Obligations.**

3       **1.      Impairment and Voting.**

4       Class 9 is not Impaired by this Plan since the treatment of this Class will not affect

5  the legal, equitable or contractual rights of the holders of the Claims, and, accordingly, the

6  holders of Claims in this Class are not entitled to vote to accept or reject this Plan in accordance

7  with the Plan Solicitation Order.

8       **2.      Treatment**

9       Class 9 consists of Claims of the holders of bonds and notes that are secured by

10  special and restricted sources of revenues and are not payable from the General Fund.

11       Water Enterprise Revenue Bond and Notes Payable Obligations.  The City's water

12  enterprise obligations are secured by a pledge of and lien on revenues of the City's water system,

13  which are restricted revenues pursuant to the State Constitution, and are "special revenues" as

14  defined in section 902(2) of the Bankruptcy Code.  These revenues are not a part of or available

15  to the General Fund, and the General Fund is not obligated to make any payment on the water

16  enterprise obligations.  The City may transfer amounts from the water enterprise fund to the

17  General Fund only to pay costs which are directly incurred by the General Fund to provide the

18  enterprise-related services.  Such transfers are treated by the enterprise as operation and

19  maintenance expenses.  The City will continue to apply revenues from the water system to the

20  payment of the water enterprise obligations as required by the terms of such obligations.

21       Special Assessment and Special Tax Obligations.  The City's special assessment

22  and special tax obligations are secured by certain special assessments and special taxes levied on

23  specific real property within the respected districts for which these obligations were issued.

24  These special assessment and special tax revenues are legally restricted to the payment of debt

25  service on the special assessment and special tax obligations, are "special revenues" as defined in

26  section 902(2) of the Bankruptcy Code, and cannot be used for any other purpose or be

27  transferred to the City's general fund.  The City's general fund is not obligated to pay debt service

28  on the special assessment and special tax obligations.  The City will continue to apply revenues

from the applicable special assessments and special taxes to pay the special assessment and special tax obligations as required by the terms of such obligations.

## V. ACCEPTANCE OR REJECTION; CRAM DOWN

### A. Voting of Claims.

Each holder of an Allowed Claim classified into Classes 1A, 1B, 1C, 1D, 2A, 2B, 3, 6 and 7 shall be entitled to vote each such Claim to accept or reject this Plan.

With respect to any Impaired Class of Claims that fails to accept this Plan, the City, as proponent of this Plan, intends to request that the Bankruptcy Court nonetheless confirm this Plan pursuant to the so-called "cram down" powers set forth in Bankruptcy Code section 1129(b).

## VI. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A. Assumption of Executory Contracts and Unexpired Leases.

As to any executory contract or unexpired lease that the City elects to assume, the City shall make the Assumption/Assignment Motion, which, if granted shall cause the City to assume such contracts and leases pursuant to order of the Bankruptcy Court.

### B. Cure Payments.

After the provision of notice and the opportunity for a hearing on the Assumption/Assignment Motion, in accord with the Bankruptcy Rules, the Bankruptcy Court shall resolve all disputes regarding: (a) the amount of any cure payment to be made in connection with the assumption of any contract or lease; (b) the ability of the City to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code under the contract or lease to be assumed; and (c) any other matter pertaining to such assumption and assignment. Any party to an executory contract or unexpired lease that is included in the Assumption/Assignment Motion that asserts that any payment or other performance is due as a condition to the proposed assumption shall file with the Bankruptcy Court and serve upon the City a written statement and accompanying declaration in support thereof, specifying the basis for its claim within such deadline and in the manner established for filing objections as shall be set forth in the Assumption/Assignment Motion. The failure to timely file and serve such a statement

in accordance with the instructions set forth in the Assumption/Assignment Motion shall be deemed to be a waiver of any and all objections to the proposed assumption and any claim for cure amounts of the agreement at issue.

**C.    Rejection of Executory Contracts and Unexpired Leases.**

The Rejection Motion shall seek authority to reject all executory contracts and unexpired leases that that the City in the exercise of its business judgment deems warranted.  The City anticipates rejecting any executory contract and unexpired lease that is not needed for it to continue operating as a City.

**D.    Claims Arising From Rejection**.

Proofs of Claims arising from the rejection of executory contracts or unexpired leases must be filed with the Bankruptcy Court and served on the City no later than thirty (30) days after the date on which notice of entry of the order approving the rejection is mailed.  Any Claim for which a proof of claim is not filed and served within such time will be forever barred and shall not be enforceable against the City or its assets, properties, or interests in property. Unless otherwise ordered by the Bankruptcy Court, all such Claims that are timely filed as provided herein shall be classified into Class 6 and treated accordingly.

**E.    Executory Contracts and Unexpired Leases Not Included in Motion**

The City is a party to over 1,000 executory contracts and unexpired leases.  It is reasonable to expect that due to accident or inadvertence, one or more will be omitted from the schedules that will be attached to the Assumption Motion and the Rejection Motion (collectively, "Omitted Agreements").  The Omitted Agreements, if any, shall be deemed assumed as of the Effective Date, provided, however, that any nondebtor party may, within 60 days of receiving notice from the City that such agreement is being assumed, file a motion in the Bankruptcy Court seeking an order reconsidering the assumption of the agreement.

**VII.    IMPLEMENTATION AND MEANS FOR IMPLEMENTATION OF THIS PLAN**

Following the Effective Date, the City will continue to operate pursuant to the City Charter, the Constitution of the State of California and other applicable laws.  While the City Council adopted the fiscal policies and projections in Five-Year General Fund Business Plan to

govern the allocation of the City's unrestricted resources, the City acknowledges and understands that financial plans and budgets are not fixed in stone, and that ongoing adjustments will have to be made during the course of the five years covered by the Five-Year General Fund Business Plan in order to enable the City to adjust to changing economic and operational needs. However, this Plan represents the City's commitment to the binding treatment of the holders of Claims in the various Classes as enumerated in this Plan.

