**FILED**

**May 20, 2011**

CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

0003508767

**95**

MARC A. LEVINSON (SBN 57613)
NORMAN C. HILE (SBN 57299)
JOHN H. KNOX (SBN 129777)
JOHN W. KILLEEN (SBN 258395)
ORRICK, HERRINGTON & SUTCLIFFE LLP
400 Capitol Mall, Suite 3000
Sacramento, CA 95814
Telephone:    (916) 447-9200
Facsimile:    (916) 329-4900
malevinson@orrick.com
nhile@orrick.com
jknox@orrick.com
jkilleen@orrick.com

Attorneys for Debtor
City of Vallejo

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| In re:<br><br>CITY OF VALLEJO, CALIFORNIA,<br><br>          Debtor | **Case No. 2008-26813**<br><br>**DC No. OHS-10**<br><br>**Chapter 9**<br><br>**DISCLOSURE STATEMENT WITH RESPECT TO SECOND AMENDED PLAN FOR THE ADJUSTMENT OF DEBTS OF CITY OF VALLEJO, CALIFORNIA, DATED MAY 20, 2011**<br><br>**Date:   May 26, 2011[1]**<br>**Time:  10:00 a.m.**<br>**Dept:  A**<br>**Judge: Hon. Michael S. McManus** |

---

[1] At a hearing on May 9, 2011, the Court specially set a hearing for any objections to the adequacy of this Disclosure Statement on May 26, 2011, at 10:00 a.m.

**TABLE OF CONTENTS**

|  |  |  | **Page** |
|---|---|---|---|
| I. | | INTRODUCTION | 6 |
| | A. | The Purpose of This Disclosure Statement | 6 |
| | B. | Summary of Entities Entitled to Vote on the Plan and of Certain Requirements Necessary for Confirmation of the Plan | 7 |
| | C. | Voting Procedures, Balloting Deadline, Confirmation Hearing, and Other Important Dates, Deadlines, and Procedures | 8 |
| | | 1. Voting Procedures and Deadlines | 8 |
| | | 2. Date of the Confirmation Hearing and Deadlines for Objection to Confirmation of the Plan | 9 |
| | D. | Important Notices and Cautionary Statements | 9 |
| | E. | Additional Information | 11 |
| II. | | BACKGROUND INFORMATION | 11 |
| | A. | The City | 11 |
| | B. | The City's Financial Problems | 11 |
| III. | | ADMINISTRATION OF THE CITY'S CHAPTER 9 CASE | 13 |
| | A. | Pendency Plans | 13 |
| | B. | Eligibility Litigation | 14 |
| | C. | Motion for Rejection of Collective Bargaining Agreements & Subsequent Agreements Between the City and its Bargaining Units | 14 |
| | D. | Formation of the Committee to Represent Retirees | 16 |
| | | 1. City's and Committee's Dispute Over Certain Claims of Retirees | 16 |
| | | 2. Litigation Between the City and the Committee | 17 |
| | | 3. City's Objection to Health Benefit Claims of Certain Retirees | 18 |
| | E. | Participation of Union Bank and of National Public Finance Guarantee Corporation, which Credit-Enhanced the Series 1999 COPs | 19 |
| | F. | Alco Litigation | 20 |
| | G. | Motions for Relief From Stay to Pursue General Liability Claims | 21 |
| IV. | | THE CITY'S LIABILITIES AND ASSETS | 21 |
| | A. | Liabilities | 21 |
| | | 1. Liabilities Listed by the City in its Filings on the Petition Date | 21 |
| | | 2. Proofs of Claim | 22 |
| | | 3. General Unsecured Claims | 24 |
| | | 4. Priority Unsecured Claims | 25 |
| | | 5. Secured Claims | 25 |
| | | 6. Claims Relating to the COPs Documents and the MPA Lease | 26 |

7.    Role of Mayor Osby Davis ("Davis") and Orrick, Herrington & Sutcliffe ("Orrick") in Certain COPs Transactions ................................. 29

8.    Statement Regarding Liabilities ................................................. 32

B.    Assets ...................................................................................................... 32

1.    Capital Assets; Valuation Thereof ............................................ 32

2.    Claims and Causes of Action Against Third Parties .................. 33

V.    SUMMARY OF THE PLAN OF ADJUSTMENT ............................................. 33

A.    Classification and Treatment of Claims .................................................. 34

1.    Unclassified Claims .................................................................. 34

2.    Classes 1A1 through 1D1 and Classes 1A2 through 1D2, Inclusive (Union Bank) ................................................................. 37

3.    Classes 2A and 2B (Series 1999 COPs) .................................... 45

4.    Class 3 (Claims of MPA Assignees under the MPA Lease) ......... 46

5.    Class 4 (Claims of Westamerica under the Westamerica Lease) ............. 46

6.    Class 5 (Claims of CalPERS with Respect to the CalPERS Pension Plan, as Trustee Under the CalPERS Pension Plan for the Benefit of CalPERS Pension Plan Participants) ................................................. 46

7.    Class 6A (General Unsecured Claims Convenience Class – Retiree Health Benefits Claims) ........................................................... 47

8.    Class 6B (General Unsecured Claims) ....................................... 47

9.    Class 7 (General Liability Claims) ............................................. 49

10.   Class 8 (Workers Compensation Claims) .................................... 49

11.   Class 9 (Restricted Revenue Bond and Note Payable Obligations) .......... 49

B.    Consolidation of Union Bank Information ............................................... 50

C.    Treatment of Executory Contracts and Unexpired Leases ...................... 50

1.    Generally ................................................................................. 50

2.    Assumption .............................................................................. 51

3.    Rejection .................................................................................. 51

4.    Deadline for the Assertion of Rejection Damage Claims; Treatment of Rejection Damage Claims ..................................................... 52

D.    Means for Execution and Implementation of the Plan ............................ 52

E.    Distributions ........................................................................................... 53

1.    Undeliverable Distributions ...................................................... 54

2.    Timeliness of Payments ............................................................ 54

3.    Compliance With Tax, Withholding and Reporting Requirements ........ 55

4.    Time Bar to Cash Payments ...................................................... 55

**TABLE OF CONTENTS**
**(continued)**

Page

| | | | | |
|---|---|---|---|---|
| | | 5. | No De Minimis Distributions | 55 |
| | | 6. | No Distributions on Account of Disputed Claims | 55 |
| | | 7. | No Postpetition Accrual of Interest | 56 |
| | F. | | Disputed Claims | 56 |
| | | 1. | Claims Objection Deadline; Prosecution of Objections | 56 |
| | | 2. | Reserves, Payments, and Distributions With Respect to Disputed Claims | 56 |
| | G. | | Continuing Jurisdiction of the Bankruptcy Court | 57 |
| VI. | | | CONFIRMATION AND EFFECTIVENESS OF THE PLAN | 57 |
| | A. | | Voting and Right to Be Heard at Confirmation | 57 |
| | | 1. | Who May Support or Object to Confirmation of the Plan? | 57 |
| | | 2. | Who May Vote to Accept or Reject the Plan? | 58 |
| | | 3. | Who Is Not Entitled to Vote? | 58 |
| | | 4. | Vote Necessary to Confirm the Plan | 58 |
| | B. | | The "Best Interests" Test | 59 |
| | C. | | Feasibility | 59 |
| | D. | | Cram Down | 60 |
| | E. | | Effective Date | 61 |
| | | 1. | Conditions to the Occurrence of the Effective Date | 61 |
| | | 2. | Non-Occurrence of Effective Date | 61 |
| | F. | | Effect of Confirmation | 62 |
| | | 1. | Discharge of the City | 62 |
| | | 2. | Injunction | 62 |
| | | 3. | Term of Existing Injunctions and Stays | 63 |
| VII. | | | CERTAIN RISK FACTORS TO BE CONSIDERED | 63 |
| VIII. | | | CERTAIN FEDERAL INCOME TAX CONSEQUENCES | 63 |
| IX. | | | RECOMMENDATION AND CONCLUSION | 65 |

**TABLE OF AUTHORITIES**

**Page**

**FEDERAL CASES**

*In re City of Vallejo,*
    403 B.R. 72 (Bankr. E.D. Cal. 2009) ........................................................................ 15

*In re City of Vallejo,*
    408 B.R. 280 (B.A.P. 9th Cir. 2009) ........................................................... 6, 14, 49

*In re City of Vallejo, California,*
    432 B.R. 262 (E.D. Cal. 2010) ............................................................................... 15

*In re City of Vallejo,*
    No. 08-26813-A-9, 2008 WL 4180008 (Bankr. E.D. Cal. Sept. 5, 2008) .............................. 6

*N.L.R.B. v. Bildisco & Bildisco,*
    465 U.S. 513 (1984) .............................................................................................. 15

**OTHER CASES**

*City of Los Angeles v. Offner,*
    19 Cal. 2d 483 (1942) .......................................................................................... 26

*Dean v. Kuchel,*
    35 Cal. 2d 444 (1950) .......................................................................................... 26

**FEDERAL STATUTES**

11 U.S.C. § 101 ...................................................................................................... 14

11 U.S.C. § 109 ...................................................................................................... 14

11 U.S.C. § 326 ...................................................................................................... 35

11 U.S.C. § 365 ................................................................................................. 15, 51

11 U.S.C. § 503 ...................................................................................................... 34

11 U.S.C. § 507 ................................................................................................. 25, 34

11 U.S.C. § 553 ...................................................................................................... 63

11 U.S.C. § 924 ...................................................................................................... 21

11 U.S.C. § 925 ...................................................................................................... 21

DISCLOSURE STATEMENT FOR CITY'S SECOND
AMENDED PLAN OF ADJUSTMENT

**TABLE OF AUTHORITIES**
**(cont)**

Page

11 U.S.C. § 943 ................................................................................. 35, 59, 60

11 U.S.C. § 944 ............................................................................................. 62

11 U.S.C. § 1124 ............................................................................................. 7

11 U.S.C. § 1125 ............................................................................................. 6

11 U.S.C. § 1129 ................................................................................... 8, 60, 61

**STATE STATUTES**

Cal. Gov't Code § 900 *et seq.* ....................................................................... 33

Cal. Gov't Code § 37351.5 ....................................................................... 27, 39

**CONSTITUTIONAL PROVISIONS**

Article XVI, § 18 of the California Constitution ............................................ 26

DISCLOSURE STATEMENT FOR CITY'S SECOND
AMENDED PLAN OF ADJUSTMENT

1   **NOTE:  The Bankruptcy Court Has Not Yet Approved This Disclosure Statement Pursuant**

2   **To Section 1125(b) Of The Bankruptcy Code For Use In The Solicitation Of The Plan Of**

3   **Adjustment Of Debts Described Herein.  The Filing And Distribution Of This Disclosure**

4   **Statement Therefore Is Not Intended As, And Should Not Be Construed To Be, A**

5   **Solicitation Of Acceptance Or Rejection Of That Plan Or Any Other Plan.**

DISCLOSURE STATEMENT FOR CITY'S SECOND
AMENDED PLAN OF ADJUSTMENT

# SUMMARY

The following pages summarize certain important information set forth elsewhere in this Disclosure Statement. Capitalized terms are defined in the text of this Disclosure Statement and in the Plan, and any Capitalized term used but not defined in the Disclosure Statement shall have the meaning ascribed to it in the Plan.

The Disclosure Statement contains important information that is not summarized in this Summary and that may influence your decision regarding whether to accept or reject the Plan or otherwise affect your rights. Please do not rely on this Summary standing alone, and please read all of this document and the accompanying materials thoroughly.

The "Second Amended Plan For The Adjustment Of Debts Of City of Vallejo, California, Dated May 20, 2011" (the "Plan") proposed by the City of Vallejo, California (the "City"), involves the restructuring of the approximately $50 million of publicly-held securities that evidence and represent undivided fractional interests in General Fund leases of many of the City's capital assets that are essential to municipal operations (such as City Hall, the JFK Library and police and fire stations). The Plan also addresses and resolves (1) the City's obligations to current and former employees, including those relating to the collective bargaining agreements signed during the course of the chapter 9 case that replaced CBAs that provided greater compensation and health benefits; (2) claims of former employees who were not paid the full amount of accrued vacation and other benefits on their separation from the City; (3) claims arising from tort and breach of contract lawsuits against the City; and (4) various other claims. Importantly, the Plan does not impair the City's obligations to either CalPERS in its capacity as trustee for the pension trusts nor the City's retired workers and their dependants who are the beneficiaries of such trusts. Accordingly, pension payments to such persons will not be altered by the Plan.

Payment to holders of General Unsecured Claims – which holders include retirees (on account of reduction of certain retirement healthcare benefits), former employees (on account of unpaid leave buyout claims), current and former IBEW and IAFF members (on account of the City's rejection of CBAs), and a number of miscellaneous claims – will be paid a pro rata distribution of approximately $6 million over a two year period. In light of a recent settlement

with members of IAFF and IBEW, the payment to members of such unions, before deductions of withholding, taxes, CalPERS and other charges, will amount to $5.1 million (although over $1 million thereof will be paid directly to counsel for the two unions). The estimated payment to such holders, as well as to other holders of Class General Unsecured Claims, is approximately 20% to 30% of their claims amount. Approximately 81 retirees who hold an aggregate of approximately $60,000 of health benefit claims will be paid in full. While the City regrets that it cannot pay a higher percentage to holders of General Unsecured Claims, the fact is that the City lacks the revenues to do so while maintaining an adequate level of municipal services such as the provision of fire and police protection and the repairing of the City's streets. Indeed, the union representing the City's police officers contends that current levels of municipal services are inadequate.

The Plan does not alter the obligations of those City funds that are restricted by grants, by federal law and by California law; pursuant to the Tenth Amendment to the United States Constitution and the provisions of the Bankruptcy Code that implement the Tenth Amendment, such funds cannot be impacted in the Bankruptcy Case. Thus, securities issued by restricted funds, such as the approximately $175 million in Water Revenue Bonds and other special tax obligations secured by special revenues of the City's restricted funds, are not altered by the Plan.

The following chart summarizes key information, including the proposed treatment of the various classes of claims:

| | |
|---|---|
| **Debtor** | City of Vallejo, California |
| **Bankruptcy Court** | United States Bankruptcy Court for the Eastern District of California, Sacramento Division, The Honorable Michael S. McManus presiding. |
| **Plan** | Second Amended Plan For The Adjustment Of Debts Of City of Vallejo, California, Dated May 20, 2011. |
| **Purpose of the Disclosure Statement** | To provide information of a kind, and in sufficient detail, that would enable a typical holder of claims in a class impaired under the Plan to make an informed judgment with respect to voting on the Plan. |

| | |
|---|---|
| **Balloting Information** | Ballots have been provided with this Disclosure Statement to creditors known to have claims that are impaired under the Plan. Ballots must be returned to and received by the Ballot Tabulator by no later than 4:30 p.m., Pacific Time, on July 5, 2011. Objections to confirmation also must be filed and served by no later than July 5, 2011. |
| **Ballot Tabulator** | Shelley White, Senior Paralegal, Orrick, Herrington & Sutcliffe LLP, 400 Capitol Mall, Suite 3000, Sacramento, California 95814 (facsimile: 916-329-4900). |
| **Confirmation Hearing and Confirmation Objections** | A hearing regarding confirmation of the Plan will be held by the Bankruptcy Court on July 28, 2011, commencing at 10:00 a.m., Pacific Time. |
| **Treatment of Claims** | If the Court confirms the Plan and the Plan becomes effective, claims will be treated as follows: |
|     Administrative Claims | Paid in full, except to the extent that the holder of an Administrative Claim agrees to different treatment. |
|     Class 1A1 Union Bank as Holder of the Series 2000 COPs | Impaired. Union Bank, the holder of the Series 2000 COPs, will receive a new lease-leaseback obligation in exchange for cancellation of the Series 2000 COPs. |
|     Class 1A2 Claims of Union Bank as obligee of the City under the Series 2000 COPs Reimbursement Agreement | Impaired. Union Bank will receive a new reimbursement agreement payment agreement obligation in exchange for cancellation of the Series 2000 COPs Reimbursement Agreement. |
|     Class 1B1 Union Bank as Holder of the Series 2001 COPs | Impaired. Union Bank, the holder of the Series 2001 COPs, will receive a new lease-leaseback obligation in exchange for cancellation of the Series 2001 COPs. |
|     Class 1B2 Claims of Union Bank as obligee of the City under the Series 2001 COPs Reimbursement Agreement | Impaired. Union Bank will receive a new reimbursement agreement payment agreement obligation in exchange for cancellation of the Series 2001 COPs Reimbursement Agreement. |
|     Class 1C1 Union Bank as Holder of the Series 2002 COPs | Impaired. Union Bank, the holder of the Series 2002 COPs, will receive a new lease-leaseback obligation in exchange for cancellation of the Series 2002 COPs. |

DISCLOSURE STATEMENT FOR CITY'S SECOND
AMENDED PLAN OF ADJUSTMENT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| Class 1C2 Claims of Union Bank as obligee of the City under the Series 2002 COPs Reimbursement Agreement | Impaired.  Union Bank will receive a new reimbursement agreement payment agreement obligation in exchange for cancellation of the Series 2002 COPs Reimbursement Agreement. |
| --- | --- |
| Class 1D1 Union Bank as Holder of the Series 2003 COPs | Impaired.  Union Bank, the holder of the Series 2003 COPs, will receive a new lease-leaseback obligation in exchange for cancellation of the Series 2003 COPs. |
| Class 1D2 Claims of Union Bank as obligee of the City under the Series 2003 COPs Reimbursement Agreement | Impaired.  Union Bank will receive a new reimbursement agreement payment agreement obligation in exchange for cancellation of the Series 2003 COPs Reimbursement Agreement. |
| Class 2A Indenture Trustee as trustee for the Holders of the Series 1999 COPs | Impaired.  The Indenture Trustee, as trustee for the Holders of the Series 1999 COPs, will receive reduced and restructured payments through fiscal year 2013-14. |
| Class 2B National as insurer of the Series 1999 COPs | Impaired.  National as insurer of the Series 1999 COPs will receive reduced and restructured payments through fiscal year 2024-25, and the amount of the reimbursement of its attorney fees will be reduced. |
| Class 3 MPA Assignees of the MPA Lease | Impaired.  The Assignees will receive reduced and restructured lease payments through 2019-20, and the amount of the reimbursement of their attorney fees will be reduced. |
| Class 4 Westamerica under the Westamerica Lease | Unimpaired. |
| Class 5 CalPERS on account of the CalPERS Retirement Plan | Unimpaired. |

| | |
|---|---|
| Class 6A<br><br>General Unsecured Claims Convenience Class – Retiree Health Benefits Claim | Unimpaired.  There are an estimated 80 Holders of Allowed Health Benefit Claims (which are claims for the several month period during which the City unilaterally reduced its health benefits contribution prior to reaching new labor agreements with IAFF and IBEW (which new agreements included provisions reducing payments to active employees).  Such Claims aggregate approximately $60,000, and will be paid in full within 60 days after the Effective Date. |
| Class 6B<br><br>General Unsecured Claims | Impaired.  Holders of Allowed Claims, which includes all Claims related to the rejection of the IAFF and IBEW labor contracts, as well as Claims for loss of leave buyouts.  Members of IBEW and IAFF will be paid $2.1 million and $3 million, respectively, but the actual payments to Holders from these amounts will reduced, in the case of IAFF, by payments to counsel (and to repayment of union loans for attorney fees and expenses) totaling approximately $900,000, and in the case of IBEW, by payments to counsel totaling approximately $450,000, and for tax, withholding, CalPERS and other charges.  Holders of other General Unsecured Claims will receive the same pro rata share of the $6 million that will fund payment of Class 6B claims.  The estimated range of payments for all holders of Allowed Class 6B Claims is 20% to 30%.  The payments will be made in two equal installments – one prior to September 30, 2011 and the other prior to September 30, 2012. |
| Class 7<br><br>General Liability Claims | Impaired.  Holders may pursue insurers and recover in full to the extent of insurance coverage.  Allowed Claims with respect to the City's self insurance retention (SIR) and Allowed Claims in excess of the City's insurance coverage shall receive the same percentage on the dollar as holders of Allowed Class 6A and Class 6B Claims. |
| Class 8<br><br>Workers Compensation Claims | Unimpaired. |
| Class 9<br><br>Restricted Obligations | Unimpaired.  The Class is included in the Plan in order to make it clear that the Restricted Obligations are not obligations of the City's General Fund.  Such obligations have been paid by sources other than the General Fund on a current basis during the Chapter 9 Case, and will continue to be so paid in the future.  To the extent that the General Fund backstops such obligations, any related Claims will be disallowed as speculative. |
| **Background Information:** | See pages 11 to 21. |

DISCLOSURE STATEMENT FOR CITY'S SECOND
AMENDED PLAN OF ADJUSTMENT

| | |
|---|---|
| **Questions:** | Contact the City's counsel, Marc A. Levinson, Orrick, Herrington & Sutcliffe LLP, 400 Capitol Mall, Suite 3000, Sacramento, California 95814 (malevinson@orrick.com; facsimile 916-329-4900). |

To the extent that there is any inconsistency between the Plan (including the Exhibits and any supplements to the Plan) and the description in the Disclosure Statement, the terms of the Plan (including the Exhibits to the Plan) will govern.

## I.    INTRODUCTION

The City filed a petition under chapter 9 of title 11 of the United States Code (the "Bankruptcy Code") on May 23, 2008 (the "Petition Date"), which was designated Case Number 2008-26813 (the "Chapter 9 Case"). An order for relief[2] was entered on September 8, 2008, and the Chapter 9 Case is currently pending before the United States Bankruptcy Court for the Eastern District of California, Sacramento Division (the "Bankruptcy Court").

The City is the proponent of the Plan, a copy of which is attached to this Disclosure Statement as Exhibit A. [At a hearing held on May 26, 2011, the Bankruptcy Court determined that this Disclosure Statement contains "adequate information" within the meaning of section 1125 of the Bankruptcy Code and authorized the City to transmit it to holders of impaired claims in connection with the solicitation of votes with respect to the Plan.]