**A. Claims and Causes of Action**.

All of the City's claims, causes of action, rights of recovery, rights of offset, recoupment rights to refunds and similar rights shall be retained by the City. The failure to list in the Disclosure Statement any potential or existing Right of Action retained by the City is not intended to and shall not limit the rights of the City to pursue any such action although the City acknowledges that it has no claims, causes of action, etc. against Union Bank with respect to the Union Bank COPs. Unless a Right of Action is expressly waived, relinquished, released, compromised or settled in this Plan, the City expressly reserves all Rights of Action for later adjudication and, as a result, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Rights of Action upon or after the confirmation or consummation of this Plan or the Effective Date. In addition, the City expressly reserves the right to pursue or adopt against any other entity any claims alleged in any lawsuit in which the City is a defendant or an interested party.

**VIII. DISTRIBUTIONS**

**A. Distribution Agent**.

On or after the Effective Date, the City may retain one or more agents to perform or assist it in performing the distributions to be made pursuant to this Plan, which agents may perform without bond. The City may provide reasonable compensation to any such agent(s) without further notice or Court approval.

**B. Delivery of Distributions**.

All distributions to any holder of an Allowed Claim shall be made at the address of

such holder as set forth in the books and records of the City or its agents, unless the City has been notified by such holder in a writing that contains an address for such holder different from the address reflected in its books and records. All distributions to with respect to Classes 1A, 1B, 1C, 1D, 2A, 2B and 3 shall be made in accordance with the New Union Bank Documents, the COPs Documents, the National Settlement Agreement and the New MPA Lease Payment Schedule, as appropriate.

### C. Undeliverable Distributions.

#### 1. Holding of Undeliverable Distributions.

If any distribution to any holders is returned to the City or its agent as undeliverable, no further distributions shall be made to such holder unless and until the City is notified in writing of such holder's then-current address. Unless and until the City is so notified, such distribution shall be deemed to be "Unclaimed Property" and shall be dealt with in accordance with Section VIII(C)(2).

#### 2. Unclaimed Property.

If any entity entitled to receive distributions pursuant to this Plan does not present itself on the Effective Date or on such other date on which such entity becomes eligible for distribution, such distributions shall be deemed to be "Unclaimed Property." Unclaimed Property shall be set aside and held in a segregated account to be maintained by the City pursuant to the terms of this Plan.

#### 3. Notification and Forfeiture of Unclaimed Property.

No later than 60 days after the first Payment Date, the City shall file with the Bankruptcy Court a list of Unclaimed Property, together with a schedule that identifies the name and last-known address of holders of the Unclaimed Property; the City otherwise shall not be required to attempt to locate any such entity. On the 60th day following the second Payment Date, all remaining Unclaimed Property and accrued interest or dividends earned thereon shall be remitted to and vest in the City.

### D. Distributions of Cash.

Any payment of Cash to be made by the City or its agent pursuant to this Plan

shall be made by check drawn on a domestic bank or by wire transfer, at the sole option of the City.

E. **Timeliness of Payments**.

Any payments or distributions to be made pursuant to this Plan shall be deemed to be timely made if made within 14 days after the dates specified in this Plan. Whenever any distribution to be made under this Plan shall be due on a day that is a Saturday, Sunday, or legal holiday, such distribution instead shall be made, without interest, on the immediately succeeding day that is not a Saturday, Sunday, or legal holiday, but shall be deemed to have been timely made on the date due.

F. **Compliance With Tax Requirements**.

The City shall comply with all tax withholding and reporting requirements imposed on it by any government unit, and all distributions pursuant to this Plan shall be subject to such withholding and reporting requirements. In connection with each distribution with respect to which the filing of an information return (such as Internal Revenue Service Forms W-2, 1099 or 1042) or withholding is required, the City shall file such information return with the Internal Revenue Service and provide any required statements in connection therewith to the recipients of such distribution, or effect any such withholding and deposit all moneys so withheld to the extent required by law. With respect to any entity from whom a tax identification number, certified tax identification number, or other tax information is required by law to avoid withholding has not been received by the City, the City at its sole option, may withhold the amount required and distribute the balance to such entity or decline to make such distribution until the information is received.

G. **Time Bar to Cash Payments**.

Checks issued by the City on account of Allowed Claims shall be null and void if not negotiated within 90 days from and after the date of issuance thereof. Requests for reissuance of any check shall be made directly to the City by the holder of the Allowed Claim with respect to which such check originally was issued. Any claim in respect of such a voided check shall be made on or before the second anniversary of the Effective Date. After such date, all Claims in

respect of voided checks shall be discharged and forever barred and the City shall retain all moneys related thereto.

**H.** **No *De Minimis* Distributions**.

Notwithstanding any other provision of this Plan, no Cash payment of less than ten dollars shall be made by the City on account of any Allowed Claim.

**I.** **No Distributions on Account of Disputed Claims.**

Notwithstanding anything to the contrary in this Plan, and consistent with Section IX.B, no distributions shall be made on account of any part of any Disputed Claim until such Claim becomes Allowed (and then only to the extent so Allowed). Distributions made after the Effective Date in respect of Claims that were not Allowed as of the Effective Date (but which later became Allowed) shall be deemed to have been made as of the Effective Date.

**J.** **No Postpetition Accrual.**

Except as provided in the National Settlement Agreement, unless otherwise specifically provided in this Plan or Allowed by order of the Bankruptcy Court, the City shall not be required to pay to any holder of a Claim any interest, penalty or late charge accruing with respect to such Claim on or after the Petition Date.