As described more fully elsewhere in this document, the City believes that the Plan provides the greatest and earliest possible recoveries to holders of claims, that acceptance of the Plan is in the best interests of all parties, and that any alternative restructuring or reorganization would result in delay, uncertainty, expense, litigation and, ultimately, smaller or no distributions to creditors. Accordingly, **the City urges that you cast your ballot in favor of the Plan.**

### A.    The Purpose of This Disclosure Statement.

The Bankruptcy Code generally requires that the proponent of a plan of adjustment prepare and file with the applicable bankruptcy court a "disclosure statement" that provides

---

[2] As is explained in more detail below, three unions challenged the eligibility of the City to be a chapter 9 debtor. The Bankruptcy Court overruled such objection and entered the order for relief. *See In re City of Vallejo*, No. 08-26813-A-9, 2008 WL 4180008 (Bankr. E.D. Cal. Sept. 5, 2008). The Bankruptcy Appellate Panel for the Ninth Circuit affirmed. *See In re City of Vallejo*, 408 B.R. 280 (B.A.P. 9th Cir. 2009).

information of a kind, and in sufficient detail, that would enable a typical holder of claims in a class impaired under that plan to make an informed judgment with respect to the plan.  This Disclosure Statement provides such information.  ***Parties in interest should read this Disclosure Statement, the Plan, and all of the exhibits accompanying such documents in their entirety in order to ascertain:***

    1.     How the Plan will affect their claims against the City;

    2.     Their rights with respect to voting for or against the Plan;

    3.     Their rights with respect to objecting to confirmation of the Plan; and

    4.     How and when to cast a ballot with respect to the Plan.

This Disclosure Statement, however, cannot and does not provide creditors with legal or other advice or inform such parties of all aspects of their rights.  Claimants are advised to consult with their attorneys and/or financial advisors to obtain more specific advice regarding how the Plan will affect them and regarding their best course of action with respect to the Plan.  As noted below, retirees are advised to consult with the Committee, which was appointed by the Office of the United States Trustee to represent retirees in the Chapter 9 Case.

This Disclosure Statement has been prepared in good faith and in compliance with applicable provisions of the Bankruptcy Code.  Based upon information currently available, the City believes that the information contained in this Disclosure Statement is correct as of the date of its filing.  The Disclosure Statement, however, does not and will not reflect some events that occur after May 20, 2011 (and, where indicated, specified earlier dates), and the City assumes no duty and presently does not intend to prepare or distribute any amendments or supplements to reflect such events.

**B.**      <u>Summary of Entities Entitled to Vote on the Plan and of Certain Requirements Necessary for Confirmation of the Plan.</u>

Holders of Allowed Claims in the following Classes are entitled to vote on the Plan because the Claims in each such Class are "impaired" under the Plan within the meaning of Section 1124 of the Bankruptcy Code: Class 1 and all of its various subclasses (each of which relate to the Series 2000 COPs, the Series 2001 COPs, the Series 2002 COPs or the Series 2003

COPs), Class 2A (Claims by the Indenture Trustee for the holders of the Series 1999 COPs), Class 2B (Claims by National as insurer of the Series 1999 COPs), Class 3 (MPA Assignees), Class 6B (General Unsecured Claims) and Class 7 (General Liability Claims).

The Bankruptcy Court may confirm the Plan only if at least one Class of impaired claims has voted to accept the Plan (without counting the votes of any insiders whose claims are classified within that Class) and if certain statutory requirements are met as to both non-consenting members within a consenting Class and as to any dissenting Classes. A Class of claims has accepted the Plan only when at least more than one-half in number and at least two-thirds in amount of the Allowed Claims actually voting in that Class vote in favor of the Plan.

In the event of a rejection of the Plan by any of the voting Classes, the City will request that the Bankruptcy Court confirm the Plan in accordance with those portions of section 1129(b) of the Bankruptcy Code that are applicable to the Chapter 9 Case, which provisions permit confirmation by a process known as "cram down" notwithstanding such rejection if the Bankruptcy Court finds, among other things, that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each rejecting Class. Other sections of this Disclosure Statement provide a more detailed description of the requirements for acceptance and confirmation of the Plan.

**C.**     **Voting Procedures, Balloting Deadline, Confirmation Hearing, and Other Important Dates, Deadlines, and Procedures.**

**1.**     **Voting Procedures and Deadlines.**

The City has provided copies of this Disclosure Statement and ballots to all known holders of impaired claims in the Voting Classes. Those holders of an Allowed Claim in each of the Voting Classes who seek to vote to accept or reject the Plan must complete a ballot and return it to the Court-appointed ballot tabulator – Shelley White, Senior Paralegal, Orrick, Herrington & Sutcliffe LLP, 400 Capitol Mall, Suite 3000, Sacramento, California 95814 (facsimile: 916-329-4900) (the "Ballot Tabulator") – so that their ballots actually are received by no later than the Balloting Deadline (as defined two paragraphs below). Ballots do not constitute proofs of claim and must be returned directly to the Ballot Tabulator, **not** to the Bankruptcy Court.

*All ballots, including ballots transmitted by facsimile, must be completed, signed, returned to, and* <u>*actually received*</u> *by the Ballot Tabulator by not later than July 5, 2011, at 4:30 p.m. Pacific Time (the "Balloting Deadline"). Neither Ballots received after the Balloting Deadline, nor ballots returned directly to the Bankruptcy Court rather than by the Ballot Tabulator, shall be counted in connection with confirmation of the Plan.*

        **2.**    <u>**Date of the Confirmation Hearing and Deadlines for Objection to Confirmation of the Plan**</u>.

The hearing to determine whether the Bankruptcy Court will confirm the Plan (the "Confirmation Hearing") will commence on July 28, 2011, at 10:00 a.m. Pacific Time in the Courtroom of the Honorable Michael S. McManus, United States Bankruptcy Judge for the Eastern District of California, in his Courtroom on the 7th floor of the United States Courthouse, 501 I Street, Sacramento, California 95814. The Confirmation Hearing may be continued from time to time, including by announcement in open court, without further notice.

Any objections to confirmation of the Plan must be filed with the Bankruptcy Court and served on the following entities so as to be <u>actually received</u> by no later than July 5, 2011: (a) Fred Soley, City Attorney, City of Vallejo, P.O. Box 3068, 555 Santa Clara Street, Vallejo, CA 94590; (b) Marc A. Levinson, Orrick, Herrington & Sutcliffe LLP, 400 Capitol Mall, Suite 3000, Sacramento, CA 95814-4497 (counsel to the City); and (c) Jim Paul, Downey Brand LLP, 621 Capitol Mall, 18th Floor, Sacramento, CA 95814 (counsel to the Official Unsecured Creditors Committee of City of Vallejo Retirees). Objections that are not timely filed and served <u>may not be considered</u> by the Bankruptcy Court. *Please refer to the accompanying notice of the Confirmation Hearing for specific requirements regarding the form and nature of objections to confirmation of the Plan.*

        **D.**    <u>**Important Notices and Cautionary Statements**</u>.

        1.    The historical financial data relied upon in preparing the Plan and this Disclosure Statement is based upon the City's books and records. Although certain professional advisors of the City assisted in the preparation of this Disclosure Statement, in doing so such professionals relied upon factual information and assumptions regarding financial, business, and

accounting data provided by the City and third parties, much of which has not been audited. The City's most recent audited financial statement (i.e., its Comprehensive Annual Financial Report, or CAFR), which cover the fiscal year ended June 30, 2010, is voluminous, and is not attached hereto. However, it is available on the City's website or upon a written request[3].

*The professional advisors of the City have not independently verified such information and, accordingly, make no representations or warranties as to its accuracy.* Moreover, although reasonable efforts have been made to provide accurate information, the City does not warrant or represent that the information in this Disclosure Statement, including any and all financial information and projections, is without inaccuracy or omissions, or that actual values or distributions will comport with the estimates set forth herein.

2.    ***No entity may rely upon the Plan or this Disclosure Statement or any of the accompanying exhibits for any purpose other than to determine whether to vote in favor of or against the Plan.*** Nothing contained in such documents constitutes an admission of any fact or liability by any party, and no such information will be admissible in any proceeding involving the City or any other party, nor will this Disclosure Statement be deemed evidence of the tax or other legal effects of the Plan on holders of claims in the Chapter 9 Case.

3.    Certain information included in this Disclosure Statement and its Exhibits contains forward-looking statements. The words "believe", "expect", "anticipate" and similar expressions identify such forward-looking statements. The forward-looking statements are based upon information available when such statements are made, and are subject to risks and uncertainties that could cause actual results to differ materially from those expressed in the statements. A number of those risks and uncertainties are described below. Readers therefore are cautioned not to place undue reliance on the forward-looking statements in this Disclosure Statement. The City undertakes no obligation to publicly update or revise any forward-looking statements, whether as a result of new information, future events or otherwise.

---

[3] To locate the CAFR on the City's website: (1) go to www.ci.vallejo.ca.us (2) place the cursor on Departments, which is located in the horizontal navy blue bar at the top of the home page, (3) move the cursor to Finance in the drop down menu, (4) click on the link to Comprehensive Annual Financial Report. A printed copy will be mailed to you upon your request mailed to the following address: City of Vallejo, Attn: Anne Maze, P.O. Box 3068, 555 Santa Clara Street, Vallejo, California 94590.

4. Neither the Securities and Exchange Commission nor any other regulatory agency has approved or disapproved this Disclosure Statement. Nor has any such agency determined whether this Disclosure Statement is accurate, truthful or complete.

### E. **Additional Information**.

If you have any questions about the procedures for voting on the Plan, desire another copy of a ballot, or seek further information about the timing and deadlines with respect to confirmation of the Plan, please write to counsel for the City as follows: Marc A. Levinson, Orrick, Herrington & Sutcliffe LLP, 400 Capitol Mall, Suite 3000, Sacramento, California 95814-4497 (facsimile: 916-329-4900, email malevinson@orrick.com). Please note that counsel for the City cannot and will not provide creditors with any legal advice, including advice regarding how to vote on the Plan or the effect that confirmation of the Plan will have upon claims against the City. **Retirees** should contact counsel for the Committee, Jim Paul, Downey Brand, 621 Capitol Mall, 18th Floor, Sacramento, California 95814 (facsimile: 916-444-2100, email jpaul@downeybrand.com).

## II. **BACKGROUND INFORMATION**

### A. **The City**

The City is a municipal corporation and charter city formed and organized under its charter and the Constitution of the State of California. Its governing body is a seven-member City Council. The City encompasses approximately 50 square miles in southwestern Solano County, adjoining the San Pablo Bay. Approximately 120,000 people reside within the City.

### B. **The City's Financial Problems**

After several years of struggling to balance inadequate revenues with increasing expenditures, in early 2008 the City confronted the reality that it would soon be unable to pay its bills as they became due. Adverse economic conditions significantly affected the City's primary revenue sources: property taxes, sales taxes, assessments and fees. The crash of the housing market and the slowing economy decreased property and sales tax revenues, as well as other important revenue sources, such as motor vehicle licensing fees and real estate development fees.

1  Compounding these economic challenges, the City – like all California cities – is limited by law

2  in its ability to generate new revenues.

3      The City took drastic steps in order to avoid insolvency.  For several years, the City

4  attempted to address the fundamental imbalance in its General Fund by reducing the number of its

5  employees, cutting funding and services not controlled by contract, and severely reducing or

6  completely cutting off funding for numerous community services (such as its senior center,

7  library, parks, and others), as well as infrastructure (such as street maintenance and vehicle

8  replacement).  These cuts have had a dramatic negative impact on the quality of life of the City's

9  residents.

10      The City intensified its cost savings and other efforts as it became clear that the General

11  Fund would run out of money before the June 30, 2008, end of the 2007-08 fiscal year.  The City

12  retained a consultant to identify potential sources of new and additional revenue and implemented

13  these recommendations where possible.  But recognizing that labor costs were its largest General

14  Fund expenditure, the City also engaged its employee unions to discuss potential CBA

15  modifications as a component of the City's financial recovery.  Most City employees were

16  represented by one of the four labor associations which previously had entered into CBAs with

17  the City.[4]

18      In early March 2008, VPOA, IAFF and the City agreed to temporary modifications to the

19  police and firefighter CBAs, referred to by the parties as the Interim Agreements, effective

20  through June 30, 2008.  The savings, including the savings to the City from paying recent retirees

21  only half of their leave buyout payments, and $2.4 million in one-time cash transfers from the

22  City's few non-restricted funds, permitted the City to avoid insolvency through the end of the

23  fiscal year.  Despite a lengthy mediation conducted by a paid labor mediator involving 11

24  sessions, the City and Unions were unable to negotiate agreements which would ensure the long-

25  term solvency of the City.

26  
[4] Each of the four labor groups was represented by a "Union."  Specifically, police officers were represented by Vallejo Police Officers Association ("VPOA"); firefighters by the International Association of Firefighters, Local 1186 ("IAFF"); various city employees, such as administrative, engineering, information technology and public works employees, by the International Brotherhood of Electrical Workers ("IBEW"); and management employees by Confidential, Administrative, Managerial and Professional Employees Association of Vallejo ("CAMP").

DISCLOSURE STATEMENT FOR CITY'S SECOND
                                        AMENDED PLAN OF ADJUSTMENT

1    Also in March and April 2008, the City discussed adjustments to the City's outstanding

2    lease obligations as well as the City's potential bankruptcy filing with Union Bank, previously

3    known as Union Bank of California ("Union Bank"), the issuer of several letters of credit

4    supporting approximately $50 million of obligations of the General Fund.  Such obligations are

5    discussed in more detail below.  The City requested that Union Bank extend the letter of credit

6    coming due on December 1, 2008, and that it commit to a lower interest rate on the City's lease

7    obligations.  Union Bank was willing to engage in general discussions, but its representatives told

8    the City that it could not commit to specific adjustments to the City's lease obligations until the

9    City presented a comprehensive long-term financial plan addressing the General Fund imbalance.

10   Without an agreement with the Unions creating long-term General Fund solvency, the City could

11   not present such a plan or discuss specific financial restructuring with Union Bank.

12   On May 6, 2008, with the City's fiscal year and the Interim Agreements soon ending,

13   lacking a viable long-term agreement with the Unions, and with no ability to restructure its

14   obligations to Union Bank, the City Council authorized the City to file a petition under chapter 9.

15   The City filed its petition on May 23, 2008 (the "Petition Date").

16   **III.    ADMINISTRATION OF THE CITY'S CHAPTER 9 CASE**

17   **A.    Pendency Plans**

18   In order to continue to fund municipal operations following the Petition Date, the City

19   unilaterally modified its financial obligations so as to balance General Fund expenditures with

20   revenues during the course of the Chapter 9 Case, in what it calls its Pendency Plan.  This interim

21   but balanced budget froze all employees' compensation at the levels being paid on the Petition

22   Date, and capped the City's payments on its public finance lease obligations (such that the City

23   "short paid" interest payments to Union Bank and, beginning in early 2009, failed to make any

24   payments to Union Bank and the 1999 Indenture Trustee).  The City implemented these

25   expenditure modifications beginning on July 1, 2008.  This action enabled the City to save the

26   costs of the CBA-mandated salary increases that were due in fiscal year 2008-09 (which would

27   have layered on top of the salary increases otherwise effective on the expiration of the Interim

28

1    Agreements).  The City has continued to operate under subsequent versions of the Pendency Plan

2    during the Chapter 9 Case.

3        **B.    Eligibility Litigation**

4        On June 27, 2008, IBEW, IAFF and VPOA filed an objection to the City's chapter 9

5    petition, challenging the City's eligibility to seek bankruptcy relief.  The three Unions asserted

6    that the City did not meet the eligibility criteria set forth in Bankruptcy Code section 109(c)[5],

7    including the requirement that the City be insolvent on the Petition Date.  After substantial

8    discovery and briefing, the Bankruptcy Court conducted an evidentiary hearing on eligibility that

9    consumed part or all of eight court days.  On September 5, 2008, the Bankruptcy Court issued its

10   Eligibility Findings, holding that the City met the chapter 9 eligibility criteria and, in particular,

11   that the City was insolvent.  The Clerk of the Bankruptcy Court entered the order for relief on

12   September 8, 2011.  The three Unions appealed to the Bankruptcy Appellate Panel for the Ninth

13   Circuit, which thereafter affirmed the Order for Relief.[6]  *See In re City of Vallejo*, 408 B.R. 280

14   (B.A.P. 9th Cir. 2009).

15       **C.    Motion for Rejection of Collective Bargaining Agreements & Subsequent**
            **Agreements Between the City and its Bargaining Units**
16

17       Meanwhile, on June 17, 2008, the City filed a motion for rejection of its collective

18   bargaining agreements ("CBA Motion"), in recognition that it could not rebalance the General

19   Fund and emerge from bankruptcy without significantly lowering its short and long term labor

20   costs.  The City filed the CBA Motion before implementing the Pendency Plan at the beginning

21   of fiscal year 2008-09 to provide its employees with notice that their salaries would be frozen and

22   that the City would be rejecting the existing CBAs in the Chapter 9 Case.

23       The Court, the City and the Unions agreed that it would be inefficient to litigate the CBA

24   Motion until eligibility had been determined, and as a result, the hearing on the CBA Motion was

25   delayed repeatedly while the eligibility contest unfolded.  After the Court issued its Eligibility

26   Findings and Order for Relief in September 2008, the parties engaged in additional discovery and

27   [5] The Bankruptcy Code is 11 U.S.C. § 101 *et seq*.

28   [6] On January 27, 2009, the City and VPOA reached agreement on an amended CBA.  Thereafter, the City withdrew
     the CBA Motion with respect to VPOA, and VPOA withdrew from the appeal of the Order for Relief.

1  briefing on the CBA Motion.  Three unions – VPOA, IAFF and IBEW – filed their opposition

2  pleadings on December 11, 2008, and the City filed its reply on January 23, 2009, more than

3  seven months after filing the CBA Motion.  The Bankruptcy Court held an evidentiary hearing on

4  the CBA Motion in February 2009[7].

5          On March 13, 2009, the Bankruptcy Court issued a memorandum deciding the central

6  legal issues contested in the CBA Motion ("CBA Memorandum")[8].  The Court held that federal

7  bankruptcy law, specifically Bankruptcy Code § 365 as interpreted by the United States Supreme

8  Court in *N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513 (1984), controlled whether public sector

9  labor agreements could be rejected in a chapter 9 case and that *Bildisco* provided the legal

10  standard for determining whether rejection was warranted.  The Bankruptcy Court withheld ruling

11  on whether the evidence adduced at the evidentiary hearing satisfied the legal standard, and

12  instead, directed the City, IAFF and IBEW to participate in settlement discussions presided over

13  by United States Bankruptcy Judge Elizabeth Perris of Portland, Oregon.

14          From June through August 2009, Judge Perris presided over multiple in-person and

15  telephonic mediation sessions in an attempt to resolve the CBA issues between the City on one

16  hand and IAFF and IBEW on the other.  On August 24, 2009, IAFF stipulated to rejection of its

17  CBA, and the City and IAFF agreed to enter into binding interest arbitration pursuant to the

18  Vallejo City Charter, Section 809,[9] to establish a new CBA.  When IBEW and the City failed to

19  reach agreement on CBA modifications or rejection, the CBA Motion went forward with respect

20  to IBEW.  On August 31, 2009, the Bankruptcy Court ruled that the evidence submitted by the

21  City satisfied the *Bildisco* standard and granted the City's motion to reject the IBEW CBA ("CBA

22  Rejection Order").

23          IBEW appealed both the CBA Memorandum and the CBA Rejection Order to the United

24  States District Court for the Eastern District of California, which thereafter affirmed[10].  IBEW

---

25  [7] Because VPOA and the City reached agreement on a new CBA in January 2009, and because the City and CAMP
26  reached agreement around the same time, the City withdrew the CBA Motion as to VPOA and CAMP.  As a result
    the evidentiary hearing proceeded against only IAFF and IBEW.
    [8] *In re City of Vallejo*, 403 B.R. 72 (Bankr. E.D. Cal. 2009).
27  [9] In June 2010, Vallejo residents voted to remove the binding arbitration provision from the Vallejo City Charter.  In
    March 2010, the City and IAFF reached agreement on a new CBA.
28  [10] *In re City of Vallejo, California*, 432 B.R. 262 (E.D. Cal. 2010).

DISCLOSURE STATEMENT FOR CITY'S SECOND
AMENDED PLAN OF ADJUSTMENT

filed a notice of appeal of the District Court's ruling, but it dropped its appeal to the Ninth Circuit

after extensive mediation and negotiations resulted in the City and IBEW agreeing upon a new

CBA in December 2010.

All told, though expensive to litigate, mediate, and arbitrate over a two-year period, the

rejection and renegotiation of the City's CBAs resulted in an estimated approximately $34 million

of cost avoidance and savings for the City through June 30, 2010 (without taking into

consideration the professional fees paid by the City).  The largest cost savings were achieved by

the closing of two fire stations, which would have been prohibited under the CBA with IAFF.

Moreover, because of the filing of the Chapter 9 Case, the City was able to impose reductions in

payments to its creditors, which allowed the City to continue to operate pending the confirmation

of a plan of adjustment.

### D.    Formation of the Committee to Represent Retirees

On October 7, 2008, the United States Trustee appointed the members of the Official

Unsecured Creditors Committee of City of Vallejo Retirees ("Committee").  As the name

indicates, the Committee represents only retirees from the City.  The Committee does not

represent current City employees, or any other creditors.  The Committee consists of retired City

employees John Bunch, Douglas Darling, Michael Feenan, Robert C. Lewis, Thomas Liddicoet

(Committee Chair), LaMonte Morris, James Phillips, John Ranacis and Vincent J. Sarullo.  The

Committee is represented by Downey Brand LLP.  In late 2008, the City agreed to pay and has

paid the reasonable fees and costs incurred by the Committee on a regular basis.