**IX.** **DISPUTED CLAIMS; OBJECTIONS TO CLAIMS; PROSECUTION OF OBJECTIONS TO DISPUTED CLAIMS**

**A.** **Claims Objection Deadline; Prosecution of Objections.**

The City shall have the right to object to the allowance of Claims filed with the Bankruptcy Court with respect to which liability or allowance is disputed in whole or in part. Unless otherwise ordered by the Bankruptcy Court, the City shall file and serve any such objections to Claims by not later than 180 days after the Effective Date (or, in the case of Claims lawfully filed after the Effective Date, by not later than 180 days after the date of filing of such Claims).

**B.** **Reserves, Payments, and Distributions With Respect to Disputed Claims.**

Prior to making a *pro rata* distribution to holders of Class 6 claims, the City shall reserve from the amount of the distribution a reserve for Class 6 Claims to the extent that such

Claims are Disputed Claims. The amount reserved for each such Claim shall be on the same *pro rata* basis as the distribution to Class 6, based upon the lesser of (a) the amount asserted by the holder of the Claim to be owing, and (b) such amount as the Bankruptcy Court may estimate for all distribution purposes upon motion of the City, which motion may be made initially or from time to time. Such reserves may be established and maintained by the City as accounting entries within the General Fund.

So long as the first or second Payment Date has occurred, at such time as a Disputed Claim becomes an Allowed Claim, in whole or in part, the City or its agent shall distribute to the holder thereof the distributions, if any, to which such holder is then entitled under this Plan. Such distributions, if any, shall be made as soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing such Disputed Claim becomes a Final Order (or such other date as the Claim becomes an Allowed Claim), but in no event more than 60 days thereafter. Unless otherwise specifically provided in this Plan or Allowed by order of the Bankruptcy Court, no interest shall be paid on Disputed Claims that later become Allowed Claims.

## X.  EFFECT OF CONFIRMATION

### A.  Discharge of the City.

Pursuant to Section 944 of the Bankruptcy Code, upon the Effective Date, the City shall be discharged from all debts (as defined in the Bankruptcy Code) of the City and Claims against the City other than (a) any debt specifically and expressly excepted from discharge by this Plan or the Confirmation Order, or (b) any debt owed to an entity that, before the Confirmation Date, had neither notice nor actual knowledge of the Chapter 9 Case; *provided*, *however*, that such discharge does not discharge the obligations contained in the National Settlement Agreement, the New Union Bank Documents or the New MPA Lease Payment Schedule.

The rights afforded in this Plan and the treatment of all Holders of Claims, be the Claims Impaired or Unimpaired under this Plan, shall be in exchange for and in complete satisfaction, discharge and release of all Claims of any nature whatsoever arising on or before the Effective Date, known or unknown, including any interest accrued or expenses incurred thereon

from and after the Petition Date, whether against the City or any of its properties, assets or interests in property.  Except as otherwise provided herein, upon the Effective Date, all Claims against the City that arose prior to the Confirmation Date ("Pre-Effective Date Claims") shall be and shall be deemed to be satisfied, discharged and released in full, be they Impaired or Unimpaired under this Plan.

**B.**     **Injunction**.

Except as otherwise expressly provided in this Plan, all entities who have held, hold or may hold pre-Effective Date Claims shall be permanently enjoined from and after the Effective Date, from: (a) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such pre-Effective Date Claim against the City or its property; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree or order against the City or its property with respect to such pre-Effective Date Claims; (c) creating, perfecting, or enforcing any lien or encumbrance of any kind against the City or its property; and (d) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due to the City with respect to any such pre-Effective Date Claim, except as otherwise permitted by section 553 of the Bankruptcy Code.

**C.**     **Term of Existing Injunctions or Stays.**

Unless otherwise provided, and as provided in the National Settlement Agreement, all injunctions or stays provided for in the Chapter 9 Case pursuant to sections 105, 362, or 922 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

**XI.     RETENTION OF AND CONSENT TO JURISDICTION**

Following the Effective Date, the Bankruptcy Court shall retain and have exclusive jurisdiction over any matter arising under the Bankruptcy Code and relating to the City, arising in or related to the Chapter 9 Case or this Plan, and otherwise, for the following:

1.     To resolve any matters related to the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease to which the City is a party or with respect to which the City may be liable, and to hear, determine and, if necessary,

liquidate, any Claims arising therefrom, including those matters related to the amendment after the Effective Date, and to add any executory contracts or unexpired leases to the Rejection Motion, as necessary;

2.      To enter such orders as may be necessary or appropriate to implement or consummate the provisions of this Plan, and all other contracts, instruments, releases, and other agreements or documents related to this Plan;

3.      To determine any and all motions, adversary proceeding, applications and contested or litigated matters that may be pending on the Effective Date or that, pursuant to this Plan, may be instituted by the City after the Effective Date or that are instituted by any holder of a Claim before or after the Effective Date concerning any matter based upon, arising out of, or relating to the Chapter 9 Case, whether or not such action initially is filed in the Bankruptcy Court or any other court;

4.      To ensure that distributions to holders of Allowed Claims are accomplished as provided herein;

5.      To hear and determine any objections to Claims or to proofs of Claim filed, both before and after the Effective Date, including any objections to the classification of any Claim, and to allow, disallow, determine, liquidate, classify, estimate or establish the priority of or secured or unsecured status of any Claim, in whole or in part;

6.      To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, reversed or vacated;

7.      To issue such orders in aid of execution of this Plan, to the extent authorized by section 1142(b) of the Bankruptcy Code;

8.      To consider any modifications of this Plan, to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order;

9.      To hear and determine all applications for awards of compensation for services rendered and reimbursement of expenses incurred prior to the Effective Date;

10. To hear and determine all disputes or controversies arising in connection with or relating to this Plan or the Confirmation Order or the interpretation, implementation, or enforcement of this Plan or the Confirmation Order or the extent of any entity's obligations incurred in connection with or released under this Plan or the Confirmation Order;