### 1.    City's and Committee's Dispute Over Certain Claims of Retirees

The Committee has vigorously participated in the case, as reflected by the fact that the

City had paid Committee counsel in excess of $820,000 through February 28, 2011[11].  On

December 16, 2008, the Committee filed an opposition to the CBA Motion, and thereafter

actively participated in the evidentiary hearing on that motion in February 2009.  It filed a motion

to dismiss the Chapter 9 Case in September 2009 (which motion was denied), and appeared at the

several hearings attendant to its motion.  The motion to dismiss ultimately resulted in the

---

[11] The sums paid by the City to all professionals through February 28, 2011 are shown at page 35 *infra*.

1    Bankruptcy Court's order filed on August 10, 2010, that set January 18, 2011 as the date by when

2    the City must file a chapter 9 plan of adjustment or face dismissal of the Chapter 9 Case.

3          Until April 11, 2011, the Committee argued that certain postpetition actions taken by the

4    City violated the rights of retirees.  Such argument (which was abandoned when the Committee

5    filed pleadings in connection with the City's objection to certain proofs of claims filed by 10

6    retirees) was based on the City's unilateral reduction under its Pendency Plan of its contributions

7    toward health benefits for retirees formerly represented by IAFF and IBEW (which unions had no

8    CBA in place following the Court's orders in late 2009 rejecting such contracts).  It should be

9    noted that the City also unilaterally reduced its contributions toward health benefits for exempt

10   management retirees and City Council retirees.

11         Second, after the filing of the CBA Rejection Motion, the City negotiated amended CBAs

12   with VPOA, IAFF, and CAMP.  The City also negotiated an amended CBA with IBEW

13   following the rejection of the IBEW CBA.  As of January 1, 2010 (April 1, 2010 for IAFF and

14   July 1, 2010 for IBEW), these amended CBAs, consistent with the reduced contributions agreed

15   to by the City and the *active* union members in the amended CBAs, also had the effect of

16   reducing the City's contribution toward health benefits for VPOA, CAMP, IAFF, and IBEW[12]

17   retirees.

18                    2.    **Litigation Between the City and the Committee**

19         The Committee sued the City directly on behalf of its individual members, despite

20   knowledge of the "insurmountable" conflicts of interest inherent in any such action.  *See*

21   Reporter's Transcript, May 19, 2010 Hearing, at 18:16-19:10.  The Committee sought to recover

22   damages for the reduction in health benefits described above that served to reduce the monthly

23   contributions the City made toward retiree health benefits.  As the Committee's counsel explained

24   to the Court at such hearing, the Committee's legal theory hinged on the premise that retiree

25   health benefits "… can be increased or improved, but [] can not be decreased" by later

26   negotiations between the City and the active employee Unions.  The Committee also sought a

27   _____

28   [12]  The treatment of IAFF and IBEW members and retirees is a hybrid situation; the City reduced its contribution to
     IAFF and IBEW health benefits first by unilateral action and then again when the parties agreed to the terms of an
     amended CBA.

determination of the amount and nature of the claims of retirees against the City. The City's position is that there exists no contract distinct from the amended CBAs between the City and its retirees which was impaired, and that the Committee's other statutory and constitutional claims lack merit. The dispute involves millions of dollars of claims. The City believes that the aggregate general unsecured claims for reduced retiree health benefits of IAFF and IBEW retirees is approximately $60,000, and the Committee believes that such Claims may amount to tens of millions of dollars.

Initially, the Committee filed a motion for class certification, but it withdrew the motion two weeks later. This motion had sought an order designating a class of all retirees in connection with fixing the claims of retirees against the City. Shortly thereafter, on March 11, 2010, the Committee filed an adversary complaint seeking damages and injunctive relief. Despite being advised by the City of its belief that the Committee lacked standing to represent individual retirees in a suit for damages against the City, the Committee amended its complaint on April 22, 2010. The City moved to dismiss the amended complaint on May 6, 2010, which motion the Bankruptcy Court granted on August 10, 2010, ruling that the Committee lacked standing to bring its claims. The Court declined to reach the substantive legal issues raised by the Committee.

### 3.    City's Objection to Health Benefit Claims of Certain Retirees

On March 11, 2011, the issue of whether retirees have allowable Claims for the reduction of healthcare benefits was joined when the City filed objections to the proofs of claim filed by 10 retirees – two each from CAMP, VPOA, IAFF, IBEW and the class of exempt employees. The Committee filed its responses on April 11, to which the City replied on April 18. Importantly, in its April 11 responses, the Committee abandoned its long-asserted theory that retiree health benefits can increase but can never decrease. The City believes that such tacit concession will result in the allowance of the health benefit Claims of the Committee's constituents in an aggregate amount of approximately $60,000 (as opposed to the tens of millions of dollars asserted by the Committee). In orders filed April 25, 2011, the Bankruptcy Court approved the objection to the 10 claims, although it did not rule on the merits of the City's objection related to claims allegedly arising under PEMHCA. On May 20, 2011, the City filed objections to all retiree health

1    benefit claims allegedly arising under PEMHCA. The hearing on the over 400 objections is

2    scheduled for June 21, 2011.

3        E.      **Participation of Union Bank and of National Public Finance Guarantee Corporation, which Credit-Enhanced the Series 1999 COPs**

4

5          In July of 2008, Union Bank exercised its right to declare a mandatory tender of the Series

6    2000 COPs, the Series 2001 COPs, the Series 2002 COPs and the Series 2003 COPs (together,

7    the "Union Bank COPs") for which it had issued letters of credit. As a result of such tender,

8    previous holders of the Union Bank COPs were paid in full, and Union Bank became the sole

9    holder of the Union Bank COPs. As described above, the Pendency Plan enabled the City to

10   reduce the payments under the Union Bank COPs.

11         The City also reduced the amount of interest it paid on the Series 1999 COPs, which were

12   credit-enhanced by MBIA Insurance Corporation ("MBIA"), whose rights are now owned by

13   National Public Finance Guarantee Corporation ("National"). The reduction in payments and the

14   City's subsequent cessation of payments resulted in National making payments pursuant to the

15   Debt Service Reserve Surety Bond ("National Surety") and the Financial Guaranty Insurance

16   Policy ("National Policy") in favor of the Indenture Trustee for the benefit of the holders of the

17   Series 1999 COPs. National thereafter filed a motion for relief from the automatic stay, seeking

18   access to certain motor vehicle license fees collected by the State of California ("MVLFs")

19   pursuant to an intercept provision in the California Government Code. Had National prevailed on

20   its claim to the MVLFs, the City's obligations to National and to the Indenture Trustee (for the

21   benefit of the holders of the 1999 COPs) would have been paid in full based on the current level

22   of MVLFs available, assuming that no additional claim to the MVLF was made[13]. The

23   Bankruptcy Court denied the motion on procedural grounds, and on October 21, 2010, National

24   filed an adversary proceeding seeking declaratory relief regarding its claim of entitlement to the

25   MVLFs. Thereafter, National filed a motion for summary judgment. The adversary proceeding

26   prompted settlement negotiations, and, as described more fully in Section V(A)(3) *infra*, the City

27   _____

28   [13] Union Bank also has a claim to the MVLFs with respect to the Series 2000 COPs, but has no made any attempt to intercept the MVLFs.

and National have entered into a global settlement agreement under which, *inter alia,* certain payments have been made and will be made to National and the City acknowledges that National may seek an intercept of the MVLFs in the event of a future default. Such agreement is memorialized in and attached as an exhibit to the Plan, and once the Plan is confirmed by a final order, National will dismiss the adversary proceeding.

### F.      Alco Litigation

After the Court granted them the necessary relief from the stay, on April 22, 2010, Alco Iron & Metal Co. ("Alco") and its affiliate, Kantor Mare Island Properties Ltd., LLC, ("Kantor"), filed a civil action in the Superior Court of the State of California in and for the County of Solano (Case number FCS035663). The action was based on the Vallejo City Council's formation in 2002 of the Mare Island Community Facilities District ("Mare Island CFD" or "CFD") to help finance municipal services on Mare Island through the imposition of a special tax levy on the real property within the boundaries of the CFD. The Mare Island CFD imposed special taxes to fund the services necessary to meet increased demands placed upon the City as the result of development occurring within Mare Island and the loss of federal funding following the closure of the Mare Island Naval Shipyard.

Alco and Kantor own and lease real property on Mare Island, which is located within the City, and allege that they were required to pay a disproportionate and/or unfair amount of the special tax. Alco and Kantor alleged that the CFD and the special tax on Mare Island should be terminated, and that services such as police and fire should instead by funded from the City's General Fund. They also alleged that the City received "surplus funds" from CFD taxes and that they are entitled to reimbursement of overpaid taxes.

On May 25, 2010, the City removed the state court proceeding to the Bankruptcy Court, and thereafter the Bankruptcy Court denied Alco's motion to remand the case back to the Superior Court. Thereafter, the City and Alco/Kantor settled their disputes consensually, with the City agreeing to include an agreed-upon policy statement regarding CFD tax methodology and related topics in its fiscal year 2011-12 budget document. The Parties filed a stipulation for

dismissal of the adversary proceeding on March 29, 2011, and the Bankruptcy Court entered its

order dismissing the adversary proceeding with prejudice on April 1, 2011.

**G.      Motions for Relief From Stay to Pursue General Liability Claims**

Several motions requesting relief from the automatic stay have been filed by plaintiffs in

lawsuits pending in other courts in which damages have been sought based on allegations of civil

rights violations and other General Liability Claims.  The City stipulated to relief from the stay

being granted in those cases in which the movant agreed to liquidate its claim in another forum,

agreed not to enforce any claim so liquidated against assets or property that were the City's,

agreed to look exclusively to insurance proceeds, or agreed to proceed with its underlying lawsuit

but seek further leave of court should it obtain a monetary award.

**IV.     THE CITY'S LIABILITIES AND ASSETS**

As noted in section I(D) and in footnote 2 *supra*, the CAFR for the City's fiscal year

ending June 30, 2010 is not attached, but is available on-line or by written request.  This

document provides all manner of information and financial data and includes the City's

independently audited financial statements.  Set forth below is a summary of the liabilities and

assets that are relevant to the Plan.

**A.      Liabilities.**

**1.      Liabilities Listed by the City in its Filings on the Petition Date.**

As required by Bankruptcy Code sections 924 and 925 and by Bankruptcy Rule 1007-1,

on the Petition Date the City filed its list of creditors and claims (the "Creditors' List") [Docket

No. 5].  The cover sheet to the Creditors' List disclosed as follows:

> The Creditors' List represents obligations of the City's General
> Fund as well as obligations of the City's designated special use
> funds, for example the Water Enterprise Fund.  Such obligations are
> included on the Creditors' List for purposes of full disclosure.  The
> City maintains that California or federal law prohibit the use of
> such special use funds to pay General Fund obligations.  Moreover,
> certain of such obligations are payable only from such special use
> funds.

DISCLOSURE STATEMENT FOR CITY'S SECOND
AMENDED PLAN OF ADJUSTMENT

While the City believes that the Creditors' List was accurate at the time it was filed, subsequent events have negated if not eliminated the relevance of the amounts disclosed therein. For example, the Bankruptcy Court, affirmed by BAP, has agreed that the City's special or restricted funds may not be used to pay General Fund obligations. Moreover, in the Plan, the City assumes the retiree pension obligations to CalPERS. And the over $163 million listed as Long-Term Debt is being adjusted under the Plan. In short, the City submits that while the Creditors' List may have been a helpful tool at the outset of this case, it is largely irrelevant for purposes of the Plan and the Disclosure Statement.

### 2.  Proofs of Claim.

The Bankruptcy Court established two deadlines for filing proofs of claim against the City. The first such bar date, August 16, 2010, applied to all claims except those specifically excluded. The excluded claims were primarily those relating to pension benefits or to the loss of healthcare benefits. The second bar date, November 1, 2010, was limited to claims relating to the loss of healthcare benefits and to claims of lowered future pension benefits occasioned by the rejection of the CBAs and the subsequent new agreements between the City and the Unions.

Approximately 1,015 proofs of claim have been filed to date. Though many of the proofs of claim did not specify the classification to which they belonged, the City classified these claims to the best of its ability based on other groups of claims received and on the City's knowledge of property pledged to secure certain claims. Accordingly, the City catalogued approximately 971 General Unsecured Claims, 12 Unsecured Priority Claims, and 32 Secured Claims. Approximately 489 of the proofs of claim, rather than listing a specific amount being sought, were filed with amounts shown as "unknown," "to be determined," or "unliquidated." Such "unknown" claims include but are not limited to those filed by or on behalf of retirees on account of the City's unilateral reduction of its contribution to their healthcare premiums. The proofs of claim listing a specific amount aggregate approximately $479 million, comprised of approximately $262 million of General Unsecured Claims as calculated by the filing entities, $45 million of Unsecured Priority Claims, and $172 million of Secured Claims.

DISCLOSURE STATEMENT FOR CITY'S SECOND
AMENDED PLAN OF ADJUSTMENT

1    In furtherance of its continuing claims analysis and resolution process, the City will be

2    filing a series of omnibus as well as specific objections to various classes of Claims, through

3    which process the City expects to eliminate an additional approximately $150 million in claims.

4    Such objections will be both on the merits as well as to claims based on obligations for which the

5    City contends it is not liable.  For as described above, on April 25, 2011, the Bankruptcy Court

6    sustained the City's objections to the healthcare benefit claims of 10 retirees, and on May 20,

7    2011, the City filed objections to the health benefits claims of approximately 400 retirees.  The

8    matter is set for hearing on June 21, 2011.

9    Although the City is confident with regard to many of its defenses relating to the disputed

10   Claims, it is important to note there is no assurance as to whether or not the City will be

11   successful in eliminating or reducing any or all of these claims.  Moreover, as noted above, many

12   of the Claims will be adjusted through the Plan (such as the Claims held by Union Bank, the

13   Indenture Trustee, National and the MPA Lease Assignees), and some will be assumed and paid

14   over time such as the approximately $101 million pension benefits claim asserted by CalPERS,

15   the approximately $18.8 million contingent environmental remediation claim filed by the

16   California Department of Toxic Substances (ESCA Trust) and the approximately $1.4 million

17   claim filed by Recology Vallejo.

18   In addition, workers compensation claims have been filed in an aggregate amount of $28.3

19   million.  Pursuant to the Plan, such Claims, when Allowed, will be paid in the ordinary course of

20   business.  Based on its analysis of such claims, factoring in available actuarial data, the City

21   estimates that ultimately such claims will be Allowed in an aggregate amount under $4 million.

22   Finally, General Liability Claims, as filed, amount to an aggregate of $113 million.

23   Pursuant to the Plan, the $500,000 Self Insured Retention portion of such Claims will be paid by

24   the Risk Management Internal Service Fund on the same percentage as the Class 6A and 6B

25   claims.  Based again on its analysis of such claims, including available actuarial data, the City

26   estimates that ultimately the SIR portion of such claims, once Allowed, will approximate $2

27   million.  Thus, if holders of Class 6B Claims are paid somewhere between 20 and 30 cents on the

28

DISCLOSURE STATEMENT FOR CITY'S SECOND
AMENDED PLAN OF ADJUSTMENT

1　dollar, holders of Allowed Class 7 Claims would receive the same percentage of approximately

2　$2 million.

3　　　　　　　　**3.　　General Unsecured Claims.**

4　　　　　A total of 548 proofs of claim were filed as General Unsecured Claims.  An additional 423

5　have been classified by the City as General Unsecured Claims, for a total of 971 General

6　Unsecured Claims.  The General Unsecured Claims include, but are not limited to, Claims (1) of

7　members and former members of IAFF and IBEW for damages stemming from the City's

8　rejection of the CBAs; (2) of retirees for the City's reduction in healthcare benefits; (3) of certain

9　retirees for unpaid leave buyout obligations; (4) of persons with Claims against the City for,

10　among other things, torts and civil rights violations; and (5) workers compensation claims.  As

11　discussed in other places in this Disclosure Statement, General Unsecured Claims are placed into

12　several classes in the Plan (namely:  Class 6A – Convenience Class of Retiree Health Benefit

13　Claims paid in full; Class 6B – employee, leave buyout, and miscellaneous other general

14　unsecured claims; Class 7 – Claims General Liability Claims; and Class 8 – Workers

15　Compensation Claims).

16　　　　　By its analysis and calculations, the City believes that the Allowed Amount of General

17　Unsecured Claims in Classes 6A and 6B will aggregate between approximately $20 million and

18　$30.4 million.  The high end of such range is comprised of Claims for (1) $27 million of damages

19　due to the rejection of the IBEW and IAFF contracts (including both wages and associated future

20　pension impairment); (2) loss of retiree healthcare contributions of approximately $60,000; (3)

21　approximately $2.7 million related to leave buyouts; and miscellaneous other claims aggregating

22　approximately $600,000.  The low end factors in the reduction by $10 million of the $27 million

23　of IBEW and IAFF Claims (although the actual reduction could be greater).

24　　　　　The Claims, as filed, *greatly* exceed the $30.4 million amount, and, as noted above, the

25　City has engaged in a process aimed at ascertaining the differences between the amounts asserted

26　in the General Unsecured Claims and the amounts reflected as owing to the claimants in the

27　City's books and records or as otherwise evaluated by the City.  If the City's estimate of the

28　allowable amounts of the Claims is too low, the percentage of distribution to holders of Class 6A

and Class 6B Claims would be lower. Thus, a distribution of approximately $6 million to holders of the estimated $20 million of Allowed Class 6B Claims equates to a payout of 30%. A $6 million distribution to $30.4 million of Allowed Class 6A and 6B Claims means a payout of 19.7%. If the Allowed claims amount to $40 million, the distribution is 15%. At $50 million, the distribution drops to 12%. In light of the City's recent settlement with members of IBEW and IAFF, the City estimates that a distribution of 20% to 30% will occur.

### 4.     Priority Unsecured Claims.

12 proofs of claim have been categorized as Priority Unsecured Claims, which assert an aggregate of approximately $45 million in obligations against the City.

The City believes that most, if not all, of such claims are more properly characterized as General Unsecured Claims, and has treated them as such in this Disclosure Statement. Moreover, because Chapter 9 only incorporates administrative claims allowed under Bankruptcy Code Section 507(a)(2), which Administrative Claims are discussed in Section V(A) below, the City submits that virtually all such Claims are not entitled to priority status under chapter 9. Accordingly, the City intends to object to virtually every Claim filed as a Priority Claim. The City expects that this objection and reclassification will substantially reduce the priority claim pool, if not eliminate it altogether.

### 5.     Secured Claims

The City has categorized 32 filed proofs of claim as Secured Claims. They assert an aggregate of $172 million in obligations against the City. However, six of the proofs of claim did not list a claimed amount. Consequently, the City's estimate of its secured liabilities approximates $233 million, of which approximately $50 million is impaired General Fund debt. The City has engaged in a process aimed at ascertaining the differences between the amounts asserted in the Secured Claims and the amounts reflected as owing to the claimants in the City's books and records or as otherwise evaluated by the City. Many of the Secured Claims – including all of the General Fund Secured Claims – related to the COPs and the MVLF Intercept, and will be resolved through the treatment of Union Bank's and the MPA Assignees' Claims in the Plan and by the settlement with National that will be approved by confirmation of the Plan.

6.      **Claims Relating to the COPs Documents and the MPA Lease.**

a.      **Background**

The City has outstanding General Fund lease obligations which will be restructured through the Plan and through the various new instruments, described below, which will become effective on the Effective Date.

In general, all of the lease obligations follow the form of a lease out of City-owned property (a "Site Lease") to a separate entity (either a non-profit corporation or to the Vallejo Public Financing Authority ("Authority") which is a joint exercise of powers authority created by the City and the Vallejo Redevelopment Agency for the purpose of assisting in financings) (each a "Conduit Entity") and the simultaneous lease back of the same property to the City by the Conduit Entity (the "Facilities Lease"). Payments under the Facilities Lease are, in the case of the Certificate of Participation ("COP") transactions, distributed to the holders of the COPs or, pursuant to the MPA Lease transaction, paid directly to the assignees of the lease, who are individual investors.

The lease payments are divided into "principal components" and "interest components" the sum of which in each rental period make up the rent payable for that rental period. This is required in order for the interest components to be treated as tax-exempt under federal tax law. The sum of the principal components is referred to as the principal amount of the transaction. Transactions such as the ones into which the City has entered are structured in this way so that they comply with the so-called "lease exception" to the limitations on indebtedness in Article XVI, Section 18 of the California Constitution, as described in *City of Los Angeles v. Offner*, 19 Cal. 2d 483 (1942) and *Dean v. Kuchel*, 35 Cal. 2d 444 (1950), the California Supreme Court cases that establish the lease exception. For this reason, these types of leases are often referred to as "Offner-Dean" leases.

An important feature of Offner-Dean leases is that they cannot be accelerated, which is a corollary to the requirement of the *Offner* and *Dean* cases that the City's obligation to pay rent under the Facilities Lease is limited to payment for beneficial use and occupancy of the leased premises during the rental period for which payment is due.

b.     **City's Lease Obligations**

(i)     *Series 1999 COPs*

The Series 1999 COPs consist of a single series of COPs entered into in 1999 and structured as fixed interest rate obligations. The Series 1999 COPs were sold to investors in a public offering and are still held by various investors. The 1999 COPs were additionally secured by the National Surety and the National Policy.

The Series 1999 COPS were originally executed and delivered with aggregate principal components of $4,815,000 of which $3,785,000 remains unpaid. The final stated payment date of the 1999 COPs is in 2030.