11. To issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation or enforcement of this Plan;

12. To determine any other matters that may arise in connection with or are related to this Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document related to this Plan or the Disclosure Statement, *provided, however*, that the Bankruptcy Court shall not have jurisdiction over any disputes relating to defaults after the Effective Date under the New Union Bank Documents;

13. To hear any other matter or for any purpose specified in the Confirmation Order that is not inconsistent with the Bankruptcy Code;

14. To hear and determine all disputes or controversies arising in connection with or relating to the terms or enforcement of the National Settlement Agreement; and

15. To enter a final decree closing the Chapter 9 Case.

## XII. CONDITIONS PRECEDENT

### A. Condition Precedent to Confirmation.

The entry of the Confirmation Order in form and substance satisfactory to the City, and is reasonably satisfactory to Union Bank, National and the Indenture Trustee, is a condition precedent to confirmation of this Plan.

### B. Conditions Precedent to Effective Date.

The "effective date of the plan," as used in section 1129 of the Bankruptcy Code, shall not occur, and this Plan shall be of no force and effect, until the Effective Date. The occurrence of the Effective Date is subject to the satisfaction (or waiver as set forth in Section XII(C)) of the following conditions precedent:

1.      **Confirmation Order**.  The Confirmation Order shall have been entered.

2.      **Documents**.  All agreements and instruments contemplated by, or to be entered into pursuant to, this Plan shall be in form and substance acceptable to the City shall have been duly and validly executed and delivered, or deemed executed by the parties thereto, and all conditions to their effectiveness shall have been satisfied or waived.

3.      **Timing**.  The Effective Date shall occur on the first day after which the conditions set forth in Sections XII(B)(1) and XII(B)(2) are satisfied or waived; provided that, unless otherwise ordered by the Bankruptcy Court, the Effective Date must occur by no later than six months after the Confirmation Date.

C.      **Waiver of Conditions to Effective Date**.

The City may waive in whole or in part any condition to effectiveness of this Plan.  Any such waiver of a condition may be effected at any time, without notice or leave or order of the Bankruptcy Court and without any formal action, other than the filing of a notice of such waiver with the Bankruptcy Court.

D.      **Effect of Failure of Conditions**.

In the event that the conditions to effectiveness of this Plan have not been timely satisfied or waived, and upon notification submitted by the City to the Bankruptcy Court (a) the Confirmation Order shall be vacated, (b) no distributions under this Plan shall be made, (c) the City and all holders of Claims shall be restored to the *status quo* as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred, and (d) all of the City's obligations with respect to the Claims shall remain unchanged and nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against the City or any other entity or to prejudice in any manner the rights of the City or any entity in any further proceedings involving the City.

## XIII.   **MISCELLANEOUS PROVISIONS**

A.      **Dissolution of the Committee**.

On the Effective Date, the Committee shall be released and discharged of and from all further authority, duties, responsibilities and obligations relating to and arising from and in

connection with the Chapter 9 Case and the Committee shall be deemed dissolved and its

appointment terminated.  The professionals retained by the Committee and the members thereof

shall not be entitled to compensation or reimbursement of expenses for any services rendered or

expenses incurred after the Effective Date, except for services rendered and expenses incurred in

connection with any applications by such professionals or committee members for allowance of

Professional Claims timely filed after the Effective Date as provided in this Plan.

**B.** **Severability**.

If, prior to the Confirmation Date, any term or provisions of this Plan is held by

the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, with the

consent of the City, shall have the power to alter and interpret such term or provision to make it

valid or enforceable to the maximum extent practicable, consistent with the original purpose of

the term or provision held to be invalid, void or unenforceable, and such term or provision shall

then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or

interpretation, the remainder of the terms and provisions of this Plan shall remain in full force and

effect and shall in no way be affected, impaired or invalidated by such holding, alteration or

interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide

that each term and provision of this Plan, as it may have been altered or interpreted in accordance

with the foregoing, is valid and enforceable pursuant to its terms.

**C.** **Governing Law.**

Except to the extent that the Bankruptcy Code or other federal law is applicable, or

to the extent that an Exhibit hereto or Plan Document provides otherwise, the rights, duties and

obligations arising under this Plan shall be governed by, and construed and enforced in

accordance with, the laws of the State of California, without giving effect to principles of

conflicts of laws.

**D.** **Effectuating Documents and Further Transactions**.

Each of the officials and employees of the City is authorized to execute, deliver,

file, or record such contracts, instruments, releases, indentures, and other agreements or

documents and take such actions as may be necessary or appropriate to effectuate and further

evidence the terms and provisions of this Plan.

E.      **Notice of Effective Date**.

On or before 10 days after occurrence of the Effective Date, the City or its agent shall mail or cause to be mailed to all holders of Claims a Notice that informs such holders of: (a) entry of the Confirmation Order; (b) the occurrence of the Effective Date; (c) the assumption and rejection of the City's executory contracts and unexpired leases pursuant to this Plan, as well as the deadline for the filing of Claims arising from such rejection; (d) the deadline established under this Plan for the filing of Administrative Claims; (e) the procedures for changing an address of record pursuant to Section XIII(B); and (f) such other matters as the City deems to be appropriate.