The National Surety was issued by MBIA in lieu of a cash reserve fund to secure the City's lease payment obligations, was drawn upon due to the City's failure to make Facilities Lease payments during the pendency of the Chapter 9 Case, and has been exhausted. The National Policy insures that the holders of the Series 1999 COPs will receive full and timely payment of the amounts evidenced and represented by the 1999 COPs in the event that the City continues to fail to make payment on the underlying Facilities Lease. To date, National has honored its obligations under the National Surety and the National Policy, and National is entitled to repayment with respect to draws on the National Surety pursuant to the Financial Guaranty Agreement that MBIA entered into with the City at the time of the initial execution and delivery of the Series 1999 COPs and to be subrogated to the rights of the Indenture Trustee to collect payment from the City on behalf of the holders of the Series 1999 COPs pursuant to the Trust Agreement for the Series 1999 COPs and to the National Policy.

The Series 1999 COPs also are subject to the provisions of California Government Code section 37351.5 (the "MVLF Intercept Law") pursuant to which the City elected to guarantee payment of the lease payments payable to the holders of the Series 1999 COPs with certain MVLFs administered by the State Controller. As described in Section III(E) above, National filed an adversary proceeding in the Bankruptcy Court claiming that it has the right to demand that the Controller intercept such revenues to make payments on the Series 1999 COPs despite the filing of the Chapter 9 Case. The City disputed such claims. The City, National and State

Controller (who has intervened in the adversary proceeding) have reached a settlement pursuant to which the adversary proceeding will be dismissed once the order confirming the Plan has become a final and nonappealable order. A copy of the settlement agreement is Exhibit A to the Plan.

(ii)    <em>Union Bank COPs</em>

The largest group of the City's lease obligations is comprised of the four series of COPs executed and delivered originally as variable interest rate obligations secured by letters of credit issued by Union Bank. These consist of the following (the "Union Bank COPs"):

| Series | Original Aggregate Principal Components | Remaining Unpaid Principal Components | Original Final Payment Date |
|---|---|---|---|
| 2000 | $30,380,000 | $22,050,000 | 9/1/2040 |
| 2001 | 16,350,000 | 9,490,000 | 6/1/2040 |
| 2002 | 12,415,000 | 8,190,000 | 12/1/2023 |
| 2003 | 8,000,000 | 6,132,760 | 12/1/2023 |
| Totals | $67,145,000 | $45,862,760 | |

The real property subject to the Site Leases and Facilities Leases for the Union Bank COPs is described in Exhibit C to the Plan. The City does not have any appraisal of these properties; however, the City's casualty insurer values the buildings owned by the City at "replacement cost, as new" values, which are shown in Exhibit D attached hereto. These values do not include land value for the listed properties. The City believes these replacement cost values significantly overstate the fair market value of these buildings in their current condition and uses. The City receives no net rental income from any of the leased properties.

Like the Series 1999 COPs, the Series 2000 COPs were additionally covered by an election under the MVLF Intercept Law.

The Union Bank COPs were issued as variable rate obligations backed by letters of credit issued by Union Bank. The letters of credit were issued pursuant to reimbursement agreements by and between the City and Union Bank which provide for the mechanics of the issuance of, draws upon and reimbursement to the Bank with respect to the letters of credit, as well as the terms of the Union Bank COPs when they are purchased by Union Bank pursuant to optional or mandatory tenders of the Union Bank COPs by investors. The City's obligations under the reimbursement agreements are expressly limited to payments the City makes under the Facilities

Lease for each series of Union Bank COPs, and in turn each Facilities Lease defines the Lease Payments to include amounts payable pursuant to the associated reimbursement agreement.

          *(iii)*    *MPA Lease*

In 2001, the City entered into a lease/leaseback transaction with MPA Leasing Corporation, with an original aggregate of principal components of lease payments of $1,150,000. The current aggregate unpaid principal components of lease payments is $829,248, and the final payment date is June 1, 2021. In this transaction, there are no COPs, but instead the Facilities Lease and Site Lease were assigned to two individual investors (the "MPA Assignees") in a private placement, and those investors still hold their respective interests. There is no guarantor or other credit support.

The real property subject to the Site Lease and the Facilities Lease for the MPA transaction is the JFK Library, which was among the properties subject to the Site Lease and Facilities Lease for the Series 2000 COPs a year earlier. The Site Lease and Facilities Lease for the Series 2000 COPs were recorded, and thus the rights the MPA Assignees with respect to the JFK library are subordinate to the rights of Union Bank as the holder of the Series 2000 COPs.

### 7.    Role of Mayor Osby Davis ("Davis") and Orrick, Herrington & Sutcliffe ("Orrick") in Certain COPs Transactions.

The Court's March 7, 2011, Amended Civil Minute Order required the City in its Amended Disclosure Statement to provide "additional disclosure concerning Osby Davis, the City's mayor, and the Orrick law firm, counsel for the city, and their work on the COPs being reorganized by the plan." The City hereby provides such information.

### a.    Role of Osby Davis as Disclosure Counsel in the COPs Transactions.

Prior to taking office as Mayor in January 2008, Davis was engaged by the City to act as disclosure counsel with respect to the Series 1999, 2000, 2001, 2002 and 2003 COPs financings. He has not been engaged by the City with respect to any other financings. Davis' client was the City in each of these transactions. His role as disclosure counsel was to assist in the preparation and review of the official statements for the COPs. Official statements are the disclosure

1  documents pursuant to which municipal securities (such as the City's COPs) are marketed to

2  investors.

3      Davis provided a so-called "negative assurances" letter with respect to each of the series

4  of COPs.  In each letter, he stated that, based on the activities he had undertaken in connection

5  with the representation of the City in the matter, he had no reason to believe that the official

6  statement contained an untrue statement of a material fact or omitted to state a material fact which

7  was necessary, in light of the statements made in the official statement, to make the statements

8  made therein not misleading.  Such letters are commonly referred to in the municipal securities

9  practice as "10b-5 opinions" (so named after Rule 10b-5 promulgated under the Securities

10  Exchange Act of 1934); they are intended to assist the underwriters of municipal bonds in

11  satisfying their "due diligence" obligations.

12      Davis' engagements as disclosure counsel with respect to each series of COPs ended on

13  the closing date of each series of COPs.  Thus, his role as disclosure counsel with respect to the

14  COPs concluded in December 2003, over seven years ago.

15      No demand or claim has been made against Davis by his client (the City) or by any other

16  party to the COPs transactions.  The City does not believe that it has any claims against Davis on

17  account of his role as disclosure counsel.

18          **b.      Role of Orrick in City Financing Transactions.**

19      Commencing in 2005, Orrick provided legal services to the City as bond counsel on

20  several matters, including work with respect to the replacement of the letter of credit on the Series

21  2000 COPs, the extension of the letter of credit on the Series 2001 COPs and the sublease of

22  certain real property which is the subject of the leases in the Series 2002 COPs.  In all of these

23  matters, Orrick's client was the City.  A brief description of this work follows:

24      *Series 2000 COPs*.  In 2005, Orrick represented the City in connection with the

25  replacement of the letter of credit securing the Series 2000 COPs originally issued by KBC Bank

26  N.V., New York Branch, with a new letter of credit issued by Union Bank.  This work involved

27  the preparation of certain documents to be entered into by the City and the Authority in

28  connection with the new letter of credit and the review of documents prepared by Union Bank's

DISCLOSURE STATEMENT FOR CITY'S SECOND
AMENDED PLAN OF ADJUSTMENT

counsel.  Orrick also prepared a revised Reoffering Memorandum pursuant to which the Remarketing Agent for the Series 2000 COPs reoffered the Series 2000 COPs to investors with the new letter of credit as security.  Orrick provided a "no adverse effect" tax opinion with respect to the transaction.  This opinion expressly states that Orrick did not reconfirm the original opinion of bond counsel delivered at the time of the issuance of the Series 2000 COPs, but merely that the replacement of the letter of credit would not, in and of itself, adversely affect the tax status of the Series 2000 COPs.

*Series 2001 COPs*.  In 2006, Orrick represented the City in connection with the extension of the letter of credit issued by Union Bank securing the Series 2001 COPs issued by Union Bank and the release of a confirming letter of credit issued by the California State Teachers' Retirement System that had also secured the Series 2001 COPs .  This work involved the preparation of certain documents to be entered into by the City and the Authority in connection with the extension of the letter of credit and the review of documents prepared by Union Bank's counsel.  Orrick also prepared a revised Reoffering Memorandum pursuant to which the Remarketing Agent for the Series 2001 COPs reoffered the Series 2001 COPs to investors with the new amended letter of credit as security.  Orrick was not requested or required to deliver any legal opinion in connection with this transaction.

*Series 2002 COPs*.  In the Fall of 2008 (after the commencement of this case), Orrick represented the City in connection with the sublease by the City to T-Mobile of a portion of the real property leased with respect to the Series 2002 COPs for the purpose of allowing a cellular telephone antenna tower to be constructed on the site.  Orrick provided a "no adverse effect" tax opinion with respect to the sublease.

In addition to the above matters, Orrick has represented the City as bond counsel in connection with several other issues, including various series of Revenue Anticipation Notes in connection with the former Marine World project (which has since been sold by the City), certain Water Revenue Bonds, the formation of CFDs related to Lennar Mare Island, and the refinancing of conduit revenue bonds issued for Touro University.

DISCLOSURE STATEMENT FOR CITY'S SECOND
AMENDED PLAN OF ADJUSTMENT

With respect to each of the above referenced transactions, Orrick's representation ended at the time of the closing of each respective transaction. No demand or claim has been made against Orrick by its client (the City) or any other party with respect to any of these transactions. The City does not believe that it has any claims against Orrick on account of its foregoing roles.

**8.     <u>Statement Regarding Liabilities.</u>**

The City disputes a number of the claims that have been asserted against it, and the City's review and analysis of claims is ongoing. Given the fact and inherent uncertainties in any litigation regarding claims, no assurance can be given regarding the successful outcome of any litigation that may be initiated in objection to such claims or regarding the ultimate amount of unsecured claims that will be allowed against the City.

As described below, the Plan enables the City to file objections to claims at any time within 180 days after the Effective Date. The Plan also provides for the City to retain any and all defenses, offset and recoupment rights, and counterclaims that may exist with respect to any disputed claim, whether under sections 502, 552, or 558 of the Bankruptcy Code or otherwise. The City reserves all rights with respect to the allowance and disallowance of any and all claims. **In voting on the Plan, creditors may not rely on the absence of a reference in this Disclosure Statement or the Plan or the absence of an objection to their proof(s) of claim as any indication that the City ultimately will not object to the amount, priority, security, or allowance of their claims.**

**B.     <u>Assets.</u>**

**1.     <u>Capital Assets; Valuation Thereof.</u>**

The City owns numerous and varied capital assets, including buildings, roads, bridges, infrastructure and utility improvements, parks, undeveloped real property and service vehicles (such as fire trucks, police cars and street equipment). Virtually all of these municipal assets are used daily in the performance of public functions and cannot be easily liquidated – particularly under current market conditions. They are valued in the City's books and records at depreciated historical cost, which does not represent the cash value that could be recognized by the City in the event of a voluntary sale. California law does not permit the levy on or sale of a city's assets in

order to satisfy a court judgment.  Cal. Gov't Code § 900 *et seq.*  Thus, the City has not sought or

obtained a valuation of its capital assets.  It has valued its structures for insurance purposes, and

such values are shown on Exhibit D.  Such values, however, do not and cannot reflect the value to

the City and its residents of, for example, City Hall, fire and police stations and the JFK Library.

### 2.    Claims and Causes of Action Against Third Parties.

Parties in interest may not rely on the absence of a reference in this Disclosure Statement

or in the Plan as any indication that the City ultimately will not pursue any and all available

claims, rights and causes of action against them.  **All parties who previously dealt with the City**

**hereby are on notice** that the Plan preserves certain of the City's rights, claims, causes of action,

interests and defenses.  The City expects that any and all meritorious claims will be pursued and

litigated after the Effective Date to the extent they remain vested in the City.

## V.    SUMMARY OF THE PLAN OF ADJUSTMENT

The discussion of the Plan set forth below is qualified in its entirety by reference to the

more detailed provisions set forth in the Plan and its exhibits, the terms of which are controlling.

Holders of claims and other interested parties are urged to read the Plan and its exhibits, copies of

which are attached to this Disclosure Statement as Exhibit A, in their entirety so that they may

make an informed judgment regarding the Plan.

The Plan is premised upon the Five Year General Fund Business Plan, which is the

financial planning document adopted by the City Council on November 30, 2010, that presents

strategies for the City to maintain a balanced operating budget, to address the City's debts, to

rebuild fiscal stability, and to enable the City to continue to provide municipal services through

June 30, 2015.  The Plan includes adjustment of the obligations imposed by the Union Bank

COPs, the Series 1999 COPs and the MPA Lease.  It creates two pools aggregating approximately

$6 million in cash for payment to General Unsecured Creditors over two years, with payments

based on the Allowed Amount of each such creditor's claim, and pays holders of General

Liability Claims the same pro rata percentage, but acknowledges that such claims have rights to

pursue one of the City's insurance pools for a portion of the City's liability to them.  It pays the

full amount of Workers Compensation Claims because, absent the City paying its share, the City and its injured workers would lose State excess coverage.

While those portions of the Five Year General Fund Business Plan that relate to the treatment of Claims under the Plan will be binding on the City, on creditors and on parties in interest on the Effective Date, the sources and uses of funds during the next five years are projections and, as budgets are adopted during the next five years, undoubtedly will not mirror those budgeted in the Five Year General Fund Business Plan.

On a going-forward basis, the City will assume substantially all of its prepetition and postpetition contractual obligations, including the four CBAs into which it entered after the Petition Date. It will honor current and future negotiated obligations with respect to sick leave, vacation pay and to healthcare premiums for the City's employees, and will assume its pension contracts with CalPERS, meaning that pension benefits will not be altered. The Plan does not purport to bind the City or its unions with respect to future collective bargaining agreements.

Finally, and equally important, the City will maintain the municipal services it provides to City residents and businesses.

A.     **Classification and Treatment of Claims.**

1.     **Unclassified Claims.**

Section II of the Plan governs the treatment of certain claims that are not classified into Classes under the Plan.

a.     **Administrative Expense Claims.**

Administrative Expense Claims are claims of the kind described in sections 503(b) and 507(a)(2) of the Bankruptcy Code. Section II(A) of the Plan provides for the treatment of Administrative Claims. Throughout the course of the Chapter 9 Case, the City has endeavored to satisfy administrative expenses as they became due. Accordingly, the City believes that most claims that otherwise would constitute Allowed Administrative Claims previously have been or will be satisfied in the ordinary course of business prior to and after the Effective Date.

(i)     *Treatment of All Other Administrative Claims Other Than Professional Claims.*

The Plan provides that, except as provided in Section II(B) of the Plan, with respect to Professional Claims, or to the extent that the holder of an Allowed Administrative Claim agrees to a different treatment, the City or its agent will pay to each holder of an Allowed Administrative Claim, in full satisfaction, release and discharge of such claim, cash in an amount equal to such Allowed Administrative Claim in the ordinary course of the City's business, but in no event later than the later of the date that is practicable after (i) the Effective Date, or (ii) the date on which such claim becomes an Allowed Administrative Claim.

Professional Claims are claims of professionals for unpaid services and costs incurred prior to the Effective Date or for services to be rendered following the Effective Date or expenses to be incurred in rendering such services following the Effective Date either in the Chapter 9 Case or incident to the Plan.

Section II(D) of the Plan provides that, pursuant to section 943(a)(3) of the Bankruptcy Code, all Professional Claims must be disclosed and be reasonable and that, upon being deemed reasonable, the City or the Disbursing Agent will pay to each holder of a Professional Claim, in full satisfaction, release and discharge of such Claim, cash in an amount equal to that portion of such Claim that is deemed reasonable.

The City has paid the fees of its bankruptcy counsel, labor counsel and other professionals, as well as the fees of counsel for the Committee, on a regular basis during the Chapter 9 Case. Pursuant to the requirements of the COPs Documents, the City also has reimbursed Union Bank and the Indenture Trustee (on account of all City COPs, including the General Fund COPs that are restructured in the Plan). Pursuant to its settlement with National, the City reimbursed National in late January 2011 for its attorney fees and costs – at an agreed-upon discounted amount. Pursuant to the provisions of the MPA Lease Documents, in March 2011, the City paid a compromised attorney fees amount to one of the MPA Assignees.

The fees described in the preceding paragraph are not Professional Fees because they have been paid prior to the Effective Date. Nor are such fees subject to Bankruptcy Court review or approval, as Bankruptcy Code § 326 *et seq*. do not apply in chapter 9 cases. The following chart, which lists the payments in excess of $10,000 to professionals (or the reimbursement of creditors

for professional fees) from the Petition Date through February 28, 2011, is included in the spirit of full disclosure:

| Professional | Dates of Service | Fees/Expenses Paid Through February 28, 2011 |
|---|---|---|
| Orrick, Herrington & Sutcliffe LLP (Bankruptcy Counsel to the City) | 6/1/08 – present | $4,675,038 |
| Renne Sloan Holtzman Sakai (Labor Counsel to the City) | 9/1/08 – present | $1,881,780 |
| Public Financial Management ("PFM" – City's financial advisor) | 2/1/09 – present | $18,000 |
| Bartel & Associates (Actuarial services) | 2/1/09 – present | $73,913 |
| Downey Brand LLP (Counsel to the Committee) | 12/1/08 – present | $821,921 |
| Jeffer Mangels (Counsel to Union Bank) | 2/1/08 – present | $796,784 (includes some fees incurred prior to the Petition Date) |
| Reed Smith (Counsel to Indenture Trustee) | 10/1/08 – present | $368,775 |
| Winston & Strawn, successor to Squire, Sanders & Dempsey, LLP  (Counsel to National) | 11/9/09 – present | $400,000 |
| Gurshuni & Katz (Counsel to Peg Yorkin Living Trust, an MPA Assignee holding approximately 88% of the obligation) | 10/10 – present | $20,000 (paid 3/9/11) |
| Management Partners, Inc. (City bankruptcy consultant/expert witness) | 7/30/08 – 5/19/09 | $76,760 |
| Maze & Associates (City auditors) | 1/12/09 – present | $122,519 |
| Maze & Associates (City bankruptcy consultant) | 10/1/10 – present | $34,715 |

As of the date of this Disclosure Statement, the City is not aware of any Claims for Professional Fees.

       **b.**        **Bar Date for Assertion of Requests for Payment of Administrative Claims (Other Than Ordinary Course Administrative Claims) and Professional Claims.**

Section II(D) of the Plan provides that all requests for approval of Administrative Expense and Professional Claims must be filed with the Bankruptcy Court and served upon the City no later than thirty (30) days after the date on which the Notice of Effective Date is mailed pursuant to the Plan.

*Any request for payment of an Administrative Claim, and any request for a finding that a Professional Claim is reasonable, that is not timely filed by that deadline will be forever barred, and holders of such claims will be barred from asserting such claims in any manner against the City.*

>    2.   <u>Classes 1A1 through 1D1 and Classes 1A2 through 1D2, Inclusive (Union Bank).</u>

>        a.   <u>Summary</u>

As described above, all of the Union Bank COPs were purchased by Union Bank in July of 2008, and all of the former holders of the COPs have been paid in full by Union Bank, which is the sole owner of the Union Bank COPs. The Union Bank COPs Documents and the obligations of the City thereunder, representing, in the aggregate, the Claims held by Union Bank in Classes 1A1, 1A2, 1B1, 1B2, 1C1, 1C2, 1D1, and 1D2, all of which are deemed Allowed under the Plan, will be adjusted as described in detail below. Pursuant to the Reimbursement Agreements, the interest components evidenced and represented by the Union Bank COPS are adjusted based on a Default Rate of interest (Reference Rate +3%, currently 6.25%). Because interest rates are at historic lows, and because the City's obligations under the Union Bank COPs run until the year 2041, the City believes that the Reference Rate (and thus the cost of the Union Bank COPs) would increase during that payoff period. As described below, the Plan will result in the City modifying the extant leases and reimbursement agreements, assuming them as modified (including a one-year extension of the obligations), and writing down accrued but unpaid interest on the obligations by approximately $6,425,461.[14]

---

[14] The restructured obligation will include only $1,827,573 of the accrued but unpaid interest on the Union Bank COPs since the inception of the Chapter 9 Case. The City estimates the total amount of such interest to be $3,924,860 at the non-default interest rate under the existing obligations, plus an additional $4,328,174 in default interest. Thus, Union Bank will suffer a loss of such interest in an amount of approximately $6,425,461, which is included in the Original Obligation column in the chart for FYE 2012.