DATED:  January 18, 2011                    CITY OF VALLEJO, CALIFORNIA


By:    /s/  Phil Batchelor
                                            Phil Batchelor
                                            City Manager



Submitted By:
_____

ORRICK, HERRINGTON & SUTCLIFFE LLP


          /s/ Marc A. Levinson
_____
Marc A. Levinson
Norman C. Hile
John H. Knox
John W. Killeen
Attorneys for the City of Vallejo

# EXHIBITS TO PLAN FOR THE ADJUSTMENT OF DEBTS OF CITY OF VALLEJO, CALIFORNIA, DATED JANUARY 18, 2011

**EXHIBIT A**   National Settlement Agreement

**EXHIBIT B**   New MPA Lease Payment Schedule

**EXHIBIT C**   Schedule of Union Bank Leased Property

**EXHIBIT D**   Schedule of New Union Bank Lease Payments

OHS WEST:261065460.5

# Exhibit A

# SETTLEMENT AGREEMENT

This Settlement Agreement (the "Settlement Agreement") is entered into as of the 25th day of January 2011, by and among

(1)    National Public Finance Guarantee Corporation ("National");

(2)    The City of Vallejo, California (the "City"); and

(3)    The Controller for the State of California (the "Controller") with respect to Sections 1, 3 and 7 only.

Where applicable, National, the City and the Controller are hereinafter individually and collectively referred to as each "Party" or as the "Parties."

## Recitals

WHEREAS, National[1] insures the Vallejo Public Financing Authority Certificates of Participation (1999 Capital Improvements Project) ("1999 COPs"), for which Wells Fargo Bank, N.A. acts as trustee (the "Trustee") pursuant to the Trust Agreement dated as of July 1, 1999 (the "Trust Agreement").;

WHEREAS, National has also issued a Surety Bond pursuant to a Financial Guaranty Agreement with the City, dated as of July 13, 1999 (the "Financial Guaranty Agreement");

WHEREAS, the proceeds of the 1999 COPs funded the construction of Fire Station #7; financed improvements to Fire Station #1, 2, 3, 4, 5 and 6; and provided upgrades to the fire and police communications systems, among other capital improvement projects within the City;

WHEREAS, the Vallejo Public Financing Authority (the "Authority") leased the foregoing properties and improvements to the City pursuant to a Lease Agreement dated as of

---

[1] National represents that it is a stock insurance corporation, duly organized and existing under the laws of the State of New York, and is the reinsurer pursuant to the Quota Share Reinsurance Agreement, effective as of January 1, 2009, by and between MBIA Insurance Corporation ("MBIA") and MBIA Insurance Corp. of Illinois, now known as National Public Finance Guarantee Corporation. MBIA insured the 1999 COPs and issued a Debt Service Reserve Surety Bond (the "Surety Bond") upon their original issuance.

July 1, 1999 (the "Lease Agreement");

WHEREAS, the Authority assigned its interest under the Lease Agreement to the Trustee pursuant to an Assignment Agreement dated as of July 1, 1999;

WHEREAS, by Resolution adopted by the City Council on June 22, 1999, the City notified the Controller that it elected to provide a guarantee to the lease payments supporting the 1999 COPs pursuant to California Government Code § 37351.5 (the "Intercept Act") from Motor Vehicle License Fees and successor taxes (collectively, "VLFs") allocated from time-to-time by the State of California to the City;

WHEREAS, on May 23, 2008 (the "Petition Date"), the City commenced a case under chapter 9 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of California (the "Bankruptcy Court"), Case No. 08-26813 (the "Bankruptcy Case");

WHEREAS, on May 1, 2009, the City gave notice to the Trustee that it was suspending lease payments owed to the Trustee for the benefit of the holders of the 1999 COPs for the remainder of Fiscal Year 2008-2009 and has continued to suspend such lease payments (the "Lease Default");

WHEREAS, as of the date of this Settlement Agreement, the Trustee has filed or will file claims with National that National has paid as draws on the Surety Bond held in the debt service reserve established under the Trust Agreement in the aggregate amount of approximately $303,440, plus accrued interest;

WHEREAS, National has incurred significant attorney's fees and expenses in connection with the Bankruptcy Case and the Lease Default and provided documentation thereof to the City;

WHEREAS, National has commenced an Adversary Proceeding against the City (No. 10-

02722) (the "Adversary Proceeding") in the Bankruptcy Case seeking, among other things, to enforce the Intercept Act and the Controller has moved to intervene in the Adversary Proceeding;

WHEREAS, the Parties wish to settle all claims, resolve any and all issues among them without the expense and inconvenience associated with further litigation and put any and all claims, related or unrelated, finally to rest;

WHEREAS, the City filed its proposed plan of adjustment (the "Plan") on or about January 18, 2011 and the agreement between National and the City memorialized herein is incorporated into the Plan;

NOW, THEREFORE, in full and final settlement of any and all claims, in consideration of the promises and mutual agreements herein contained, and intending to be legally bound and achieve the utmost of finality, the Parties agree as follows:

(1)     Acknowledgement. The City and the Controller acknowledge and agree that (i) the Intercept Act has been triggered by the failure of the City to pay the scheduled amounts due under the Lease Agreement for the benefit of the 1999 COPs and (ii) the Trustee, for the benefit of the 1999 COPs, is entitled to the VLFs pursuant to the Intercept Act, subject to the terms of this Settlement Agreement;

(2)     Settlement Payments.

        (a)     Initial Payment. On or before January 31, 2011, the City shall pay National $248,462 by wire transfer of immediately available funds, which is equal to 75% of the principal amount of National's current outstanding claim of $303,440 plus accrued interest, with the unpaid balance thereof (the "Default Balance") to be included in the Shortfall Indebtedness (as defined below). National shall not contest the receipt and application of VLFs by the City from the Petition Date through the date of this Settlement Agreement.

        (b)     Forbearance Period; Future Payment. For the fiscal years 2010-11 (for that portion commencing on February 1, 2011), 2011-12 and

2012-13 (the "<u>Forbearance Period</u>"), the City shall pay the Trustee an amount equal to 75% of the scheduled amount due under the Lease Agreement for the benefit of the 1999 COPs as and when due. Subject thereto, National shall instruct the Trustee to forbear with respect to recovery of any shortfall on payments due from the City under the Lease Agreement for the benefit of the 1999 COPs (the "<u>Lease Shortfall</u>").