DISCLOSURE STATEMENT FOR CITY'S SECOND AMENDED PLAN OF ADJUSTMENT

1    Union Bank will be paid a fixed interest rate of 2.5% per annum on a restructured

2    obligation of $20 million and a fixed interest rate of 1.625% on a restructured obligation of

3    approximately $21.37 million (as opposed to what the City projects would be a 7.28% interest

4    component obligation absent modification).  The following chart reflects the payment obligations,

5    which, as described below, include the write down of pre-Effective Date interest and the

6    nonaccrual of interest from the Effective Date of the Plan through December 31, 2014.  The City

7    estimates that the reduction in interest accrual and rate will amount to a net present value

8    reduction of its costs of approximately 47%.

| Plan Treatment of Union Bank | | | |
|---|---|---|---|
| Variable Interest Rate Assumption | 6.25% - 7.25% | 0.00% - 2.50% | |
| Fiscal Year | Original Obligation | Plan Treatment | Difference |
| Aggregate DS Schedule | | | |
| FYE 2012 | $10,771,037 | $7,323,338[2] | (3,447,699) |
| FYE 2013 | $4,605,013 | $1,120,604 | (3,484,409) |
| FYE 2014 | $4,549,937 | $1,382,872 | (3,167,065) |
| FYE 2015 | $4,500,359 | $1,864,604 | (2,635,755) |
| FYE 2016 | $4,447,238 | $1,864,604 | (2,582,634) |
| FYE 2017 | $4,392,220 | $1,864,604 | (2,527,615) |
| FYE 2018 | $4,333,112 | $1,864,604 | (2,468,508) |
| FYE 2019 | $4,268,840 | $1,864,604 | (2,404,235) |
| FYE 2020 | $4,214,116 | $1,864,604 | (2,349,511) |
| FYE 2021 | $4,152,533 | $1,864,604 | (2,287,929) |
| FYE 2022 | $4,080,620 | $1,864,604 | (2,216,016) |
| FYE 2023 | $4,012,211 | $1,864,604 | (2,147,607) |
| FYE 2024 | $3,942,068 | $1,864,604 | (2,077,463) |
| FYE 2025 | $2,471,730 | $1,698,666 | (773,064) |
| FYE 2026 | $2,435,922 | $1,698,666 | (737,255) |
| FYE 2027 | $2,402,274 | $1,731,432 | (670,842) |
| FYE 2028 | $2,361,028 | $1,741,210 | (619,818) |
| FYE 2029 | $2,326,641 | $1,741,041 | (585,599) |
| FYE 2030 | $2,279,595 | $1,733,654 | (545,941) |
| FYE 2031 | $2,239,679 | $2,054,666 | (185,013) |
| FYE 2032 | $2,191,531 | $2,054,666 | (136,865) |
| FYE 2033 | $2,140,483 | $2,054,666 | (85,817) |
| FYE 2034 | $2,100,901 | $2,054,666 | (46,235) |
| FYE 2035 | $2,042,966 | $2,054,666 | 11,701 |
| FYE 2036 | $1,996,768 | $2,054,666 | 57,899 |
| FYE 2037 | $1,936,643 | $1,449,220 | (487,423) |
| FYE 2038 | $1,892,319 | $1,054,666 | (837,652) |
| FYE 2039 | $1,824,491 | $1,054,666 | (769,824) |
| FYE 2040 | $1,767,494 | $1,054,666 | (712,827) |
| FYE 2041 | $1,209,440 | $1,054,666 | (154,773) |
| FYE 2042 | $0 | $403,337 | 403,337 |

| | | | | Percentage Reduction |
|---|---|---|---|---|
| Total DS | $97,889,208 | $57,216,751 | ($40,672,457) | 41.55% |
| Present Value to 7/1/2011[3] | $48,602,707 | $25,767,791 | ($22,834,915) | 46.98% |

(1) Based on payments required under existing documents and an assumed all-in interest rate of

| Plan Treatment of Union Bank | | | |
|---|---|---|---|
| Variable Interest Rate Assumption | 6.25% - 7.25% | 0.00% - 2.50% | |
| Fiscal Year | Original Obligation | Plan Treatment | Difference |

7.28%. Such rate is the City's best estimate of the variable rate that would apply over the life of the obligations under the existing documents, and is based on advice by the City's financial advisor, Public Financial Management.

(2) $6,425,461 of interest write-down is included in the Original Obligation amount for FYE 2012 and $6,137,400 of unspent proceeds held by the Trustee and transferred to Union Bank are included as a payment for FYE 2012.

(3) Discounted at the City's estimated all-in true interest cost under the original obligation of 7.28%

### b.    Restructuring of Union Bank COPs Documents.

The key terms of the Union Bank restructuring include:

The City, as lessor, shall be deemed to assume each of the Union Bank COPs Site Leases by the amendment and restatement thereof, as described below, by the New Union Bank Site Lease;

The City, as tenant, shall be deemed to assume each of the Union Bank COPs Facility Leases by amendment and restatement thereof by the New Union Bank Facility Lease as provided below;

The Union Bank COPs Site Leases and the Union Bank COPs Facility Leases will be amended and restated, respectively, by the New Union Bank Site Lease and the New Union Bank Facility Lease.  The annual payment obligations of the City under the New Union Bank Facilities Lease shall be as set forth in the preceding section of the Disclosure Statement (which also is Exhibit D to the Plan). The amount of such payments was calculated as described below.

In recognition of the MVLF Intercept guaranteeing the payment of the 2000 COPs, a portion of these lease payments to be made by the City pursuant to the New Union Bank Facility Lease will be deemed to be guaranteed by the City's election under California Government Code Section 37351.5; *provided*, *however*, that Union Bank shall not be deemed to posses any greater rights with respect to the MVLF Intercept than it would have had with respect to the Series 2000 COPs;

The amount of approximately $6,137,400 of unspent proceeds of the Union Bank COPs, which are pledged to the payment of obligations owing to Union Bank with respect to the Union

DISCLOSURE STATEMENT FOR CITY'S SECOND
AMENDED PLAN OF ADJUSTMENT

Bank COPs, will be paid to Union Bank on the Effective Date and applied to reduce the principal amount owing to Union Bank with respect to the Union Bank COPs;

The Union Bank COPs Reimbursement Agreements will be amended and restated by the New Union Bank Reimbursement Agreement Payment Agreement. Payments under the New Union Bank Reimbursement Agreement Payment Agreement will consist of principal, negative amortization, and interest payments as shown in Exhibit E to the Plan. The combination of such principal and interest payments, assuming all payments are made timely as required by the New Union Bank Reimbursement Agreement Payment Agreement, will exactly equal the payments under the New Union Bank Facilities Lease as described in Exhibit D to the Plan, and payment by the City of such lease payments under the New Union Bank Facilities Lease shall be credited against amounts payable under the New Union Bank Reimbursement Agreement Payment Agreement.

The Union Bank COPs Assignment Agreements will be amended and restated by the New Union Bank Assignment Agreement;

The City shall pay to the respective trustees under the Union Bank COPs Trust Agreements all accrued but unpaid fees, expenses, and charges due each thereunder.

The City shall pay to Union Bank (other than as trustee under any of the Union Bank COPs Trust Agreements) all accrued but unpaid fees, expenses, and charges (but, for the avoidance of doubt, excluding principal or accrued but unpaid interest) due under the Union Bank COPs Documents.

All of the Union Bank COPs and the remaining Union Bank COPs Documents will be deemed terminated and have no further force or effect except to the extent that any of those Union Bank COPs Documents have been amended and restated pursuant to the Plan by one of the New Union Bank Documents, in which case, all the obligations of the City and the other parties thereto are deemed continued in and subsumed by that amended and restated New Union Bank Document as provided therein.[15]

---

[15] The City will file the New Union Bank Document and serve them on the special notice list no later than seven business days prior to the date on which objections to confirmation of the Plan are due.

DISCLOSURE STATEMENT FOR CITY'S SECOND
AMENDED PLAN OF ADJUSTMENT

c.    **Calculation of New Union Bank Payments**

The lease payment schedule under the New Union Bank Facilities Lease was calculated based on the formula outlined in the New Union Bank Reimbursement Agreement Payment Agreement assuming all payments payable thereunder are paid in full and on time.  As shown in the chart in Section V.A.2.a. above, based on certain assumptions concerning the future level of the Union Bank Reference Rate and the requirements of the existing Union Bank COPs Documents, the City will pay substantially less over the remaining term of these obligations than it would have paid under the existing obligations.  The New Union Bank Reimbursement Agreement Payment Agreement provides for payments calculated as follows:

While deemed a single payment obligation, the components of that payment obligation will be comprised of two conceptual payment obligations (or tranches)—respectively, the "A" obligation and the "B" obligation—each with a notional starting principal balance, a period of no interest accrual, a following period of interest accrual at a fixed interest rate, annual payments beginning on various dates certain of a portion of that notional principal balance and of accrued but unpaid interest thereon, and, in the case of the "B" obligation, capitalization for some period of time of certain accrued but unpaid interest, all as set forth below;

The notional starting principal balance of (i) the "A" obligation will be $20,000,000; and (ii) the "B" obligation will be the "New Union Bank Reimbursement Obligations Starting Principal Balance" less $20,000,000.   The "New Union Bank Reimbursement Obligations Starting Principal Balance" is equal to (i) the aggregate principal amount due the Bank under the Union Bank COPs Reimbursement Agreements ($45,677,760); plus (ii) a portion of the amount of accrued but unpaid interest on that aggregate principal amount equal to $1,827,573; less (iii) the amount of the Unspent Proceeds (presently estimated to be $6,137,400), all calculated as of the Effective Date, for an presently estimated total of $41,367,933.  Thus the estimated starting principal balance of the "B" obligation  is approximately $21,367,933;

No interest will accrue on either the "A" obligation or the "B" obligation from the Effective Date through December 31, 2014, and interest will commence to accrue on both those

DISCLOSURE STATEMENT FOR CITY'S SECOND
AMENDED PLAN OF ADJUSTMENT

1   obligations on January 1, 2015. In other words, there will be a three and one half year "interest

2   honeymoon" were the Effective Date to occur on July 1, 2011;

3          When interest commences to accrue, it will accrue on the principal balance from time to

4   time outstanding of (i) the "A" obligation at the fixed rate per annum of 2.5%; and (ii) the "B"

5   obligation at the fixed rate per annum of 1.625%, in each case until that balance of principal has

6   been paid in full. As noted above, this compares to the current interest rate applicable to such

7   balances of 6.25%, which is equal to the Union Bank Reference Rate (sometimes called the

8   "Prime Rate") plus 3% at a time when Prime Rates are at historic lows.

9          From the time that interest commences to accrue on the "B" obligation (January 1, 2015),

10  the amount of interest that will accrue thereon during each calendar year, after giving effect to

11  any payment of principal that is to be paid on that obligation on the first Business Day of that

12  calendar year as described in Exhibit E to the Plan, if remaining unpaid, will be added to the

13  outstanding principal balance of that obligation as of January 1st of that year and will thereafter

14  bear interest as part of that principal until paid.

15         Interest will be payable annually on the first Business Day of each calendar year in a

16  single annual payment, in advance, commencing with (i) as to the "A" obligation, the 2015

17  calendar year; and (ii) as to the "B" obligation, the 2018 calendar year and continuing, in each

18  case, until the principal balance of that obligation has been paid in full; *provided, however*, that if

19  an interest payment as to either obligation was due and payable on the first Business Day of the

20  prior calendar year and any interest has accrued on that obligation as of the first Business Day of

21  the current calendar year that was not paid in advance on the first Business Day of that prior

22  calendar, all that accrued but not previously paid in advance interest must also be paid on the first

23  Business Day of the current calendar year;

24         Principal will be payable annually on the first Business Day of each calendar year, in a

25  single annual payment, commencing with, (i) as to the "A" obligation, the 2012 calendar year;

26  and (ii) as to the "B" obligation, the 2025 calendar year as to each of those years for each of those

27  obligations in the respective amounts set forth on Exhibit E to the Plan.

28

DISCLOSURE STATEMENT FOR CITY'S SECOND
AMENDED PLAN OF ADJUSTMENT

Subject to paragraphs 9 and 10 below, the outstanding principal balance, all accrued but unpaid interest and all other amounts due under the New Union Bank Reimbursement Agreement Payment Agreement with respect to (i) the "A" obligation will be due and payable on January 1, 2026; and (ii) the "B" obligation will be due and payable on January 1, 2042 (those dates, respectively, being the nominal maturity dates of those obligations);

Notwithstanding paragraphs 6 through 8 above, if the principal and interest payment obligation of the City under the New Union Bank Reimbursement Agreement Payment Agreement on the first Business Day of any calendar year exceeds the lease payment paid by the City to the Authority under the New Union Bank Facility Lease for that year and assigned to the Bank by the Authority pursuant to the New Union Bank Assignment Agreement, the amount of that payment obligation in excess of that lease payment, (i) if and to the extent that the same constitutes interest (with the "A" obligation being deemed to be paid before the "B" obligation and interest being deemed to be paid before principal), will be added to the outstanding principal balance of the "B" obligation as of January 1st of that year, and will thereafter bear interest as part of that principal until paid; and (ii) if and to the extent that the same constitutes principal, will be deferred until after the nominal maturity date of the respective "A" or "B" obligation that is not so paid, all as provided in paragraph 10 below;

If any principal payment obligation of the City under the New Union Bank Reimbursement Agreement Payment Agreement is deferred as provided in the preceding paragraph, (i) the maturity date of the respective "A" obligation or "B" obligation with respect to which that principal payment obligation is deferred will be extended to January 1st of the following year (and, if the nominal maturity date of the "B" obligation is being so extended, the respective terms of the New Union Bank Site Lease and the New Union Bank Facility Lease will be commensurately extended for an additional year as provided therein) and from year to year until the "A" obligation and "B" obligation have, respectively, been paid in full; and (ii) the amount of principal to be paid on the first Business Day of each calendar year after the year in which the nominal maturity of the "B" obligation occurs will be (i) the fair rental value of the properties leased to the City under the New Union Bank Facility Lease for the calendar year in

1   which that first Business Day occurs; less (ii) the amount of interest due and payable pursuant to

2   paragraph 6 above;

3        If there is an event of default under the New Union Bank Reimbursement Agreement

4   Payment Agreement, at the election of Union Bank, the respective rates at which interest will

5   accrue on the "A" obligation and the "B" obligation set out in paragraph 4 above will increase by

6   1% per annum until each Event of Default has been cured or waived; provided, however, that the

7   adding of accrued but unpaid interest to the outstanding principal balance of the "B" obligation as

8   otherwise described above will not constitute a cure of any Event of Default that arises due to the

9   failure to pay the default interest differential.

10        The payment obligations of the City under the New Union Bank Reimbursement

11   Agreement Payment Agreement may not be accelerated; however, pursuant to the New Union

12   Bank Facilities Lease, to the extent that all of the obligations under the New Union Bank

13   Reimbursement Agreement Payment Agreement are not fully paid as of the end of the nominal

14   term of the New Union Bank Facilities Lease, the New Union Bank Facilities Lease will be

15   extended for an additional term (not to exceed any legal limitation on the term of such lease) until

16   such obligations are fully paid.

17        Notwithstanding any other provision of the New Union Bank Reimbursement Agreement

18   Payment Agreement, the City's obligation to make payments thereunder shall be limited to

19   amounts the City is obligated to pay under the New Union Bank Facilities Lease, and under no

20   circumstances shall the City be obligated to make any payment to Union Bank thereunder to the

21   extent such payment is not paid as a result of a payment under the New Union Bank Facilities

22   Lease.

23        **d.    Allocation of New Union Bank Facilities Lease Payments to Funds**

24        The Union Bank COPs financed various facilities of the City, some of which were related

25   to certain special restricted funds of the City, including the Marina Fund, the Golf Fund, and the

26   Redevelopment Agency.  Accordingly, the City's practice was to allocate rental payments for the

27   various series of COPs to these funds internally to the extent revenues were sufficient.  The City's

28   General Fund is obligated to make 100% of the rental payment obligations with respect to the

Union Bank COPs so in the event of insufficiency of these special funds, the General Fund will pay the shortfall. In arriving at the proposed restructuring of the Union Bank COPs as described in the Plan, the City continues to make these allocations, provided that one requirement of the restructuring is that the General Fund have no payment allocated to it during the first three years of the restructured obligations. Attached hereto as <u>Exhibit C</u> are tables showing how the City allocated payments with respect to the New Union Bank Facilities Lease across the various funds involved and how the overall restructuring was calculated.

                    **3.**        <u>**Classes 2A and 2B (Series 1999 COPs).**</u>

As described above, the 1999 COPs are insured by the National Policy, which guarantees payment in full to the holders of the Series 1999 COPs. Because the 1999 COPs (like all COPs) are not separate stand-alone obligations, but merely represent evidence of the undivided fractional interests of the holders thereof in the lease payments under the Facilities Lease for the Series 1999 COPs transaction, adjustment of the City's obligations to National pursuant to the National Settlement Agreement does not impair the rights of the holders to be paid under the National Policy.

The City and National (together with the State Controller) have entered into a Settlement Agreement pursuant to which the City will be permitted to defer a portion of the lease payments through fiscal year 2012-13, but will then be required to resume making full lease payments thereafter, and will be required additionally to apply MVLF Revenues available in excess of the full lease payments to repay the deferred amounts. Interest on the deferred amounts will accrue at the annual rate of 5.25%, which is estimated to be 1% to 2% less than the amount the City would be obligated to pay under the COPs Documents applicable to the Series 1999 COPs. Pursuant to the settlement, the City has paid $400,000 to National to settle National's claim for reimbursement of its attorney fees and costs through January 31, 2011, which fees and costs National contends exceeded $600,000.

If National ceases to make payments or is in default of its obligations in the future, the Indenture Trustee shall nevertheless forbear from exercising any remedies under the indenture for

the Series 1999 COPs so long as the City performs its obligations to make lease payments pursuant to the National Settlement Agreement.

**4.    Class 3 (Claims of MPA Assignees under the MPA Lease).**

The City will assume the MPA Lease, and in connection therewith, the schedule of the City's payment obligations under the MPA Lease shall be replaced by Exhibit B to the Plan, which reflects a reduction of what the City believes is approximately 45% on a net present value basis of the City's obligations under the MPA Lease.  Also, the City has paid $20,000 to the MPA Assignee holding approximately 88% of the obligation to settle the claim for reimbursement of attorney fees and costs.

**5.    Class 4 (Claims of Westamerica under the Westamerica Lease)**

The Westamerica Lease, which is dated as of October 9, 1997, by and between the City and Municipal Leasing Associates, Inc., of which Westamerica is the assignee, concerns, among other things, modular buildings used by the Police Department.  There remain aggregate principal components of unpaid lease payments in the approximate amount of $186,236.  The City will continue to honor its obligations under the Westamerica Lease, and Westamerica retains all of its rights and remedies under applicable nonbankruptcy law.

**6.    Class 5 (Claims of CalPERS with Respect to the CalPERS Pension Plan, as Trustee Under the CalPERS Pension Plan for the Benefit of CalPERS Pension Plan Participants).**

The City will continue to honor its obligations under the CalPERS Pension Plan, and CalPERS, as trustee, and the CalPERS Pension Plan Participants will retain all of their rights and remedies under applicable nonbankruptcy law.  Thus, CalPERS and the CalPERS Pension Plan Participants will be entitled to the same rights and benefits to which they are currently entitled under the CalPERS Pension Plan and CalPERS, pursuant to the CalPERS Pension Plan, will continue to be made available to provide pension benefits for participants in the manner indicated under the provisions of the CalPERS Pension Plan.

DISCLOSURE STATEMENT FOR CITY'S SECOND
AMENDED PLAN OF ADJUSTMENT

## 7.   Class 6A (General Unsecured Claims Convenience Class – Retiree Health Benefits Claims).

Retiree Health Benefit Claims are claims by former City employees on account of or in any way related to the City's postpetition reduction of its contribution to health benefit payments to former City employees.  So long as Allowed Retiree Health Benefit Claims aggregate less than $100,000, which the City believes likely to occur, holders will be paid in full on or before the first Business Day following the 60-day anniversary of the Effective Date, and in any event shall be paid on or before September 30, 2011.  The City estimates that there will be approximately 80 Allowed Retiree Health Benefit Claims, and that such Allowed Claims will aggregate approximately $60,000.  If the Allowed Amount in the aggregate is greater than $100,000, then Retiree Health Benefit Claims shall instead be classified as Class 6B Claims, and treated accordingly

## 8.   Class 6B (General Unsecured Claims)

The Plan classifies most General Unsecured claims in Class 6B, and includes, without limitation, the Claims of members and former members of IAFF and IBEW for damages stemming from the City's rejection of the CBAs, the Claims of retirees for the City's reduction in health benefits (to which the City has objected) and the Claims of former employees who were not paid the full amount of their vacation pay and/or sick leave as of the date of their separation from the City.  As of the bar dates established by prior orders of the Bankruptcy Court, proofs of claim asserting general unsecured claims totaling approximately $262 million, plus "unknown," "unliquidated" or "to be determined" amounts – which potentially represent tens if not hundreds of millions of dollars of Claims, were timely filed with the Bankruptcy Court.   The City estimates that once the claims resolution process has been completed, the amount of Allowed Class 6B Claims will approximate $20 million to $30.4 million (although the filed amounts are much greater).   Holders of Allowed Class 6B Claims will share pro rata in distributions from the General Unsecured Claims Pool and the Restricted Funds Claims Pool, less the amounts paid to holders of Allowed Class 6A Claims.  Such amount will approximate $5.9 million, of which approximately $1 million will be funded by the Restricted Funds Claims Pool on account of those

IBEW employees compensated from Restricted Funds. The distributions will be made on the Payment Dates[16].

Prior to the Confirmation Date, the City on one hand, and IAFF and IBEW on the other hand, will enter into a settlement agreement or settlement agreements that provide for the reduction of the IAFF/IBEW Member Claims and reduced payment of the remainder of such Claims. The reductions in the claimed amounts will constitute the settlement of disputes between the City and the two unions and their members of the allowable amounts of such Claims (which, in the aggregate, amount to in excess of $32 million), and will result in payments to members of IAFF totaling $3 million and to members of IBEW totaling $2.1 million. The settlement agreements also will direct that specified amounts of those payments otherwise due to holders of Allowed IAFF/IBEW Member Claims on the first of the Payment Dates (the "Direct Payments") will instead be paid by the City directly to counsel for the two unions or to the repayment to the unions themselves of loans incurred (or repayment directly to the entities from whom they borrowed) in order to enable the unions to pay legal fees and costs, which are currently estimated in aggregate to be approximately $900,000 for the IAFF and $450,000 for the IBEW. The City and the unions believe but do not guaranty that the Direct Payments will not be taxable to the holders of such Allowed IAFF/IBEW Member Claims, and thus that the Direct Payments will not result in withholding obligations by the City. The settlement agreements will further provide that the Claims of union members to their share of the net payments to pursuant to the Plan (after payment of the attorney fees and related loans, as well as after payment of employee and employer withholding and related charges, including any payments related to CalPERS required pension obligations) shall be proportionate to such members' claims as agreed by the City and the unions and approved by the Bankruptcy Court as part of approving the settlement agreement(s).