(c)     <u>Shortfall Indebtedness</u>. The Lease Shortfall and the Default Balance shall accrue and bear interest at a rate equal to the weighted average coupon payable on the 1999 COPs, namely 5.25% per annum and shall be referred to herein collectively as the "<u>Shortfall Indebtedness.</u>"

(d)     <u>Payments After July 1, 2013</u>. Commencing on July 1, 2013 (the first day of the City's 2013-2014 fiscal year), the City shall timely pay the Trustee the full scheduled amount as and when due under the Lease Agreement for the benefit of the 1999 COPs, and commencing on January 15, 2014 additionally shall pay National, on January 15 and July 15 of each year, an amount equal to (a) 100% of all VLFs to which the City would be entitled under the California Revenue and Taxation Code during the previous 6 months <u>minus</u> (b) the amount paid to the Trustee under the Lease Agreement for the same period, provided that the VLFs exceed the total amounts due under the Lease Agreement for such period. The funds paid to National in excess of the amounts due under the Lease Agreement shall be referred to herein as the "<u>VLF Catch-up Payment</u>." For the avoidance of doubt, the City's obligation to pay amounts due under the Lease Agreement for the benefit of the 1999 COPs shall not be dependent on the City's receipt of VLFs in any amount.

(e)     <u>Application of VLF Catch-up Payment</u>. The VLF Catch-up Payment shall be applied to the Shortfall Indebtedness until paid in full. For the avoidance of doubt, each VLF Catch-Up Payment shall be applied to the Shortfall Indebtedness in the following order of priority: (i) interest and (ii) principal. To the extent that the Shortfall Indebtedness is not paid in full by the time of the last scheduled payment under the Lease Agreement, the City shall pay the unpaid balance of the Shortfall Indebtedness to National no later than January 15, 2030.

(f)     <u>Reimbursement of National's Attorney's Fees</u>. On or before January 31, 2011 the City shall reimburse National for its attorney's fees and expenses accrued through January 31, 2011 by wire transfer of immediately available funds in the amount of

$400,000 as a compromise and settlement of National's significantly larger reimbursement claim. The City further agrees to reimburse National for all of its reasonable attorney's fees and expenses incurred in connection with the Bankruptcy Case accrued from February 1, 2011 promptly upon receipt of documentation thereof.

(3)     <u>Future Default by City</u>.  If the City fails to perform any of its obligations under this Settlement Agreement (a "<u>City Default</u>"), the City agrees that (a) any act by National or the Trustee that informs the Controller of the City's nonpayment under the 1999 COPs pursuant to the Intercept Act or otherwise shall not be deemed a violation of the automatic stay under Section 362 of the Bankruptcy Code and (b) the City will not oppose payment by the Controller of VLFs to National or the Trustee under the Intercept Act.  The Controller acknowledges that upon a City Default the Controller will comply with the statutory requirements of the Intercept Act and pay VLFs to the Trustee without further notice or order of any court; provided, however, that nothing in this Section 3 shall have any effect on any rights or remedies relating to the VLFs that any other creditor of the City may have under the Intercept Act.

(4)     <u>Union Bank Claims</u>.  The City represents, acknowledges and agrees that the terms of this Settlement Agreement are not inconsistent with any compromise, settlement or proposed Plan treatment of the claims filed by or on behalf of Union Bank (the "<u>UB Claims</u>") in the Bankruptcy Case.

(5)     <u>Incorporation of Terms in Plan</u>.  The Plan and any other plan of adjustment filed or to be filed by the City in the Bankruptcy Case shall incorporate terms that are consistent with the terms herein, including, without limitation, acknowledgment by the City that the Trustee is entitled to receipt of VLFs under the Intercept Act as contemplated herein, and disclosing the settlement and/or adjustment of the UB Claims, and such terms shall be subject to National's review and approval prior to filing by the City (such Plan terms, as approved by National, are

referred to herein as the "<u>Plan Settlement Terms</u>").

(6)     <u>Rule 9019 Motion/Adversary Proceeding</u>.  Upon execution of this Settlement Agreement, the City and National shall promptly file a motion for approval of this Settlement Agreement pursuant to Federal Rule of Bankruptcy Procedure 9019 (the "<u>Rule 9019 Motion</u>").  Any hearings on motions in the Adversary Proceeding, including National's Motion for Summary Judgment and the Controller's Motion to Intervene, and the Rule 9019 Motion shall be adjourned and continued until confirmation of a plan of adjustment in the Bankruptcy Case is approved or denied, or until the Plan is withdrawn (without the filing of an amended plan of adjustment).  Upon entry of a final, non-appealable order approving the Plan or of another plan of adjustment containing the Plan Settlement Terms, the Parties shall seek approval of the Rule 9019 Motion and, upon entry of a final, non-appealable order approving the Rule 9019 Motion, the Adversary Proceeding shall be dismissed.

(7)     <u>Termination</u>.  The City acknowledges and agrees that (i) if a plan of adjustment is confirmed that does not contain the Plan Settlement Terms, (ii) if a plan of adjustment containing the Plan Settlement Terms is withdrawn and not replaced by an amended plan of adjustment which contains the Plan Settlement Terms, or (iii) if no plan of adjustment is confirmed and the Bankruptcy Case is dismissed, then the Rule 9019 Motion shall be withdrawn, this Settlement Agreement shall terminate and National may prosecute the Adversary Proceeding and take such other actions that it deems appropriate.  In no event will any payments made by the City to National or the Trustee hereunder be repaid or refunded to the City, provided that payments made under Sections 2(a), (b), (d) and (f) hereunder shall be credited to the City's indebtedness to National.