The remaining members of Class 6B will receive the same percentage payment on account of their Allowed Claims as will the holders of the IAFF Member General Unsecured Claims and

---

[16] The Plan defines Payment Dates as shall mean a day on or before September 30, 2011, and a day on or before September 30, 2012. Half of the payments to holders of Allowed Class 6B Claims will be made on the first such Payment Date, and the second half will be made on the second such Payment Date.

the IBEW Member General Unsecured Claims, which the City estimates to be approximately 20% to 30%.

### 9. Class 7 (General Liability Claims).

General Liability Claims are the tort or contract claims filed against the City pursuant to the Government Claims Act. Such claims are covered by insurance provided by two insurance pools of which the City is a member. However, the insurance payments are conditional on the payment (or the obligation by the City to pay) the first $500,000 of any resolved claim. Such obligation is known as a self insurance retention ("SIR"). The SIR portion of each Allowed General Liability Claim will be paid on the Payment Dates from the Risk Management Internal Service Fund, and will receive the same percentage payment on the dollar of Allowed Claim as will the holders of Allowed Class 6A and 6B Claims. The Insured Portion of each Allowed General Liability Claim is not Impaired and shall be paid by the applicable insurance pool.

### 10. Class 8 (Workers Compensation Claims).

Workers Compensation Claims are subject to the SIR as well, but California law requires that the SIR be paid by the City in full in order for injured workers to obtain the state provided insurance coverage in amounts in excess of the SIR. In order to protect its current and future employees, the Plan treats Class 8 as unimpaired. The SIR, as it applies to Workers Compensation Claims, will be paid from the Risk Management Internal Service Fund.

### 11. Class 9 (Restricted Revenue Bond and Note Payable Obligations).

The Bankruptcy Court ruled in the Eligibility Findings that special and restricted sources of revenues may not be used to pay General Fund obligations. Such ruling was affirmed on appeal. *See In re City of Vallejo*, 408 B.R. 280 (B.A.P. 9th Cir. 2009). The City included Class 9 in the Plan in order to make it clear that Restricted Revenue Bond and Note Payable Obligations are not obligations of the General Fund and cannot be and are not impaired under the Plan. To the extent that the General Fund serves as a backstop for obligations of restricted funds, because all payments by restricted funds have been and are current, the City will object to any proofs of claim as too speculative and contingent to be Allowed.

DISCLOSURE STATEMENT FOR CITY'S SECOND
AMENDED PLAN OF ADJUSTMENT

**B.    Consolidation of Union Bank Information.**

Owed in excess of $50 million, Union Bank is the holder of the largest Claims in the Chapter 9 Case. The debt structure is complex, as is the proposed treatment of the Claims in the Plan. References to Union Bank, the Claims it holds, and the treatment of the Claims may be found throughout this Disclosure Statement, generally adjacent to the discussion of the Claims held by other creditors, the treatment of the various Claims, etc. The City tried but is unable to "consolidate" in one place information regarding "the Union Bank COPs and their payment, Class 1A through 1D" as mandated by the Bankruptcy Court's March 7th amended minute order [Docket No. 856]. However, while the City cannot consolidate this information and data without either gutting other sections of the Disclosure Statement and/or repeating vast quantities of information. The City includes this section to provide the Court and the parties with a convenient summary of all the Union Bank COPs information contained in this Disclosure Statement:

*Definition and Summary of Plan Treatment of Union Bank COPs.* This information can be found in the Summary section of this Disclosure Statement (which section, among other things, incorporates the 100+ definitions in the Plan. The Summary begins at page 1 of this Disclosure Statement.

*Union Bank's Participation in Bankruptcy Case.* This information can be found at Section III(E), page 18 of this Disclosure Statement.

*Detailed Description of Union Bank's Claims and Proposed Union Bank COPs Restructuring.* This information can be found at Section IV(A)(5), page 25, and (V)(A)(2), page 37, of this Disclosure Statement along with the City's treatment of all other Classes of Claims.

*Treatment of Union Bank Leases.* This information can be found at Section (V)(C), page 50 of this Disclosure Statement within a broader discussion of the City's treatment of its executory contracts and unexpired leases.

**C.    Treatment of Executory Contracts and Unexpired Leases.**

**1.    Generally.**

The Bankruptcy Code empowers debtors, subject to the approval of the Bankruptcy Court, to assume or reject their executory contracts and unexpired leases. An "executory contract"

generally means a contract under which material performance other than the payment of money is due by the parties.

A debtor's assumption of an executory contract or unexpired lease means that it will and must continue to honor its obligations under such agreement. In other words, as to such agreement, it is business as usual. **As described in the next section, the City will assume almost all of its executory contracts and unexpired leases**. Rejection of an executory contract or unexpired lease constitutes a prepetition breach of such agreement, excusing the debtor's future performance but creating a claim for the breach.

### 2.    Assumption.

The City is a party to hundreds of executory contracts and unexpired leases. Significant agreements include (1) its collective bargaining agreements with its four unions, each of which was reached after the Petition Date, (2) its agreements with CalPERS relating to both pension benefits and healthcare, (3) the COPs Documents and other agreements relating its extant COPs, and (4) the MPA Lease. The City has elected to assume such agreements as well as virtually all of its other executory contracts and unexpired leases and will do so pursuant to the Assumption/Assignment Motion (although certain of the COPs Documents as well as the MPA Lease are restructured in the Plan as described herein). The City will not seek to assign any of the agreements that it assumes.

The City believes that it is current in its payments and other obligations under the executory contracts and unexpired leases that it will assume pursuant to the Assumption/Assignment Motion. However, after the provision of notice and the opportunity for a hearing on the Assumption/Assignment Motion, the Bankruptcy Court will resolve any disputes regarding: (a) the amount of any cure payment to be made in connection with the assumption of any contract or lease; and (b) any other matter pertaining to such assumption and assignment.

### 3.    Rejection.

The City will file the Rejection Motion, pursuant to section 365(a) of the Bankruptcy Code, to seek approval and authorization for the rejection of such executory contracts and unexpired leases that it does not elect to assume. Such agreements are those that the City, in the

DISCLOSURE STATEMENT FOR CITY'S SECOND
AMENDED PLAN OF ADJUSTMENT

exercise of its business judgment, deems burdensome.  As described above, in 2009 the City

rejected two of its collective bargaining agreements – the one with IAFF by consent and the one

with IBEW over its objection.  The City also negotiated new labor agreements with VPOA and

CAMP without the need to formally reject the prebankruptcy CBAs.  All four agreements are

unaltered by the Plan.  The City anticipates rejecting few executory contracts or unexpired leases.

**4.** **Deadline for the Assertion of Rejection Damage Claims; Treatment of Rejection Damage Claims.**

All proofs of claim on account of Claims arising from the rejection of executory contracts

or unexpired leases must be filed with the Bankruptcy Court and served on the City no later than

30 days after the date on which notice of entry of the order approving the rejection is mailed.

Any Claim for which a proof of Claim is not filed and served within such time will be forever

barred and shall not be enforceable against the City or its assets, properties, or interests in

property.  Unless otherwise ordered by the Bankruptcy Court, all such Claims that are timely filed

as provided herein shall be classified into Class 6 (General Unsecured Claims) and treated

accordingly.

**D.** **Means for Execution and Implementation of the Plan.**

The City will continue to operate under its Charter, governed by the City Council,

following the Effective Date.  It will continue to collect real property tax revenues, sales tax

revenues, the user utility tax and other taxes following the Effective Date, spending such revenues

on municipal services such as providing fire and police protection, paving roads, and facilitating

the provision of funding for transportation services.  On November 30, 2010, the City Council

adopted the Five-Year General Fund Business Plan that provides the framework for sustainable

operation of the City through June 30, 2015 by allocating available unrestricted revenues among

the City's obligations.  The Five-Year General Fund Business Plan balances the need to satisfy

prebankruptcy debt with the City's obligation to provide services to its residents and businesses.

The Plan implements the Five-Year General Fund Business Plan by creating the General

Unsecured Claims Pool, which will contain $5 million from the General Fund and an estimated

$970,000 in the Restricted Funds Claims Pool, which will be paid to holders of General

DISCLOSURE STATEMENT FOR CITY'S SECOND
AMENDED PLAN OF ADJUSTMENT

1  Unsecured Claims and Restricted Funds Payment Claims, respectively, pro rata according to the

2  Allowed amounts of such claims.  The Plan also includes concessions by Union Bank, the

3  Indenture Trustee, National, and the MPA Assignees with respect to the obligations to them that

4  are secured by leases of General Fund and other real estate assets.  The concessions involve

5  reduction of interest rates, re-amortization of payments, including a three-to-three and one-half

6  year interest accrual honeymoon following the Effective Date during which the General Fund

7  payment obligations for the Union Bank COPs and the MPA Lease are suspended, and during

8  which the General Fund payments with respect to the Series 1999 COPs are reduced by 25%, and

9  a significant reduction of the amount of attorney fees and costs to which National contends it is

10  entitled.

11      The Plan provides that the City retains all of its Claims, causes of action, rights of

12  recovery, rights of offset, recoupment rights to refunds and similar rights after the Effective Date.

13  Unless a Right of Action is expressly waived, relinquished, released, compromised or settled in

14  this Plan, the City expressly reserves all Rights of Action for later adjudication and, as a result, no

15  preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion,

16  claim preclusion, estoppel (judicial, equitable or otherwise), or laches, shall apply to such Rights

17  of Action upon or after the confirmation or consummation of this Plan or the Effective Date.  In

18  addition, the City expressly reserves the right to pursue or adopt against any other entity any

19  claims alleged in any lawsuit in which the City is a defendant or an interested party.  In the Plan,

20  the City acknowledges that it has no rights of action against Union Bank on account of the Union

21  Bank COPs.

22      **E.    Distributions.**

23      The City may retain one or more agents to perform or assist it in performing the

24  distributions to be made pursuant to the Plan, which agents may serve without bond.  The City

25  may provide reasonable compensation to any such agent(s) without further notice or Bankruptcy

26  Court approval.  However, because the overwhelming majority of the distributions in terms of the

27  number of checks to be cut will be made to holders of Class 6A and Class 6B Claims on account

28

DISCLOSURE STATEMENT FOR CITY'S SECOND
AMENDED PLAN OF ADJUSTMENT

of employment-related Claims – thus necessitating W-2 and other tax reporting – the City likely will make the distributions under the Plan.

All distributions to any holder of an Allowed Claim shall be made at the address of such holder as set forth in the books and records of the City or its agents, unless the City has been notified by such holder in a writing that contains an address for such holder different from the address reflected in its books and records. All such notifications of address changes and all address confirmations should be mailed to: City of Vallejo, Attn: Anne Maze, P.O. Box 3068, 555 Santa Clara Street, Vallejo, California 94590. All distributions to the Indenture Trustee, Union Bank, National or the MPA Assignees shall be made in accordance with the COPs Documents or the MPA Lease, as applicable.

### 1. __Undeliverable Distributions.__

If any distribution to any Claim holder is returned to the City or its agent as undeliverable, no further distributions shall be made to such holder unless and until the City is notified in writing of such holder's then-current address. Unless and until the City is so notified, such distribution shall be deemed to be "Unclaimed Property."

No later than 60 days after the first Payment Date, the City will file with the Bankruptcy Court a list of Unclaimed Property, together with a schedule that identifies the name and last-known address of holders of the Unclaimed Property; the City otherwise will not be required to attempt to locate any such entity. On the 60th day following the second Payment Date, all remaining Unclaimed Property and accrued interest or dividends earned thereon will be remitted to and vest in the City.

### 2. __Timeliness of Payments.__

Any payments or distributions to be made pursuant to the Plan shall be deemed to be timely made if made within 14 days after the dates specified in the Plan. Whenever any distribution to be made under the Plan shall be due on a day that is a Saturday, Sunday, or legal holiday, such distribution instead shall be made, without interest, on the immediately succeeding day that is not a Saturday, Sunday, or legal holiday, but shall be deemed to have been made on the date due.

**3.**      **Compliance With Tax, Withholding and Reporting Requirements**.

The City shall comply with all tax, withholding and reporting and like requirements imposed on it by any government unit, including without limitation, payments related to CalPERS required pension obligations, and all distributions pursuant to this Plan shall be subject to such withholding and reporting requirements. In connection with each distribution with respect to which the filing of an information return (such as Internal Revenue Service Forms W-2, 1099 or 1042) or withholding is required, the City shall file such information return with the Internal Revenue Service and provide any required statements in connection therewith to the recipients of such distribution, or effect any such withholding and deposit all moneys so withheld to the extent required by law. With respect to any entity from whom a tax identification number, certified tax identification number, or other tax information is required by law to avoid withholding has not been received by the City, the City at its sole option, may withhold the amount required and distribute the balance to such entity or decline to make such distribution until the information is received.

**4.**      **Time Bar to Cash Payments**.

Checks issued by the City on account of Allowed Claims will be null and void if not negotiated within 90 days from and after the date of issuance thereof. Requests for reissuance of any check shall be made directly to the City by the holder of the Allowed Claim with respect to which such check originally was issued. Any claim in respect of such a voided check must be made on or before the second anniversary of the Effective Date. After such date, all claims in respect of voided checks will be discharged and forever barred and the City will retain all moneys related thereto.

**5.**      **No *De Minimis* Distributions**.

Notwithstanding any other provision of the Plan, no payment of less than ten dollars will be made by the City on account of any allowed claim.

**6.**      **No Distributions on Account of Disputed Claims**.

No distributions shall be made on account of any part of any Disputed Claim until such Claim becomes Allowed (and then only to the extent so Allowed). Distributions made after the

Effective Date in respect of Claims that were not Allowed as of the Effective Date (but which later became Allowed) shall be deemed to have been made as of the Effective Date.

**7.      No Postpetition Accrual of Interest.**

Unless otherwise specifically provided in the Plan or allowed by order of the Bankruptcy Court, the City will not be required to pay to any holder of a claim any interest, penalty or late charge accruing with respect to such claim on or after the Petition Date.

**F.      Disputed Claims.**

**1.      Claims Objection Deadline; Prosecution of Objections.**

The City will have the right to object to the allowance of claims filed with the Bankruptcy Court with respect to which liability or allowance is disputed in whole or in part.  Unless otherwise ordered by the Bankruptcy Court, the City must file and serve any such objections to claims by not later than 180 days after the Effective Date (or, in the case of claims lawfully filed after the Effective Date, by not later than 180 days after the date of filing of such claims).

**2.      Reserves, Payments, and Distributions With Respect to Disputed Claims.**

Prior to making a *pro rata* distribution to holders of Class 6B claims, the City shall reserve from the amount of the distribution a reserve for Class 6B Claims to the extent that such Claims are Disputed Claims. The amount reserved for each such Claim shall be on the same *pro rata* basis as the distribution to Class 6, based upon the lesser of (a) the amount asserted by the holder of the Claim to be owing, and (b) such amount as the Bankruptcy Court may estimate for all distribution purposes upon motion of the City, which motion may be made initially or from time to time.  Such reserves may be established and maintained by the City as accounting entries within the General Fund.

So long as the first or second Payment Date has occurred, at such time as a disputed claim becomes an Allowed Claim, in whole or in part, the City or its agent will distribute to the holder thereof the distributions, if any, to which such holder is then entitled under the Plan.  Such distributions, if any, will be made as soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing such disputed claim becomes a Final Order (or such other date

as the claim becomes an allowed claim), but in no event more than 60 days thereafter. Unless otherwise specifically provided in the Plan or allowed by order of the Bankruptcy Court, no interest will be paid on Disputed Claims that later become Allowed Claims.

### G. Continuing Jurisdiction of the Bankruptcy Court.

The Plan provides for the Bankruptcy Court to retain jurisdiction over a broad range of matters relating to the Chapter 9 Case, the Plan, and other related items. Readers are encouraged to review the Plan carefully to ascertain the nature of the Bankruptcy Court's continuing post-Effective Date jurisdiction.

## VI.    CONFIRMATION AND EFFECTIVENESS OF THE PLAN

**Because the law with respect to confirmation of a plan of adjustment is complex, creditors concerned with issues regarding confirmation of the Plan should consult with their own attorneys and financial advisors.** The following discussion is intended solely for the purpose of providing basic information concerning certain confirmation issues. The City cannot and does not represent that the discussion contained below is a complete summary of the law on this topic.

Many requirements must be met before the Bankruptcy Court may confirm the Plan. Some of the requirements discussed in this Disclosure Statement include acceptance of the Plan by the requisite number of creditors, and whether the Plan is in the "best interests" of creditors. These requirements, however, are not the only requirements for confirmation, and the Bankruptcy Court will not confirm the Plan unless and until it determines that the Plan satisfies all applicable requirements, including requirements not referenced in this Disclosure Statement.

### A.    Voting and Right to Be Heard at Confirmation.

#### 1.    Who May Support or Object to Confirmation of the Plan?

Any party in interest may support or object to the confirmation of the Plan. Even entities who may not have a right to vote (e.g., entities whose claims are classified into an unimpaired Class) may still have a right to support or object to confirmation of the Plan. (*See* Section I(C)(2) for information regarding the applicable deadlines for objecting to confirmation of the Plan).

### 2. Who May Vote to Accept or Reject the Plan?

A creditor generally has a right to vote for or against the Plan if its Claim is both Allowed for purposes of voting and is classified into an impaired Class. Generally, a Claim is deemed allowed if a proof of claim was timely filed, provided, however, that if an objection to a claim has been filed, the claimant cannot vote unless the Bankruptcy Court, after notice and hearing, either overrules the objection or allows the claim for voting purposes. Thus, **the definition of "Allowed Claim" used in the Plan for purpose of determining whether creditors are entitled to receive distributions is different from that used by the Bankruptcy Court to determine whether a particular claim is "allowed" for purposes of voting. Holders of claims are advised to review the definitions of "Allowed," "Claim," and "Disputed" set forth in Section I(A) of the Plan to determine whether they may be entitled to vote on, and/or receive distributions under, the Plan.**

### 3. Who Is Not Entitled to Vote?

The holders of the following types of claims are not entitled to vote on the Plan: (a) Claims that have been disallowed; (b) Claims that are subject to a pending objection and which have not been allowed for voting purposes; (c) Claims that are not impaired; and (d) Administrative Expense Claims, since such Claims are not placed in Classes and are required to receive certain treatment specified by the Bankruptcy Code.

### 4. Vote Necessary to Confirm the Plan.

The Bankruptcy Court cannot confirm the Plan unless, among other things, (a) at least one impaired Class has accepted the Plan without counting the votes of any insiders within that Class; and (b) either all impaired Classes have voted to accept the Plan, or the Plan is eligible to be confirmed by "cram down" with respect to any dissenting impaired Class.

A Class of claims is considered to have accepted the Plan when more than one-half in number <u>and</u> at least two-thirds in dollar amount of the claims that actually voted in that Class have voted in favor of the Plan.

**B.    The "Best Interests" Test.**

The Bankruptcy Court also must determine that the Plan is in the "best interests of creditors" pursuant to section 943(b)(7) of the Bankruptcy Code, which in the chapter 9 context means that treatment under the Plan must be better than the only alternative available, which is dismissal of the case. Dismissal permits every creditor to fend for itself in the race to the courthouse, since a municipality such as the City is not eligible under the Bankruptcy Code for a court-supervised liquidation under chapter 7.

The City submits that the Plan is in the best interests of all creditors because significant payments will be made to all impaired Classes, including the consensually reduced payments to Union Bank, the Indenture Trustee, National, and the MPA Lease Assignees. While the Plan permits the City to continue to maintain minimally acceptable levels of vital municipal services for its residents and businesses, and while it devotes substantial resources to the repayment of the City's creditors, it nevertheless further defers infrastructure maintenance as well as the optimal staffing of City service units such as police and fire.

In contrast, in the absence of the financial adjustments made in Plan, the City's creditors would be left to "fend for themselves." Individual creditor collection actions likely would aggregate, through lawsuits, attempts at attachments and writs of mandate, to make continued operation of the City untenable. Massive litigation costs would burden the City, its creditors, and all parties in interest, although creditors financially equipped to pursue litigation most quickly (and thus win "the race to the courthouse") would benefit disproportionately. And even the swiftest of creditors would likely find its ability to collect on a judgment stymied by the inability of the City to pay without violating provisions of California law by raiding Restricted Funds. In short, the City cannot afford to pay its creditors absent the debt relief afforded by the Plan, and dismissal of the Chapter 9 Case could well result in chaos, with few if any creditors emerging safely from the blizzard of inevitable litigation.

**C.    Feasibility.**

To satisfy the requirement set forth in Bankruptcy Code section 943(b)(7) that the Plan be feasible, the City must demonstrate the ability to make the payments required under the Plan and

still maintain its operations at the level that it deems necessary to the continued viability of the City. The City submits that the Plan is feasible. The financial underpinning of the Plan, the Five-Year Business Plan, attached as Exhibit B, constitutes a sustainable matching of revenues and expenses, including the expenses created by or modified in the Plan. It relies on the CBAs reached following the filing of the Chapter 9 Case, at least two of which agreements, if not three or all four, would not have been possible absent the Bankruptcy Case.

### D. Cram Down.

The Bankruptcy Code provides that the Bankruptcy Court may confirm a plan of adjustment that is not accepted by all impaired classes if at least one impaired Class of claims accepts the Plan and the so-called "cram down" provisions set forth in sections 1129(b)(1), (b)(2)(A) and (b)(2)(B) of the Bankruptcy Code are satisfied. The Plan may be confirmed under the cram down provisions if, in addition to satisfying the other requirements of section 943(b) of the Bankruptcy Code, it (a) is "fair and equitable", and (b) does not discriminate unfairly with respect to each Class of claims that is impaired under and has not accepted the Plan.

The "fair and equitable" standard, also known as the "absolute priority rule," requires, among other things, that unless a dissenting unsecured Class of claims receives payment in full for its allowed claims, no holder of allowed claims in any Class junior to that Class may receive or retain any property on account of such claims. The "fair and equitable" standard also has been interpreted to prohibit any class senior to a dissenting Class from receiving more than 100% of its allowed claims under a plan. The City believes that the Plan satisfies the "fair and equitable" standard because, among other things, no classes junior to the classes of unsecured claims are receiving or retaining any property under the Plan.