(8)     <u>Reporting Requirements</u>.  While any obligations of the City hereunder are

outstanding:

       (a)    <u>VLF Notices</u>.  At the time of its semi-annual shortfall indebtedness payment to National, as required in Section 2(d) hereof, the City shall submit copies of the monthly VLF remittance notices received from the Controller for the periods covered by such payment; and

       (b)    <u>On-Going Information</u>.  As soon as they become available to the public, the City will forward to National (i) its annual general fund budget, (ii) any mid-year or other update to the annual general fund budget, and (iii) its annual audited financial statements.  The City agrees to promptly comply with National's reasonable requests for additional information regarding the City.

All such notices, information and certificates shall be deemed effective upon personal delivery or e-mail delivery or within five (5) days after deposit with the United States Postal Service by Certified Mail, postage prepaid, return receipt requested, and addressed to:

       National Public Finance Guaranty Corporation
       113 King Street
       Armonk, New York 10504

       Att:    Gary Saunders, Esq.
              Deputy General Counsel

       E-mail:   gary.saunders@optinuityar.com

(9)    <u>Releases</u>.  Upon entry of a final, non-appealable order of the Bankruptcy Court approving the Rule 9019 Motion and except as otherwise provided in this Settlement Agreement, National, the City and  the Controller shall each forever release and discharge each other and each other's predecessors, successors, assigns, partners, executive members, members, officers, managers, employees, representatives, attorneys, agents, divisions, subsidiaries, affiliates (and past and present partners, executive members, members, officers, managers, employees, agents, representatives and attorneys of such divisions, subsidiaries, and affiliates), executors, or administrators, and all persons acting by, through, under or in concert with any of them, from

any and all charges, complaints, claims, liabilities, obligations, promises, agreements, controversies, damages, actions, causes of action, suits, rights, demands, costs, losses, debts and expenses (including attorneys' fees and costs actually incurred) of any nature whatsoever, in law or equity, known or unknown, suspected or unsuspected, that the Parties ever had, now have or hereafter can, shall or may have, for, upon, or by reason of any matter, cause or thing whatsoever with respect to National's claims in connection with the 1999 COPs. Notwithstanding anything in this Settlement Agreement to the contrary, the right of the Parties to enforce any of the terms of this Settlement Agreement and the matters set forth in Section 7 herein shall survive this release.

(10)   Rule of Ambiguities.  Each Party agrees that this Settlement Agreement was authored by all of the Parties, and that this Settlement Agreement does not constitute the exclusive written product of any Party.

(11)   No Modification.  No waiver or modification of this Settlement Agreement or any term hereof shall be binding unless it is in writing and signed by each Party affected thereby or its expressly authorized representatives.

(12)   Choice of Law.  This Agreement shall be construed and interpreted, and the rights of the Parties shall be determined, in accordance with the laws of the State of California, without giving effect to any provision thereof that would require the application of the substantive laws of any other jurisdiction, except to the extent that such laws are superseded by the Bankruptcy Code.

(13)   Jurisdiction.  Without limiting any Party's right to appeal any order of the Bankruptcy Court, (i) provided that no plan of adjustment has been confirmed and the Bankruptcy Case has not been dismissed before any action or proceeding respecting this

Settlement Agreement has been commenced, the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Settlement Agreement and to decide any claims or disputes which may arise or result from, or be connected with this Settlement Agreement, any breach of default hereunder, or the transactions contemplated hereby, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court.  If the Bankruptcy Case is dismissed without the confirmation of a plan of adjustment, then any such proceeding may be commenced in any state or federal court of competent jurisdiction located in the State of California.

(14)    Further Assurances.  Each of the Parties hereto will execute, acknowledge and deliver any further assurances, documents and instruments and take such other actions as reasonably requested by any other Party hereto for the purpose of giving effect to the transactions contemplated herein or the intentions of the Parties with respect thereto.

(15)    Benefit and Burden.  This Settlement Agreement shall be binding upon, and inure to the benefit of, the Parties hereto and their respective representatives, successors, agents and assigns.

(16)    Voluntary Execution.  The Parties hereby acknowledges that they have read and that they understand the foregoing Settlement Agreement and that they have affixed their signature hereto voluntarily and without coercion.

(17)    Counterparts.  This Settlement Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all counterparts so executed shall constitute one agreement binding on all of the Parties hereto, notwithstanding that all of the Parties are not signatory to the same counterpart.  This Settlement Agreement may be executed

either by original or facsimile, either of which will be equally binding.

(18)    Entire Agreement.  All agreements, covenants, representations and warranties, express or implied, oral or written, of the Parties hereto concerning the subject matter hereof are contained herein.  No other agreements, covenants, representations or warranties, express or implied, oral or written, have been made by any party hereto to any other party concerning the subject matter hereof.  All prior and contemporaneous conversations, negotiations, possible and alleged agreements, representations, covenants and warranties concerning the subject matter hereof are merged herein.  This is an integrated Settlement Agreement.

(19)    Authority.  The undersigned signatories hereto each represent and warrant that they have the authority to execute this Settlement Agreement and to bind the Parties to this Settlement Agreement upon whose behalf they are executed.

(20)    Representation by Counsel.  The Parties acknowledge that they consulted with their attorneys concerning the releases and waivers contained in this Settlement Agreement and that the releases and waivers they have made herein are knowing, conscious and with full appreciation that they are forever foreclosed from pursuing any of the rights so waived.

(21)    Bankruptcy Court Approval.  This Settlement Agreement is expressly subject to approval of the Bankruptcy Court and, except as provided in Sections 1, 2(a) and (f), 6 and 7 hereof which are immediately binding and enforceable, shall have no force or effect unless and until so approved by the Bankruptcy Court.