The requirement that the plan not "discriminate unfairly" means, among other things, that a dissenting Class must be treated substantially equally with respect to other Classes of equal rank. The City does not believe that the Plan unfairly discriminates against any Class that may not accept or otherwise consent to the Plan.

**As noted above, the City has reserved the right to request the Bankruptcy Court to confirm the Plan by "cram down" in accordance with sections 1129(b)(1), (b)(2)(a) and**

**(b)(2)(b). The City also has reserved the right to modify the Plan to the extent, if any, that confirmation of the Plan under sections 943 and 1129(b) of the Bankruptcy Code requires such modifications.**

     **E.**       <u>**Effective Date.**</u>

           **1.**      <u>**Conditions to the Occurrence of the Effective Date.**</u>

        The Plan will not become effective and operative unless and until the Effective Date occurs. Section XII of the Plan sets forth certain conditions to the occurrence of the Effective Date. The City may waive in whole or in part the condition regarding agreements and instruments contemplated by, or to be entered into pursuant to, the Plan. Any such waiver of a condition may be effected at any time, without notice or leave or order of the Bankruptcy Court and without any formal action, other than the filing of a notice of such waiver with the Bankruptcy Court.

        The Effective Date will occur on the first Business Day after which the conditions set forth in Section XII of the Plan are satisfied or waived; *provided* that the Effective Date must occur by no later than six months after the Confirmation Date.

           **2.**      <u>**Non-Occurrence of Effective Date.**</u>

        The Plan provides that, if confirmation occurs but the Effective Date does not occur within six months after the Confirmation Date, upon notification submitted by the City to the Bankruptcy Court: (a) the Confirmation Order shall be vacated; (b) no distributions under this Plan shall be made; (c) the City and all holders of Claims shall be restored to the *status quo* as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred; and (d) all of the City's obligations with respect to the Claims shall remain unchanged, and nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against the City or any other entity or to prejudice in any manner the rights of the City or any entity in any further proceedings involving the City. The failure of the Effective Date to occur, however, will not affect the validity of any order entered in the Chapter 9 Case other than the Confirmation Order.

**F.      Effect of Confirmation.**

Section X of the Plan provides that confirmation of the Plan and the occurrence of the Effective Date will have a number of important and binding effects, some of which are summarized below.  Readers are encouraged to review Section X of the Plan carefully and in its entirety to assess the various consequences of confirmation of the Plan.

**1.      Discharge of the City.**

Pursuant to section 944 of the Bankruptcy Code, on the Effective Date the City will be discharged from all debts (as defined in the Bankruptcy Code) of the City and claims against the City other than (a) any debt specifically and expressly excepted from discharge by the Plan or the Confirmation Order, or (b) any debt owed to an entity that, before the confirmation of the Plan, had neither notice nor actual knowledge of the Chapter 9 Case.

The rights afforded in the Plan and the treatment of claims will be in exchange for and in complete satisfaction, discharge and release of all claims of any nature whatsoever arising on or before the Effective Date, known or unknown, including any interest accrued or expenses incurred thereon from and after the Petition Date, whether against the City or any of its properties, assets, or interests in property.  Except as otherwise provided in the Plan, on the Effective Date all Claims against the City will be deemed to be satisfied, discharged and released in full.

**2.      Injunction.**

The Plan provides that all entities who have held, hold or may hold pre-Effective Date claims will be permanently enjoined, from and after the Effective Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such pre-Effective Date claim against the City; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree or order against the City with respect to such pre-Effective Date claims; (c) creating, perfecting, or enforcing any lien or encumbrance of any kind against the City or its property or interests in property; and (d) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due to the City with respect to any

1  such pre-Effective Date claim, except as otherwise permitted by section 553 of the Bankruptcy

2  Code.

3          **3.**     **Term of Existing Injunctions and Stays.**

4       The Plan provides that all injunctions or stays provided for in the Chapter 9 Case pursuant

5  to sections 105, 362, or 922 of the Bankruptcy Code, or otherwise, and in existence on the

6  Confirmation Date, will remain in full force and effect until the Effective Date.

7  **VII.    CERTAIN RISK FACTORS TO BE CONSIDERED**

8       Confirmation of the Plan and the occurrence of the Effective Date are not without risk to

9  the City and its creditors in that the sources of revenue projected in the Five Year General Fund

10  Business Plan could contract.  Thus, while the City devoted considerable time and effort in

11  formulating the Five Year General Fund Business Plan, there can be no guaranty that it will be

12  100% accurate.  For example, few California cities, if any, predicted the length and depth of the

13  economic downturn that saw real property values (and thus real property tax revenues) plummet.

14  Nor did city financial planners predict the high unemployment and underemployment that

15  accompanied the burst of the housing bubble and reduced the amount of sales tax revenues to

16  state and local governments.  Conversely, while the General Fund expenditures projected in the

17  Five Year General Fund Business Plan are the City's best and most reasoned estimate of costs,

18  the occurrence of a natural or human-caused disaster could and likely would cause costs to rise, if

19  not to spike.  These risk factors should not, however, be regarded as constituting the only risks

20  involved in connection with the Plan and its implementation.

21       **The City submits, though, that the risk to creditors and parties in interest is greater**

22  **if the Plan is not confirmed and consummated than if it is.**

23  **VIII.   CERTAIN FEDERAL INCOME TAX CONSEQUENCES**

24       The implementation of the Plan may have federal, state, local and foreign tax

25  consequences to the City and its creditors.  No tax opinion has been sought or will be obtained

26  with respect to any tax consequences of the Plan.  However, because the City is a municipal

27  corporation duly organized and existing under its Charter and the Constitution of the State of

28  California, and is treated as a political subdivision of the State of California for federal income

tax purposes, the City believes that it will not be subject to any federal income tax liability from implementation of the Plan.  The City anticipates that, in conformity with past practice, it will not file any federal corporate income tax returns with respect to the periods in which the Plan is implemented nor report any income for federal income tax purposes as a result of implementing the Plan.

Because individual circumstances may differ, and the income tax consequence of a chapter 9 case are complex and uncertain, this summary does not address the federal income tax consequences that may be relevant to the creditors of the City as a result of the Plan. Accordingly, the creditors should consult with their own tax advisors regarding the income tax consequences of the Plan to them, including the effect, if any, the Plan may have on prior outstanding obligations the interest components of which the creditors were treating as excludable from gross income for federal income tax purposes.

**To ensure compliance with requirements imposed by the Internal Revenue Service, you are hereby notified that any tax advice contained in this summary is not intended or written to be used by any taxpayer, and cannot be used by any taxpayer, for the purpose of avoiding tax-related penalties that otherwise may be imposed under the Internal Revenue Code on the taxpayer.  Such advice was written in connection with the solicitation of votes in favor of the Plan. The City and its creditors should seek tax advice regarding the tax consequences to them of the Plan based on their particular circumstances from an independent tax advisor.**

DISCLOSURE STATEMENT FOR CITY'S SECOND
AMENDED PLAN OF ADJUSTMENT

1

2

## IX.   RECOMMENDATION AND CONCLUSION

The City believes that confirmation and implementation of the Plan is preferable to all

other available and feasible alternatives.  Accordingly, **the City urges holders of impaired**

**claims to vote to accept the Plan by so indicating on their ballots and returning them as**

**specified in this Disclosure Statement and on their ballots.**

DATED:  May 20, 2011                              CITY OF VALLEJO, CALIFORNIA


By:    /s/  Phil Batchelor
          Phil Batchelor
          City Manager


Submitted By:


ORRICK, HERRINGTON & SUTCLIFFE LLP


By:_____/s/ Marc A. Levinson_____
                    Marc A. Levinson
                    Norman C. Hile
                    John H. Knox
                    John W. Killeen

Counsel for City of Vallejo, California

**EXHIBITS TO DISCLOSURE STATEMENT WITH RESPECT TO THE
SECOND AMENDED PLAN FOR THE ADJUSTMENT OF DEBTS OF
CITY OF VALLEJO, CALIFORNIA, DATED MAY 20, 2011**

Exhibit A        Second Amended Plan for the Adjustment of Debts of City of Vallejo, California, Dated May 20, 2011

Exhibit B        Financial Statements from Five-Year Business Plan

Exhibit C        City of Vallejo Debt Allocation Summary

Exhibit D        Insurance Values of Union Bank Leased Property

# Exhibit A

# EXHIBIT A

Exhibit A to the Disclosure Statement with Respect to the Second Amended Plan for the Adjustment of Debts of the City of Vallejo, California, Dated May 20, 2011 ("Disclosure Statement") is the Second Amended Plan for the Adjustment of Debts of the City of Vallejo, California, Dated May 20, 2011 ("Plan").  Because the Plan was served and filed on all parties on May 20, 2011, a copy of the Plan is not attached to the Disclosure Statement being filed concurrently.

# Exhibit B



**General Fund**

# Five-Year Business Plan

**Fiscal Years 2010-11 to 2014-15**

**November 30, 2010**



**General Fund 5-Year Business Plan**
2010-11 to 2014-15

# Table of Contents

**Introductory Section**                                            A
    City-wide organization chart                 A - 1
    Executive summary                            A - 2

**Summary Projections**                                             B
    Revenue and Expenditure Trends               B - 1
    5-Year financial projections
        Gross cost basis     B - 2
        Net cost basis       B - 3
        Functional cost basis B - 4

**Assumptions**
    <u>Revenues</u>                               C

    <u>Expenditures</u>                           D
      Expenditures by function           D - 1
        Labor costs          D - 2
        Authorized positions D - 3

      Capital                            E
        Vehicles and equipment replacement E - 1
        Infrastructure maintenance E - 3

      Debt                               F
        Pension              F - 1
        Retiree health       F - 4
        Bond/lease obligations F - 5
        Compensated absences F - 7
        Bankruptcy claims    F - 8

      Reserves                           G
        Self-Insurance       G - 1
        Capital              G - 3
        Economic contingency G - 3

**Programs**
    <u>Services, budgets, organization charts, and staffing levels</u>   H
      Expenditures by Program            H - 1
      Police                             H - 2
      Fire                               H - 7
      Community Development               H - 12
      Public Works                       H - 23
      Administration                     H - 40
      Non-departmental                   H - 50

    Summary of service, supply, and other non-labor costs by program   H - 52
    Interfund cost allocations by program   H - 54



**General Fund 5-Year Business Plan**
**2010-11 to 2014-15**

# Introductory Section

# City of Vallejo Organization Chart





**General Fund 5-Year Business Plan**
**2010-11 to 2014-15**

# EXECUTIVE SUMMARY

## Current Fiscal Reality

The City of Vallejo has been subject to significant changing conditions since filing for chapter 9 bankruptcy protection in May 2008. The City Council has also taken difficult steps to begin to create a sustainable balance between expenditures and revenues as it prepares to emerge from bankruptcy protection. The City has adopted and maintained General Fund balanced budgets since 2008. It is important that the City Council and community acknowledge the following fiscal and service reality as the city puts into place a General Fund five-year business plan that will allow it to emerge from bankruptcy:

1. **General Fund revenue has declined significantly since 2008**
   a. Revenues have declined from $83 million to $65 million (or 22%) since FY 2007-08.
   b. Median residential sales prices in Vallejo have plummeted from a high of $440,000 in 2006 to $142,500 in 2009 for a devastating drop of 67% according to the respected financial advisors HDL.
   c. Property taxes have declined by 29% since 2007-08.
   d. The contraction of the economy has resulted in City of Vallejo sales taxes declining by 17% during the past three years.

2. **Police services have been dramatically reduced**
   a. Staffing in the police department has been slashed from 228 positions in 2003-04 to 121 in 2010-11 for an extraordinary reduction of 47%.
   b. Sworn staff has declined from 155 positions in 2003-04 to 90 positions in 2010-11, which has severally reduced the Vallejo Police Department's ability to provide law enforcement service to the City.
   c. Non-sworn staff has declined from 73 in 2003-04 to 31 in 2010-11 for 58% reduction.
   d. Dispatch staff that handles emergency calls has declined from 27 positions in 2003-04 to 16 positions in 2010-11 for a 40% reduction.
   e. Staffing available for patrol has declined from 90 officers to 55 for a reduction of 39%.
   f. Traffic enforcement has been reduced from 13 officers to 6 for a 54% reduction.
   g. Most crime prevention activities and four out of five canine teams have been eliminated.
   h. The violent crimes per officer in Vallejo are significantly higher than similarly-sized Bay Area cities.

3. **Fire protection services have been dramatically reduced**
   a. Staffing in the fire department has been reduced from 122 in 2003 to 70 in 2010 for a devastating reduction of 42%.
   b. The number of fire stations has been reduced from 8 in 2003 to 5 in 2010.
   c. Service calls increased from 10,361 in 2003 to a projected 13,500 in 2010 for a 30% increase in calls to be handled by a staff that has been reduced by 42%.
   d. The number of firefighters per 1,000 population in the City of Vallejo is one of the lowest in the Bay area at .54 compared to Palo Alto at 1.91 or Benicia at 1.25 or Alameda at 1.48.



**General Fund 5-Year Business Plan**
2010-11 to 2014-15

# EXECUTIVE SUMMARY, Continued

4. **The City's contribution to quality of life services has been eliminated**
   a. Funding to support increased hours at Solano County run libraries has been eliminated.
   b. Funding to Greater Vallejo Recreation District to support park maintenance and recreation activities has been eliminated.
   c. Grants to arts and cultural institutions such as the Vallejo Naval and Historical Museum, Vallejo Symphony, Vallejo Community Arts Foundation, Police Athletic League, Convention & Visitors Bureau, Youth & Family Services and Florence Douglas Senior Center have been eliminated.

5. **Maintenance of the City's more than $300 million of road, grounds and building assets has been reduced to a fraction of recommended levels**
   a. Only $760,000 has been budgeted in FY 2010-11 that provides only 10% of the maintenance level need.
   b. The average pavement condition index (PCI) rating of the 681 lane miles of roadway is only 51 compared to the Bay Area average of 66 and a desirable level of 83.
   c. Approximately 28% of City's lane miles are rated poor with the local residential streets being in the worst condition with an average PCI of 42.
   d. It would require an investment of $268 million to bring the roads up to a desirable PCI level of 83.
   e. Lack of maintenance on the City's street trees, sidewalks, stairs, etc., increase liability exposure.

6. **Replacement and maintenance of the City's 254 vehicles is below industry standards**
   a. The City's vehicle fleet is 87% depreciated.
   b. Reduced funding for vehicle maintenance combined with the City's increasing backlog of vehicles needing replacement reduces the reliability and availability for essential services (i.e. police and fire emergency response).

7. **Debt obligations**
   a. The current public safety and other service levels have been reduced so dramatically that there are very few dollars available to provide for repayment to creditors without further compromising the continued operation of City services or jeopardizing the safety of the citizens of Vallejo.

## Path Forward to Emerge From Bankruptcy

The Business Plan is the next step in the City's "Path Forward" to emerge from bankruptcy. In May 2008, the City filed its chapter 9 bankruptcy petition after years of severe budgetary stress and deteriorating financial condition. With post-petition labor terms now near completion with all employee groups, the City looks ahead to filing a plan of adjustment in the bankruptcy court no later than mid-January 2011.



**General Fund 5-Year Business Plan**
2010-11 to 2014-15

# EXECUTIVE SUMMARY, Continued

The Business Plan is consistent with the following principles:

1. Live within our means – 5 year projection
2. Look to the future – prioritize
3. Stop deferring expenses – maintenance, capital
4. Establish an emergency reserve fund to provide funding in the event of a natural disaster or in case of unforeseen emergency
5. Utilize one time sources of revenue to fund one time expenditure items.

This Business Plan updates revenue projections, quantifies service costs, confirms current service levels, and provides strategies to address legacy debt obligations, including claims filed in the bankruptcy case, while rebuilding fiscal stability.

City Council has previously adopted five year financial projections in its Bankruptcy Workout Plan (December 2009) and also considered updates in March 2010. While revenue and service cost projections have fluctuated, many of the debt strategies in the current Business Plan remain unchanged from those adopted in December 2009. In these days of economic uncertainty, we are pleased that service levels have been able to be planned at current levels, without further erosion, during this projection window.

While the Business Plan identifies resources available for the payment of creditor claims, it is a separate and distinct document from the plan of adjustment to be filed no later than mid-January. That plan will propose the adjustment of specific debt and creditor claims. Creditor negotiations continue within the context of the resources in this Business Plan. Filing in the bankruptcy court of the plan of adjustment is expected to kick off an estimated four to six months of hearings, objections, and balloting before ultimate creditor and court confirmation.

The Business Plan has been developed with assistance and input from the City's revenue, labor, benefit, pension, and debt experts. Two community outreach sessions, held on October 28 and 30, 2010, have also informed recommendations. We look forward to additional stakeholder input through this workshop as the City prepares to take this important next step to emerge from bankruptcy and rebuild its financial future.

## General Fund Focus

The focus of this Business Plan is the City's General Fund. The General Fund is the repository for unrestricted tax and other revenues available for general municipal services such as public safety. While the City structures its budget and operations through over 100 separate funds to provide accountability for special grant, tax, assessment, and fee revenues, these other programs are almost exclusively restricted in use and are unavailable to address unrelated general unsecured claims.

## Balancing Competing Objectives

This Business Plan is designed to balance competing financial objectives. Available revenues have been allocated between the following three objectives:

A-4

 **General Fund 5-Year Business Plan**
**2010-11 to 2014-15**

# EXECUTIVE SUMMARY, Continued

1) Provide resources to sustain current municipal services, without further erosion of severely depleted service levels;
2) Address debt obligations, including unfunded pension and retiree health benefits, bond/lease debt service, compensated absences due to employees, and other claims; and
3) Restore fiscal stability through increasing economic contingency reserves.

We prepare this Business Plan as the national economy grasps a slow and fragile recovery. The risk of a "double dip" recession hovers along with continued high foreclosure and unemployment rates. Despite these risks, the ultimate goal is to balance these three competing objectives and achieves feasible, ongoing fiscal sustainability.

## Summary of Plan Results

- The financial projections presented in this document first allocate slowly growing revenues to the preservation of current services. With public safety services at levels 40% below pre-bankruptcy levels, additional reductions would put the community at even greater risk.

- Additional labor unit cost reductions, through ongoing benefit reform as labor contracts renew, provide budget capacity for a gradual restoration of investment in the City's street and infrastructure investment. At the minimal funding levels presented, however, the current below-par street conditions will continue to deteriorate during this five year period.

- Unsecured creditor claims will be addressed through a $5 million claims pool.

- During the five years presented in the Business Plan, available reserves grow to 5% of annual operations. This is well below recommended levels. These reserves serve as an "Economic Contingency" reserve to help ensure the City's continued fiscal stability.

- Longer-term plans to restore municipal services and to further build the economic contingency reserve to the City Council goal of 15% can be considered when economic growth, development, and the City's tax base resume a solid upward trend.

## Key Assumptions

The following is a summary of key assumptions used to develop financial projections. More information on each of these topics is presented later in this document.

### Revenue
- During the next five years, General Fund revenues are projected to slowly increase from $65 million to $68 million. After three years of declines, including a 5% reduction still projected for 2010-11, revenues are expected to "flatten out" at a cumulative 22% decline from a high of $83 million in FY 2007-08. Key Vallejo revenue sources appear to be leveling at this significantly reduced level. The City's Sales Tax realized its first positive point-of-sale year-to-year growth in two years during the quarter ended June 30, 2010.

 **General Fund 5-Year Business Plan**
2010-11 to 2014-15

# EXECUTIVE SUMMARY, Continued

- Each of the City's major tax sources has been analyzed individually for potential growth rates during the five year projection period, including property, sales, and franchise/utility user tax. Composite growth rates improve to an anticipated flat 0% growth in 2011-12, to 1% and 2% in successive years through 2015.

**Labor Costs**
- Projections assume that the City will maintain its diminished but stabilized workforce at current levels throughout the 5-year term of the Business Plan. The following is a summary of cumulative General Fund workforce reductions by program:

|  | Current Positions | % Reduction from 2003-04 |
|---|---|---|
| Police | 121 | (47)% |
| Fire | 71 | (42)% |
| Community Development | 22 | (33)% |
| Public Works | 58 | (14)% |
| Administration | 32 | (33)% |
| City Council | 8 | ( 0)% |
| Total | 312 | (37)% |

- The City, along with its employee groups, continues to explore ways to address and reduce workforce unit costs. Each of the four labor contracts has been or continues to be renegotiated in the two plus years since the bankruptcy petition.

- Vallejo joins many other municipalities and the State of California in moving toward new public employee benefit structures. The following are examples of benefit reform already in progress in some form in each of the current contracts, with additional reform projected as contracts expire in 2012 (2013 for CAMP).

  o <u>Pension</u> – Reduced second benefit tier for new employees (such as 2% @ 50 for safety employees and 2% @ 60 for miscellaneous employees) and increased cost share for existing employees.
  o <u>Retiree Health</u> - Phase out of full payment of lifetime medical benefits; $300 per month benefit, without annual cost inflator, implemented for all groups. This benefit level currently approximates the cost for a single Medicare Kaiser enrollment.
  o <u>Active Health</u> – Initially, 25% employee cost participation, moving to lower overall coverage and plan design in 2012-13.
  o <u>Longevity pay</u> – Continued phase out of longevity pay for long-term employees.
  o <u>Vacation, sick, and holiday leave</u> - Continued reduction in overall leave accrual rates, caps on leave accumulation, and limited non-vested sick leave cash-outs at retirement.

**Capital Programs**
- Vehicle and Equipment Replacement - The General Fund supports 254 vehicles in the City's equipment replacement program with a total replacement cost of $15 million. 106 items totaling $4.7 million are scheduled for replacement in the next five years, for an average annual replacement cost of $950,000.