<table>
<tr><td></td><td>National Public Finance Guarantee</td></tr>
<tr><td>Dated:  January __, 2011</td><td>Corporation</td></tr>
</table>

By:  _____

The City of Vallejo, California

Dated:  January __, 2011

By:  _____

The Controller for the State of California
with respect to Sections 1, 3 and 7 only

Dated:  January __, 2011

By:  _____

## ACKNOWLEDGEMENT OF TRUSTEE

Wells Fargo Bank, N.A., as Indenture Trustee for the 1999 COPs ("Wells"), acknowledges that it has read and understands this Settlement Agreement.  It agrees that the provisions of Section 2(b) hereof constitute an instruction by National to forebear from exercising any remedies with respect to the Lease Shortfall, and that it will comply with such instruction until further instruction is given by National.  Wells reserves the right to demand an appropriate indemnity from National in accord with the provisions of the Indenture for both this instruction and any future instruction.

Wells Fargo Bank, N.A., solely in its capacity as Trustee for the 1999 COPs

By:_____
    Virginia A. Housum, Vice President



Exhibit B

## Exhibit B - Schedule of New MPA Lease Payments

| Payment Date | Payment Amount |
|---|---|
| 12/1/2011 | 0 |
| 6/1/2012 | 0 |
| 12/1/2012 | 0 |
| 6/1/2013 | 0 |
| 12/1/2013 | 0 |
| 6/1/2014 | 0 |
| 12/1/2014 | 50,732 |
| 6/1/2015 | 50,732 |
| 12/1/2015 | 50,732 |
| 6/1/2016 | 50,732 |
| 12/1/2016 | 50,732 |
| 6/1/2017 | 50,732 |
| 12/1/2017 | 50,732 |
| 6/1/2018 | 50,732 |
| 12/1/2018 | 50,732 |
| 6/1/2019 | 50,732 |
| 12/1/2019 | 50,732 |
| 6/1/2020 | 50,732 |
| 12/1/2020 | 50,732 |
| 6/1/2021 | 50,732 |
| | |
| Total: | 710,248 |



# Exhibit C

EXHIBIT C

DESCRIPTION OF LEASED PROPERTIES
(Union Bank COPs and MPA Lease)

| **Property Description** | **Address** |
|---|---|
| **Series 2000 COPs** | |
| City Hall | 555 Santa Clara Street |
| John F. Kennedy Library | 505 Santa Clara Street |
| Corp. Yard (excluding Police) | 111 Amador Street |
| Florence Douglas Senior Center | 333 Amador Street |
| Naval Museum | 734 Marin Street |
| Community Center | 401 Amador Street |
| So. Vallejo Community Center | 545 Magazine Street |
| Transit Yard (VCTC Facility) | 1850 Broadway Street |
| Ball Field | No Addresss |
| **Series 2001 COPs** | |
| Blue Rock Springs Golf Course | 655 Columbus Parkway |
| **Series 2002 COPs** | |
| Vacant Land (at Glen Cove) | APN: 0079-220-070 |
| Vacant Land (at Hiddenbrooke) | APN: 0182-060-030 |
| Vacant Land (at Hiddenbrooke) | APN: 0182-060-040 |
| Vacant Land (at Hiddenbrooke) | APN: 0182-060-430 |

| Property Description | Address |
|---|---|
| Vacant Land (at Hiddenbrooke) | APN: 0182-280-020 |
| Vacant Land (at Hiddenbrooke) | APN: 0182-280-120 |
| Fire Station #27 | 1585 Ascot Court |

## Series 2003 COPs

| | |
|---|---|
| Vacant Land (at Glen Cove) | APN: 0079-340-020 |
| Vacant Land (at Glen Cove) | APN: 0079-330-290 |
| Naval Museum | 734 Marin Street |

## MPA Lease

| | |
|---|---|
| John F. Kennedy Library | 505 Santa Clara Street |



# Exhibit D

## Exhibit D - Schedule of New Union Bank Lease Payments

| Payment Date | Payment Amount | MVLF Intercept Portion |
|---|---|---|
| 1/1/2012 | 1,185,938 | 632,695 |
| 1/1/2013 | 1,120,604 | 566,592 |
| 1/1/2014 | 1,382,872 | 696,655 |
| 1/1/2015 | 1,864,604 | 980,395 |
| 1/1/2016 | 1,864,604 | 980,395 |
| 1/1/2017 | 1,864,604 | 980,395 |
| 1/1/2018 | 1,864,604 | 980,395 |
| 1/1/2019 | 1,864,604 | 980,395 |
| 1/1/2020 | 1,864,604 | 980,395 |
| 1/1/2021 | 1,864,604 | 980,395 |
| 1/1/2022 | 1,864,604 | 980,395 |
| 1/1/2023 | 1,864,604 | 980,395 |
| 1/1/2024 | 1,864,604 | 980,395 |
| 1/1/2025 | 1,698,666 | 980,395 |
| 1/1/2026 | 1,698,666 | 980,395 |
| 1/1/2027 | 1,731,432 | 996,644 |
| 1/1/2028 | 1,741,210 | 1,001,493 |
| 1/1/2029 | 1,741,041 | 1,001,409 |
| 1/1/2030 | 1,733,654 | 997,745 |
| 1/1/2031 | 2,054,666 | 1,156,941 |
| 1/1/2032 | 2,054,666 | 1,156,941 |
| 1/1/2033 | 2,054,666 | 1,156,941 |
| 1/1/2034 | 2,054,666 | 1,156,941 |
| 1/1/2035 | 2,054,666 | 1,156,941 |
| 1/1/2036 | 2,054,666 | 1,156,941 |
| 1/1/2037 | 1,449,220 | 902,182 |
| 1/1/2038 | 1,054,666 | 661,024 |
| 1/1/2039 | 1,054,666 | 661,024 |
| 1/1/2040 | 1,054,666 | 661,024 |
| 1/1/2041 | 1,054,666 | 678,713 |
| 1/1/2042 | 403,337 | 48,670 |
| | | |
| Total: | 51,079,351 | 28,212,250 |