**General Fund 5-Year Business Plan**
2010-11 to 2014-15

# EXECUTIVE SUMMARY, Continued

- Infrastructure Maintenance (Streets, Grounds, and Buildings) - The General Fund's investment in infrastructure maintenance is projected to increase slowly over the next five years, from 10% to 50% of the $7 million annual investment recommended to maintain the City's already depleted infrastructure system. This will result in continued deterioration of the system until full funding can be restored.

## Pension
- Pension obligations represent the City's single largest debt. Unfunded General Fund obligations at June 2009 (most current information available) are estimated at $195 million. Pension benefits are protected by California law, and no change in benefit levels or payments is contemplated for existing employees or current retirees. Lower tier benefit structures for future new employees, however, are in the process of negotiation and implementation.

- The City is challenged with significant and growing unfunded pension obligations due to California Public Employees Retirement System (CalPERS) pension trust investment losses, demographic changes as employees live longer, and a 7.75% discount assumption that appears unsustainable. As the City workforce is downsized, these obligations are amortized over a smaller payroll base.

- To address these challenges, the Business Plan begins to amortize 80% of the City's unfunded pension obligations as a level percentage of payroll, using the CalPERS 3.25% long-term salary growth assumption. This assumption departs significantly from CalPERS smoothing mechanisms that currently defer employer contributions and are expected to ramp up contribution rates by over 20% of salary over the next 3-5 years.

- The City is departing from the CalPERS funding formula in order to "right size" its organization and financial plan upfront, rather than to continue annual service and staff reductions each year as CalPERS implements a series of steep annual rate increases.

## Retiree Health Benefits
- Retiree health cost projections assume that the City will continue to negotiate and implement a $300 per month city-paid retiree health benefit for current and future retirees as each employee association contract is renewed. This benefit reduction eliminates approximately $100 million in General Fund debt obligations.

## Bond/Lease Obligations
- The Business Plan assumes restructured future lease payments. The proposal maintains the COPS lease structure, reduces and waives interest, and defers but maintains principal repayment. The Business Plan includes no baseline General Fund payments for the initial three years of the plan, stepping up to $1 million per year thereafter. Specific terms remain under discussion with creditors.

## Compensated Absences
- The General Fund cost for compensated absence payouts to separating and retiring employees is expected to drop by half during the next few years as new payout provisions are negotiated with employee groups.

 **General Fund 5-Year Business Plan**
2010-11 to 2014-15

# EXECUTIVE SUMMARY, Continued

### Bankruptcy Claims Pool
- The 5-year financial projection provides additional contributions to a "Claims Pool" from which to satisfy the General Fund's obligations to its unsecured creditors pursuant to the plan of adjustment. Such claims include those held by employees and retirees. The General Fund share of the Claims Pool is funded at $5 million over a period of several years.

### Self Insurance Reserve
- The City is self-insured for losses up to $500,000 per claim. Claim liabilities are accrued at the minimum 50% confidence level permitted by Generally Accepted Accounting Principles, which is significantly below the 70% level considered "marginally acceptable" by the City's actuary. City programs are charged annual contributions through rates based upon five years of historical losses. At June 2010, self insurance program liabilities exceeded assets by $2.9 million. Relief from this deficit is anticipated as liability program claims are subject to the plan of adjustment.

### Capital Reserve
- The City has dedicated a Capital Reserve to begin to support its estimated $300 million book value investment in General Fund infrastructure and other capital assets.

- This reserve has been initiated during 2009-10 using the proceeds of three surplus property sales. The reserve balance at June 30, 2010 of $380,000 is held in the City's Capital Outlay Capital Projects Fund. Additional parcels have been designated as surplus property and continue to be marketed as a source to further augment this reserve.

- Funds are held as a strategic reserve that could be available to support and leverage future development opportunities with infrastructure improvements.

- Capital Reserves will be especially important for the City going forward because of the likelihood that the City will have difficulty re-entering the bond market to raise funds for futures capital expenditures allocable to the General Fund for at least several years.

### Economic Contingency Reserve
- 5-year financial projections provide for a gradual restoration of unrestricted and undesignated ("available") fund balance over the next five years to 5% of expenditures.

- This Business Plan proposes dedication of the available 5% balance targeted as of 2014-15 as an "Economic Contingency Reserve."

## Business Plan Contents

This document provides readers with additional supporting details about City projections and service delivery through the following sections:

- Summary Financial Projections
- Assumptions
- Programs



**General Fund 5-Year Business Plan**
2010-11 to 2014-15

# Summary Projections



General Fund 5-Year Business Plan
2010-11 to 2014-15

## Revenue and Expenditure Trends

| | FY 05-06 Actual | FY 06-07 Actual | FY 07-08 Actual | FY 08-09 Actual | FY 09-10 Projected | FY 10-11 Projected | FY 11-12 Projected | FY 12-13 Projected | FY 13-14 Projected | FY 14-15 Projected |
|---|---|---|---|---|---|---|---|---|---|---|
| Revenues | $81,109,558 | $82,507,578 | $83,628,701 | $76,672,351 | $68,544,190 | $65,164,000 | $65,496,600 | $66,026,000 | $67,095,000 | $68,226,000 |
| Expenditures | $84,324,002 | $86,882,536 | $87,344,005 | $76,119,104 | $67,030,618 | $65,716,141 | $66,449,326 | $65,802,310 | $66,329,270 | $67,552,842 |

Bankruptcy Petition

VPOA/CAMP Contracts

Council/Director Reductions

IAFF Contract

Revenues

Expenditures

11-7-10

B-1

Filed 05/20/11        Case 08-26813        Doc 1045

11/10/2010

# City of Vallejo General Fund
## Five-Year Business Plan - Gross Cost Basis
Fiscal Years 2010-11 to 2014-15

| | FY 09-10 Unaudited A | FY 10-11 Projected B | FY 11-12 Projected C | FY 12-13 Projected D | FY 13-14 Projected E | FY 14-15 Projected F |
|---|---|---|---|---|---|---|
| **Beginning Available Balance** | $ 1,533,477 | $ 2,570,256 | $ 2,670,115 | $ 1,717,389 | $ 1,941,079 | $ 2,706,809 |
| *% annual expenditures* | 2.3% | | | | | |
| **Revenues** | | | | | | |
| Tax and other unrestricted revenues | 57,388,642 | 55,145,000 | 55,431,000 | 56,328,000 | 57,378,000 | 58,466,000 |
| Program revenues | 11,155,548 | 10,019,000 | 10,065,600 | 9,698,000 | 9,717,000 | 9,760,000 |
| Subtotal, unrestricted revenues | 68,544,190 | 65,164,000 | 65,496,600 | 66,026,000 | 67,095,000 | 68,226,000 |
| **Expenditures** | | | | | | |
| Program Costs, before revenue/reimbursements | | | | | | |
| Police      90 Sworn Officers | 26,928,524 | 24,825,358 | 25,436,185 | 24,259,518 | 24,330,935 | 24,419,737 |
| Fire          5 Companies | 16,597,150 | 14,818,487 | 14,493,507 | 14,135,056 | 14,181,018 | 14,230,178 |
| Community Development | 3,374,418 | 3,830,480 | 3,824,069 | 3,778,813 | 3,769,344 | 3,782,431 |
| Public Works | 7,389,982 | 7,681,431 | 7,578,889 | 7,422,243 | 7,405,303 | 7,442,643 |
| Administration | 6,957,600 | 6,829,892 | 6,750,404 | 6,731,586 | 6,621,952 | 6,646,261 |
| Non-department | 5,069,021 | 3,816,284 | 2,769,039 | 2,169,039 | 2,269,039 | 2,169,039 |
| | 66,316,695 | 61,801,932 | 60,852,093 | 58,496,255 | 58,577,591 | 59,690,289 |
| Interfund Reimbursements | (9,409,397) | (9,663,539) | (8,958,539) | (8,808,539) | (8,683,539) | (8,683,539) |
| Infrastructure/capital maintenance, including streets | - | 766,000 | 768,274 | 1,541,147 | 3,091,601 | 3,867,383 |
| *% of balance to maintain current condition* | | 10% | 10% | 20% | 40% | 50% |
| **Debt** | | | | | | |
| Pension (unfunded liability)    195,000,000 | 3,140,291 | 8,926,746 | 9,685,000 | 10,000,000 | 10,325,000 | 10,660,000 |
| *80% amortized over 30 years, 3.25% growth factor* | | | | 3.25% | 3.25% | 3.25% |
| Retiree health (unfunded liability)    27,000,000 | 2,953,730 | 2,385,002 | 2,402,498 | 1,473,447 | 1,218,617 | 1,218,709 |
| Bonds/leases    23,000,000 | 1,564,576 | 200,000 | - | - | 1,000,000 | 1,000,000 |
| Compensated absences    13,000,000 | 1,464,723 | 1,300,000 | 1,700,000 | 800,000 | 800,000 | 800,000 |
| Bankruptcy claims pool    5,000,000 | 1,000,000 | | | 2,300,000 | | |
| Liability    263,000,000 | 10,123,320 | 12,811,748 | 13,787,498 | 14,573,447 | 13,343,617 | 13,678,709 |
| Subtotal, expenditures | 67,030,618 | 65,716,141 | 66,449,326 | 65,802,310 | 66,329,270 | 67,552,842 |
| **Decrease (increase) program reserves** | (476,793) | 652,000 | - | 223,690 | 765,730 | 673,158 |
| **Annual Operating Results** | $ 2,570,256 | $ 2,670,115 | $ (952,726) | $ 1,717,389 | $ 765,730 | $ 673,158 |
| **Ending Available Balance** | $ 2,570,256 | $ 2,670,115 | $ 1,717,389 | $ 1,941,079 | $ 2,706,809 | $ 3,379,967 |
| *% annual gross expenditures* | 3.8% | 4.1% | 2.6% | 2.9% | 4.1% | 5.0% |





**General Fund 5-Year Business Plan**
2010-11 to 2014-15

# BANKRUPTCY CLAIMS POOL

## ASSUMPTIONS

The 5-year General Fund financial projection includes additional contributions to a "Claims Pool" from which to satisfy the General Fund's obligations to its unsecured creditors pursuant to the plan of adjustment. Such claims include those held by employees and retirees. The General Fund share of the Claims Pool is targeted for $5 million.

## BACKGROUND

- Over 1,000 proofs of claim have been filed by creditors in the City's bankruptcy case. The final claims bar date was November 1, 2010, and the proofs of claim filed immediately prior to that deadline are currently under analysis and validation. Totals and estimated obligations are not yet available.

- The bulk of the creditors asserting claims include employees (reduced wages and benefits), retirees (reduced health benefits and deferred compensated absence leave payouts), indenture trustee, banks, bondholders and credit insurer.

- The City's upcoming plan of adjustment will sort creditors into classes of those holding secured and unsecured claims. Various bondholder claims, for example, are secured by special revenues of the Water Fund, Improvement Districts, and Redevelopment Agency. These particular bonds are not paid from General Fund sources and have been unimpaired during the pendency of the bankruptcy case. Lease obligations payable from the General Fund will also likely be separated into one or more classes based on the security afforded to them through assignment of the leasehold interests in various City real estate assets, as well as the Motor Vehicle License Fee guarantee for the 1999 and 2000 COPS. Almost all of the claims held by employees and retirees are general unsecured claims.

- The City anticipates that its plan of adjustment will include a $5 million pool for General Fund unsecured creditors; such a bankruptcy plan is called a "Pot Plan" because all claims in the classes covered by the "pot" will be paid from the $5 million pool regardless of the aggregate amount of the claims. Claim adjustments are anticipated to fit within the resources of the pool. Accordingly, the General Fund already has started to accumulate resources for settlement of these claims in its Bankruptcy Claims Internal Service Fund. The following are actual and projected contributions to the pool as presented in the accompanying financial projections.

| Year of Contribution | | |
|---|---|---|
| 2008-09 | General Fund contribution | $  900,000 |
| 2009-10 | General Fund contribution | $1,000,000 |
| | Water Fund debt retirement | 710,000* |
| | Investment income | 40,000 |
| | | $1,750,000 |
| 2010-11 | | - |
| 2011-12 | | - |
| 2012-13 | | $2,300,000 (projected) |
| Rounding | | 50,000 (projected) |
| Total | | $5,000,000 |

*The Water Fund has repaid the General Fund $710,000 to retire its proportional share of the outstanding 2002 Certificates of Participation bond obligations. The cash is currently held in the 2002 COPS Debt Service Fund.

# Exhibit C

## Exhibit C - Vallejo Debt Allocation Summary

### FY 2009 - 2010 Principal Balances

| | 1999 COPs | 2000 COPs | 2001 COPs | 2002 COPs | 2003 COPs | 2001 Lease | Total | Union Bank Only |
|---|---|---|---|---|---|---|---|---|
| Principal Balance as of 6/30/2009 | 4,010,000 | 22,820,000 | 9,670,000 | 9,085,000 | 6,615,000 | 879,697 | 53,079,697 | 48,190,000 |
| FY 09-10 Scheduled Payments | (110,000) | (375,000) | (180,000) | (440,000) | (320,000) | (50,249) | (1,475,249) | (1,315,000) |
| Principal Balance at 6/30/10 | 3,900,000 | 22,445,000 | 9,490,000 | 8,645,000 | 6,295,000 | 829,448 | 51,604,448 | 46,875,000 |
| Original Final Maturity | 7/15/2029 | 9/1/2040 | 6/1/2040 | 12/1/2040 | 12/1/2023 | 6/1/2021 | | |

### FY 2010 - 2011 Principal Balances

| | 1999 COPs | 2000 COPs | 2001 COPs | 2002 COPs | 2003 COPs | 2001 Lease | Total | Union Bank Only |
|---|---|---|---|---|---|---|---|---|
| Principal Balance as of 6/30/2010 | 3,900,000 | 22,445,000 | 9,490,000 | 8,645,000 | 6,295,000 | 829,448 | 51,604,448 | 46,875,000 |
| FY 10-11 Scheduled Payments | (115,000) | (395,000) | (185,000) | (455,000) | (162,240) | 0 | (1,312,240) | (1,197,240) |
| Additional Prepayments (Trustee) | 0 | (222,400) | (844,000) | (5,071,000) | | 0 | (6,137,400) | (6,137,400) |
| Additions for National Advances | 91,517 | | | | | | 91,517 | 0 |
| Principal Balance at 6/30/11 | 3,876,517 | 21,827,600 | 8,461,000 | 3,119,000 | 6,132,760 | 829,448 | 44,246,325 | 39,540,360 |
| Original Final Maturity | 7/15/2029 | 9/1/2040 | 6/1/2040 | 12/1/2040 | 12/1/2023 | 6/1/2021 | | |

### Post Restructuring (as of 7/1/2011)

| | 1999 COPs | 2000 COPs | 2001 COPs | 2002 COPs | 2003 COPs | 2001 Lease | Total | Union Bank Only |
|---|---|---|---|---|---|---|---|---|
| Restructured Balances | 3,876,517 | 21,827,600 | 8,461,000 | 3,119,000 | 6,132,760 | 829,448 | 44,246,325 | 39,540,360 |
| + Unpaid Interest (Current + FYE 11) | | 881,189 | 370,312 | 340,519 | 235,553 | 57,123 | 1,884,696 | 1,827,573 |
| Final Restructured Balances | 3,876,517 | 22,708,789 | 8,831,312 | 3,459,519 | 6,368,313 | 886,571 | 46,131,021 | 41,367,933 |
| General Fund | 3,876,517 | 6,828,941 | 0 | 3,459,519 | 3,481,884 | 886,571 | 18,533,432 | 13,770,344 |
| Marina Fund | 0 | 15,879,848 | 0 | 0 | 936,316 | 0 | 16,816,164 | 16,816,164 |
| Golf Fund | 0 | 0 | 8,831,312 | 0 | 0 | 0 | 8,831,312 | 8,831,312 |
| Water Fund | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Redevelopment Fund | 0 | 0 | 0 | 0 | 1,950,113 | 0 | 1,950,113 | 1,950,113 |
| General Fund | 100.00% | 30.07% | 0.00% | 100.00% | 54.68% | 100.00% | | |
| Marina Fund | 0.00% | 69.93% | 0.00% | 0.00% | 14.70% | 0.00% | | |
| Golf Fund | 0.00% | 0.00% | 100.00% | 0.00% | 0.00% | 0.00% | | |
| Water Fund | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | | |
| Redevelopment Fund | 0.00% | 0.00% | 0.00% | 0.00% | 30.62% | 0.00% | | |

### Loan A Balances

| | 1999 COPs | 2000 COPs | 2001 COPs | 2002 COPs | 2003 COPs | 2001 Lease | Total | Union Bank Only |
|---|---|---|---|---|---|---|---|---|
| Loan A Balances | | 10,978,933 | 4,269,641 | 1,672,561 | 3,078,864 | | 20,000,000 | 20,000,000 |
| General Fund | | 3,301,562 | 0 | 1,672,561 | 889,544 | | 5,863,667 | 5,863,667 |
| Marina Fund | | 7,677,371 | 0 | 0 | 239,208 | | 7,916,579 | 7,916,579 |
| Golf Fund | | 0 | 4,269,641 | 0 | 0 | | 4,269,641 | 4,269,641 |
| Water Fund | | 0 | 0 | 0 | 0 | | 0 | 0 |
| Redevelopment Fund | | 0 | 0 | 0 | 1,950,113 | | 1,950,113 | 1,950,113 |
| General Fund | | 30.07118% | 0.0000% | 100.0000% | 28.8919% | | | |
| Marina Fund | | 69.9282% | 0.0000% | 0.0000% | 7.7694% | | | |
| Golf Fund | | 0.0000% | 100.0000% | 0.0000% | 0.0000% | | | |
| Water Fund | | 0.0000% | 0.0000% | 0.0000% | 0.0000% | | | |
| Redevelopment Fund | | 0.0000% | 0.0000% | 0.0000% | 63.3387% | | | |

### Loan B Balances

| | 1999 COPs | 2000 COPs | 2001 COPs | 2002 COPs | 2003 COPs | 2001 Lease | Total | Union Bank Only |
|---|---|---|---|---|---|---|---|---|
| Remaining Unamortized Principal | | 11,729,856 | 4,561,670 | 1,786,958 | 3,289,448 | | 21,367,933 | 21,367,933 |
| Total Loan B Balances | | 11,729,856 | 4,561,670 | 1,786,958 | 3,289,448 | | 21,367,933 | 21,367,933 |
| General Fund | | 3,527,378 | 0 | 1,786,958 | 2,592,340 | | 7,906,677 | 7,906,677 |
| Marina Fund | | 8,202,477 | 0 | 0 | 697,108 | | 8,899,586 | 8,899,586 |
| Golf Fund | | 0 | 4,561,670 | 0 | 0 | | 4,561,670 | 4,561,670 |
| Water Fund | | 0 | 0 | 0 | 0 | | 0 | 0 |
| Redevelopment Fund | | 0 | 0 | 0 | 0 | | 0 | 0 |
| General Fund | | 30.07% | 0.00% | 100.00% | 78.81% | | | |
| Marina Fund | | 69.93% | 0.00% | 0.00% | 21.19% | | | |
| Golf Fund | | 0.00% | 100.00% | 0.00% | 0.00% | | | |
| Water Fund | | 0.00% | 0.00% | 0.00% | 0.00% | | | |
| Redevelopment Fund | | 0.00% | 0.00% | 0.00% | 0.00% | | | |

| | Loan A | Loan B |
|---|---|---|
| 2000 COPs | 54.895% | 54.895% |
| 2001 COPs | 21.348% | 21.348% |
| 2002 COPs | 8.363% | 8.363% |
| 2003 COPs | 15.394% | 15.394% |



# CITY OF VALLEJO
List of Leased Properties for Union Bank COPs

March 10, 2011
CJPRMA (Appraised)
Value of Buildings[2]

| Property Description | Address | |
|---|---|---|
| **2000 COPs[1]** | | |
| City Hall | 555 Santa Clara Street | $20,173,000 |
| John F. Kennedy Library | 505 Santa Clara Street | $20,252,000 |
| Corp. Yard (excluding Police) | 111 Amador Street | $6,344,000 |
| Florence Douglas Senior Center | 333 Amador Street | $1,862,000 |
| Naval Museum | 734 Marin Street | $6,772,000 |
| Community Center | 401 Amador Street | $1,126,000 |
| So. Vallejo Community Center | 545 Magazine Street | $2,116,000 |
| Transit Yard (VCTC Facility) | 1850 Broadway Street | $4,879,000 |
| Ball Field | APN: 0056-156-010 and 0056-156-030 | not valued |
| **Total** | | $63,524,000 |
| **2001 Golf COPs[1]** | | |
| Blue Rock Springs Golf Course | 655 Columbus Parkway | not valued |
| **2002 COPs[1]** | | |
| Vacant Land (at Glen Cove) | APN: 0079-220-070 | not valued |
| Vacant Land (at Hiddenbrooke) | APN: 0182-060-030 | not valued |
| Vacant Land (at Hiddenbrooke) | APN: 0182-060-040 | not valued |
| Vacant Land (at Hiddenbrooke) | APN: 0182-060-430 | not valued |
| Vacant Land (at Hiddenbrooke) | APN: 0182-280-420 and 0182-280-430 | not valued |
| Vacant Land (at Hiddenbrooke) | APN: 0182-280-120 | not valued |
| **2003 COPs[1]** | | |
| Vacant Land (at Glen Cove) | APN: 0079-340-020 | not valued |
| Vacant Land (at Glen Cove) | APN: 0079-330-290 | not valued |

**Notes:**

[1]  In most cases, the leased property includes certain parcels of "real property" and the "improvements" situated upon said real property.

[2]  Value shown is "Cost of Reproduction New" for the Buildings only. The value shown does not include land value or building contents value.
Values were provided by CJPRMA 2011 insuranced values report.